UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDA MCGARR,<br><br>        Plaintiff,<br><br>        v.<br><br>CITY OF PEEKSKILL,WESTCHESTER COUNTY, DAVID LEVINE, THOMAS MCINTYRE, WALTER BROVARSKI, EUGENE TUMOLO, JOHN AND JANE DOE SUPERVISORS, DANIEL STEPHENS, LOUIS ROH, and MILLARD HYLAND<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

07 CIV 9488

**COMPLAINT AND
JURY DEMAND**

OCT 2 4 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Linda McGarr, by and through her attorneys, the law firm of Emery Celli Brinckerhoff & Abady LLP, states as follows:

1. On November 15, 1989, a fifteen year old Peekskill High School sophomore, A.C.,[1] left her home after school to take pictures for her high school photography class.  A.C., by all accounts a quiet and gentle girl with a sweet disposition who had recently immigrated from Colombia, walked to a nearby park to photograph the fall foliage.

2. A.C. never returned home.  That afternoon, Steven Cunningham, a twenty-nine-year-old with a drug habit and a criminal record, spotted A.C. in the park as he sat smoking crack.  He attacked her, then he raped her, and ultimately he murdered her, leaving behind a trail of evidence demonstrating his involvement in the crime - including, critically, his semen.

---

[1] The victim will be referred to as "A.C." throughout the complaint in an effort to protect the privacy of her family.

3.The horrible tragedy of A.C.'s death was inexcusably compounded when her classmate, Jeffrey Deskovic, who had just turned sixteen years old, was wrongly arrested, prosecuted, and convicted of the crime. Unbelievably, Mr. Deskovic was convicted despite DNA testing on Cunningham's semen which proved, months prior to Mr. Deskovic's criminal trial, that he could not have committed the terrible crime with which he was charged.

4. Mr. Deskovic spent almost sixteen years of his adolescence and young adulthood fighting from behind bars to prove his innocence. He was finally vindicated in 2006, when new DNA testing established that the semen found on A.C.'s body came from Cunningham, who subsequently confessed, pled guilty to, and was convicted of the crime. Even worse, not only was an innocent youth wrongly convicted and A.C.'s actual killer allowed to go free, but in a final sickening turn of events Cunningham killed again, murdering another Peekskill woman just four years after his rape and murder of A.C.

5. Mr. Deskovic's wrongful conviction and years of wrongful incarceration, despite the fact that police and prosecutors knew of the DNA evidence and other clearly exculpatory facts, was the direct result of a veritable perfect storm of misconduct by virtually every actor at every stage of his investigation and prosecution.

6. Peekskill detectives and supervisors investigating A.C.'s rape and murder targeted Mr. Deskovic as a suspect, and then failed to investigate evidence pointing to his innocence. Instead, they built their case by systematically coercing and fabricating Mr. Deskovic's false confession, by similarly coercing and fabricating allegedly corroborating evidence from witnesses, and by hiding evidence of Mr. Deskovic's innocence and their improper investigation from prosecutors and the defense - even after learning that DNA evidence proved Mr. Deskovic's innocence.

7. So, too, did Westchester County officials systematically fabricate false proof of Mr. Deskovic's guilt and conceal evidence that supported his innocence.  Deputy Medical Examiner Louis Roh provided Westchester County prosecutors with fabricated "evidence" that purported to explain how Mr. Deskovic could have raped A.C. despite the presence of another man's semen inside of her.  Thus, Dr. Roh told prosecutors before trial - and provided testimony that was central to the trial prosecutor's presentation to the jury - that based upon his autopsy of A.C., he had scientific proof that she had in fact been sexually active on multiple occasions prior to her rape.  In fact, not only did Dr. Roh lack any credible observational evidence or scientific basis for such conclusions, but the assertion that the victim was ever sexually active was completely contrary to all known facts about A.C. - who was by all accounts a reserved, traditionally Catholic, and completely sexually inexperienced young girl.

8. The pervasive and systematic official misconduct that led to Mr. Deskovic's wrongful conviction did not occur in isolation, outside of official bureaucratic channels.  Rather, the actors who deprived Mr. Deskovic of his constitutional protections and caused him to be wrongly arrested, prosecuted, and convicted were acting with the direct participation, knowledge, and/or acquiescence of supervisors and policymakers in Peekskill and Westchester County, and pursuant to policies, customs, or patterns and practices of misconduct and egregious failures of supervision and oversight within the Peekskill Police Department, the Westchester County District Attorney's Office, and the Westchester County Medical Examiner's Office.

9. The plaintiff in this action, Linda McGarr, is Mr. Deskovic's mother.  Defendants' systematic misconduct caused Ms. McGarr to suffer an unthinkable ordeal:  the loss of her child. Defendants wrested her son from her, framed him for a murder he did not commit, and took him

3

hundreds of miles away from her to a prison facility where she could not watch him grow, could not educate him, and, perhaps worst of all, could not protect him from the horrendous abuse she knew he was suffering – all in violation of her well-established constitutional right to familial association.

## JURISDICTION

10. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

## VENUE

11. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York, the judicial district in which the claims arose, in which Mr. Deskovic currently resides, and in which defendants City of Peekskill, Putnam County, and Westchester County conduct their business.

## JURY DEMAND

12. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

13. Plaintiff Linda McGarr is, and at all times material to this Complaint was, a citizen and resident of the State of New York. She resides in Cobleskill, New York.

14. Defendant City of Peekskill is a municipality that is a political subdivision of the State of New York, was the employer of defendants Levine, McIntyre, Brovarski, Tumolo, and John and Jane Doe Supervisors, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Peekskill Police Department ("PPD").

15. Defendant Westchester County is a municipality that is a political subdivision of the State of

New York, was the employer of defendants Roh and Hyland, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Westchester County District Attorney's Office and the Westchester County Medical Examiner's Office.

16. Defendant David Levine at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He is sued in his individual capacity.

17. Defendant Thomas McIntyre at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He is sued in his individual capacity.

18. Defendant Walter Brovarski at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He is sued in his individual capacity.

19. Defendant Eugene Tumolo at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. Defendant Tumolo is sued in his individual capacity for that conduct undertaken by him when he possessed the rank of lieutenant with the PPD. He is sued in his official capacity as the current Chief of the PPD.

20. Defendants John and Jane Does at all times relevant to this complaint were duly appointed

and acting supervisors of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. They are sued in their individual capacities.

21. Defendant Daniel Stephens at all times relevant to this complaint was a duly appointed and acting investigator of the Putnam County Sheriff's Department, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York. Defendant Stephens is sued in his individual capacity.

22. Defendant Louis Roh at all times relevant to this complaint was a duly appointed and acting Deputy Medical Examiner in the Westchester County Medical Examiner's Office, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Westchester County and the State of New York. Defendant Roh is sued in his individual capacity.

23. Defendant Millard Hyland at all times relevant to this complaint was the duly appointed and acting Chief Medical Examiner for Westchester County, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Westchester County and the State of New York. Defendant Hyland is sued in his individual and official capacities.

## FACTS

### The Crime and Initial Investigation

24. On the afternoon of November 15, 1989, fifteen-year-old Peekskill High School sophomore A.C. came home from school, and then went out again to take photographs very close to her home, for a photography class assignment. When A.C. did not return home that day, her family contacted the Peekskill Police Department and reported her missing.

6

25. From November 15 until November 17, the PPD conducted, at best, a reckless investigation into A.C.'s disappearance. As a result, although A.C.'s body would ultimately be found only a few hundred yards from her home, the PPD was unable to adduce any leads as to her location for more than thirty-six hours. Ultimately, the New York State Police were brought in to assist in the investigation, which, together with A.C.'s family's distress, greatly increased the pressure on PPD detectives and supervisors to solve the case.

26. On the morning of November 17, PPD officers and members of the State Police found the body of A.C. in a heavily wooded area of Hillcrest Park near Griffins Pond, very close to her family's home. Her body was discovered covered with leaves and naked from the waist down in a part of the park known as "the Pit." A.C. had been raped, and had died from asphyxiation and blunt trauma to the head.

27. Between the time of A.C.'s disappearance and when her body was discovered, heavy storms and tornado conditions had blown through Peekskill.

28. More than a dozen police officers, medical personnel, and employees of the Westchester County District Attorney's office responded to the Griffins Pond area in the hours following the discovery of A.C.'s body. Although crime scene tape was put up around the scene, public access to the area - which included several walking paths and was located near an apartment complex - was not otherwise restricted. Hence, passers-by were able to visit and examine the area prior and subsequent to the police investigation there on the 17th.

29. PPD personnel, including defendants Levine, McIntyre, Brovarski, and Tumolo, and additional PPD patrol officers, detectives, and supervisors, assisted by the New York State Police, canvassed the crime scene and collected and vouchered dozens of items of evidence.

Among the evidence recovered by the police were a torn note found underneath A.C.'s body, a white bra found along a dirt path that led to A.C.'s body, and a 35 millimeter camera found along a paved park path.

30. Immediately in the investigation PPD personnel, including the PPD defendants, developed very specific theories as to how A.C.'s rape and murder had transpired. The PPD defendants built and pursued their investigation around leads that correlated to their initial theories, and those theories were adopted by the prosecutor and argued to the jury at Jeffrey Deskovic's trial.

31. Thus, based upon the note found under A.C.'s body - which appeared to be in her handwriting and to refer an individual named "Freddy" - the PPD defendants concluded that A.C. had been in a romantic relationship with a Peekskill High School student named Freddy Claxton, and that her rape and murder was connected to that relationship.

32. This initial theory also led the PPD defendants to create, with the assistance of the New York City Police Department, a suspect profile suggesting, among other characteristics, that A.C. had known her attacker, that the perpetrator was a white or Hispanic man younger than nineteen years old and approximately five feet, ten inches tall, and that he was a loner with physical or mental handicaps.

33. Additionally, on November 17, PPD investigators, including but not limited to defendants Levine, McIntyre, Brovarski, and Tumolo, surmised that the crime had occurred in three separate locations: crime scene "one," where the police thought A.C. had left her camera when initially assaulted by her attacker; crime scene "two," where the police believed A.C. had been raped and her bra left behind; and crime scene "three," the place to which A.C.'s body was dragged after the rape. PPD detectives, including defendants Levine and McIntyre, photographed, diagramed,

and, upon information and belief, marked the three crime scene areas.

34. In fact, the theories and profile developed by the PPD defendants in the earliest hours and days of their investigation bore almost no relationship to the manner in which the actual perpetrator, Steven Cunningham, carried out the crime. Cunningham was a twenty-nine-year-old African American man who was over six feet tall. He had never known or seen A.C. prior to November 15. On the day of A.C.'s murder Cunningham had been drinking at a local bar, bought crack, and then went to the Pit, where he smoked the crack and four cigarettes. Cunningham carried out the crime in only two locations: He grabbed A.C. from behind on a park path, and dragged her to the Pit area, where he raped and killed her, and left her body.

35. Cunningham left four cigarette butts at the crime scene, as well as his crack pipe and full vials of crack. Before he left the scene, he spoke to two boys who were playing basketball at a court in Hillcrest Park. Cunningham was known to the PPD, had been arrested prior to November 15, and, upon information and belief, his fingerprints were on file with the PPD.

36. A.C.'s body was taken from the crime scene by Deputy Medical Examiner Dr. Louis Roh and his assistant, and an autopsy was performed on November 17. The results of the autopsy, contained in a report dated November 20, 1989, included that A.C. had died from asphyxia due to ligature strangulation, and a fractured skull.

37. Dr. Roh found loose hairs on A.C.'s right breast, right leg, and left arm, and in A.C.'s pubic region, which he submitted to a hair examiner in the Westchester County Department of Laboratories and Research for analysis. Dr. Roh also prepared oral, rectal, and vaginal swabs, and submitted them along with A.C.'s bra, jeans, and underwear for serological analysis by the Westchester County laboratory.

9

### Peekskill Police Focus on Peekskill High School for Suspects

38. Defendants Levine and McIntyre were the assigned detectives handling the A.C.

investigation, and they conducted the investigation with the assistance of other PPD detectives,

including but not limited to defendant Brovarski, and under the supervision of defendants

Tumolo and John and Jane Doe Supervisors not known at this time.

39. Within a week of A.C.'s rape and murder, Freddy Claxton was called to the office of

Peekskill High School Principal Sheldon Levine - who, upon information and belief, was the

brother of defendant Detective David Levine.  When Freddy arrived Principal Levine was present

with multiple PPD investigators, including, upon information and belief, one or more of the PPD

defendants, who expressed that they wished to speak with Freddy in connection with A.C.  In the

presence of and/or with the knowledge of the PPD investigators, Principal Levine called Freddy's

mother to obtain her permission for the questioning, and she refused.

40. At or prior to that meeting, Freddy had told PPD investigators, including, upon information

and belief, one or more PPD defendants, that he lived in an apartment complex next to Hillcrest

Park, and that there was a male drifter who was frequently spotted in, and possibly lived in,

Hillcrest Park, who may have committed the crime.  Upon information and belief, PPD personnel

never investigated Freddy's information concerning this drifter.

41. Later that day, one or more of the same PPD investigators who had been present in Principal

Levine's office, including upon information and belief one or more PPD defendants, went to

Freddy's house.  Freddy answered the door, and the investigators asked Freddy to accompany

them to the PPD stationhouse.  When Freddy refused, reiterating that his mother did not want

him to speak to the police, and that he needed to stay home to take care of his younger brother,

10

the investigators told Freddy, in substance, that they just needed his assistance, that it was okay for him to accompany them to the stationhouse, and that he should bring his younger brother along.

42. Once at the PPD stationhouse, Freddy was separated from his younger brother and placed in an office with multiple investigators, including, upon information and belief, one or more PPD defendants. The detectives asked Freddy what his relationship was with A.C., and Freddy told them that he knew A.C. but never spoke with her. The detectives began to interrogate Freddy aggressively, standing around him while he was seated in a chair, and repeatedly accusing him of having exchanged romantic notes with A.C. and hiding a romantic relationship with her. Freddy repeatedly and consistently denied the detectives' allegations.

43. The interrogation continued until Freddy's father entered the interrogation room and interrupted the questioning. Upon information and belief, Freddy's father had arrived at the PPD stationhouse approximately a half hour previously, having learned of the interrogation, but had been prevented by PPD investigators, including one or more PPD defendants, from seeing his son and ending the interrogation.

**The PPD Defendants Conceal Material, Exculpatory and Impeachment Evidence**

44. The interrogation of Freddy Claxton, the circumstances under which PPD detectives isolated, deceived, and coercively questioned Freddy, and the substance of Freddy's denials that he and A.C. had any romantic relationship, were never documented by PPD detectives.

45. PPD detectives continued to investigate Freddy Claxton by interviewing other witnesses, including, for example, other Peekskill High School students, both prior to and, upon information and belief, subsequent to the indictment. PPD detectives, including but not limited to the

11

defendants, were consistently told by multiple sources that Freddy and A.C. had not had any romantic relationship. During those interviews one or more PPD defendants coerced or attempted to coerce witnesses to state that Freddy and A.C. had been in a romantic relationship. Detectives, including the defendants, failed to document or disclose to prosecutors material, exculpatory and impeachment evidence concerning interviews conducted by them, the circumstances of their coercion of witnesses, and the substance of multiple witnesses' statements denying the existence of a relationship between Freddy and A.C.

46. Furthermore, PPD investigators, including the PPD defendants, interviewed multiple witnesses, many on multiple occasions, who provided information that A.C. had never been involved in any romantic relationship - let alone a sexual relationship - prior to her death. The PPD defendants failed to document or disclose to prosecutors this material, exculpatory and impeachment evidence concerning A.C.'s sexual history.

47. The subsequent revelation that DNA testing proved the sperm found inside A.C. had not come from Jeffrey, and ensuing efforts by the prosecution and defendant Roh to advance a theory of Jeffrey's guilt notwithstanding the presence of sperm from another man inside of A.C., meant that evidence concerning Freddy and A.C.'s alleged relationship and/or any consensual sexual partners that A.C. could have had was critical to the continued existence of probable cause to prosecute Jeffrey and to his ultimate conviction.

### The Investigation Focuses on Jeffrey Deskovic

48. In November 1989 Jeffrey Deskovic had just turned sixteen and was a Peekskill High School sophomore. He was white, approximately five feet, ten inches tall, and was acquainted with A.C. as a classmate.

12

49. Jeffrey had struggled socially and academically in school in the years leading up to A.C.'s death. Although his grades were improving his sophomore year, he had been evaluated by and received assistance from schools and outside sources in connection with his academic struggles and learning disabilities. School records also reflected that Jeffrey was seeing a school social worker.

50. Jeffrey had also received emotional and psychological counseling and treatment from a number of outside sources since a relatively young age. Jeffrey had been evaluated and treated for a variety of psychological symptoms, including anxiety, depression, and, for a time, complaints of hearing voices.

51. Jeffrey had also received counseling and other mental health evaluation and treatment in connection with his family life. Jeffrey never met his biological father, whom Ms. McGarr never married, and he and his half brother were raised by Ms. McGarr and her mother. With the exception of a brief and abusive relationship Ms. McGarr and the father of Jeffrey's brother, Jeffrey grew up without any father figure in the home.

52. Jeffrey was deeply affected by A.C.'s death, which prompted his feelings for her, previously casual, to intensify into a deeper admiration and attachment. Jeffrey attended multiple wakes held for A.C. as well as her funeral, and was visibly distraught at these events. Jeffrey also visited the crime scene shortly after A.C.'s body was found - following a map that had been published in the local newspaper, as well as other public descriptions of the area, which he was generally familiar with from prior visits to Hillcrest Park.

**PPD Investigators Exploit Jeffrey's Emotional and Psychological Vulnerabilities**

53. The attention of PPD investigators, including the PPD defendants, was drawn to Jeffrey after

receiving reports that he had been extremely emotional at A.C.'s wakes and funeral, and appeared to be taking an unusual interest in A.C.'s death.

54. Immediately upon beginning their investigation of Jeffrey Deskovic, the PPD defendants learned that Jeffrey was affected by emotional and psychological difficulties, struggled academically and socially in school, and led a troubled family life. Indeed, Jeffrey's known difficulties in these regards were, upon information and belief, a significant factors in causing the PPD defendants to view Jeffrey as a suspect, and to initiate questioning of Jeffrey in connection with the crime.

55. The PPD defendants, knowing of Jeffrey's emotional and psychological problems, deliberately and recklessly devised a strategy for investigating and questioning Jeffrey that played upon and exploited those vulnerabilities, and carried out that strategy throughout the course of their investigation and numerous meetings with and interrogations of Jeffrey. The tactics devised by the defendants included, without limitation, the following: building a false relationship of friendship, trust, and cooperation with Jeffrey by repeatedly telling him that the police needed his assistance in the investigation of A.C.'s death and that he had unique abilities and access that enabled him to provide important assistance to the police; encouraging Jeffrey to conduct his own investigation into the crime and to share with them any information or leads that he was able to acquire; otherwise building a false relationship of trust and cooperation with Jeffrey; and purposefully isolating Jeffrey from Ms. McGarr in order to maximize their chances of extracting a false confession from him.

56. The defendants' tactics were deliberately calculated, and were calibrated to Jeffrey's known emotional and psychological vulnerabilities to mislead Jeffrey concerning the nature of his

relationship and interactions with the police.

57. The defendants' tactics were also deliberately calculated to neutralize the ability of Ms. McGarr to protect her son from their misconduct.

58. Several weeks after A.C.'s death, defendants Levine and McIntyre approached Jeffrey on the street as he was walking to school in the morning. Levine and McIntyre asked Jeffrey to accompany them to the PPD stationhouse to speak with them about A.C. Jeffrey agreed to accompany them. Defendants Levine and McIntyre did not attempt to contact Ms. McGarr or inform her of Jeffrey's whereabouts.

59. Prior to that day, Jeffrey had never been arrested, had never been to the PPD stationhouse, and had never been questioned by police.

60. Assistant district attorney Neary was notified by defendant Tumolo that Jeffrey was being questioned, and Neary was present at the PPD stationhouse for some of that morning. Neary did not speak with Deskovic, but instructed the PPD defendants to obtain Jeffrey's consent to take a polygraph examination.

61. Upon information and belief, assistant district attorney George Bolen, who was the supervising trial attorney in the Westchester District Attorney's Office, was also notified concerning the December 12 questioning of Jeffrey Deskovic, and was told of all subsequent important investigative events and decisions of which the District Attorney's Office was aware concerning Jeffrey Deskovic.

62. Upon Jeffrey's arrival, he was taken to an office where, for the next several hours, he was alone with and questioned by McIntyre and Levine. Jeffrey told the PPD defendants, among other things, that he had visited the crime scene within twenty-four hours of A.C.'s body being

15

found, and that he had learned certain facts about the crime from the newspaper and other public sources.

63. In the course of McIntyre and Levine's questioning of Jeffrey, McIntyre accused Jeffrey of the rape and murder of A.C. When Jeffrey reacted by denying the accusation, McIntyre discouraged Jeffrey from ending the interview by suggesting to him that it was a sign of guilt and encouraging Jeffrey, again, to assist the PPD in its investigation.

64. During the questioning Jeffrey was shown one or more photographs of the deceased A.C. and of the crime scenes. McIntyre and Levine also shared with Jeffrey details of the crime and the investigation that had not been made public - including, but not limited to, the fact that a note concerning Freddy Claxton had been found under A.C.'s body, and the PPD's theory that A.C. and Freddy had been romantically involved.

65. In fact, during the first and subsequent meetings with and interrogations of Jeffrey, PPD investigators, including the PPD defendants, provided Jeffrey with information about numerous non-public details and investigative theories concerning A.C.'s death. Throughout their numerous meetings with and interrogations of Jeffrey, the PPD defendants encouraged and coerced Jeffrey to incorporate those details into his own statements concerning the crime. The PPD defendants subsequently falsely represented, in police reports and conversations with prosecutors, that Jeffrey actually had independent knowledge of the facts provided by them.

66. The PPD defendants also became aware that Jeffrey had learned, through newspapers and other sources, certain facts about the crime and the investigation that had not been kept confidential by the police. The PPD defendants subsequently falsely represented, in police reports, conversations with prosecutors before trial, pretrial hearings, and at trial that these public

facts were actually the product of Jeffrey's independent knowledge about the crime.

67. The details and theories provided to Jeffrey by the PPD defendants, and/or known by the PPD defendants to have been learned by Jeffrey through public sources rather than by his independent knowledge of the crime, included but were not limited to the following facts: (a) that a note referring to Freddy Claxton was discovered under A.C.'s body; (b) that a bra was found away from A.C.'s body; (c) that A.C.'s body was covered in leaves; (d) the manner in which police believed A.C. to have been asphyxiated; (e) the nature and location of A.C.'s head trauma;(f) the location where A.C.'s camera was discovered; (g) that A.C. had lost a set of keys; (h) the possibility that the rapist had not ejaculated; and (I) the three crime scene locations identified by the PPD.

68. Jeffrey's alleged independent knowledge of the above facts was critical to obtaining a probable cause determination from the grand jury and in procuring Jeffrey's conviction at his criminal trial.

**Jeffrey Obtains Legal Counsel - Which the Defendants Disregard**

69. After leaving the PPD stationhouse, Jeffrey went to Peekskill High School and informed one of his teachers, Mr. Tompkins, that he had been interrogated by the police and accused of the murder of A.C.  That afternoon a meeting was convened that included Mr. Tompkins, Jeffrey, school administrators including Principal Sheldon Levine, and, eventually Ms. McGarr.

70. At the meeting, Jeffrey told the school officials present that he had been interrogated and accused of A.C.'s murder.  The school officials then questioned Jeffrey concerning the crime, and asked him if he had committed it.  Jeffrey denied any involvement.

71. When Ms. McGarr arrived at the meeting she expressed to all those present that she did not

want Jeffrey to speak with the Peekskill Police, and that she would be retaining an attorney to represent Jeffrey.

72. Upon information and belief, one or more school officials present at this meeting subsequently informed one or more of the PPD defendants that Ms. McGarr did not wish for him to speak to the police, and that she was retaining an attorney to represent her son.

73. The day after his interrogation and subsequent meeting with school officials, Ms. McGarr and Jeffrey met with attorney Lou Ecker. Jeffrey and Ecker spoke privately, and at the conclusion of the meeting Ecker informed Ms. McGarr and Jeffrey that he would contact the Peekskill Police Department, inform them that Jeffrey was represented by counsel, and request that no further questioning of Jeffrey occur outside the presence of counsel. Jeffrey understood then and up through the time of his alleged confession that Lou Ecker was representing him as his attorney. Ms. McGarr understood that, based upon her express instructions and Mr. Ecker's express instructions, the PPD defendants would not question her son outside the presence of counsel.

74. Within days of Ecker's meeting with Jeffrey, Ecker contacted the PPD, spoke with defendant Tumolo, and informed Tumolo that he represented Jeffrey and that Jeffrey should not be questioned any further. This information was shared with all of the PPD defendants, and with representatives of the Westchester County District Attorney's Office, including but not limited to assistant district attorneys Bolen and Neary.

75. Subsequent to Ecker's call to Tumolo, defendant Levine reached out to Jeffrey to attempt to speak with him. Jeffrey told Levine that he was represented by attorney Ecker, and that pursuant to Ecker's instructions Jeffrey was not to speak with the police concerning the A.C. investigation. Although, upon information and belief, Levine knew that Ecker had told prosecutors that he no

longer represented Jeffrey and had referred Jeffrey to Legal Aid, Levine did not inform Jeffrey of this fact or otherwise attempt to resolve the evident confusion regarding the status of Ecker's representation. Rather, Levine told Jeffrey, in substance, that it was okay for Jeffrey to speak to the police notwithstanding Ecker's advice and notwithstanding Ms. McGarr's express instructions. Levine's statements deliberately disregarded Jeffrey's invocation of his right to counsel, and were a deliberate effort to interfere with Ms. McGarr's parental rights by misleading Jeffrey into believing that the police were not required to cease all contact with him if he requested and/or was represented by an attorney.

76. Levine's advice concerning the status and significance of Jeffrey's legal representation was erroneous, deceptive, and deliberately coercive, such that any subsequent waiver by Jeffrey of his right to counsel in speaking with the police was not knowing or voluntary.

### The PPD Defendants Conceal Their Fifth Amendment Violations

77. Trusting Levine's representation, and believing representations by the PPD defendants that he could be of assistance to their investigation, Jeffrey agreed to meet again with the police in connection with the A.C. investigation. PPD investigators, including but not limited to the PPD defendants, met with and questioned Jeffrey on many occasions over the course of many hours on many days, up to and including January 25, 1990. Jeffrey told the PPD defendants on numerous occasions in the course of these interviews that Ms. McGarr did not want him to be with the police, did not know that he was with the police, and that the police should not inform her of Jeffrey's whereabouts.

78. At these meetings, Jeffrey was repeatedly given Miranda warnings, and the PPD defendants, including but not limited to Levine and McIntyre, prepared Miranda waiver forms representing

19

that Jeffrey's waivers of his <u>Miranda</u> rights were knowing and voluntary. In light of defendant

Levine's earlier statement to Jeffrey that, despite Jeffrey's understanding and invocation of his

legal representation it was okay for Jeffrey to speak to the police, Jeffrey's waivers of his

<u>Miranda</u> rights at those subsequent meetings were not in fact knowing or voluntary. The

defendants deliberately obtained and documented Jeffrey's alleged waivers of his <u>Miranda</u> rights

in order to conceal Levine's knowing misrepresentation concerning the status and significance of

Jeffrey's legal representation.

79. Throughout their numerous meetings with Jeffrey, the PPD defendants also deliberately

employed tactics to denigrate and minimize the importance of the rights about which they were

advising Jeffrey. Those tactics included but were not limited to deliberately portraying

interrogation sessions as meetings in which Jeffrey was assisting the police, and telling and

suggesting to Jeffrey that assertion of his rights to counsel and to terminate questioning would be

signs of guilt and would impede the A.C. investigation.

80. Throughout the numerous meetings and interrogations that the PPD conducted with Jeffrey,

the PPD defendants had access to one or more microcassette recorders, and understood the

importance of recording suspect interrogations for the purpose of later establishing, in legal

proceedings, the content of those interrogation sessions. The PPD defendants deliberately

recorded only a small portion of their interactions with Jeffrey in order to misrepresent the nature

of their course of conduct with Jeffrey, to hide the deliberately coercive and deceptive tactics

employed by them, and to conceal exculpatory and impeachment evidence. Upon information

and belief, the PPD defendants subsequently lied to prosecutors and to the jury in Jeffrey's

criminal proceedings concerning the circumstances of their recordings and the reasons why large

portions of their meetings with Jeffrey were unrecorded. The defendants' selective recording tactics culminated in their final interrogation session on January 25, 1990, which the defendants knew was aimed at coercing Jeffrey's confession to the crime, and of which no recordings were made.

### The Police Question Jeffrey and Fabricate Additional Evidence of Guilt

81. Subsequent to informing Levine and the other PPD defendants that he was represented by counsel, Jeffrey met with Levine and the PPD defendants for a day-long session on a school day. This day-long session was later documented by the PPD defendants in police reports, partially recorded by the PPD defendants in audiotapes, and discussed by the PPD defendants in trial and pretrial testimony, and, upon information and belief, in pretrial conversations with prosecutors.

82. According to the PPD defendants' version of events, Jeffrey came to the Peekskill stationhouse with typewritten notes that he had prepared of his own investigation and discussed his investigation with Detective Levine. Then, according to the PPD defendants, Jeffrey independently drew crime scene maps indicating the three crime scene locations identified by the police and the fact that A.C.'s body was covered by leaves, and showing the path that A.C. walked from her home to Hillcrest Park - all, according to the PPD defendants, based on non-public information that Jeffrey knew because he was A.C.'s killer. Later that day, according to the PPD defendants, Jeffrey accompanied them to the crime scene and further demonstrated his knowledge of non-public facts about the crime, including but not limited to the three crime scene locations and where A.C.'s camera had been found. Following the crime scene trip, Jeffrey allegedly returned to the Peekskill stationhouse where he answered more questions about the crime scene and, according to the PPD defendants, used the map he had drawn earlier in the day

to show detective McIntyre where A.C.'s camera had been found.

83. In fact, the PPD defendants deliberately misrepresented critical facts and concealed material, exculpatory and impeachment evidence concerning that meeting as well as other sessions in which Jeffrey and the PPD defendants discussed the A.C. investigation. Contrary to the PPD defendants' representation that Jeffrey's crime scene maps depicted his own, independent knowledge of non-public facts, in fact the PPD defendants knew or in the absence of their deliberate and reckless indifference should have known that they had provided Jeffrey non-public facts about the crime, that other facts provided by Jeffrey were in fact public, and that Jeffrey had incorporated those facts into his maps. The PPD defendants deliberately concealed and manipulated their interactions with Jeffrey by selectively recording only short segments of the many hours of questioning and deliberately failing to record critical events, including but not limited to Jeffrey's drawing of crime scene maps, the visit to the crime scene, and an hour or more period of interrogation by defendant Levine during which he directly accused Jeffrey of raping and murdering A.C.

84. Levine requested that Jeffrey sign the crime scene maps drawn by him, and showed the maps to defendants McIntyre and Tumolo. The maps were subsequently provided to prosecutors.

### The Police Plan to Procure Jeffrey's Confession

85. In the course of his meetings with the PPD, the PPD defendants encouraged Jeffrey to submit to a polygraph examination. The PPD defendants convinced Jeffrey to take the polygraph "test" by telling him that if he "passed," they would permit him to be more fully involved in the A.C. investigation, and would provide him with access to their police files. Jeffrey ultimately agreed to come to the PPD stationhouse on January 25, 1990 for the polygraph exam.

86. In fact, the polygraph "test" was a deliberate tactic employed by the defendants, including but not limited to Levine, McIntyre, and Tumolo, to escalate substantially the aggressiveness of their interrogation of Jeffrey and to exploit his intellectual, emotional, and psychological vulnerabilities in a manner that would produce a confession to A.C.'s rape and murder.

87. Upon information and belief, the PPD defendants, including Levine, McIntyre, and Tumolo, had polygraph testing services available to them through other law enforcement agencies and routinely used the services of those other agencies in order to conduct routine polygraphs. However the defendants, including but not limited to Levine, McIntyre, and Tumolo, jointly agreed to depart from their usual procedure for Jeffrey's polygraph examination, and to enlist the services of a polygrapher from the Putnam County Sheriff's Department, defendant Dan Stephens.  Defendant Stephens performed polygraph "testing" out of a private, non-law-enforcement office in Brewster, New York, approximately an hour's drive from Peekskill.

88. The PPD defendants conveyed to Stephens, and Stephens understood, that his job on January 25 was not to obtain polygraph results from Jeffrey, but to obtain his confession.  The PPD defendants and defendant Stephens deliberately and recklessly agreed and mutually planned and understood that the interrogation of Jeffrey by Stephens, under the guise of a polygraph examination, would produce a confession by, among other means, isolating Jeffrey in a location that was unfamiliar to him, purposefully far from and without the knowledge of Ms. McGarr, deceiving him by interrogating him in a non-law-enforcement setting, aggressively interrogating him in a manner that would confuse and threaten him, confusing Jeffrey as to the nature of his knowledge of and involvement in the crime, increasing Jeffrey's dependency upon familiar investigators, including in particular defendant McIntyre, and otherwise deliberately exploiting

23

Jeffrey's known age and intellectual, emotional, and psychological vulnerabilities.

89. No personnel from the Westchester County District Attorney's Office were present at, and no recording equipment was brought by the PPD defendants to, Stephens's office on January 25. Upon information and belief, these were departures from the ordinary policies, procedures, customs, and practices followed by the PPD and the Westchester County District Attorney's Office in connection with confessions, and were deliberately done by the PPD defendants in order to conceal the nature and substance of the coercive interrogation they had planned to carry out with Jeffrey.

### The Coerced "Confession"

90. On the morning of January 25, 1990, a school day, Jeffrey arrived at the PPD stationhouse with his friend, Martin Burrett, in order to take the polygraph examination. Martin was asked to leave, and at approximately 10:00 a.m. Jeffrey was driven by defendant McIntyre to Stephens's office in Brewster, New York, approximately an hour away from Peekskill. Defendants Levine and Tumolo accompanied Jeffrey and McIntyre in a separate car.

91. Upon information and belief, defendants McIntyre, Levine, Tumolo, and Stephens knew that Ms. McGarr did not know of his whereabouts, believed him to have been in school, and would not have permitted Jeffrey to take the polygraph test if she had known.

92. When Jeffrey arrived in Brewster, Stephens was dressed in civilian clothing, and was not identified to him as a law enforcement officer. Jeffrey told Stephens that he had come to take a polygraph examination in order to be permitted to assist the PPD with their investigation into A.C.'s death.

93. Shortly after his arrival, defendant Stephens escorted Jeffrey to a small room with a table,

two chairs, and a polygraph machine. Jeffrey remained in that room from approximately 11:00 a.m. until approximately 7:00 p.m. He had not eaten prior to arriving in Brewster, and he was given no food for at least the first six hours that he was in the room. Defendant Stephens and other individuals provided Jeffrey with multiple cups of coffee throughout the course of the day.

94. Defendants Levine, McIntyre, and Tumolo, who remained in a separate room monitoring the questioning and interrogation through a listening device, either witnessed or heard the words spoken to and by Jeffrey while at the Brewster office.

95. Stephens told Jeffrey, in substance, that once the polygraph examination began, it could not be stopped. One or more pieces of polygraph equipment was affixed to Jeffrey throughout the entire time that he spoke about and was questioned concerning A.C.'s death.

96. As PPD investigators had done in prior sessions with Jeffrey, Stephens provided Jeffrey with and obtained Jeffrey's signature on numerous waivers and releases, including on a "participatory" Miranda warning form and on consents to the polygraph examination.

97. Stephens began to question Jeffrey concerning the rape and murder of A.C., and Jeffrey told Stephens what he believed he knew about the crime and had discussed previously with PPD investigators. Jeffrey's responses incorporated details and theories that had been provided and suggested to him by the PPD defendants and/or Stephens, as well as facts that the PPD defendants knew to be publicly ascertainable.

98. During the course of his questioning of Jeffrey, Stephens employed interrogation tactics that were designed to trick, deceive, confuse, and intimidate Jeffrey, including but not limited to shouting at Jeffrey, invading Jeffrey's personal space, repeatedly accusing Jeffrey of raping and murdering A.C., and telling Jeffrey that he had failed the polygraph test and had already told

Stephens "within himself" that he was guilty of the crime. Jeffrey repeatedly denied his involvement in the crime to Stephens.

99. Several hours into the questioning and interrogation, at a point when Jeffrey was visibly and obviously distraught, frightened, and confused, Stephens turned to another deliberate tactic, "good cop-bad cop," and told Jeffrey that he could speak with his "favorite" PPD detective. Jeffrey chose defendant McIntyre. Upon information and belief, defendants Levine, McIntyre, Tumolo, and Stephens knew that Jeffrey viewed McIntyre as his friend and a "father figure," and intended that McIntyre's interaction with Jeffrey at this point would be the culmination of their deliberate manipulation to obtain Jeffrey's involuntary confession.

100. Stephens left the room in which Jeffrey was sitting, and continued to listen to the remainder of the interrogation in the nearby room where Levine, McIntyre, and Tumolo had been monitoring the earlier questioning.

101. When McIntyre entered the room with Jeffrey, he was not the friend and father figure that he had been previously and which he knew Jeffrey expected from their interactions. McIntyre told Jeffrey, among other things, that he had known for weeks that Jeffrey was guilty of the crime. He told Jeffrey in substance that Levine, Tumolo, and Stephens would physically harm Jeffrey if he did not confess, and that McIntyre was trying to hold them back but that he didn't have any "bullets" in his "gun," and that Jeffrey needed to give him some "bullets" by confessing.

102. Upon information and belief, McIntyre drew upon his knowledge that Jeffrey had in the past suffered from hearing "voices," as well as other symptoms of mental illness, to coerce Jeffrey's admission of guilt. After threatening Jeffrey with physical violence, McIntyre walked to the sole

window in the small room, gestured to the sky, and told Jeffrey that A.C. was looking down from heaven, and wanted Jeffrey's help to find her killer. McIntyre also promised Jeffrey that if Jeffrey confessed he could go home, and that the only punishment Jeffrey would receive was treatment in a mental facility.

103. Frightened, confused, hungry, and trusting McIntyre's word that he would be physically harmed if he did not give the PPD defendants a confession, Jeffrey provided information that drew upon details concerning the crime that had been provided to him by the PPD defendants - many of which were inaccurate. By the end of his statement Jeffrey was sobbing uncontrollably. He eventually fell from his chair and curled himself in a fetal position under the table at which he had been sitting.

104. When Jeffrey finished his statement to McIntyre, defendants Tumolo and Stephens burst in the room, and Tumolo yelled, in substance, that Jeffrey had to repeat his confession, and that they would stay all night if he didn't. Jeffrey attempted to repeat the story that he had told McIntyre.

105. Jeffrey was placed under arrest in Brewster, and was transported by the PPD defendants back to the PPD stationhouse. During the ride back to Peekskill, McIntyre, Levine, and/or Tumolo attempted to convince Jeffrey to provide a more detailed confession. Jeffrey did not do so.

106. Subsequent to January 25, 1990, defendant McIntyre prepared a police report purporting to describe the events that transpired that day with respect to Jeffrey. McIntyre's report documenting Jeffrey's statements and alleged confession on January 25 falsely represented that critical details originated with Jeffrey, when in fact they had been provided and/or suggested to Jeffrey by various PPD defendants over the course of their multiple interviews and

27

interrogations. Upon information and belief, those details included but were not limited to the following: the fact that A.C.'s bra had been ripped and removed from her body; the fact that A.C.'s body was covered with leaves; the fact that the perpetrator had covered A.C.'s mouth with his hand; the fact that A.C. had been struck on the back of the head; the fact that A.C. had lost her keys; and the location where A.C.'s camera was found.

107. In addition to failing to disclose that critical details in Jeffrey's January 25 statements had been supplied by the PPD defendants, McIntyre's police report also deliberately excluded material, exculpatory and impeachment evidence concerning the coercive circumstances of Jeffrey's interrogation on January 25, including but not limited to the threats of violence against Jeffrey by the PPD defendants and the promise to Jeffrey that if he confessed he could go home and would receive mental health treatment.

108. Stephens prepared documentation of his questioning of Jeffrey during the alleged polygraph, including the words that Jeffrey allegedly spoke to him concerning A.C.'s rape and murder. This documentation falsely represented that facts relayed by Jeffrey originated with him, rather than with the defendants, and does not document material, exculpatory and impeachment evidence including but not limited to the coercive tactics utilized in his questioning, and the sources of the details that he attributed to Jeffrey. The details of the crime that were falsely attributed to Jeffrey's independent knowledge include but were not limited to the following: that A.C. suffered a blow to the back of her head with a blunt object; the possibility that the perpetrator did not ejaculate; that A.C.'s body was covered with leaves; that A.C. dropped her keys; and that A.C.'s camera was lost; and the locations of the crime.

**Police Coerced, Fabricated, and Concealed Exculpatory Evidence Concerning Additional Investigation of Jeffrey Deskovic**

109. Prior to and, upon information and belief, subsequent to Jeffrey's false confession and arrest, PPD investigators interviewed additional witnesses, including but not limited to Jeffrey's friends Martin Burrett and John Laurino, Martin's and John's family members, and additional witnesses whose statements were not documented and/or were misrepresented in critical respects. In the course of these interviews investigators, including but not limited to defendants Levine, McIntyre, and Brovarski, coerced and intimidated witnesses into providing false inculpatory information concerning Jeffrey, fabricated inculpatory statements, including statements portraying Jeffrey as violent or threatening, and failed to document and disclose to prosecutors interviews or portions of interviews that revealed material, exculpatory and impeachment evidence. This undisclosed evidence included, but was not limited to (a) the coercive and intimidating tactics utilized by police in interviewing the witnesses; (b) evidence that Jeffrey played no role in and had no independent knowledge of A.C.'s rape and murder; (c) evidence that A.C. and Freddy Claxton had no romantic or sexual relationship; and (d) evidence that A.C. had not had consensual sex prior to her rape and murder.

110. The PPD defendants' multiple interviews with Jeffrey's friend Martin Burrett became a centerpiece of their investigation. The PPD defendants knew that Jeffrey and Martin were best friends who spent much of their free time together, and as a result the defendants met with Martin, as well as his parents, both to attempt to obtain inculpatory information concerning Jeffrey as well as to monitor Jeffrey's response to their questioning of him. In the course of these meetings, the defendants deliberately and recklessly employed many of the same tactics of

deception and coercion that they employed with Jeffrey and, previously, with Freddy Claxton,

including but not limited to aggressively questioning and threatening Martin into making false

inculpatory statements about Jeffrey, and selectively recording their interactions with Jeffrey.

Upon information and belief, the PPD defendants fabricated inculpatory information allegedly

provided by Martin and his parents, including but not limited to statements alleging that Jeffrey

had threatened to kill Martin, and statements concerning Jeffrey's relationship with A.C.  The

PPD defendants also learned from Matin's statements to them that Jeffrey had learned non-public

facts concerning A.C.'s death and the investigation from PPD investigators.

111. The PPD defendants deliberately failed to document and affirmatively concealed material,

exculpatory and impeachment evidence concerning interviews conducted with Martin Burrett and

his family, including but not limited to the coercive tactics they utilized to obtain inculpatory

statements from Martin, their fabrications of allegedly inculpatory evidence, and information

provided to them from Martin that revealed that investigative facts known by Jeffrey had been

provided to him by the PPD defendants.

### Jeffrey's Indictment Is Procured With Fabrications and Concealment of Material, Exculpatory and Impeachment Evidence

112. Prior to Jeffrey's false confession and subsequent indictment, PPD defendants and

prosecutors had taken steps to obtain DNA testing to definitively include or exclude Jeffrey as

the perpetrator.  Prior to his false confession, Jeffrey consented to have his blood drawn and

tested by the PPD, based upon his desire to assist the police, and upon the PPD defendants'

representation that a blood test could clear Jeffrey of any involvement in the crime.  Jeffrey's

blood sample and a vaginal swab with semen that was taken from A.C. were sent to the FBI for

DNA testing. In a letter accompanying the samples and requesting DNA testing, defendant

Tumolo stated that the PPD "anticipate[d] that semen evidence will match that from Deskovic's

blood; hence either incriminating or exonerating him in this matter."

113. The PPD defendants and prosecutors were aware that the results of that testing would be

available in a short period of time. However rather than delay Jeffrey's indictment in order to

present the grand jury with the results of the DNA testing, which could conclusively prove or

disprove Jeffrey's guilt or innocence, prosecutors chose to seek Jeffrey's indictment immediately,

without the benefit of those results.

114. On February 27, 1990 Jeffrey Deskovic was indicted on three counts of murder in the

second degree, one count of first degree rape, and one count of fourth degree possession of a

weapon.

115. Jeffrey Deskovic was charged and indicted based upon evidence that was fabricated by the

defendants and by means of the defendants' concealment from prosecutors and the grand jury of

material, exculpatory and impeachment evidence that undermined a probable cause

determination. These material misrepresentations included, but were not limited to, the

following: (a) the PPD defendants' creation of false police reports and false statements to

prosecutors representing that Jeffrey Deskovic possessed independent knowledge of numerous

non-public facts concerning A.C.'s death, when in fact those facts were provided to him by PPD

investigators and/or were known by the PPD defendants to be public knowledge; (b) the

defendants' fabrication of evidence to make Jeffrey's statements and ultimate confession appear

knowing and voluntary, including but not limited to preparing Miranda waiver forms that falsely

represented Jeffrey to have knowingly and voluntarily waived his right to counsel when in fact

because of Levine's misrepresentations to Jeffrey concerning Lou Ecker Jeffrey's waivers were

not knowing and voluntary; (c) the PPD defendants' concealment of material facts concerning

the coercive, deceptive, and intimidating tactics employed by them in the course of questioning

Jeffrey on and prior to January 25, including but not limited to their concealment of Stephens'

and McIntyre's coercive promises and direct and indirect threats of physical harm; and (d) the

PPD defendants' concealment of additional material, exculpatory and impeachment evidence

concerning witness interviews conducted by them in the case, including but not limited to

coercive tactics utilized in witness interviews, evidence that A.C. and Freddy Claxton had no

romantic or sexual relationship, evidence that A.C. had not had consensual sex prior to her rape

and murder, and other evidence that Jeffrey played no role in and had no independent knowledge

of A.C.'s rape and murder.

### DNA Evidence Exonerates Jeffrey - But the Prosecution Continues

116. Just days after Jeffrey's indictment, DNA testing by the FBI lab excluded Jeffrey as the

source of the semen found on the vaginal swab taken from A.C.  The Westchester County

District Attorney's Office, including but not limited to Bolen, and the PPD, including but not

limited to defendants Levine, McIntyre, and Tumolo, were informed of this result, which was

documented in a March 26, 1990 report.

117. Additionally, microscopic hair analysis and comparison of the hairs found on A.C.'s arm,

leg, breast, and pubic area with the head and pubic hairs of Jeffrey Deskovic excluded Jeffrey as

the source of those hairs.  Critically, the hair analyst concluded that at least one hair found on

A.C. was consistent with a "negroid-type" hair, typically shed by an African American

individual.  The Westchester County District Attorney's Office, including but not limited to

Bolen, and the PPD, including but not limited to defendants Levine, McIntyre, and Tumolo, were informed of these results.

118. Bolen understood that in the absence of evidence that A.C. had been raped and murdered by multiple perpetrators, or that the semen found in A.C. was attributable to a consensual sexual encounter shortly before her death, the DNA evidence establishing that Jeffrey was not the source of the semen definitively proved Jeffrey's innocence and was fatal to his prosecution. Accordingly, Bolen directed that additional investigation be done, and/or conducted further investigation in order to find evidence supporting probable cause to prosecute Jeffrey, and in particular to provide an explanation for the presence of another man's semen inside A.C. following her rape and murder.

119. Bolen also turned to defendant Deputy Medical Examiner Louis Roh to provide evidence to support the continued prosecution of Jeffrey Deskovic in the face of exonerative DNA evidence. Soon after the disclosure of the exculpatory DNA results, Bolen and Roh discussed and agreed that Roh would provide evidence that in his scientific opinion A.C. had been sexually active on multiple occasions prior to her rape and death, and that during his autopsy he had observed scarring on A.C.'s hymen that proved this fact.

120. In fact, Roh knew, or in the absence of his deliberate and reckless indifference should have known, that he had no scientific basis for stating that A.C. had been sexually active on multiple occasions, and had not in fact observed the scarring that he reported to Bolen. In the absence of his deliberate and reckless indifference to the truth, Bolen also should have known that Roh's conclusions and findings were false and fabricated. Roh and/or Bolen concealed that Roh's conclusions and findings concerning A.C.'s sexual history were fabricated - a fact which was

33

material, exculpatory and impeachment evidence.

121. Additionally, Bolen deliberately and recklessly failed to investigate known exculpatory evidence. For example, prior to trial, the State's hair comparison expert contacted Bolen and requested that he obtain hair reference samples from Roh, Roh's assistant, and Freddy Claxton, in order to prove or disprove the theory that the hairs found on A.C. that did not match Jeffrey Deskovic originated with those individuals. Bolen represented to the hair examiner that he would obtain those samples, and then deliberately or recklessly failed to do so. Bolen also deliberately or recklessly failed to obtain DNA testing on blood samples from Freddy Claxton, or from any other potential consensual donor of semen.

122. The PPD defendants also understood, in light of the exonerative DNA results, that the DNA evidence conclusively establishing that Jeffrey was not the source of the semen fatally undermined their theory of his guilt and the validity of his confession.

123. This was all the more evident in light of the PPD defendants' investigative misconduct prior to Jeffrey's indictment - including, but not limited to, the defendants' interference with Jeffrey's right to counsel; their coercion of allegedly inculpatory statements from Jeffrey; their providing to Jeffrey one or more of the non-public facts contained in his allegedly inculpatory statements; their fabrications of allegedly inculpatory witness statements; and their withholding of additional exculpatory and impeachment evidence that undermined probable cause, including but not limited to evidence concerning their coercive tactics in witness interviews, witness statements and other evidence that Freddy Claxton and A.C. had not had a romantic relationship, witness statements and other evidence that A.C. was not sexually active, and other evidence undermining Jeffrey Deskovic's guilt. Even after learning of the DNA test results, however, the PPD

34

defendants continued to conceal from prosecutors their previously undisclosed misconduct and still failed to disclose exculpatory and impeachment evidence to the prosecution.

124. Moreover, the PPD defendants conducted further investigation on their own initiative and at the direction of prosecutors. Upon information and belief, in the course of that investigation the PPD defendants uncovered additional exculpatory and impeachment evidence, including but not limited to evidence that was material to the prosecution's efforts to account for the fact that Jeffrey was not the source of the semen found inside A.C. The PPD defendants failed to document and disclose this evidence.

125. Had the PPD defendants taken basic steps prior to and following Jeffrey's indictment to investigate known exculpatory evidence and leads, instead of blindly investigating only to corroborate theories of guilt, they would have uncovered readily available evidence that not only exonerated Jeffrey, but also undermined their initial theories of the case and led them to the actual perpetrator. These investigative steps include, but are not limited to, the following: (a) conducting and documenting thorough interviews with individuals who were near the crime scene on November 15, 1989, including two individuals who were playing basketball and who spoke to Steven Cunningham that day; (b) conducting and documenting a complete and thorough canvass of the crime scene, and collecting and vouchering all available evidence, which upon information and belief would have led to the discovery of physical evidence traceable to Steven Cunningham; (c) thoroughly and completely investigating and documenting information provided to the police by witnesses who stated unequivocally that Freddy Claxton and A.C. had not had a romantic relationship of any kind; (d) thoroughly and completely investigating and documenting information provided to the police by witnesses who stated unequivocally that A.C.

35

had not had consensual sex prior to her rape and murder; (e) thoroughly and completely investigating and documenting the possible sources for details and theories contained in Jeffrey Deskovic's statements to the police, which would have undermined the contention by the police and prosecutors that he had independent knowledge that could only have been possessed by the perpetrator.

### Prosecutorial and Police Misconduct Deprive Jeffrey of a Fair Trial

126. A critical challenge facing the prosecution at Jeffrey's criminal trial was to explain how Jeffrey could have raped A.C. despite scientific proof that the semen found inside of her, and hairs found on her body, were not his. At trial, Bolen explained to the jury why his theory of the case was true, despite clearly exculpatory evidence to the contrary, by arguing false and unsupported evidentiary inferences to the jury through baseless allegations concerning a consensual sexual relationship between Freddy Claxton and A.C., and through Roh's fabrications.

127. Bolen elicited from Roh the false and fabricated testimony that they had discussed prior to trial: (a) that Roh had a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her death; and (b) that during his autopsy Roh had observed scarring on A.C.'s hymen. Bolen relied upon Roh's fabrications in his opening and closing arguments to the jury as the sole evidence supporting the prosecution theory that the semen found in A.C. had come from a consensual sex partner - namely Freddy Claxton. Roh and/or Bolen concealed the critical, exculpatory fact that Roh's critical testimony on this score had been fabricated prior to trial.

128. Furthermore, Bolen explained to the jury that the presence on A.C.'s body of hairs that did

not match Jeffrey - including hairs consistent with a "negroid" type - by advancing the baseless

theory that the hairs had in fact been shed by Roh, his African American assistant, and Freddy

Claxton. Bolen advanced this argument despite his deliberate and reckless decision never to

obtain hair samples from Roh, his assistant, or Claxton for comparative analysis to confirm or

conclusively refute his theory - despite Bolen's representation to the State's hair expert that such

samples would be obtained for comparison.

129. The PPD defendants' fabrications and concealment of material, exculpatory and

impeachment evidence adduced in their investigation also were critical in obtaining Mr.

Deskovic's conviction.

130. The PPD defendants' fabrications formed the basis for Bolen's argument at trial that

Jeffrey's January 25 confession and prior allegedly incriminating statements were knowing and

voluntary, and demonstrated that he knew facts that only the perpetrator of A.C.'s rape and

murder could have known. In particular, Bolen argued that Jeffrey's knowledge of the note

referring to Freddy Claxton proved that he had been present at and motivated to commit the

crime; that Jeffrey's statement that he ripped off A.C.'s bra was consistent with the non-public

fact that A.C.'s bra had been found away from her body; that Jeffrey's statement that he held his

hand over A.C.'s mouth matched non-public details concerning A.C.'s injuries; that Jeffrey's

statement that he hit A.C. on the back of the head with a Gatorade bottle matched non-public

facts concerning A.C.'s cause of death; that Jeffrey's knowledge that A.C. had lost her keys

corroborated his involvement in the crime; that Jeffrey's statement that the perpetrator might not

have ejaculated confirmed that he could have committed the crime and not left behind semen;

and that Jeffrey's drawing of three crime scenes and the location where A.C.'s camera was found

was consistent with the PPD's non-public theory of how the crime was committed.

131. Furthermore, the PPD defendants' deliberate concealment of material, exculpatory and impeachment evidence was material to the jury's consideration of all of the issues raised at trial - including but not limited to the voluntariness and truthfulness of Jeffrey's confession, and the prosecutor's arguments concerning a relationship between Freddy Claxton and A.C. and A.C.'s sexual history - as well as to the jury's assessment of the credibility of the State's witnesses and the integrity of the investigation of the case.

### Mr. Deskovic's Incarceration and Efforts to Prove His Innocence

132. On December 7, 1990 Jeffrey Deskovic was convicted by a Westchester County jury of murder, rape, and possession of a weapon. On January 18, 1991, at a sentencing proceeding where Jeffrey proclaimed his innocence and pleaded for mercy from the court, Judge Collabella sentenced Jeffrey to fifteen years to life in prison.

133. From the time of his conviction until his ultimate release in 2006 Jeffrey Deskovic fought tirelessly to vindicate his innocence, through the courts on appeal and through habeas petitions, and by direct appeals to policymakers, including former Westchester County District Attorney Jeanine Pirro, that his case and criminal trial be reexamined.

134. Mr. Deskovic appealed his conviction to the New York Appellate Division, Second Department. The court affirmed his conviction on February 14, 1994. On July 6, 1994 the New York Court of Appeals denied Jeffrey leave to appeal the decision of the Second Department.

135. Mr. Deskovic sought relief from his wrongful conviction through a petition for a writ of habeas corpus, which was denied by District Judge Barbara Jones on November 21, 1997. In his December 4, 1997 appeal of that denial to the Second Circuit Court of Appeals, Mr. Deskovic

argued that he should have "the opportunity to further establish his innocence by additional and new DNA testing employing the state of the art of DNA investigation in a science which can be even more certain today." The appeal was rejected on April 26, 2000, and Mr. Deskovic's petition for certiorari was denied by the United States Supreme Court on January 8, 2001

### The Real Killer Is Identified and Jeffrey Is Exonerated

136. Jeffrey Deskovic continued his tireless efforts to obtain DNA retesting and comparison, until 2006 when newly elected Westchester County District Attorney Janet DiFiore consented to conduct STR DNA testing on the semen found on the vaginal swab taken from A.C., and to run the results of that testing against the available DNA databases for convicted offenders.

137. In September 2006 the DNA profile obtained from the semen found on the vaginal swab was matched to Steven Cunningham, who was already incarcerated in New York for the 1993 murder of a Peekskill school teacher. In March 2007 Mr. Cunningham pleaded guilty to the rape and murder of A.C., and on May 2, 2007 he was sentenced to an additional twenty years in prison for the crime.

138. Jeffrey Deskovic did not know Steven Cunningham, and had never met or seen him prior to attending court proceeding in 2007.

139. On September 20, 2006 Jeffrey Deskovic's conviction was vacated and he was released from prison based upon a joint CPL § 440.10 motion by the Westchester County District Attorney's Office and counsel for Mr. Deskovic.

140. On November 2, 2006, on motion by the Westchester County District Attorney, the indictment against Mr. Deskovic was dismissed on the ground of actual innocence.

**Policies and Customs of the PPD, the Westchester County District Attorney's Office, and
the Westchester County Medical Examiner's Office**

141. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey

Deskovic, the City of Peekskill and the PPD, by and through their final policymakers, maintained

a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper,

illegal, and unconstitutional investigative techniques, including but not limited to the following:

(a) disregarding the Fifth Amendment rights of criminal suspects and defendants; (b) fabricating

evidence; (c) failing to document and disclose material, exculpatory and impeachment evidence

to prosecutors; (d) failing to investigate known exculpatory evidence and otherwise failing to

conduct constitutionally adequate investigations; (e) and deliberately isolating minor suspects

from their parents and otherwise scheming to evade the known wishes of the parents of minor

suspects regarding their interrogations.

142. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey

Deskovic, the City of Peekskill and the PPD, by and through their final policymakers, maintained

a policy, custom, or pattern and practice of failing to adequately train and supervise PPD

investigators in connection with fundamental investigative tasks implicating the constitutional

rights of witnesses and suspects, including but not limited to conducting custodial interrogations

and witness interviews, understanding and respecting the rights of the parents of minor suspects,

and documenting and disclosing exculpatory and impeachment evidence to prosecutors.

143. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to

train and supervise PPD investigators were reflected by the multiple acts of misconduct and

illegality committed by multiple PPD detectives and supervisors in relation to multiple suspects

and witnesses in the A.C. investigation, as described above.

144. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and train were also reflected in numerous prior cases and investigations which, upon information and belief, were known to the PPD defendants and policymakers prior to the A.C. investigation. The misconduct committed in those cases by PPD investigators, including but not limited to defendant Tumolo and other investigators involved in Mr. Deskovic's case, was actually or constructively known to PPD supervisors and policymakers prior to the A.C. investigation - including by means of their direct participation in the investigations, and/or by published judicial decisions exposing the investigative misconduct - and, upon information and belief, PPD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate PPD investigators in response to such notice.

145. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to adequately supervise, train and discipline assistant district attorneys in connection with fundamental and recurring constitutional duties, including but not limited to (a) the disclosure of exculpatory and impeachment evidence to the defense; (b) investigating and acting upon exculpatory evidence that vitiates probable cause; (c) constitutional prohibitions on fabricating evidence and suborning perjury; and (d) understanding and respecting the rights of the parents of minor suspects.

146. Pursuant to this policy, custom, or pattern and practice, policymakers for the District Attorney's Office abdicated and effectively delegated to senior assistant district attorneys and

41

supervisors, including but not limited to Bolen, the authority and discretion to conduct and supervise investigations and prosecutions with deliberate and reckless disregard for their constitutional and ethical duties.  As a result, assistant district attorneys and supervisors, including but not limited to Bolen, routinely and knowingly engaged in prosecutorial misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of impunity.

147. In particular, as a direct result of policymakers' and supervisors' abdication of authority for supervising, training, and disciplining prosecutors, assistant district attorney Bolen routinely, notoriously, and as a matter of policy, custom, and pattern or practice violated constitutional and ethical norms by concealing material, exculpatory and impeachment evidence from the defense in order to permit him to argue evidentiary inferences to juries that he knew, or in the absence of his deliberate indifference should have known, were unsupported or contradicted by known facts.  In furtherance of this policy, custom, and pattern or practice Bolen routinely failed to disclose material, exculpatory and impeachment evidence to the defense; deliberately and recklessly failed to investigate known exculpatory evidence, and in particular forensic evidence; deliberately and recklessly relied upon forensic experts, including Deputy Medical Examiner Roh, to provide fabricated, baseless, and/or misleading scientific inculpatory evidence; deliberately and recklessly disregarded Ms. McGarr's parental rights; and engaged in additional acts of prosecutorial misconduct aimed at securing convictions at all costs.

148. The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was reflected by the multiple acts of misconduct and illegality committed by multiple members of and supervisors in the Westchester County District Attorney's Office in the course of the investigation and prosecution of Jeffrey Deskovic, as described above.  The District

Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was also reflected by multiple high priority and highly publicized prosecutions and post-conviction proceedings prior and subsequent to the prosecution of Jeffrey Deskovic, in which senior district attorneys and supervisors, including but not limited to Bolen, engaged in, condoned, and facilitated prosecutorial misconduct.

149. The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was known, or in the absence of their deliberate and reckless indifference should have been known, to policymakers for the District Attorney's Office, at and prior to the time of Jeffrey Deskovic's prosecution. Policymakers were on actual and constructive notice of the misconduct of Bolen and other assistant district attorneys through, among other mechanisms, their direct involvement in Jeffrey Deskovic's prosecution, Bolen's widely known reputation for engaging in and condoning prosecutorial misconduct, and misconduct perpetrated in multiple high priority and highly publicized prosecutions and post-conviction proceedings prior to Mr. Deskovic's conviction.

150. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through its final policymakers and their delegees, maintained a policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions to Westchester County prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that such conclusions would violate criminal suspects' right to a fair trial. In particular, defendant and Deputy Medical Examiner Roh routinely, notoriously, and as a matter of policy, custom, and pattern or practice fabricated evidence, gave perjured testimony, and/or engaged in deliberate and

reckless overreaching with respect to allegedly inculpatory scientific conclusions.

151. Additionally, prior to and at the time of the investigation, prosecution, and conviction of

Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final

policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to

supervise, train and discipline deputy medical examiners.  The absence of supervision, training,

and discipline as a matter of policy, custom, or pattern and practice established a climate of

impunity in which the misconduct of defendant Roh and others was condoned and facilitated, and

created a known and obvious risk that the constitutional rights of criminal suspects would be

violated.

152. Policymakers for the Westchester County Medical Examiner's Office were on actual and

constructive notice of the misconduct of Roh and other deputy medical examiners through,

among other mechanisms, their direct involvement in and knowledge of Jeffrey Deskovic's

prosecution, Roh's widely known reputation for fabricating engaging in and condoning

prosecutorial misconduct, and specific publicity and notoriety generated from Roh's conduct in

highly publicized criminal proceedings prior to Mr. Deskovic's conviction.

**DAMAGES**

153. The actions of the defendants deprived plaintiff Linda McGarr of her civil rights under the

First Amendment and the Due Process Clause of the Fourteenth Amendment to the United States

Constitution.

154. The unlawful, intentional, wilful, deliberately indifferent, reckless, and/or bad-faith acts and

omissions of the defendants caused Linda McGarr to be deprived of her constitutionally

protected right to familial association, and to the companionship, care, and custody of her son.

44

155. The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the defendants caused Linda McGarr the following injuries and damages, which continue to date and will continue into the future: pain and suffering; severe mental anguish; severe emotional distress; loss of family relationships; severe psychological damage; loss of income and familial support; infliction of physical illness; and humiliation, indignities, embarrassment, and degradation.

156. All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## COUNT I

### 42 U.S.C. § 1983
### First Amendment and Fourteenth Amendment Due Process Clause
### Right to Familial Association
### Against All Defendants

157. Ms. McGarr hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows

158. Ms. McGarr has a constitutionally protected liberty interest in the companionship of her son, the ability to make fundamental choices about the manner in which he is raised, and the preservation of her intimate and private familial relations free from unwarranted government interference.

159. Ms. McGarr has a fundamental constitutional right to the companionship, care, custody, and management of her son.

160. The right of a nuclear family to remain together without coercive interference by the

government is one of the most essential and basic aspects of constitutionally recognized familial privacy rights.

161. Through the conduct alleged in this Complaint, defendants deprived Ms. McGarr of her fundamental right to familial association by falsely accusing, prosecuting, and convicting her son of a crime that he did not commit.

162. Defendants' conduct was purposefully directed at Ms. McGarr's relationship with her son. Defendants intended – or at a minimum were reckless and deliberately indifferent to the obvious risk – that their conduct would interfere with Ms. McGarr's constitutionally protected relationship with her son. Among other things, defendants (together with Bolen) purposefully isolated Jeffrey from his mother in a conscious scheme to evade her express instructions that they not question him without counsel, and purposefully manipulated Jeffrey's emotions about his mother in order to maximize their chances of extracting a false confession from and conviction of him.

163. Defendants' actions were in violation of clearly established constitutional law. No reasonable government official in 1989 and 1990 would have believed that defendants' actions were lawful.

164. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly convicted and imprisoned for sixteen years, and Ms. McGarr was deprived of her constitutionally protected right to familial association.

165. By their conduct and under color of state law, defendants had opportunities to intercede on behalf of Mr. Deskovic to prevent his coerced confession, malicious prosecution, and deprivation of liberty without due process of law but, due to their intentional conduct and/or deliberate or

reckless indifference, declined or refused to do so.

166. Defendants similarly had opportunities to intercede on behalf of Ms. McGarr to prevent the deprivation of her fundamental right to familial association but, due to their intentional conduct and/or deliberate or reckless indifference, declined or refused to do so.

167. The defendants' failures to intercede violated Ms. McGarr's clearly established constitutional right to familial association. No reasonable government official in 1989 and 1990 would have believed that their conduct did not violate Ms. McGarr's constitutionally protected rights.

168. As a direct and proximate result of the defendants' failures to intercede, Mr. Deskovic was wrongly prosecuted and convicted, and Ms. McGarr was deprived of her constitutionally protected right to familial association.

169. Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others yet unknown agreed among themselves and with other individuals to act in concert in order to deprive Ms. McGarr of her clearly established constitutional right to familial association.

170. In furtherance of the conspiracy the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a)  Defendants Levine, McIntyre, Tumolo, Stephens, and others planned to obtain Jeffrey's confession through physical threats, trickery, deceptive promises, and other means deliberately designed to exploit Jeffrey's known age, intellectual, emotional, and psychological vulnerabilities, and the nature of his relationship with his mother;

    b)  Defendants Levine, McIntyre, Tumolo, and others provided Jeffrey Deskovic with non-public facts known to the PPD in connection with the A.C. investigation, and through

coercion, deception, and trickery compelled Jeffrey to adopt those facts as his own by

incorporating them into allegedly inculpatory statements concerning his knowledge of

and involvement in the crime;

c)   Defendant Levine and others deceived Jeffrey concerning the status and legal significance

of his representation by Lou Ecker in relation to the defendants' questioning of him, and

defendants Levine, McIntyre, Stephens, and others subsequently caused Jeffrey to waive

his Miranda rights under circumstances that were not knowing and voluntary and that

directly violated Ms. McGarr's express instructions;

d)   Defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens deliberately and

recklessly created false police reports, reported false facts to prosecutors, and otherwise

fabricated evidence that falsely inculpated Mr. Deskovic and concealed the defendants'

investigative misconduct, including but not limited to police reports and other documents

falsely representing that Mr. Deskovic had independent knowledge of non-public facts

concerning A.C.'s rape and murder; Miranda waiver forms falsely representing that Mr.

Deskovic's waivers were knowing and voluntary; and allegedly inculpatory witness

statements.

e)   Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others deliberately

concealed additional material, exculpatory and impeachment evidence from prosecutors,

including but not limited to facts concerning the coercive and intimidating tactics used by

them to interview witnesses and interrogate Jeffrey Deskovic; evidence that Freddy

Claxton and A.C. had not been in a romantic or sexual relationship; evidence that A.C.

had not been sexually active prior to her rape and murder; and other evidence tending to

establish Jeffrey Deskovic's innocence, including material, exculpatory and impeachment evidence discovered subsequent to Mr. Deskovic's indictment which vitiated probable cause;

f)  Prior and subsequent to Mr. Deskovic's arrest, charging, and indictment for the crime, defendants Levine, McIntyre, Brovarski, Tumolo, and others deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Mr. Deskovic's innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Deskovic's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses; failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence; and failing to pursue evidence and leads concerning other suspects after their theory of Mr. Deskovic's guilt had been fatally undermined by known exculpatory evidence;

g)  Defendants Levine, McIntyre, Stephens, and others hid their misconduct and secured Mr. Deskovic's wrongful conviction by deliberately provided perjured testimony in the grand jury and/or in Mr. Deskovic's criminal trial.

171. As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Deskovic was wrongly arrested, prosecuted, convicted, and imprisoned for sixteen years, and Ms. McGarr was deprived of her constitutionally protected right to familial association.

172. The City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal,

and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants, in particular juveniles; (b) fabricating evidence; (c) failing to document and disclose material, exculpatory and impeachment evidence to prosecutors; (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations; and (e) and deliberately isolating minor suspects from their parents and otherwise scheming to evade the known wishes of the parents of minor suspects regarding their interrogations.

173. Furthermore, the City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to train and supervise PPD investigators in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting and documenting criminal investigations, conducting custodial interrogations and witness interviews, documenting and disclosing exculpatory and impeachment evidence to prosecutors, and understanding and respecting the rights of the parents of minor suspects.

174. The PPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to train and supervise PPD investigators, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple investigators and supervisors in the PPD in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent cases.

175. PPD policymakers were deliberately indifferent to the known and obvious risk that the policy, custom, or pattern and practice of investigative misconduct and failure to train and

supervise PPD investigators created a risk that the constitutional rights of criminal suspects like Mr. Deskovic and parents like Ms. McGarr would be violated.

176. The misconduct and constitutional violations committed by the PPD defendants in the course of the investigation and prosecution of Jeffrey Deskovic were carried out pursuant to the PPD's policy, custom, or pattern and practice of investigative misconduct, and were directly and proximately caused by the PPD's failure to train and supervise investigators. As a direct and proximate result of the PPD's policies, customs, or patterns and practices, Jeffrey Deskovic was wrongly prosecuted, convicted and imprisoned for sixteen years, and Ms. McGarr was deprived of her constitutionally protected right to familial association.

177. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring constitutional and ethical duties.

178. This policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys was evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple members of and supervisors in the Westchester County District Attorney's Office in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent investigations and prosecutions.

179. As a direct and proximate result of the Westchester County District Attorney's Office policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant

51

district attorneys, prosecutors, including but not limited to assistant district attorney Bolen,
committed multiple constitutional violations and related misconduct in the course of prosecuting
Jeffrey Deskovic, including but not limited to the following:

a) Assistant district attorney Bolen deliberately or recklessly obtained Mr. Deskovic's
conviction by means of fabricated evidence, including but not limited to defendant Roh's
deliberately and recklessly false pretrial statements and testimony that (a) there was a
scientific basis for concluding that A.C. had been sexually active on multiple occasions prior
to her rape and murder, and (b) Roh had observed scarring of A.C.'s hymen during his
autopsy, which caused Mr. Deskovic to be maliciously prosecuted and subjected to an unfair
criminal trial on the basis of material fabrications;

b) Bolen concealed from the defense material, exculpatory and impeachment evidence,
including but not limited to, upon information and belief, that Roh's conclusions and findings
concerning A.C.'s sexual history were fabricated;

c) Bolen deliberately or recklessly failed to investigate known exculpatory evidence,
including but not limited to deliberately and recklessly failing to obtain reference hair
samples from Roh, his assistant, and Freddy Claxton, and deliberately or recklessly failing to
obtain DNA testing from Freddy Claxton or any other potential consensual sex partner.

d) Bolen deliberately or recklessly suborned perjury and made false arguments that lacked
evidentiary foundation in order to obtain Mr. Deskovic's conviction, including but not
limited to arguing at trial that hairs found on A.C. had come from Roh, his assistant, and
Freddy Claxton.

180. Westchester County District Attorney's Office policymakers were deliberately indifferent to

the known and obvious risk that the policy, custom, or pattern and practice of failing supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring ethical and constitutional duties created a risk that the constitutional rights of criminal suspects like Mr. Deskovic and parents like Ms. McGarr would be violated.

181. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions to Westchester County prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that such conclusions would violate criminal suspects' right to a fair trial and parents' right to familial association.

182. Additionally, prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train and discipline deputy medical examiners. County policymakers maintained this policy, custom, or pattern and practice despite the fact that they knew or, in the absence of their deliberate indifference should have known, that deputy medical examiners, including defendant Roh, openly and notoriously fabricated scientific evidence, gave perjured testimony, and otherwise committed misconduct in connection with their duties as deputy medical examiners.

183. The Westchester County Medical Examiner's Office policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions, and its policy, custom, or pattern and practice of failing to supervise, train, and discipline deputy medical examiners, were

evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple members of and supervisors in the Westchester County Medical Examiner's Office in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent cases.

184. As a direct and proximate result of the Westchester County Medical Examiner's Office's policy, custom, or pattern and practice of providing false and scientifically unsupported conclusions to Westchester County prosecutors, and of failing to supervise, train, and discipline deputy medical examiners, Deputy Medical Examiner Louis Roh committed multiple constitutional violations and related misconduct in the course of prosecuting Jeffrey Deskovic, including but not limited to the following:

a) Roh deliberately and recklessly fabricated the false fact that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and murder, in order to support the prosecution's theory that the semen found in A.C. had come from a consensual donor;

b) Roh deliberately and recklessly fabricated the false fact that he had observed scarring of A.C.'s hymen;

c) Roh concealed material, exculpatory and impeachment evidence from assistant district attorney Bolen, including, upon information and belief, the fact that his conclusions and findings concerning A.C.'s sexual history were false;

d) Roh perjured himself on multiple occasions during Mr. Deskovic's trial, including by deliberately and recklessly misstating and overstating his scientific conclusions.

185. Westchester County Medical Examiner's Office policymakers were deliberately indifferent

to the known and obvious risk that the Office's policy, custom, or pattern and practice of

providing false and scientifically unsupported evidence to prosecutors, and of failing supervise,

train, and discipline deputy medical examiners created a risk that the constitutional rights of

criminal suspects like Mr. Deskovic and parents like Ms. McGarr would be violated.

186. As a direct result of the policies, customs, or patterns and practices of Westchester County,

Jeffrey Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and Ms.

McGarr was deprived of her constitutionally protected right to familial association.

**WHEREFORE**, Linda McGarr prays as follows:

A.   That the Court award compensatory damages to her and against the defendants, jointly and severally, in an amount to be determined at trial;

B.   That the Court award punitive damages to her, and against all non-municipal defendants, in an amount, to be determined at trial, that will deter such conduct by defendants in the future;

C.   For a trial by jury;

D.   For pre-judgment and post-judgment interest and recovery of her costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.   For any and all other relief to which she may be entitled.

Respectfully submitted,

October 23, 2007

Eric Hecker (EH 0989)
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212) 763-5000
(212) 763-5001 (fax)
Attorneys for Plaintiff Linda McGarr