UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
LINDA McGARR,

                              Plaintiff,

              -against-

CITY OF PEEKSKILL, PUTNAM COUNTY,
WESTCHESTER COUNTY, DAVID LEVINE,
THOMAS McINTYRE, WALTER BROVARSKI,
EUGENE TUMOLO, JOHN AND JANE DOE
SUPERVISORS, DANIEL STEPHENS, LOUIS
ROH, MILLARD HYLAND, and GEORGE
BOLEN,

                              Defendants.
-------------------------------------------------------------x
CITY OF PEEKSKILL, DAVID LEVINE,
THOMAS McINTYRE, and WALTER
BROVARSKY,

                     Third-Party Plaintiffs,

              -against-

PETER INSERO and THE LEGAL AID SOCIETY
OF WESTCHESTER COUNTY,

                     Third-Party Defendants.
-------------------------------------------------------------x

**THIRD-PARTY
COMPLAINT**

Docket No.
07 Civ. 9488 (KMK)

          Defendants/third-party plaintiffs CITY OF PEEKSKILL, DAVID LEVINE,

THOMAS McINTYRE, and WALTER BROVARSKY, by their attorneys, MIRANDA

SOKOLOFF SAMBURSKY SLONE VERVENIOTIS, LLP, complaining of third-party

defendants, PETER INSERO and THE LEGAL AID SOCIETY OF WESTCHESTER

COUNTY, set forth as follows:

## THE PARTIES

1.      Plaintiff is an individual who resides in the State of New York.  Plaintiff purports to be the mother of Jeffrey Deskovic.

2.      Defendant/third-party plaintiff CITY OF PEEKSKILL was and is a municipal corporation that is a political subdivision of the State of New York.

3.      Defendant/third-plaintiff DAVID LEVINE is an individual who resides in the State of New York.  At all times relevant to this matter, DAVID LEVINE was employed by the City of Peekskill Police Department.

4.      Defendant/third-party plaintiff THOMAS McINTYRE is an individual who resides in the State of New York.  At all times relevant to this matter, THOMAS McINTYRE was employed by the City of Peekskill Police Department.

5.      Defendant/third-party plaintiff WALTER BROVARSKI is an individual who resides in the State of New York.  At all times relevant to this matter, WALTER BROVARSKI was employed by the City of Peekskill Police Department.

6.      Third-party defendant PETER INSERO at all times relevant to this matt was a duly appointed attorney acting within the scope of his employment by the LEGAL AID SOCIETY OF WESTCHESTER.

7.      Third-party defendant LEGAL AID SOCIETY OF WESTCHESTER COUNTY at all times relevant to this matter was a legal services organization that provided legal representation to indigent criminal defendants in Westchester County, and was the employer of defendant PETER INSERO.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction due to diversity of citizenship and an amount in controversy in excess of $75,000, exclusive of interest and costs, pursuant to 28 U.S.C. § 1332.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that the claim arose in this district.

## FACTS

10.      Following an investigation by the Peekskill Police Department into the events surrounding the death of a teenage girl, Angela Correa, on January 25, 1990, Jeffrey Deskovic was arrested by members of the Peekskill Police Department.

11.      At some point, either before or after his arrest, Jeffrey Deskovic either retained or was assigned third-party defendants PETER INSERO and/or THE LEGAL AID SOCIETY OF WESTCHESTER COUNTY to represent him in connection with the investigation and/or criminal charges stemming from it.

12.      On February 27, 1990, Jeffrey Deskovic was indicted on three counts of murder in the second degree, one count of first degree rape, and one count of fourth degree possession of a weapon.

13.      In March 1990, after a request from the Peekskill Police Department for DNA testing of semen found inside Angela Correa's deceased body, the FBI reported that the semen did not match DNA from Jeffrey Deskovic.  Those test results were given to the defense in advance of Jeffrey Deskovic's criminal trial.

14.    On December 7, 1990, Jeffrey Deskovic was convicted by a Westchester County jury of murder, rape, and possession of a weapon.  On January 18, 1991, Jeffrey Deskovic was sentenced.

15.    PETER INSERO and/or THE LEGAL AID SOCIETY OF WESTCHESTER COUNTY represented Jeffrey Deskovic through his conviction and sentencing, including but not limited to at a pre-trial <u>Huntley</u> hearing, at trial, and at sentencing.

16.    On September 20, 2006, Jeffrey Deskovic's conviction was vacated and he was released from prison based upon a joint CPL § 440.10 motion by the Westchester County District Attorney's Office and counsel for Jeffrey Deskovic.

17.    On November 2, 2006, on motion of the Westchester County District Attorney, the indictment against Jeffrey Deskovic was dismissed on the ground of actual innocence.

18.    On or about October 24, 2007, LINDA McGARR commenced the instant action against CITY OF PEEKSKILL, PUTNAM COUNTY, WESTCHESTER COUNTY, DAVID LEVINE, THOMAS McINTYRE, WALTER BROVARSKI, EUGENE TUMOLO, JOHN AND JANE DOE SUPERVISORS, DANIEL STEPHENS, LOUIS ROH, and MILLARD HYLAND.  A copy of the complaint is annexed hereto as Exhibit "A".

19.    In the complaint, LINDA McGARR asserts a number of claims arising from the arrest, prosecution, conviction, and sentencing or Jeffrey Deskovic.  She seeks damages.

20.    On or about June 13, 2008, plaintiff filed an amended complaint, in which she amplified on and added to some of the existing claims and added as a defendant GEORGE BOLEN, the Assistant District Attorney who prosecuted Jeffrey Deskovic.  A copy of the amended complaint is annexed hereto as Exhibit "B".

21.    On or about Jeffrey Deskovic commenced an action for negligence, gross negligence, and legal malpractice against PETER INSERO and the LEGAL AID SOCIETY OF WESTCHESTER COUNTY in Supreme Court, Westchester County.

22.    In his complaint, Jeffrey Deskovic alleges:

> 79.    The negligence and gross negligence of Peter Insero and [LEGAL AID SOCIETY OF WESTCHESTER COUNTY] caused Jeffrey Deskovic to be wrongfully convicted and forced to serve nearly sixteen years in prison for a crime he did not commit.

> 80.    As a direct and proximate result of Insero's negligence and gross negligence, Jeffrey Deskovic suffered the following injuries and damages, which continue to date and will continue into the future: out-of-pocket legal expenses for appellate representation; loss of income; loss of professional opportunity; loss of educational opportunity; multiple physical assaults and batteries, including assaults of a sexual nature, and other physical injuries; pain and suffering; severe mental anguish; multiple suicide attempts; emotional distress; loss of family relationships; severe psychological damage; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of person freedome including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportuinity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and epxpression, for which he is entitled to monetary relief.

23.     Defendants/third-party plaintiffs CITY OF PEEKSKILL, DAVID LEVINE, THOMAS McINTYRE, and WALTER BROVARSKY incorporate the foregoing by reference.

## FIRST CAUSE OF ACTION

24.     In the course of providing legal representation to Jeffrey Deskovic, PETER INSERO and/or THE LEGAL AID SOCIETY OF WESTCHESTER COUNTY negligently failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by an ordinary member of the legal community.  The acts of negligence of PETER INSERO and/or THE LEGAL AID SOCIETY OF WESTCHESTER COUNTY included but were not limited to: failing to retain psychological evaluations of Jeffrey Deskovic in connection with a potential claim that any inculpatory statements made to the police by Jeffrey Deskovic were not knowing and/or voluntary (and should, therefore, be suppressed) and/or for purposes of explaining to the jury in the criminal trial why Jeffrey Deskovic had given those inculpatory statements; failing to call Jeffrey Deskovic as a witness in the Huntley hearing on the issue of whether his inculpatory statements were knowing and/or voluntary; failing to call Jeffrey Deskovic as a witness during his criminal trial for purposes of explaining to the jury why he uttered inculpatory statements by him of which the jury was aware; failing to retain experts to obtain independent evaluations of false and/or baseless scientific arguments advanced by the State, including experts to evaluate the conclusions of DEPUTY MEDICAL EXAMINER ROH and to conduct hair analysis; failing to conduct a minimally adequate investigation into exculpatory DNA and other scientific evidence; failing adequately to cross-examine State witnesses or otherwise present known and/or readily available evidence at trial; failing to inform Jeffrey Deskovic concerning the nature and implications of a known conflict of

6

interest; failing to refuse representation of Jeffrey Deskovic in a situation where PETER INSERO and/or THE LEGAL AID SOCIETY OF WESTCHESTER COUNTY had a conflict of interest; failing to take reasonable steps to eliminate the conflict of interest; and negligently consuming alcohol in a manner that affected PETER INSERO's representation of Jeffrey Deskovic.

25.    If plaintiff LINDA McGARR sustained the damages in the manner and at the time and place alleged in his amended complaint in this action through any carelessness, recklessness, negligence or intentional acts, or commissions or omissions other than plaintiff's own, then said damages were sustained in whole or in part by reason of the carelessness, recklessness, negligence or intentional acts, or commissions or omissions on the part of third-party defendants PETER INSERO and/or LEGAL AID SOCIETY OF WESTCHESER COUNTY, and, if any judgment is recovered herein against defendants/third-party plaintiffs CITY OF PEEKSKILL, DAVID LEVINE, THOMAS McINTYRE, and WALTER BROVARSKY, then defendants/third-party plaintiffs CITY OF PEEKSKILL, DAVID LEVINE, THOMAS McINTYRE, and WALTER BROVARSKY would be damaged thereby and would be entitled to indemnification and/or contribution on the basis of apportionment of responsibility for the alleged occurrence and entitled to judgment over and against third-party defendants PETER INSERO and LEGAL AID SOCIETY OF WESTCHESTER COUNTY for all or part of any verdict or judgment that plaintiff LINDA McGARR may recover against defendants/third-party plaintiffs CITY OF PEEKSKILL, DAVID LEVINE, THOMAS McINTYRE, and WALTER BROVARSKY, together with costs, disbursements and attorneys' fees for this action.

Dated: Mineola, New York
       July 5, 2008

                                    MIRANDA SOKOLOFF SAMBURSKY
                                    SLONE VERVENIOTIS, LLP
                                    Attorneys    for    Defendants/Third-Party
                                    Plaintiffs CITY OF PEEKSKILL, DAVID
                                    LEVINE, THOMAS McINTYRE, and
                                    WALTER BROVARSKY

                                    By:_____
                                        BRIAN S. SOKOLOFF (bss-7147)
                                    240 Mineola Boulevard
                                    The Esposito Building
                                    Mineola, New York 11501
                                    (516) 741-7676
                                    Our File No. 07-203

TO:    EMERY CELLI BRINCKERHOFF & ABADY, LLP
       Attorneys for Plaintiff
       75 Rockefeller Plaza, 20th Floor
       New York, New York 10019

       OXMAN TULIS KIRKPATRICK WHYATT & GEIGER LLP
       Attorneys for Westchester County Defendants
       120 Bloomingdale Road
       White Plains, New York 10605

       GELARDI & RANDAZZO
       Attorneys for Putnam County Defendants
       151 Broadway
       Hawthorne, New York 10532

       STILLMAN, FRIEDMAN & SCHECTMAN, P.C.
       Attorneys for Defendant Tumolo
       425 Park Avenue
       New York, New York 10022

Exhibit "A", Part 1 (McGarr)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JEFFREY DESKOVIC,                                )
                                                 )
        Plaintiff,                               )
                                                 )
    v.                                           )    **07 CIV 8150**
                                                 )
CITY OF PEEKSKILL, PUTNAM COUNTY,                )
WESTCHESTER COUNTY, DAVID LEVINE,                )
THOMAS MCINTYRE, WALTER                          )
BROVARSKI, EUGENE TUMOLO, JOHN                   )
AND JANE DOE SUPERVISORS, DANIEL                 )
STEPHENS, LOUIS ROH, MILLARD                     )
HYLAND, and ALAN TWEED                           )
                                                 )
        Defendants.                              )

RECEIVED
SEP 18 2007
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT AND JURY DEMAND

Plaintiff Jeffrey Deskovic, by and through his attorneys, the law firm of Cochran, Neufeld &

Scheck, LLP, states as follows:

1. On November 15, 1989, a fifteen year old Peekskill High School sophomore, A.C.,[1] left her

home after school to take pictures for her high school photography class. A.C., by all accounts a

quiet and gentle girl with a sweet disposition who had recently immigrated from Colombia,

walked to a nearby park to photograph the fall foliage.

2. A.C. never returned home. That afternoon, Steven Cunningham, a twenty-nine-year-old with

a drug habit and a criminal record, spotted A.C. in the park as he sat smoking crack. He attacked

her, then he raped her, and ultimately he murdered her, leaving behind a trail of evidence

demonstrating his involvement in the crime - including, critically, his semen.

---

[1] The victim will be referred to as "A.C." throughout the complaint in an effort to protect
the privacy of her family.

1

3. The horrible tragedy of A.C.'s death was inexcusably compounded when her classmate, Jeffrey Deskovic, who had just turned sixteen years old, was wrongly arrested, prosecuted, and convicted of the crime. Unbelievably, Mr. Deskovic was convicted despite DNA testing on Cunningham's semen which proved, months prior to Mr. Deskovic's criminal trial, that he could not have committed the terrible crime with which he was charged.

4. Mr. Deskovic spent almost sixteen years of his adolescence and young adulthood fighting from behind bars to prove his innocence. He was finally vindicated in 2006, when new DNA testing established that the semen found on A.C.'s body came from Cunningham, who subsequently confessed, pled guilty to, and was convicted of the crime. Even worse, not only was an innocent youth wrongly convicted and A.C.'s actual killer allowed to go free, but in a final sickening turn of events Cunningham killed again, murdering another Peekskill woman just four years after his rape and murder of A.C.

5. Mr. Deskovic's wrongful conviction and years of wrongful incarceration, despite the fact that police and prosecutors knew of the DNA evidence and other clearly exculpatory facts, was the direct result of a veritable perfect storm of misconduct by virtually every actor at every stage of his investigation and prosecution.

6. Peekskill detectives and supervisors investigating A.C.'s rape and murder targeted Mr. Deskovic as a suspect, and then failed to investigate evidence pointing to his innocence. Instead, they built their case by systematically coercing and fabricating Mr. Deskovic's false confession, by similarly coercing and fabricating allegedly corroborating evidence from witnesses, and by hiding evidence of Mr. Deskovic's innocence and their improper investigation from prosecutors and the defense - even after learning that DNA evidence proved Mr. Deskovic's innocence.

2

7. So, too, did Westchester County officials systematically fabricate false proof of Mr. Deskovic's guilt and conceal evidence that supported his innocence. Deputy Medical Examiner Louis Roh provided Westchester County prosecutors with fabricated "evidence" that purported to explain how Mr. Deskovic could have raped A.C. despite the presence of another man's semen inside of her. Thus, Dr. Roh told prosecutors before trial - and provided testimony that was central to the trial prosecutor's presentation to the jury - that based upon his autopsy of A.C., he had scientific proof that she had in fact been sexually active on multiple occasions prior to her rape. In fact, not only did Dr. Roh lack any credible observational evidence or scientific basis for such conclusions, but the assertion that the victim was ever sexually active was completely contrary to all known facts about A.C. - who was by all accounts a reserved, traditionally Catholic, and completely sexually inexperienced young girl.

8. The pervasive and systematic official misconduct that led to Mr. Deskovic's wrongful conviction did not occur in isolation, outside of official bureaucratic channels. Rather, the actors who deprived Mr. Deskovic of his constitutional protections and caused him to be wrongly arrested, prosecuted, and convicted were acting with the direct participation, knowledge, and/or acquiescence of supervisors and policymakers in Peekskill and Westchester County, and pursuant to policies, customs, or patterns and practices of misconduct and egregious failures of supervision and oversight within the Peekskill Police Department, the Westchester County District Attorney's Office, and the Westchester County Medical Examiner's Office.

9. The victimization of Jeffrey Deskovic did not end with his wrongful conviction. Throughout his nearly sixteen years imprisoned as a juvenile and a young adult, Mr. Deskovic endured sexually humiliating acts inflicted upon him by corrections officer Alan Tweed, who, like those

3

who caused Mr. Deskovic's wrongful conviction, preyed upon Mr. Deskovic's obvious

weakness to magnify the horror of his wrongful incarceration.

10. This civil rights action seeks accountability for the official misconduct and abuses of power

that led to Mr. Deskovic's wrongful arrest, prosecution, and conviction, and that robbed Mr.

Deskovic of sixteen years of youth and young adulthood.

## JURISDICTION

11. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims

arising under 42 U.S.C. § 1983.

12. Supplemental jurisdiction over Mr. Deskovic's pendent state law claims exists pursuant to 28

U.S.C. § 1367(a).

13. Plaintiff has complied with the requirements of New York General Municipal Law Section

50-I. Mr. Deskovic made and served a notice of claim on all municipal defendants, within the

time required by New York General Municipal Law Section 50-e. More than thirty days have

elapsed since the service of those notices, and no offer of settlement has been made.

14. At the request of the City of Peekskill, Putnam County, and Westchester County, on June 28,

2007 Mr. Deskovic submitted to a hearing pursuant to New York General Municipal Law

Section 50-e.

## VENUE

15. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York, the

judicial district in which the claims arose, in which Mr. Deskovic currently resides, and in which

defendants City of Peekskill, Putnam County, and Westchester County conduct their business.

## JURY DEMAND

4

16. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

17. Plaintiff Jeffrey Deskovic is, and at all times material to this Complaint was, a citizen and resident of the State of New York. He resides in Tarrytown, New York.

18. Defendant City of Peekskill is a municipality that is a political subdivision of the State of New York, was the employer of defendants Levine, McIntyre, Brovarski, Tumolo, and John and Jane Doe Supervisors, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Peekskill Police Department ("PPD").

19. Defendant Putnam County is a municipality that is a political subdivision of the State of New York, was the employer of defendant Stephens, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Putnam County Sheriff's Department.

20. Defendant Westchester County is a municipality that is a political subdivision of the State of New York, was the employer of defendants Roh and Hyland, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Westchester County District Attorney's Office and the Westchester County Medical Examiner's Office.

21. Defendant David Levine at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He is sued in his individual capacity.

22. Defendant Thomas McIntyre at all times relevant to this complaint was a duly appointed and

acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He is sued in his individual capacity.

23. Defendant Walter Brovarski at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He is sued in his individual capacity.

24. Defendant Eugene Tumolo at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. Defendant Tumolo is sued in his individual capacity for that conduct undertaken by him when he possessed the rank of lieutenant with the PPD. He is sued in his official capacity as the current Chief of the PPD.

25. Defendants John and Jane Does at all times relevant to this complaint were duly appointed and acting supervisors of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. They are sued in their individual capacities.

26. Defendant Daniel Stephens at all times relevant to this complaint was a duly appointed and acting investigator of the Putnam County Sheriff's Department, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York. Defendant Stephens is sued in his individual capacity.

27. Defendant Louis Roh at all times relevant to this complaint was a duly appointed and acting

6

Deputy Medical Examiner in the Westchester County Medical Examiner's Office, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Westchester County and the State of New York.  Defendant Roh is sued in his individual capacity.

28. Defendant Millard Hyland at all times relevant to this complaint was the duly appointed and acting Chief Medical Examiner for Westchester County, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Westchester County and the State of New York.  Defendant Hyland is sued in his individual and official capacities.

29. Defendant Alan Tweed at all times relevant to this complaint was a duly appointed and acting corrections officer for the State of New York at the Elmira Correctional Facility, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York.  Defendant Tweed is sued in his individual capacity.

**FACTS**

**The Crime and Initial Investigation**

30. On the afternoon of November 15, 1989, fifteen-year-old Peekskill High School sophomore A.C. came home from school, and then went out again to take photographs very close to her home, for a photography class assignment.  When A.C. did not return home that day, her family contacted the Peekskill Police Department and reported her missing.

31. From November 15 until November 17, the PPD conducted, at best, a reckless investigation into A.C.'s disappearance.  As a result, although A.C.'s body would ultimately be found only a few hundred yards from her home, the PPD was unable to adduce any leads as to her location for more than thirty-six hours.  Ultimately, the New York State Police were brought in to assist in

7

the investigation, which, together with A.C.'s family's distress, greatly increased the pressure on PPD detectives and supervisors to solve the case.

32. On the morning of November 17, PPD officers and members of the State Police found the body of A.C. in a heavily wooded area of Hillcrest Park near Griffins Pond, very close to her family's home. Her body was discovered covered with leaves and naked from the waist down in a part of the park known as "the Pit." A.C. had been raped, and had died from asphyxiation and blunt trauma to the head.

33. Between the time of A.C.'s disappearance and when her body was discovered, heavy storms and tornado conditions had blown through Peekskill.

34. More than a dozen police officers, medical personnel, and employees of the Westchester County District Attorney's office responded to the Griffins Pond area in the hours following the discovery of A.C.'s body. Although crime scene tape was put up around the scene, public access to the area - which included several walking paths and was located near an apartment complex - was not otherwise restricted. Hence, passers-by were able to visit and examine the area prior and subsequent to the police investigation there on the 17th.

35. PPD personnel, including defendants Levine, McIntyre, Brovarski, and Tumolo, and additional PPD patrol officers, detectives, and supervisors, assisted by the New York State Police, canvassed the crime scene and collected and vouchered dozens of items of evidence. Among the evidence recovered by the police were a torn note found underneath A.C.'s body, a white bra found along a dirt path that led to A.C.'s body, and a 35 millimeter camera found along a paved park path.

36. Immediately in the investigation PPD personnel, including the PPD defendants, developed

very specific theories as to how A.C.'s rape and murder had transpired. The PPD defendants

built and pursued their investigation around leads that correlated to their initial theories, and

those theories were adopted by the prosecutor and argued to the jury at Jeffrey Deskovic's trial.

37. Thus, based upon the note found under A.C.'s body - which appeared to be in her

handwriting and to refer an individual named "Freddy" - the PPD defendants concluded that

A.C. had been in a romantic relationship with a Peekskill High School student named Freddy

Claxton, and that her rape and murder was connected to that relationship.

38. This initial theory also led the PPD defendants to create, with the assistance of the New York

City Police Department, a suspect profile suggesting, among other characteristics, that A.C. had

known her attacker, that the perpetrator was a white or Hispanic man younger than nineteen

years old and approximately five feet, ten inches tall, and that he was a loner with physical or

mental handicaps.

39. Additionally, on November 17, PPD investigators, including but not limited to defendants

Levine, McIntyre, Brovarski, and Tumolo, surmised that the crime had occurred in three separate

locations: crime scene "one," where the police thought A.C. had left her camera when initially

assaulted by her attacker; crime scene "two," where the police believed A.C. had been raped and

her bra left behind; and crime scene "three," the place to which A.C.'s body was dragged after

the rape. PPD detectives, including defendants Levine and McIntyre, photographed, diagramed,

and, upon information and belief, marked the three crime scene areas.

40. In fact, the theories and profile developed by the PPD defendants in the earliest hours and

days of their investigation bore almost no relationship to the manner in which the actual

perpetrator, Steven Cunningham, carried out the crime. Cunningham was a twenty-nine-year-old

African American man who was over six feet tall. He had never known or seen A.C. prior to November 15. On the day of A.C.'s murder Cunningham had been drinking at a local bar, bought crack, and then went to the Pit, where he smoked the crack and four cigarettes. Cunningham carried out the crime in only two locations: He grabbed A.C. from behind on a park path, and dragged her to the Pit area, where he raped and killed her, and left her body.

41. Cunningham left four cigarette butts at the crime scene, as well as his crack pipe and full vials of crack. Before he left the scene, he spoke to two boys who were playing basketball at a court in Hillcrest Park. Cunningham was known to the PPD, had been arrested prior to November 15, and, upon information and belief, his fingerprints were on file with the PPD.

42. A.C.'s body was taken from the crime scene by Deputy Medical Examiner Dr. Louis Roh and his assistant, and an autopsy was performed on November 17. The results of the autopsy, contained in a report dated November 20, 1989, included that A.C. had died from asphyxia due to ligature strangulation, and a fractured skull.

43. Dr. Roh found loose hairs on A.C.'s right breast, right leg, and left arm, and in A.C.'s pubic region, which he submitted to a hair examiner in the Westchester County Department of Laboratories and Research for analysis. Dr. Roh also prepared oral, rectal, and vaginal swabs, and submitted them along with A.C.'s bra, jeans, and underwear for serological analysis by the Westchester County laboratory.

### Peekskill Police Focus on Peekskill High School for Suspects

44. Defendants Levine and McIntyre were the assigned detectives handling the A.C. investigation, and they conducted the investigation with the assistance of other PPD detectives, including but not limited to defendant Brovarski, and under the supervision of defendants

Tumolo and John and Jane Doe Supervisors not known at this time.

45. Within a week of A.C.'s rape and murder, Freddy Claxton was called to the office of

Peekskill High School Principal Sheldon Levine - who, upon information and belief, was the

brother of defendant Detective David Levine. When Freddy arrived Principal Levine was

present with multiple PPD investigators, including, upon information and belief, one or more of

the PPD defendants, who expressed that they wished to speak with Freddy in connection with

A.C. In the presence of and/or with the knowledge of the PPD investigators, Principal Levine

called Freddy's mother to obtain her permission for the questioning, and she refused.

46. At or prior to that meeting, Freddy had told PPD investigators, including, upon information

and belief, one or more PPD defendants, that he lived in an apartment complex next to Hillcrest

Park, and that there was a male drifter who was frequently spotted in, and possibly lived in,

Hillcrest Park, who may have committed the crime. Upon information and belief, PPD

personnel never investigated Freddy's information concerning this drifter.

47. Later that day, one or more of the same PPD investigators who had been present in Principal

Levine's office, including upon information and belief one or more PPD defendants, went to

Freddy's house. Freddy answered the door, and the investigators asked Freddy to accompany

them to the PPD stationhouse. When Freddy refused, reiterating that his mother did not want

him to speak to the police, and that he needed to stay home to take care of his younger brother,

the investigators told Freddy, in substance, that they just needed his assistance, that it was okay

for him to accompany them to the stationhouse, and that he should bring his younger brother

along.

48. Once at the PPD stationhouse, Freddy was separated from his younger brother and placed in

an office with multiple investigators, including, upon information and belief, one or more PPD defendants.  The detectives asked Freddy what his relationship was with A.C., and Freddy told them that he knew A.C. but never spoke with her.  The detectives began to interrogate Freddy aggressively, standing around him while he was seated in a chair, and repeatedly accusing him of having exchanged romantic notes with A.C. and hiding a romantic relationship with her.  Freddy repeatedly and consistently denied the detectives' allegations.

49. The interrogation continued until Freddy's father entered the interrogation room and interrupted the questioning.  Upon information and belief, Freddy's father had arrived at the PPD stationhouse approximately a half hour previously, having learned of the interrogation, but had been prevented by PPD investigators, including one or more PPD defendants, from seeing his son and ending the interrogation.

### The PPD Defendants Conceal Material, Exculpatory and Impeachment Evidence

50. The interrogation of Freddy Claxton, the circumstances under which PPD detectives isolated, deceived, and coercively questioned Freddy, and the substance of Freddy's denials that he and A.C. had any romantic relationship, were never documented by PPD detectives.

51. PPD detectives continued to investigate Freddy Claxton by interviewing other witnesses, including, for example, other Peekskill High School students, both prior to and, upon information and belief, subsequent to the indictment.  PPD detectives, including but not limited to the defendants, were consistently told by multiple sources that Freddy and A.C. had not had any romantic relationship.  During those interviews one or more PPD defendants coerced or attempted to coerce witnesses to state that Freddy and A.C. had been in a romantic relationship.  Detectives, including the defendants, failed to document or disclose to prosecutors material,

12

exculpatory and impeachment evidence concerning interviews conducted by them, the circumstances of their coercion of witnesses, and the substance of multiple witnesses' statements denying the existence of a relationship between Freddy and A.C.

52. Furthermore, PPD investigators, including the PPD defendants, interviewed multiple witnesses, many on multiple occasions, who provided information that A.C. had never been involved in any romantic relationship - let alone a sexual relationship - prior to her death. The PPD defendants failed to document or disclose to prosecutors this material, exculpatory and impeachment evidence concerning A.C.'s sexual history.

53. The subsequent revelation that DNA testing proved the sperm found inside A.C. had not come from Jeffrey, and ensuing efforts by the prosecution and defendant Roh to advance a theory of Jeffrey's guilt notwithstanding the presence of sperm from another man inside of A.C., meant that evidence concerning Freddy and A.C.'s alleged relationship and/or any consensual sexual partners that A.C. could have had was critical to the continued existence of probable cause to prosecute Jeffrey and to his ultimate conviction.

### The Investigation Focuses on Jeffrey Deskovic

54. In November 1989 Jeffrey Deskovic had just turned sixteen and was a Peekskill High School sophomore. He was white, approximately five feet, ten inches tall, and was acquainted with A.C. as a classmate.

55. Jeffrey had struggled socially and academically in school in the years leading up to A.C.'s death. Although his grades were improving his sophomore year, he had been evaluated by and received assistance from schools and outside sources in connection with his academic struggles and learning disabilities. School records also reflected that Jeffrey was seeing a school social

13

worker.

56. Jeffrey had also received emotional and psychological counseling and treatment from a number of outside sources since a relatively young age. Jeffrey had been evaluated and treated for a variety of psychological symptoms, including anxiety, depression, and, for a time, complaints of hearing voices.

57. Jeffrey had also received counseling and other mental health evaluation and treatment in connection with his family life. Jeffrey never met his biological father, whom his mother never married, and he and his half brother were raised by his mother and grandmother. With the exception of a brief and abusive relationship between Jeffrey's mother and the father of Jeffrey's brother, Jeffrey grew up without any father figure in the home.

58. Jeffrey was deeply affected by A.C.'s death, which prompted his feelings for her, previously casual, to intensify into a deeper admiration and attachment. Jeffrey attended multiple wakes held for A.C. as well as her funeral, and was visibly distraught at these events. Jeffrey also visited the crime scene shortly after A.C.'s body was found - following a map that had been published in the local newspaper, as well as other public descriptions of the area, which he was generally familiar with from prior visits to Hillcrest Park.

**PPD Investigators Exploit Jeffrey's Emotional and Psychological Vulnerabilities**

59. The attention of PPD investigators, including the PPD defendants, was drawn to Jeffrey after receiving reports that he had been extremely emotional at A.C.'s wakes and funeral, and appeared to be taking an unusual interest in A.C.'s death.

60. Immediately upon beginning their investigation of Jeffrey Deskovic, the PPD defendants learned that Jeffrey was affected by emotional and psychological difficulties, struggled

14

academically and socially in school, and led a troubled family life. Indeed, Jeffrey's known difficulties in these regards were, upon information and belief, a significant factors in causing the PPD defendants to view Jeffrey as a suspect, and to initiate questioning of Jeffrey in connection with the crime.

61. The PPD defendants, knowing of Jeffrey's emotional and psychological problems, deliberately and recklessly devised a strategy for investigating and questioning Jeffrey that played upon and exploited those vulnerabilities, and carried out that strategy throughout the course of their investigation and numerous meetings with and interrogations of Jeffrey. The tactics devised by the defendants included, without limitation, the following: building a false relationship of friendship, trust, and cooperation with Jeffrey by repeatedly telling him that the police needed his assistance in the investigation of A.C.'s death and that he had unique abilities and access that enabled him to provide important assistance to the police; encouraging Jeffrey to conduct his own investigation into the crime and to share with them any information or leads that he was able to acquire; and otherwise building a false relationship of trust and cooperation with Jeffrey. The defendants' tactics were deliberately calculated, and were calibrated to Jeffrey's known emotional and psychological vulnerabilities, to mislead Jeffrey concerning the nature of his relationship and interactions with the police.

62. Several weeks after A.C.'s death, defendants Levine and McIntyre approached Jeffrey on the street as he was walking to school in the morning. Levine and McIntyre asked Jeffrey to accompany them to the PPD stationhouse to speak with them about A.C. Jeffrey agreed to accompany them, and specifically requested that the detectives not contact his mother to inform her of his whereabouts.

63. Prior to that day, Jeffrey had never been arrested, had never been to the PPD stationhouse, and had never been questioned by police.

64. Assistant district attorney Neary was notified by defendant Tumolo that Jeffrey was being questioned, and Neary was present at the PPD stationhouse for some of that morning. Neary did not speak with Deskovic, but instructed the PPD defendants to obtain Jeffrey's consent to take a polygraph examination.

65. Upon information and belief, assistant district attorney George Bolen, who was the supervising trial attorney in the Westchester District Attorney's Office, was also notified concerning the December 12 questioning of Jeffrey Deskovic, and was told of all subsequent important investigative events and decisions of which the District Attorney's Office was aware concerning Jeffrey Deskovic.

66. Upon Jeffrey's arrival, he was taken to an office where, for the next several hours, he was alone with and questioned by McIntyre and Levine. Jeffrey told the PPD defendants, among other things, that he had visited the crime scene within twenty-four hours of A.C.'s body being found, and that he had learned certain facts about the crime from the newspaper and other public sources.

67. In the course of McIntyre and Levine's questioning of Jeffrey, McIntyre accused Jeffrey of the rape and murder of A.C. When Jeffrey reacted by denying the accusation, McIntyre discouraged Jeffrey from ending the interview by suggesting to him that it was a sign of guilt and encouraging Jeffrey, again, to assist the PPD in its investigation.

68. During the questioning Jeffrey was shown one or more photographs of the deceased A.C. and of the crime scenes. McIntyre and Levine also shared with Jeffrey details of the crime and the

16

investigation that had not been made public - including, but not limited to, the fact that a note concerning Freddy Claxton had been found under A.C.'s body, and the PPD's theory that A.C. and Freddy had been romantically involved.

69. In fact, during the first and subsequent meetings with and interrogations of Jeffrey, PPD investigators, including the PPD defendants, provided Jeffrey with information about numerous non-public details and investigative theories concerning A.C.'s death. Throughout their numerous meetings with and interrogations of Jeffrey, the PPD defendants encouraged and coerced Jeffrey to incorporate those details into his own statements concerning the crime. The PPD defendants subsequently falsely represented, in police reports and conversations with prosecutors, that Jeffrey actually had independent knowledge of the facts provided by them.

70. The PPD defendants also became aware that Jeffrey had learned, through newspapers and other sources, certain facts about the crime and the investigation that had not been kept confidential by the police. The PPD defendants subsequently falsely represented, in police reports, conversations with prosecutors before trial, pretrial hearings, and at trial that these public facts were actually the product of Jeffrey's independent knowledge about the crime.

71. The details and theories provided to Jeffrey by the PPD defendants, and/or known by the PPD defendants to have been learned by Jeffrey through public sources rather than by his independent knowledge of the crime, included but were not limited to the following facts: (a) that a note referring to Freddy Claxton was discovered under A.C.'s body; (b) that a bra was found away from A.C.'s body; (c) that A.C.'s body was covered in leaves; (d) the manner in which police believed A.C. to have been asphyxiated; (e) the nature and location of A.C.'s head trauma;(f) the location where A.C.'s camera was discovered; (g) that A.C. had lost a set of keys;

17

(h) the possibility that the rapist had not ejaculated; and (I) the three crime scene locations identified by the PPD.

72. Jeffrey's alleged independent knowledge of the above facts was critical to obtaining a probable cause determination from the grand jury and in procuring Jeffrey's conviction at his criminal trial.

## Jeffrey Obtains Legal Counsel - Which the Defendants Disregard

73. After leaving the PPD stationhouse, Jeffrey went to Peekskill High School and informed one of his teachers, Mr. Tompkins, that he had been interrogated by the police and accused of the murder of A.C. That afternoon a meeting was convened that included Mr. Tompkins, Jeffrey, school administrators including Principal Sheldon Levine, and, eventually Jeffrey's mother.

74. At the meeting, Jeffrey told the school officials present that he had been interrogated and accused of A.C.'s murder. The school officials then questioned Jeffrey concerning the crime, and asked him if he had committed it. Jeffrey denied any involvement.

75. When Jeffrey's mother arrived at the meeting she expressed to all those present that she did not want Jeffrey to speak with the Peekskill Police, and that she would be retaining an attorney to represent Jeffrey.

76. Upon information and belief, one or more school officials present at this meeting subsequently informed one or more of the PPD defendants that Jeffrey's mother did not wish for him to speak to the police, and that she was retaining an attorney to represent her son.

77. The day after his interrogation and subsequent meeting with school officials, Jeffrey and his mother met with attorney Lou Ecker. Jeffrey and Ecker spoke privately, and at the conclusion of the meeting Ecker informed Jeffrey and his mother that he would contact the Peekskill Police

18

Department, inform them that Jeffrey was represented by counsel, and request that no further

questioning of Jeffrey occur outside the presence of counsel. Jeffrey understood then and up

through the time of his alleged confession that Lou Ecker was representing him as his attorney.

78. Within days of Ecker's meeting with Jeffrey, Ecker contacted the PPD, spoke with defendant

Tumolo, and informed Tumolo that he represented Jeffrey and that Jeffrey should not be

questioned any further. This information was shared with all of the PPD defendants, and with

representatives of the Westchester County District Attorney's Office, including but not limited to

assistant district attorneys Bolen and Neary.

79. Subsequent to Ecker's call to Tumolo, defendant Levine reached out to Jeffrey to attempt to

speak with him. Jeffrey told Levine that he was represented by attorney Ecker, and that pursuant

to Ecker's instructions Jeffrey was not to speak with the police concerning the A.C.

investigation. Although, upon information and belief, Levine knew that Ecker had told

prosecutors that he no longer represented Jeffrey and had referred Jeffrey to Legal Aid, Levine

did not inform Jeffrey of this fact or otherwise attempt to resolve the evident confusion regarding

the status of Ecker's representation. Rather, Levine told Jeffrey, in substance, that it was okay

for Jeffrey to speak to the police notwithstanding Ecker's advice. Levine's statements

deliberately disregarded Jeffrey's invocation of his right to counsel, and were a deliberate effort

to mislead Jeffrey into believing that the police were not required to cease all contact with him if

he requested and/or was represented by an attorney.

80. Levine's advice concerning the status and significance of Jeffrey's legal representation was

erroneous, deceptive, and deliberately coercive, such that any subsequent waiver by Jeffrey of

his right to counsel in speaking with the police was not knowing or voluntary.

19

**The PPD Defendants Conceal Their Fifth Amendment Violations**

81. Trusting Levine's representation, and believing representations by the PPD defendants that

he could be of assistance to their investigation, Jeffrey agreed to meet again with the police in

connection with the A.C. investigation.  PPD investigators, including but not limited to the PPD

defendants, met with and questioned Jeffrey on many occasions over the course of many hours

on many days, up to and including January 25, 1990.  Jeffrey told the PPD defendants on

numerous occasions in the course of these interviews that his mother did not want him to be with

the police, did not know that he was with the police, and that the police should not inform her of

Jeffrey's whereabouts.

82. At these meetings, Jeffrey was repeatedly given Miranda warnings, and the PPD defendants,

including but not limited to Levine and McIntyre, prepared Miranda waiver forms representing

that Jeffrey's waivers of his Miranda rights were knowing and voluntary.  In light of defendant

Levine's earlier statement to Jeffrey that, despite Jeffrey's understanding and invocation of his

legal representation it was okay for Jeffrey to speak to the police, Jeffrey's waivers of his

Miranda rights at those subsequent meetings were not in fact knowing or voluntary.  The

defendants deliberately obtained and documented Jeffrey's alleged waivers of his Miranda rights

in order to conceal Levine's knowing misrepresentation concerning the status and significance of

Jeffrey's legal representation.

83. Throughout their numerous meetings with Jeffrey, the PPD defendants also deliberately

employed tactics to denigrate and minimize the importance of the rights about which they were

advising Jeffrey.  Those tactics included but were not limited to deliberately portraying

interrogation sessions as meetings in which Jeffrey was assisting the police, and telling and

20

suggesting to Jeffrey that assertion of his rights to counsel and to terminate questioning would be signs of guilt and would impede the A.C. investigation.

84.  Throughout the numerous meetings and interrogations that the PPD conducted with Jeffrey, the PPD defendants had access to one or more microcassette recorders, and understood the importance of recording suspect interrogations for the purpose of later establishing, in legal proceedings, the content of those interrogation sessions.  The PPD defendants deliberately recorded only a small portion of their interactions with Jeffrey in order to misrepresent the nature of their course of conduct with Jeffrey, to hide the deliberately coercive and deceptive tactics employed by them, and to conceal exculpatory and impeachment evidence.  Upon information and belief, the PPD defendants subsequently lied to prosecutors and to the jury in Jeffrey's criminal proceedings concerning the circumstances of their recordings and the reasons why large portions of their meetings with Jeffrey were unrecorded.  The defendants' selective recording tactics culminated in their final interrogation session on January 25, 1990, which the defendants knew was aimed at coercing Jeffrey's confession to the crime, and of which no recordings were made.

### The Police Question Jeffrey and Fabricate Additional Evidence of Guilt

85. Subsequent to informing Levine and the other PPD defendants that he was represented by counsel, Jeffrey met with Levine and the PPD defendants for a day-long session on a school day.  This day-long session was later documented by the PPD defendants in police reports, partially recorded by the PPD defendants in audiotapes, and discussed by the PPD defendants in trial and pretrial testimony, and, upon information and belief, in pretrial conversations with prosecutors.

86. According to the PPD defendants' version of events, Jeffrey came to the Peekskill

21

stationhouse with typewritten notes that he had prepared of his own investigation and discussed his investigation with Detective Levine. Then, according to the PPD defendants, Jeffrey independently drew crime scene maps indicating the three crime scene locations identified by the police and the fact that A.C.'s body was covered by leaves, and showing the path that A.C. walked from her home to Hillcrest Park - all, according to the PPD defendants, based on non-public information that Jeffrey knew because he was A.C.'s killer. Later that day, according to the PPD defendants, Jeffrey accompanied them to the crime scene and further demonstrated his knowledge of non-public facts about the crime, including but not limited to the three crime scene locations and where A.C.'s camera had been found. Following the crime scene trip, Jeffrey allegedly returned to the Peekskill stationhouse where he answered more questions about the crime scene and, according to the PPD defendants, used the map he had drawn earlier in the day to show detective McIntyre where A.C.'s camera had been found.

87. In fact, the PPD defendants deliberately misrepresented critical facts and concealed material, exculpatory and impeachment evidence concerning that meeting as well as other sessions in which Jeffrey and the PPD defendants discussed the A.C. investigation. Contrary to the PPD defendants' representation that Jeffrey's crime scene maps depicted his own, independent knowledge of non-public facts, in fact the PPD defendants knew or in the absence of their deliberate and reckless indifference should have known that they had provided Jeffrey non-public facts about the crime, that other facts provided by Jeffrey were in fact public, and that Jeffrey had incorporated those facts into his maps. The PPD defendants deliberately concealed and manipulated their interactions with Jeffrey by selectively recording only short segments of the many hours of questioning and deliberately failing to record critical events, including but not

22

limited to Jeffrey's drawing of crime scene maps, the visit to the crime scene, and an hour or

more period of interrogation by defendant Levine during which he directly accused Jeffrey of

raping and murdering A.C.

88. Levine requested that Jeffrey sign the crime scene maps drawn by him, and showed the maps

to defendants McIntyre and Tumolo. The maps were subsequently provided to prosecutors.

### The Police Plan to Procure Jeffrey's Confession

89. In the course of his meetings with the PPD, the PPD defendants encouraged Jeffrey to submit

to a polygraph examination. The PPD defendants convinced Jeffrey to take the polygraph "test"

by telling him that if he "passed," they would permit him to be more fully involved in the A.C.

investigation, and would provide him with access to their police files. Jeffrey ultimately agreed

to come to the PPD stationhouse on January 25, 1990 for the polygraph exam.

90. In fact, the polygraph "test" was a deliberate tactic employed by the defendants, including

but not limited to Levine, McIntyre, and Tumolo, to escalate substantially the aggressiveness of

their interrogation of Jeffrey and to exploit his intellectual, emotional, and psychological

vulnerabilities in a manner that would produce a confession to A.C.'s rape and murder.

91. Upon information and belief, the PPD defendants, including Levine, McIntyre, and Tumolo,

had polygraph testing services available to them through other law enforcement agencies and

routinely used the services of those other agencies in order to conduct routine polygraphs.

However the defendants, including but not limited to Levine, McIntyre, and Tumolo, jointly

agreed to depart from their usual procedure for Jeffrey's polygraph examination, and to enlist the

services of a polygrapher from the Putnam County Sheriff's Department, defendant Dan

Stephens. Defendant Stephens performed polygraph "testing" out of a private, non-law-

enforcement office in Brewster, New York, approximately an hour's drive from Peekskill.

92. The PPD defendants conveyed to Stephens, and Stephens understood, that his job on January 25 was not to obtain polygraph results from Jeffrey, but to obtain his confession. The PPD defendants and defendant Stephens deliberately and recklessly agreed and mutually planned and understood that the interrogation of Jeffrey by Stephens, under the guise of a polygraph examination, would produce a confession by, among other means, isolating Jeffrey in a location that was unfamiliar to him, deceiving him by interrogating him in a non-law-enforcement setting, aggressively interrogating him in a manner that would confuse and threaten him, confusing Jeffrey as to the nature of his knowledge of and involvement in the crime, increasing Jeffrey's dependency upon familiar investigators, including in particular defendant McIntyre, and otherwise deliberately exploiting Jeffrey's known age and intellectual, emotional, and psychological vulnerabilities.

93. No personnel from the Westchester County District Attorney's Office were present at, and no recording equipment was brought by the PPD defendants to, Stephens's office on January 25. Upon information and belief, these were departures from the ordinary policies, procedures, customs, and practices followed by the PPD and the Westchester County District Attorney's Office in connection with confessions, and were deliberately done by the PPD defendants in order to conceal the nature and substance of the coercive interrogation they had planned to carry out with Jeffrey.

### The Coerced "Confession"

94. On the morning of January 25, 1990, a school day, Jeffrey arrived at the PPD stationhouse with his friend, Martin Burrett, in order to take the polygraph examination. Martin was asked to

leave, and at approximately 10:00 a.m. Jeffrey was driven by defendant McIntyre to Stephens's

office in Brewster, New York, approximately an hour away from Peekskill. Defendants Levine

and Tumolo accompanied Jeffrey and McIntyre in a separate car.

95. Upon information and belief, defendants McIntyre, Levine, and Tumolo knew that Jeffrey's

mother did not know of his whereabouts, believed him to have been in school, and would not

have permitted Jeffrey to take the polygraph test if she had known.

96. When Jeffrey arrived in Brewster, Stephens was dressed in civilian clothing, and was not

identified to him as a law enforcement officer. Jeffrey told Stephens that he had come to take a

polygraph examination in order to be permitted to assist the PPD with their investigation into

A.C.'s death.

97. Shortly after his arrival, defendant Stephens escorted Jeffrey to a small room with a table,

two chairs, and a polygraph machine. Jeffrey remained in that room from approximately 11:00

a.m. until approximately 7:00 p.m. He had not eaten prior to arriving in Brewster, and he was

given no food for at least the first six hours that he was in the room. Defendant Stephens and

other individuals provided Jeffrey with multiple cups of coffee throughout the course of the day.


98. Defendants Levine, McIntyre, and Tumolo, who remained in a separate room monitoring the

questioning and interrogation through a listening device, either witnessed or heard the words

spoken to and by Jeffrey while at the Brewster office.

99. Stephens told Jeffrey, in substance, that once the polygraph examination began, it could not

be stopped. One or more pieces of polygraph equipment was affixed to Jeffrey throughout the

entire time that he spoke about and was questioned concerning A.C.'s death.

25

100. As PPD investigators had done in prior sessions with Jeffrey, Stephens provided Jeffrey

with and obtained Jeffrey's signature on numerous waivers and releases, including on a

"participatory" Miranda warning form and on consents to the polygraph examination.

101. Stephens began to question Jeffrey concerning the rape and murder of A.C., and Jeffrey told

Stephens what he believed he knew about the crime and had discussed previously with PPD

investigators. Jeffrey's responses incorporated details and theories that had been provided and

suggested to him by the PPD defendants and/or Stephens, as well as facts that the PPD

defendants knew to be publicly ascertainable.

102. During the course of his questioning of Jeffrey, Stephens employed interrogation tactics

that were designed to trick, deceive, confuse, and intimidate Jeffrey, including but not limited to

shouting at Jeffrey, invading Jeffrey's personal space, repeatedly accusing Jeffrey of raping and

murdering A.C., and telling Jeffrey that he had failed the polygraph test and had already told

Stephens "within himself" that he was guilty of the crime. Jeffrey repeatedly denied his

involvement in the crime to Stephens.

103. Several hours into the questioning and interrogation, at a point when Jeffrey was visibly and

obviously distraught, frightened, and confused, Stephens turned to another deliberate tactic,

"good cop-bad cop," and told Jeffrey that he could speak with his "favorite" PPD detective.

Jeffrey chose defendant McIntyre. Upon information and belief, defendants Levine, McIntyre,

Tumolo, and Stephens knew that Jeffrey viewed McIntyre as his friend and a "father figure," and

intended that McIntyre's interaction with Jeffrey at this point would be the culmination of their

deliberate manipulation to obtain Jeffrey's involuntary confession.

104. Stephens left the room in which Jeffrey was sitting, and continued to listen to the remainder

26

of the interrogation in the nearby room where Levine, McIntyre, and Tumolo had been monitoring the earlier questioning.

105. When McIntyre entered the room with Jeffrey, he was not the friend and father figure that he had been previously and which he knew Jeffrey expected from their interactions. McIntyre told Jeffrey, among other things, that he had known for weeks that Jeffrey was guilty of the crime. He told Jeffrey in substance that Levine, Tumolo, and Stephens would physically harm Jeffrey if he did not confess, and that McIntyre was trying to hold them back but that he didn't have any "bullets" in his "gun," and that Jeffrey needed to give him some "bullets" by confessing.

106. Upon information and belief, McIntyre drew upon his knowledge that Jeffrey had in the past suffered from hearing "voices," as well as other symptoms of mental illness, to coerce Jeffrey's admission of guilt. After threatening Jeffrey with physical violence, McIntyre walked to the sole window in the small room, gestured to the sky, and told Jeffrey that A.C. was looking down from heaven, and wanted Jeffrey's help to find her killer. McIntyre also promised Jeffrey that if Jeffrey confessed he could go home, and that the only punishment Jeffrey would receive was treatment in a mental facility.

107. Frightened, confused, hungry, and trusting McIntyre's word that he would be physically harmed if he did not give the PPD defendants a confession, Jeffrey provided information that drew upon details concerning the crime that had been provided to him by the PPD defendants - many of which were inaccurate. By the end of his statement Jeffrey was sobbing uncontrollably. He eventually fell from his chair and curled himself in a fetal position under the table at which he had been sitting.

108. When Jeffrey finished his statement to McIntyre, defendants Tumolo and Stephens burst in the room, and Tumolo yelled, in substance, that Jeffrey had to repeat his confession, and that they would stay all night if he didn't. Jeffrey attempted to repeat the story that he had told McIntyre.

109. Jeffrey was placed under arrest in Brewster, and was transported by the PPD defendants back to the PPD stationhouse. During the ride back to Peekskill, McIntyre, Levine, and/or Tumolo attempted to convince Jeffrey to provide a more detailed confession. Jeffrey did not do so.

110. Subsequent to January 25, 1990, defendant McIntyre prepared a police report purporting to describe the events that transpired that day with respect to Jeffrey. McIntyre's report documenting Jeffrey's statements and alleged confession on January 25 falsely represented that critical details originated with Jeffrey, when in fact they had been provided and/or suggested to Jeffrey by various PPD defendants over the course of their multiple interviews and interrogations. Upon information and belief, those details included but were not limited to the following: the fact that A.C.'s bra had been ripped and removed from her body; the fact that A.C.'s body was covered with leaves; the fact that the perpetrator had covered A.C.'s mouth with his hand; the fact that A.C. had been struck on the back of the head; the fact that A.C. had lost her keys; and the location where A.C.'s camera was found.

111. In addition to failing to disclose that critical details in Jeffrey's January 25 statements had been supplied by the PPD defendants, McIntyre's police report also deliberately excluded material, exculpatory and impeachment evidence concerning the coercive circumstances of Jeffrey's interrogation on January 25, including but not limited to the threats of violence against

28

Jeffrey by the PPD defendants and the promise to Jeffrey that if he confessed he could go home and would receive mental health treatment.

112. Stephens prepared documentation of his questioning of Jeffrey during the alleged polygraph, including the words that Jeffrey allegedly spoke to him concerning A.C.'s rape and murder. This documentation falsely represented that facts relayed by Jeffrey originated with him, rather than with the defendants, and does not document material, exculpatory and impeachment evidence including but not limited to the coercive tactics utilized in his questioning, and the sources of the details that he attributed to Jeffrey. The details of the crime that were falsely attributed to Jeffrey's independent knowledge include but were not limited to the following: that A.C. suffered a blow to the back of her head with a blunt object; the possibility that the perpetrator did not ejaculate; that A.C.'s body was covered with leaves; that A.C. dropped her keys; and that A.C.'s camera was lost; and the locations of the crime.

### Police Coerced, Fabricated, and Concealed Exculpatory Evidence Concerning Additional Investigation of Jeffrey Deskovic

113. Prior to and, upon information and belief, subsequent to Jeffrey's false confession and arrest, PPD investigators interviewed additional witnesses, including but not limited to Jeffrey's friends Martin Burrett and John Laurino, Martin's and John's family members, and additional witnesses whose statements were not documented and/or were misrepresented in critical respects. In the course of these interviews investigators, including but not limited to defendants Levine, McIntyre, and Brovarski, coerced and intimidated witnesses into providing false inculpatory information concerning Jeffrey, fabricated inculpatory statements, including statements portraying Jeffrey as violent or threatening, and failed to document and disclose to

29

prosecutors interviews or portions of interviews that revealed material, exculpatory and impeachment evidence. This undisclosed evidence included, but was not limited to (a) the coercive and intimidating tactics utilized by police in interviewing the witnesses; (b) evidence that Jeffrey played no role in and had no independent knowledge of A.C.'s rape and murder; (c) evidence that A.C. and Freddy Claxton had no romantic or sexual relationship; and (d) evidence that A.C. had not had consensual sex prior to her rape and murder.

114. The PPD defendants' multiple interviews with Jeffrey's friend Martin Burrett became a centerpiece of their investigation. The PPD defendants knew that Jeffrey and Martin were best friends who spent much of their free time together, and as a result the defendants met with Martin, as well as his parents, both to attempt to obtain inculpatory information concerning Jeffrey as well as to monitor Jeffrey's response to their questioning of him. In the course of these meetings, the defendants deliberately and recklessly employed many of the same tactics of deception and coercion that they employed with Jeffrey and, previously, with Freddy Claxton, including but not limited to aggressively questioning and threatening Martin into making false inculpatory statements about Jeffrey, and selectively recording their interactions with Jeffrey. Upon information and belief, the PPD defendants fabricated inculpatory information allegedly provided by Martin and his parents, including but not limited to statements alleging that Jeffrey had threatened to kill Martin, and statements concerning Jeffrey's relationship with A.C. The PPD defendants also learned from Matin's statements to them that Jeffrey had learned non-public facts concerning A.C.'s death and the investigation from PPD investigators.

115. The PPD defendants deliberately failed to document and affirmatively concealed material, exculpatory and impeachment evidence concerning interviews conducted with Martin Burrett

30

and his family, including but not limited to the coercive tactics they utilized to obtain inculpatory statements from Martin, their fabrications of allegedly inculpatory evidence, and information provided to them from Martin that revealed that investigative facts known by Jeffrey had been provided to him by the PPD defendants.

### Jeffrey's Indictment Is Procured With Fabrications and Concealment of Material, Exculpatory and Impeachment Evidence

116. Prior to Jeffrey's false confession and subsequent indictment, PPD defendants and prosecutors had taken steps to obtain DNA testing to definitively include or exclude Jeffrey as the perpetrator.  Prior to his false confession, Jeffrey consented to have his blood drawn and tested by the PPD, based upon his desire to assist the police, and upon the PPD defendants' representation that a blood test could clear Jeffrey of any involvement in the crime.  Jeffrey's blood sample and a vaginal swab with semen that was taken from A.C. were sent to the FBI for DNA testing.  In a letter accompanying the samples and requesting DNA testing, defendant Tumolo stated that the PPD "anticipate[d] that semen evidence will match that from Deskovic's blood; hence either incriminating or exonerating him in this matter."

117. The PPD defendants and prosecutors were aware that the results of that testing would be available in a short period of time.  However rather than delay Jeffrey's indictment in order to present the grand jury with the results of the DNA testing, which could conclusively prove or disprove Jeffrey's guilt or innocence, prosecutors chose to seek Jeffrey's indictment immediately, without the benefit of those results.

118. On February 27, 1990 Jeffrey Deskovic was indicted on three counts of murder in the second degree, one count of first degree rape, and one count of fourth degree possession of a

31

weapon.

119. Jeffrey Deskovic was charged and indicted based upon evidence that was fabricated by the

defendants and by means of the defendants' concealment from prosecutors and the grand jury of

material, exculpatory and impeachment evidence that undermined a probable cause

determination.  These material misrepresentations included, but were not limited to, the

following: (a) the PPD defendants' creation of false police reports and false statements to

prosecutors representing that Jeffrey Deskovic possessed independent knowledge of numerous

non-public facts concerning A.C.'s death, when in fact those facts were provided to him by PPD

investigators and/or were known by the PPD defendants to be public knowledge; (b) the

defendants' fabrication of evidence to make Jeffrey's statements and ultimate confession appear

knowing and voluntary, including but not limited to preparing Miranda waiver forms that falsely

represented Jeffrey to have knowingly and voluntarily waived his right to counsel when in fact

because of Levine's misrepresentations to Jeffrey concerning Lou Ecker Jeffrey's waivers were

not knowing and voluntary; (c) the PPD defendants' concealment of material facts concerning

the coercive, deceptive, and intimidating tactics employed by them in the course of questioning

Jeffrey on and prior to January 25, including but not limited to their concealment of Stephens'

and McIntyre's coercive promises and direct and indirect threats of physical harm; and (d) the

PPD defendants' concealment of additional material, exculpatory and impeachment evidence

concerning witness interviews conducted by them in the case, including but not limited to

coercive tactics utilized in witness interviews, evidence that A.C. and Freddy Claxton had no

romantic or sexual relationship, evidence that A.C. had not had consensual sex prior to her rape

and murder, and other evidence that Jeffrey played no role in and had no independent knowledge

of A.C.'s rape and murder.

### DNA Evidence Exonerates Jeffrey - But the Prosecution Continues

120. Just days after Jeffrey's indictment, DNA testing by the FBI lab excluded Jeffrey as the source of the semen found on the vaginal swab taken from A.C. The Westchester County District Attorney's Office, including but not limited to Bolen, and the PPD, including but not limited to defendants Levine, McIntyre, and Tumolo, were informed of this result, which was documented in a March 26, 1990 report.

121. Additionally, microscopic hair analysis and comparison of the hairs found on A.C.'s arm, leg, breast, and pubic area with the head and pubic hairs of Jeffrey Deskovic excluded Jeffrey as the source of those hairs. Critically, the hair analyst concluded that at least one hair found on A.C. was consistent with a "negroid-type" hair, typically shed by an African American individual. The Westchester County District Attorney's Office, including but not limited to Bolen, and the PPD, including but not limited to defendants Levine, McIntyre, and Tumolo, were informed of these results.

122. Bolen understood that in the absence of evidence that A.C. had been raped and murdered by multiple perpetrators, or that the semen found in A.C. was attributable to a consensual sexual encounter shortly before her death, the DNA evidence establishing that Jeffrey was not the source of the semen definitively proved Jeffrey's innocence and was fatal to his prosecution. Accordingly, Bolen directed that additional investigation be done, and/or conducted further investigation in order to find evidence supporting probable cause to prosecute Jeffrey, and in particular to provide an explanation for the presence of another man's semen inside A.C. following her rape and murder.

123. Bolen also turned to defendant Deputy Medical Examiner Louis Roh to provide evidence to support the continued prosecution of Jeffrey Deskovic in the face of exonerative DNA evidence. Soon after the disclosure of the exculpatory DNA results, Bolen and Roh discussed and agreed that Roh would provide evidence that in his scientific opinion A.C. had been sexually active on multiple occasions prior to her rape and death, and that during his autopsy he had observed scarring on A.C.'s hymen that proved this fact.

124. In fact, Roh knew, or in the absence of his deliberate and reckless indifference should have known, that he had no scientific basis for stating that A.C. had been sexually active on multiple occasions, and had not in fact observed the scarring that he reported to Bolen. In the absence of his deliberate and reckless indifference to the truth, Bolen also should have known that Roh's conclusions and findings were false and fabricated. Roh and/or Bolen concealed that Roh's conclusions and findings concerning A.C.'s sexual history were fabricated - a fact which was material, exculpatory and impeachment evidence.

125. Additionally, Bolen deliberately and recklessly failed to investigate known exculpatory evidence. For example, prior to trial, the State's hair comparison expert contacted Bolen and requested that he obtain hair reference samples from Roh, Roh's assistant, and Freddy Claxton, in order to prove or disprove the theory that the hairs found on A.C. that did not match Jeffrey Deskovic originated with those individuals. Bolen represented to the hair examiner that he would obtain those samples, and then deliberately or recklessly failed to do so. Bolen also deliberately or recklessly failed to obtain DNA testing on blood samples from Freddy Claxton, or from any other potential consensual donor of semen.

126. The PPD defendants also understood, in light of the exonerative DNA results, that the DNA

34

evidence conclusively establishing that Jeffrey was not the source of the semen fatally

undermined their theory of his guilt and the validity of his confession.

127. This was all the more evident in light of the PPD defendants' investigative misconduct prior

to Jeffrey's indictment - including, but not limited to, the defendants' interference with Jeffrey's

right to counsel; their coercion of allegedly inculpatory statements from Jeffrey; their providing

to Jeffrey one or more of the non-public facts contained in his allegedly inculpatory statements;

their fabrications of allegedly inculpatory witness statements; and their withholding of additional

exculpatory and impeachment evidence that undermined probable cause, including but not

limited to evidence concerning their coercive tactics in witness interviews, witness statements

and other evidence that Freddy Claxton and A.C. had not had a romantic relationship, witness

statements and other evidence that A.C. was not sexually active, and other evidence undermining

Jeffrey Deskovic's guilt.  Even after learning of the DNA test results, however, the PPD

defendants continued to conceal from prosecutors their previously undisclosed misconduct and

still failed to disclose exculpatory and impeachment evidence to the prosecution.

128. Moreover, the PPD defendants conducted further investigation on their own initiative and at

the direction of prosecutors.  Upon information and belief, in the course of that investigation the

PPD defendants uncovered additional exculpatory and impeachment evidence, including but not

limited to evidence that was material to the prosecution's efforts to account for the fact that

Jeffrey was not the source of the semen found inside A.C.  The PPD defendants failed to

document and disclose this evidence.

129. Had the PPD defendants taken basic steps prior to and following Jeffrey's indictment to

investigate known exculpatory evidence and leads, instead of blindly investigating only to

Exhibit "A", Part 2 (McGarr)

corroborate theories of guilt, they would have uncovered readily available evidence that not only exonerated Jeffrey, but also undermined their initial theories of the case and led them to the actual perpetrator. These investigative steps include, but are not limited to, the following: (a) conducting and documenting thorough interviews with individuals who were near the crime scene on November 15, 1989, including two individuals who were playing basketball and who spoke to Steven Cunningham that day; (b) conducting and documenting a complete and thorough canvass of the crime scene, and collecting and vouchering all available evidence, which upon information and belief would have led to the discovery of physical evidence traceable to Steven Cunningham; (c) thoroughly and completely investigating and documenting information provided to the police by witnesses who stated unequivocally that Freddy Claxton and A.C. had not had a romantic relationship of any kind; (d) thoroughly and completely investigating and documenting information provided to the police by witnesses who stated unequivocally that A.C. had not had consensual sex prior to her rape and murder; (e) thoroughly and completely investigating and documenting the possible sources for details and theories contained in Jeffrey Deskovic's statements to the police, which would have undermined the contention by the police and prosecutors that he had independent knowledge that could only have been possessed by the perpetrator.

## Prosecutorial and Police Misconduct Deprive Jeffrey of a Fair Trial

130. A critical challenge facing the prosecution at Jeffrey's criminal trial was to explain how Jeffrey could have raped A.C. despite scientific proof that the semen found inside of her, and hairs found on her body, were not his. At trial, Bolen explained to the jury why his theory of the case was true, despite clearly exculpatory evidence to the contrary, by arguing false and

36

unsupported evidentiary inferences to the jury through baseless allegations concerning a consensual sexual relationship between Freddy Claxton and A.C., and through Roh's fabrications.

131. Bolen elicited from Roh the false and fabricated testimony that they had discussed prior to trial: (a) that Roh had a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her death; and (b) that during his autopsy Roh had observed scarring on A.C.'s hymen. Bolen relied upon Roh's fabrications in his opening and closing arguments to the jury as the sole evidence supporting the prosecution theory that the semen found in A.C. had come from a consensual sex partner - namely Freddy Claxton. Roh and/or Bolen concealed the critical, exculpatory fact that Roh's critical testimony on this score had been fabricated prior to trial.

132. Furthermore, Bolen explained to the jury that the presence on A.C.'s body of hairs that did not match Jeffrey - including hairs consistent with a "negroid" type - by advancing the baseless theory that the hairs had in fact been shed by Roh, his African American assistant, and Freddy Claxton. Bolen advanced this argument despite his deliberate and reckless decision never to obtain hair samples from Roh, his assistant, or Claxton for comparative analysis to confirm or conclusively refute his theory - despite Bolen's representation to the State's hair expert that such samples would be obtained for comparison.

133. The PPD defendants' fabrications and concealment of material, exculpatory and impeachment evidence adduced in their investigation also were critical in obtaining Mr. Deskovic's conviction.

134. The PPD defendants' fabrications formed the basis for Bolen's argument at trial that

37

Jeffrey's January 25 confession and prior allegedly incriminating statements were knowing and voluntary, and demonstrated that he knew facts that only the perpetrator of A.C.'s rape and murder could have known. In particular, Bolen argued that Jeffrey's knowledge of the note referring to Freddy Claxton proved that he had been present at and motivated to commit the crime; that Jeffrey's statement that he ripped off A.C.'s bra was consistent with the non-public fact that A.C.'s bra had been found away from her body; that Jeffrey's statement that he held his hand over A.C.'s mouth matched non-public details concerning A.C.'s injuries; that Jeffrey's statement that he hit A.C. on the back of the head with a Gatorade bottle matched non-public facts concerning A.C.'s cause of death; that Jeffrey's knowledge that A.C. had lost her keys corroborated his involvement in the crime; that Jeffrey's statement that the perpetrator might not have ejaculated confirmed that he could have committed the crime and not left behind semen; and that Jeffrey's drawing of three crime scenes and the location where A.C.'s camera was found was consistent with the PPD's non-public theory of how the crime was committed.

135. Furthermore, the PPD defendants' deliberate concealment of material, exculpatory and impeachment evidence was material to the jury's consideration of all of the issues raised at trial - including but not limited to the voluntariness and truthfulness of Jeffrey's confession, and the prosecutor's arguments concerning a relationship between Freddy Claxton and A.C. and A.C.'s sexual history - as well as to the jury's assessment of the credibility of the State's witnesses and the integrity of the investigation of the case.

### Mr. Deskovic's Incarceration and Efforts to Prove His Innocence

136. On December 7, 1990 Jeffrey Deskovic was convicted by a Westchester County jury of murder, rape, and possession of a weapon. On January 18, 1991, at a sentencing proceeding

where Jeffrey proclaimed his innocence and pleaded for mercy from the court, Judge Collabella
sentenced Jeffrey to fifteen years to life in prison.

137. From the time of his conviction until his ultimate release in 2006 Jeffrey Deskovic fought
tirelessly to vindicate his innocence, through the courts on appeal and through habeas petitions,
and by direct appeals to policymakers, including former Westchester County District Attorney
Jeanine Pirro, that his case and criminal trial be reexamined.

138. Mr. Deskovic appealed his conviction to the New York Appellate Division, Second
Department. The court affirmed his conviction on February 14, 1994. On July 6, 1994 the New
York Court of Appeals denied Jeffrey leave to appeal the decision of the Second Department.

139. Mr. Deskovic sought relief from his wrongful conviction through a petition for a writ of
habeas corpus, which was denied by District Judge Barbara Jones on November 21, 1997. In his
December 4, 1997 appeal of that denial to the Second Circuit Court of Appeals, Mr. Deskovic
argued that he should have "the opportunity to further establish his innocence by additional and
new DNA testing employing the state of the art of DNA investigation in a science which can be
even more certain today." The appeal was rejected on April 26, 2000, and Mr. Deskovic's
petition for certiorari was denied by the United States Supreme Court on January 8, 2001

### Jeffrey Endures Physical and Sexual Assault by Correctional Officers

140. Throughout the many years that Jeffrey Deskovic was incarcerated at Elmira Correctional
Facility, and on multiple occasions on or subsequent to September 18, 2004, defendant Tweed,
in the course of conducting routine searches of Jeffrey's person outside the confines of his prison
cell, repeatedly, routinely, and deliberately conducted pat-down searches of Jeffrey in a manner
that was contrary to prison policy for the purpose of subjecting Jeffrey to unnecessary, invasive,

39

assaultive, and violative physical contact, including contact of a sexual nature.

141. Defendant Tweed's conduct included, but was not limited to, violating policies and

procedures for pat-down searches that required prisoners to remove items from their own pockets

prior to pat-down, and instead removing items from Jeffrey's pockets himself, for the purpose of

groping Jeffrey's sexual organs and otherwise assaulting and harassing Jeffrey.

142. Upon information and belief, defendant engaged in this conduct openly and notoriously, as

a matter of routine pattern and practice, and with the knowledge and express or tacit approval of

his colleagues and supervisors.

### The Real Killer Is Identified and Jeffrey Is Exonerated

143. Jeffrey Deskovic continued his tireless efforts to obtain DNA retesting and comparison,

until 2006 when newly elected Westchester County District Attorney Janet DiFiore consented to

conduct STR DNA testing on the semen found on the vaginal swab taken from A.C., and to run

the results of that testing against the available DNA databases for convicted offenders.

144. In September 2006 the DNA profile obtained from the semen found on the vaginal swab

was matched to Steven Cunningham, who was already incarcerated in New York for the 1993

murder of a Peekskill school teacher. In March 2007 Mr. Cunningham pleaded guilty to the rape

and murder of A.C., and on May 2, 2007 he was sentenced to an additional twenty years in

prison for the crime.

145. Jeffrey Deskovic did not know Steven Cunningham, and had never met or seen him prior to

attending court proceeding in 2007.

146. On September 20, 2006 Jeffrey Deskovic's conviction was vacated and he was released

from prison based upon a joint CPL § 440.10 motion by the Westchester County District

40

Attorney's Office and counsel for Mr. Deskovic.

147. On November 2, 2006, on motion by the Westchester County District Attorney, the

indictment against Mr. Deskovic was dismissed on the ground of actual innocence.

### Policies and Customs of the PPD, the Westchester County District Attorney's Office, and the Westchester County Medical Examiner's Office

148. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey

Deskovic, the City of Peekskill and the PPD, by and through their final policymakers,

maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning

improper, illegal, and unconstitutional investigative techniques, including but not limited to the

following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants; (b)

fabricating evidence; (c) failing to document and disclose material, exculpatory and

impeachment evidence to prosecutors; and (d) failing to investigate known exculpatory evidence

and otherwise failing to conduct constitutionally adequate investigations.

149. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey

Deskovic, the City of Peekskill and the PPD, by and through their final policymakers,

maintained a policy, custom, or pattern and practice of failing to adequately train and supervise

PPD investigators in connection with fundamental investigative tasks implicating the

constitutional rights of witnesses and suspects, including but not limited to conducting custodial

interrogations and witness interviews, and documenting and disclosing exculpatory and

impeachment evidence to prosecutors.

150. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to

train and supervise PPD investigators were reflected by the multiple acts of misconduct and

41

illegality committed by multiple PPD detectives and supervisors in relation to multiple suspects

and witnesses in the A.C. investigation, as described above.

151. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to

supervise and train were also reflected in numerous prior cases and investigations which, upon

information and belief, were known to the PPD defendants and policymakers prior to the A.C.

investigation. The misconduct committed in those cases by PPD investigators, including but not

limited to defendant Tumolo and other investigators involved in Mr. Deskovic's case, was

actually or constructively known to PPD supervisors and policymakers prior to the A.C.

investigation - including by means of their direct participation in the investigations, and/or by

published judicial decisions exposing the investigative misconduct - and, upon information and

belief, PPD supervisors and policymakers failed to train, supervise, discipline, or otherwise

remediate PPD investigators in response to such notice.

152. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey

Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by

and through final policymakers and their delegees, maintained a policy, custom, or pattern and

practice of failing to adequately supervise, train and discipline assistant district attorneys in

connection with fundamental and recurring constitutional duties, including but not limited to (a)

the disclosure of exculpatory and impeachment evidence to the defense; (b) investigating and

acting upon exculpatory evidence that vitiates probable cause; and (c) constitutional prohibitions

on fabricating evidence and suborning perjury.

153. Pursuant to this policy, custom, or pattern and practice, policymakers for the District

Attorney's Office abdicated and effectively delegated to senior assistant district attorneys and

supervisors, including but not limited to Bolen, the authority and discretion to conduct and

supervise investigations and prosecutions with deliberate and reckless disregard for their

constitutional and ethical duties. As a result, assistant district attorneys and supervisors,

including but not limited to Bolen, routinely and knowingly engaged in prosecutorial

misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of

impunity.

154. In particular, as a direct result of policymakers' and supervisors' abdication of authority for

supervising, training, and disciplining prosecutors, assistant district attorney Bolen routinely,

notoriously, and as a matter of policy, custom, and pattern or practice violated constitutional and

ethical norms by concealing material, exculpatory and impeachment evidence from the defense

in order to permit him to argue evidentiary inferences to juries that he knew, or in the absence of

his deliberate indifference should have known, were unsupported or contradicted by known

facts. In furtherance of this policy, custom, and pattern or practice Bolen routinely failed to

disclose material, exculpatory and impeachment evidence to the defense; deliberately and

recklessly failed to investigate known exculpatory evidence, and in particular forensic evidence;

deliberately and recklessly relied upon forensic experts, including Deputy Medical Examiner

Roh, to provide fabricated, baseless, and/or misleading scientific inculpatory evidence; and

engaged in additional acts of prosecutorial misconduct aimed at securing convictions at all costs.

155. The District Attorney's Office's failure to supervise, train, and discipline assistant district

attorneys was reflected by the multiple acts of misconduct and illegality committed by multiple

members of and supervisors in the Westchester County District Attorney's Office in the course

of the investigation and prosecution of Jeffrey Deskovic, as described above. The District

Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was also reflected by multiple high priority and highly publicized prosecutions and post-conviction proceedings prior and subsequent to the prosecution of Jeffrey Deskovic, in which senior district attorneys and supervisors, including but not limited to Bolen, engaged in, condoned, and facilitated prosecutorial misconduct.

156. The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was known, or in the absence of their deliberate and reckless indifference should have been known, to policymakers for the District Attorney's Office, at and prior to the time of Jeffrey Deskovic's prosecution.  Policymakers were on actual and constructive notice of the misconduct of Bolen and other assistant district attorneys through, among other mechanisms, their direct involvement in Jeffrey Deskovic's prosecution, Bolen's widely known reputation for engaging in and condoning prosecutorial misconduct, and misconduct perpetrated in multiple high priority and highly publicized prosecutions and post-conviction proceedings prior to Mr. Deskovic's conviction.

157. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through its final policymakers and their delegees, maintained a policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions to Westchester County prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that such conclusions would violate criminal suspects' right to a fair trial.  In particular, defendant and Deputy Medical Examiner Roh routinely, notoriously, and as a matter of policy, custom, and pattern or practice fabricated evidence, gave perjured testimony, and/or engaged in deliberate

44

and reckless overreaching with respect to allegedly inculpatory scientific conclusions.

158. Additionally, prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train and discipline deputy medical examiners. The absence of supervision, training, and discipline as a matter of policy, custom, or pattern and practice established a climate of impunity in which the misconduct of defendant Roh and others was condoned and facilitated, and created a known and obvious risk that the constitutional rights of criminal suspects would be violated.

159. Policymakers for the Westchester County Medical Examiner's Office were on actual and constructive notice of the misconduct of Roh and other deputy medical examiners through, among other mechanisms, their direct involvement in and knowledge of Jeffrey Deskovic's prosecution, Roh's widely known reputation for fabricating engaging in and condoning prosecutorial misconduct, and specific publicity and notoriety generated from Roh's conduct in highly publicized criminal proceedings prior to Mr. Deskovic's conviction.

## DAMAGES

160. The actions of the defendants deprived plaintiff Jeffrey Deskovic of his civil rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and under the laws of New York.

161. The unlawful, intentional, wilful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Jeffrey Deskovic to be wrongly seized, maliciously prosecuted, unfairly tried, wrongfully convicted, subjected to illegal searches and cruel and

unusual punishment during the course of his incarceration, and forced to serve nearly sixteen years in prison for a crime he did not commit.

162. The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the defendants caused Jeffrey Deskovic the following injuries and damages, which continue to date and will continue into the future: multiple physical assaults and batteries, including assaults of a sexual nature, and other physical injuries; pain and suffering; severe mental anguish; multiple suicide attempts; emotional distress; loss of family relationships; severe psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; out-of-pocket legal expenses for appellate representation; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

163. All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages

## COUNT I

### 42 U.S.C. § 1983 Claim Violation of Mr. Deskovic's Right Against Self-Incrimination and to a Fair Trial Against Defendants Levine, McIntyre, Tumolo, and Stephens

164. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

165. Defendants Levine, McIntyre, Tumolo, and Stephens, acting individually and in concert, deliberately and recklessly coerced and compelled allegedly inculpatory statements from Jeffrey Deskovic and caused those statements to be introduced against him in connection with his indictment and prosecution, in violation of Jeffrey's Fifth and Fourteenth Amendment rights not to be compelled to be a witness against himself, not to be deprived of liberty without due process of law, and to a fair criminal trial.

166. Specifically, on and prior to January 25, 1990, defendants Levine, McIntyre, Tumolo, and Stephens deliberately and recklessly exploited Jeffrey Deskovic's youth, inexperience with law enforcement, emotional and psychological vulnerabilities, and lack of advice and assistance of legal or parental counsel to convince Jeffrey, through physical threats, trickery, deceptive promises, and other means to make false inculpatory statements that were not voluntarily and freely given. Furthermore, Jeffrey's waivers, on and prior to January 25, 1990, of his right not to submit to questioning by the police without the presence or assistance of legal counsel were not freely and voluntarily made, as a result of the defendants' deliberate and reckless actions to deceive Jeffrey concerning the status and legal significance of his representation and the defendants' questioning.

167. Additionally, defendants Levine, McIntyre, Tumolo, and Stephens, individually and in concert, deliberately and recklessly provided Jeffrey Deskovic with non-public facts known to the PPD in connection with the A.C. investigation, and through coercion, deception, and trickery compelled Jeffrey to adopt those facts as his own by incorporating them into allegedly inculpatory statements concerning his knowledge of and involvement in the crime.

47

168. Because of the PPD defendants' coercion and trickery Jeffrey's will was overborne such that the confession was not the product of his free will and rational intellect.

169. At the time that Jeffrey Deskovic allegedly confessed to the rape and murder of A.C., a reasonable person in Jeffrey's position would have perceived his freedom to be significantly restricted and would not have understood himself to be free to leave, and hence Jeffrey was in the defendants' custody. Among the circumstances that rendered Jeffrey's alleged confession custodial were factors that were not documented and were affirmatively concealed from prosecutors and the court by the defendants, including but not limited to the defendants' direct and indirect threats on January 25 that Jeffrey would be physically harmed if he did not confess, and the defendants' deceptive and coercive promises concerning the consequences of Jeffrey's January 25 confession.

170. The false and involuntary confession obtained from Jeffrey Deskovic on January 25, 1990 was introduced against him in pretrial proceedings and at his criminal trial.

171. Defendants' actions to compel Mr. Deskovic to be a witness against himself were in violation of clearly established constitutional law, and no reasonable police officer in 1989 and 1990 would have believed that the defendants' actions were lawful.

172. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT II

**42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material, Exculpatory and Impeachment Evidence, and Failing to Investigate in Violation of the Fourteenth Amendment**

48

**Against Defendants Levine, McIntyre, Brovarski, Tumolo, and Roh**

173. Mr. Deskovic hereby incorporates and references all of the foregoing paragraphs and further alleges as follows.

174. Defendants Levine, McIntyre, Brovarski, Tumolo, and Roh, acting individually and in concert, fabricated evidence, concealed material, exculpatory and impeachment evidence, and deliberately and recklessly failed to conduct a constitutionally adequate criminal investigation, thereby depriving Mr. Deskovic of his Fourteenth Amendment right not to be deprived of liberty without due process of law and to a fair criminal trial.

175. Specifically, defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens, deliberately and recklessly coerced inculpatory statements from Mr. Deskovic which were not the product of Mr. Deskovic's free will and rational intellect, supplied Mr. Deskovic with specific details of the crime which Mr. Deskovic subsequently incorporated and repeated in allegedly inculpatory statements, and/or knew that details known to Mr. Deskovic were readily obtainable through public sources. The defendants falsely represented to prosecutors in police reports, in the course of charging and indicting Mr. Deskovic, and at trial, that Mr. Deskovic's statements were in fact freely and voluntarily given, and that Mr. Deskovic had independent knowledge of non-public details of the crime that actually had been provided to him by the defendants and/or were available from public sources. The false evidence which the defendants thereby fabricated was introduced against Mr. Deskovic at trial, was a basis for the jury's verdict against him, and thus deprived him of a fair criminal trial.

176. Additionally, defendants Levine, McIntyre, Brovarski, and Tumolo deliberately and recklessly coerced and/or fabricated allegedly inculpatory statements from witnesses including

49

but not limited to Freddy Claxton, Martin Burrett, and Martin Burrett's parents, and concealed

additional material, exculpatory and impeachment evidence concerning witness interviews

conducted by them in the case, including but not limited to coercive tactics utilized in witness

interviews, evidence that A.C. and Freddy Claxton had no romantic or sexual relationship,

evidence that A.C. had not had consensual sex prior to her rape and murder, and other evidence

from witnesses that Jeffrey played no role in and had no independent knowledge of A.C.'s rape

and murder.

177. Furthermore, defendants Levine, McIntyre, Brovarski, and Tumolo deliberately and

recklessly failed to investigate leads pointing toward other suspects and corroborating Mr.

Deskovic's innocence, including but not limited to the following:  intentionally failing to

interview witnesses whose knowledge tended to disprove Mr. Deskovic's guilt; failing to

investigate known exculpatory and potentially exculpatory information provided by witnesses;

failing to investigate exculpatory and potentially exculpatory forensic evidence, including but

not limited to serology, hair, fingerprint, and DNA evidence; and failing to pursue evidence and

leads concerning other suspects after their theory of Mr. Deskovic's guilt had been fatally

undermined by known exculpatory evidence.  The defendants' deliberate and reckless failure to

investigate exculpatory evidence that was known to them, or that in the absence of their

deliberate and reckless indifference should have been known to them, caused Mr. Deskovic to be

deprived of a fair criminal trial.

178. Defendant Roh deliberately and recklessly fabricated allegedly inculpatory evidence

concerning A.C.'s prior sexual history, and concealed material, exculpatory and impeachment

evidence concerning those fabrications.  In the course of pretrial investigations and

conversations with Bolen, Roh falsely, deliberately, and with reckless disregard for the truth

represented (a) that there was a scientific basis for concluding that A.C. had been sexually active

on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s

hymen during his autopsy. These false and fabricated pre-trial statements were repeated by

Bolen to the court in pretrial conferences discussing the DNA testing and Mr. Deskovic's

continued prosecution, and were elicited from Roh at trial.

179. In fact Roh knew, or in the absence of his deliberate and reckless indifference should have

known, that he had no scientific basis for concluding that A.C. had been sexually active on

multiple occasions, and that he had not seen the scarring of A.C.'s hymen that he described to

Bolen. Upon information and belief, Roh concealed the material, exculpatory and impeachment

evidence of his fabrications from prosecutor Bolen.

180. This false and fabricated evidence concerning A.C.'s prior sexual history was introduced

against Mr. Deskovic at trial and relied upon by Bolen in his opening and closing statements,

was a basis for the jury's verdict, and thus deprived him of a fair criminal trial.

181. The truth of the defendants' fabrications and the other material, exculpatory and

impeachment evidence that was concealed by them could not have been discovered by the Mr.

Deskovic or his attorney through the exercise of due diligence.

182. Had the defendants' fabrications and material, exculpatory and impeachment evidence

known to them been documented and/or disclosed they would have tended to prove Mr.

Deskovic's innocence, cast doubt on the entire police investigation and prosecution, and

impeached the critical trial testimony of defendants Levine, McIntyre, Stephens, Roh, and other

witnesses. The exculpatory and impeachment evidence withheld by the defendants, considered

51

individually and collectively, undermines confidence in the verdict against Mr. Deskovic, and

the concealment of this evidence deprived Mr. Deskovic of a fair criminal trial.

183. The defendants' conduct violated Mr. Deskovic's clearly established constitutional rights to

a fair trial and not to be deprived of liberty without due process of law, as guaranteed by the

Fourteenth Amendment. No reasonable police officer or medical examiner in 1989 and 1990

would have believed that the actions taken by the defendants in fabricating evidence, failing to

document and disclose material, exculpatory evidence, and failing to investigate exculpatory

evidence were lawful.

184. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly

convicted and imprisoned for sixteen years, and suffered the other grievous and continuing

injuries and damages as set forth above.

## COUNT III

**42 U.S.C. § 1983 Claim for Malicious Prosecution
in Violation of the Fourth and Fourteenth Amendments
Against Defendants Levine, McIntyre, Tumolo, Stephens, and Roh**

185. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

186. Defendants Levine, McIntyre, Tumolo, Stephens, and Roh, despite knowing that probable

cause did not exist to arrest and prosecute Mr. Deskovic for the rape and murder of A.C., and

despite the fact that the grand jury's probable cause determination was vitiated by the

defendants' undisclosed misconduct and by other concealed, material, exculpatory and

impeachment evidence, acted individually and in concert to cause Mr. Deskovic to be arrested

and prosecuted for those crimes. The defendants' conduct violated Mr. Deskovic's right

52

pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free

of unreasonable searches and seizures, and proximately caused his wrongful conviction.

187. Specifically, defendants Levine, McIntyre, Tumolo, and Stephens knew or in the absence of

their deliberate and reckless indifference to the truth should have known of information that

probable cause did not exist to arrest and prosecute Mr. Deskovic, including but not limited to

the facts that Mr. Deskovic's waiver of his right to counsel prior to January 10, 1990 was not

knowing and voluntary, that Mr. Deskovic's allegedly inculpatory statements on and prior to

January 25, 1990 were not the product of his free will and rational intellect, that allegedly

inculpatory evidence had been fabricated by the defendants, and that those factors as well as

additional material, exculpatory and impeachment evidence which was not disclosed to the grand

jury or prosecutors undermined the evidence presented in support of a probable cause finding

against Mr. Deskovic.

188. Following Mr. Deskovic's indictment, defendants Levine, McIntyre, and Tumolo

intentionally and with deliberate and reckless disregard for the truth, caused Mr. Deskovic's

prosecution to continue despite knowing that probable cause had been vitiated. Specifically,

after DNA testing results exonerated Mr. Deskovic, the defendants continued to conceal their

pre-indictment misconduct, and committed additional misconduct in the course of post-

indictment investigation, including but not limited to concealing from prosecutors additional

material, exculpatory evidence that undermined probable cause.

189. Additionally, prior and subsequent to Mr. Deskovic's indictment and being notified of

exonerative DNA testing results, defendants Levine, McIntyre, and Tumolo deliberately and

recklessly failed to investigate evidence that they knew, or in the absence of their deliberate and

reckless indifference should have known, vitiated probable cause for Mr. Deskovic's

prosecution.  The deliberate and reckless investigative failures of the defendants included but

were not limited to failing to investigate known exculpatory and potentially exculpatory

information provided by witnesses, failing to investigate exculpatory and potentially exculpatory

forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence,

and failing to pursue evidence and leads concerning other suspects.

190. Defendant Roh caused Mr. Deskovic to be maliciously prosecuted in violation of the Fourth

Amendment by deliberately and recklessly fabricating allegedly inculpatory evidence concerning

A.C.'s prior sexual history, which was critical to the continued prosecution of Mr. Deskovic

following the exculpatory DNA test results, and which Roh knew or in the absence of his

deliberate and reckless indifference should have known would cause Mr. Deskovic's prosecution

to continue.

191. Specifically, just weeks after learning that DNA testing proved Mr. Deskovic not to be the

source of the semen found inside A.C., Roh provided assistant district attorney Bolen with a

fabricated explanation for the source of the semen by falsely stating (a) that there was a scientific

basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape

and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy.  These

false and fabricated pre-trial statements were repeated by Bolen to the court in pretrial

conferences discussing the DNA testing and Mr. Deskovic's continued prosecution, and were

elicited from Roh at trial.

192. In fact Roh knew, or in the absence of his deliberate and reckless indifference should have

known, that he had no scientific basis for concluding that A.C. had been sexually active on

54

multiple occasions, and that he had not seen the scarring of A.C.'s hymen that he described to

Bolen.  Upon information and belief, Roh concealed the material, exculpatory and impeachment

evidence of his fabrications from prosecutor Bolen.

193. The defendants performed the above-described acts deliberately, with reckless disregard for

the truth, and with malice.

194. In fact, Mr. Deskovic was innocent of the rape and murder of A.C.  On November 2, 2006,

the prosecution terminated in Mr. Deskovic's favor when charges against him were dismissed on

motion of the Westchester County District Attorney, following the vacatur of his conviction and

his release from prison on September 20, 2006, after sixteen years of wrongful incarceration.

195. Defendants' actions to deprive Mr. Deskovic of his liberty without probable cause were in

violation of clearly established constitutional law, and no reasonable police officer in 1989 and

1990 would have believed that the defendants' actions were lawful.

196. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly

prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and

continuing injuries and damages as set forth above.

### COUNT IV

**42 U.S.C. § 1983 Claim for Engaging in Conduct that Shocks the Conscience
in Violation of the Fourteenth Amendment
Against Defendants Levine, McIntyre, Brovarski, and Tumolo**

197. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

198. In their drive to secure Mr. Deskovic's wrongful conviction, defendants Levine, McIntyre,

Brovarski, and  Tumolo deliberately engaged in arbitrary and conscious-shocking conduct that

55

contravened fundamental canons of decency and fairness and violated Jeffrey Deskovic's substantive due process right under the Fourteenth Amendment.

199. Specifically, the defendants deliberately exploited Jeffrey Deskovic's vulnerabilities, tricked, and threatened Jeffrey to coerce his confession; provided investigative facts to Jeffrey that fabricated a false confession and concealed the defendants' coercion and other misconduct; fabricated additional allegedly inculpatory evidence from witnesses and other sources to corroborate Jeffrey's guilt prior to his indictment; deliberately concealed from prosecutors their pre-indictment misconduct, as well as additional exculpatory and impeachment evidence provided to them by witnesses; deliberately concealed, after DNA evidence conclusively exposed the falsity of his confession, additional exculpatory and impeachment evidence that undermined any basis for Jeffrey's guilt and continued prosecution; deliberately and recklessly failed to investigate leads pointing toward other suspects and corroborating Mr. Deskovic's innocence; and engaged in additional, conscience-shocking misconduct that led to the conviction and wrongful imprisonment of an innocent man.

200. The defendants' conduct violated Mr. Deskovic's clearly established constitutional right to substantive due process, as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1989 and 1990 would have believed that the actions taken by the defendants in deliberately failing to conduct a constitutionally adequate investigation were lawful.

201. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

**COUNT V**

56

### 42 U.S.C. § 1983 Claim for Supervisory Liability Against PPD Supervisors

202. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further states as follows.

203. Defendants Tumolo and John and Jane Doe Supervisors knew or in the absence of their deliberate indifference, recklessness, and gross negligence should have known, that their subordinate officers had deprived Mr. Deskovic of his clearly established constitutional rights through misconduct that included but was not limited to coercing and compelling allegedly inculpatory statements from Mr. Deskovic, providing Mr. Deskovic with non-public details concerning A.C.'s rape and murder and the PPD investigation, fabricating witness statements and other evidence, concealing material, exculpatory and impeachment evidence, and failing to conduct a constitutionally adequate investigation of Mr. Deskovic.  Defendants Tumolo and John and Jane Doe Supervisors, by deliberately, recklessly, and grossly negligently failing to supervise their subordinate police officers, and by their active and direct participation in and facilitation of their subordinates' misconduct, caused their subordinates to deprive Mr. Deskovic of his clearly established constitutional rights, including but not limited to his rights not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures, not to be deprived of liberty without due process of law, and to a fair trial.

204. Moreover, defendants Levine, McIntyre, Brovarski, Tumolo, and other PPD detectives acted with impunity in an environment in which they were not trained, supervised, or disciplined by defendants Tumolo and John and Jane Doe Supervisors, and in which they knew that their violations of Mr. Deskovic's constitutional rights would be facilitated, approved, and/or condoned by the defendant supervisors.

57

205. The deliberately indifferent, reckless, and/or grossly negligent conduct of defendants

Tumolo and John and Jane Doe Supervisors violated their clearly established duty, in 1989 and

1990, to supervise subordinate detectives including defendants Levine, McIntyre, and Brovarski,

and no reasonable police supervisor in 1989 and 1990 would have believed that deliberately

indifferent, reckless, and/or grossly negligent supervision in the face of actual or constructive

notice of misconduct by their subordinate officers was lawful.

206. Defendants Tumolo and John and Jane Doe Supervisors' actions and omissions proximately

and directly caused Mr. Deskovic to be wrongly prosecuted, convicted, and imprisoned for

sixteen years, and to suffer the other grievous and continuing injuries and damages as set forth

above.

### COUNT VI

**42 U.S.C. § 1983 Claim for Supervisory Liability Against Chief Medical Examiner Hyland**

207. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

states as follows.

208. Defendant Hyland acted with deliberate indifference, recklessness, and/or gross negligence

to the constitutional rights of citizens by failing to provide adequate training, supervision, and

discipline of his subordinate, Deputy Medical Examiner Roh, and thereby caused Roh to deprive

Mr. Deskovic of his rights not to be convicted on the basis of fabricated evidence, to be free

from unreasonable search and seizure, not to be deprived of liberty without due process of law,

and to a fair criminal trial, as guaranteed by the Fourth and Fourteenth Amendments.

209. Specifically, defendant Hyland knew or should have known - based on, among other facts,

Roh's reputation for and open and notorious practice of fabricating scientific conclusions and

58

providing perjured testimony, his widely reported and criticized false and baseless scientific

testimony high priority and highly publicized cases prior to Mr. Deskovic's conviction, and,

upon information and belief, his actual knowledge and/or approval of the reports prepared and

testimony given in Jeffrey Deskovic's case - of a high degree of risk that defendant Roh would

perform his duties as Deputy Medical Examiner in a manner that violated the constitutional

rights of citizens.

210. The deliberately indifferent, reckless, and/or grossly negligent conduct of defendant Hyland

violated his clearly established duty, in 1989 and 1990, to supervise subordinate medical

examiners, and no reasonable medical examiner in 1989 and 1990 would have believed that

deliberately indifferent, reckless, and/or grossly negligent supervision in the face of actual or

constructive notice of misconduct by their subordinate officers was lawful.

211. Defendant Hyland's actions and omissions proximately and directly caused Mr. Deskovic to

be wrongly prosecuted, convicted, and imprisoned for sixteen years, and to suffer the other

grievous and continuing injuries and damages as set forth above.

## COUNT VII

### 42 U.S.C. § 1983 Claim for Failure to Intercede
### Against Defendants Levine, McIntyre, Brovarski, Tumolo,
### and John and Jane Doe Supervisors

212. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

213. By their conduct and under color of state law, defendants Levine, McIntyre, Brovarski,

Tumolo, and John and Jane Doe Supervisors had opportunities to intercede on behalf of Mr.

Deskovic to prevent his coerced confession, malicious prosecution, and deprivation of liberty

without due process of law, but, due to their intentional conduct and/or deliberate or reckless indifference, declined or refused to do so.

214. The defendants' failures to intercede violated Mr. Deskovic's clearly established constitutional rights not to be compelled to be a witness against himself, to be free from unreasonable search and seizure, not to be deprived of liberty without due process of law, and to a fair trial as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer or police supervisor in 1989 and 1990 would have believed that failing to intercede to prevent the defendants from coercing suspect statements, fabricating evidence, failing to document and disclose material, exculpatory and impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Deskovic to be arrested and prosecuted without probable cause were lawful.

215. As a direct and proximate result of the defendants' failures to intercede Mr. Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### 42 U.S.C. § 1983 Civil Rights Conspiracy Claim
### Against Defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens

216. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

217. Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others yet unknown agreed among themselves and with other individuals to act in concert in order to deprive Mr. Deskovic of his clearly established Fourth, Fifth, and Fourteenth Amendment rights not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures,

60

not to be deprived of his liberty without due process of law, and to a fair criminal trial.

218. In furtherance of the conspiracy the defendants engaged in and facilitated numerous overt

acts, including, without limitation, the following:

    a) Defendants Levine, McIntyre, Tumolo, Stephens, and others planned to obtain Jeffrey's

       confession through physical threats, trickery, deceptive promises, and other means

       deliberately designed to exploit Jeffrey's known age and intellectual, emotional, and

       psychological vulnerabilities;

    b) Defendants Levine, McIntyre, Tumolo, and others provided Jeffrey Deskovic with non-

       public facts known to the PPD in connection with the A.C. investigation, and through

       coercion, deception, and trickery compelled Jeffrey to adopt those facts as his own by

       incorporating them into allegedly inculpatory statements concerning his knowledge of

       and involvement in the crime;

    c) Defendant Levine and others deceived Jeffrey concerning the status and legal

       significance of his representation by Lou Ecker in relation to the defendants' questioning

       of him, and defendants Levine, McIntyre, Stephens, and others subsequently caused

       Jeffrey to waive his <u>Miranda</u> rights under circumstances that were not knowing and

       voluntary;

    d) Defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens deliberately and

       recklessly created false police reports, reported false facts to prosecutors, and otherwise

       fabricated evidence that falsely inculpated Mr. Deskovic and concealed the defendants'

       investigative misconduct, including but not limited to police reports and other documents

       falsely representing that Mr. Deskovic had independent knowledge of non-public facts

concerning A.C.'s rape and murder; <u>Miranda</u> waiver forms falsely representing that Mr. Deskovic's waivers were knowing and voluntary; and allegedly inculpatory witness statements.

e) Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others deliberately concealed additional material, exculpatory and impeachment evidence from prosecutors, including but not limited to facts concerning the coercive and intimidating tactics used by them to interview witnesses and interrogate Jeffrey Deskovic; evidence that Freddy Claxton and A.C. had not been in a romantic or sexual relationship; evidence that A.C. had not been sexually active prior to her rape and murder; and other evidence tending to establish Jeffrey Deskovic's innocence, including material, exculpatory and impeachment evidence discovered subsequent to Mr. Deskovic's indictment which vitiated probable cause;

f) Prior and subsequent to Mr. Deskovic's arrest, charging, and indictment for the crime, defendants Levine, McIntyre, Brovarski, Tumolo, and others deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Mr. Deskovic's innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Deskovic's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses; failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence; and failing to pursue evidence and leads concerning other suspects after their theory of Mr. Deskovic's guilt had been fatally undermined by known exculpatory evidence;

62

g) Defendants Levine, McIntyre, Stephens, and others hid their misconduct and secured Mr. Deskovic's wrongful conviction by deliberately provided perjured testimony in the grand jury and/or in Mr. Deskovic's criminal trial.

219. As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Deskovic was wrongly arrested, prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### 42 U.S.C. § 1983 Claim Against the City of Peekskill

220. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

221. The City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants, in particular juveniles; (b) fabricating evidence; (c) failing to document and disclose material, exculpatory and impeachment evidence to prosecutors; and (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations.

222. Furthermore, the City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to train and supervise PPD investigators in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting and documenting

63

criminal investigations, conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory and impeachment evidence to prosecutors.

223. The PPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to train and supervise PPD investigators, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple investigators and supervisors in the PPD in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent cases.

224. PPD policymakers were deliberately indifferent to the known and obvious risk that the policy, custom, or pattern and practice of investigative misconduct and failure to train and supervise PPD investigators created a risk that the constitutional rights of criminal suspects like Mr. Deskovic would be violated.

225. The misconduct and constitutional violations committed by the PPD defendants in the course of the investigation and prosecution of Jeffrey Deskovic were carried out pursuant to the PPD's policy, custom, or pattern and practice of investigative misconduct, and were directly and proximately caused by the PPD's failure to train and supervise investigators. As a direct and proximate result of the PPD's policies, customs, or patterns and practices, Jeffrey Deskovic was wrongly prosecuted, convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT X

### 42 U.S.C. § 1983 Claim Against Westchester County

226. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

227. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey

Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by

and through final policymakers and their delegees, maintained a policy, custom, or pattern and

practice of failing to supervise, train, and discipline assistant district attorneys in connection with

fundamental and recurring constitutional and ethical duties.

228. This policy, custom, or pattern and practice of failing to supervise, train, and discipline

assistant district attorneys was evidenced by, among other actions, multiple constitutional

violations and related acts of misconduct committed by multiple members of and supervisors in

the Westchester County District Attorney's Office in the course of the investigation and

prosecution of Jeffrey Deskovic, and in the course of prior and subsequent investigations and

prosecutions.

229. As a direct and proximate result of the Westchester County District Attorney's Office

policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant

district attorneys, prosecutors, including but not limited to assistant district attorney Bolen,

committed multiple constitutional violations and related misconduct in the course of prosecuting

Jeffrey Deskovic, including but not limited to the following:

a) Assistant district attorney Bolen deliberately or recklessly obtained Mr. Deskovic's

conviction by means of fabricated evidence, including but not limited to defendant Roh's

deliberately and recklessly false pretrial statements and testimony that (a) there was a

scientific basis for concluding that A.C. had been sexually active on multiple occasions prior

to her rape and murder, and (b) Roh had observed scarring of A.C.'s hymen during his

65

autopsy, which caused Mr. Deskovic to be maliciously prosecuted and subjected to an unfair

criminal trial on the basis of material fabrications;

b) Bolen concealed from the defense material, exculpatory and impeachment evidence,

including but not limited to, upon information and belief, that Roh's conclusions and

findings concerning A.C.'s sexual history were fabricated;

c) Bolen deliberately or recklessly failed to investigate known exculpatory evidence,

including but not limited to deliberately and recklessly failing to obtain reference hair

samples from Roh, his assistant, and Freddy Claxton, and deliberately or recklessly failing to

obtain DNA testing from Freddy Claxton or any other potential consensual sex partner.

d) Bolen deliberately or recklessly suborned perjury and made false arguments that lacked

evidentiary foundation in order to obtain Mr. Deskovic's conviction, including but not

limited to arguing at trial that hairs found on A.C. had come from Roh, his assistant, and

Freddy Claxton.

230. Westchester County District Attorney's Office policymakers were deliberately indifferent

to the known and obvious risk that the policy, custom, or pattern and practice of failing

supervise, train, and discipline assistant district attorneys in connection with fundamental and

recurring ethical and constitutional duties created a risk that the constitutional rights of criminal

suspects like Mr. Deskovic would be violated.

231. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of

Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final

policymakers and their delegees, maintained a policy, custom, or pattern and practice of

providing false and scientifically unsupported scientific conclusions to Westchester County

prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that

such conclusions would violate criminal suspects' right to a fair trial.

232. Additionally, prior to and at the time of the investigation, prosecution, and conviction of

Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final

policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing

to supervise, train and discipline deputy medical examiners.  County policymakers maintained

this policy, custom, or pattern and practice despite the fact that they knew or, in the absence of

their deliberate indifference should have known, that deputy medical examiners, including

defendant Roh, openly and notoriously fabricated scientific evidence, gave perjured testimony,

and otherwise committed misconduct in connection with their duties as deputy medical

examiners.

233. The Westchester County Medical Examiner's Office policy, custom, or pattern and practice

of providing false and scientifically unsupported scientific conclusions, and its policy, custom, or

pattern and practice of failing to supervise, train, and discipline deputy medical examiners, were

evidenced by, among other actions, multiple constitutional violations and related acts of

misconduct committed by multiple members of and supervisors in the Westchester County

Medical Examiner's Office in the course of the investigation and prosecution of Jeffrey

Deskovic, and in the course of prior and subsequent cases.

234. As a direct and proximate result of the Westchester County Medical Examiner's Office's

policy, custom, or pattern and practice of providing false and scientifically unsupported

conclusions to Westchester County prosecutors, and of failing to supervise, train, and discipline

deputy medical examiners, Deputy Medical Examiner Louis Roh committed multiple

67

constitutional violations and related misconduct in the course of prosecuting Jeffrey Deskovic,

including but not limited to the following:

a) Roh deliberately and recklessly fabricated the false fact that there was a scientific basis for

concluding that A.C. had been sexually active on multiple occasions prior to her rape and

murder, in order to support the prosecution's theory that the semen found in A.C. had come

from a consensual donor;

b) Roh deliberately and recklessly fabricated the false fact that he had observed scarring of

A.C.'s hymen;

c) Roh concealed material, exculpatory and impeachment evidence from assistant district

attorney Bolen, including, upon information and belief, the fact that his conclusions and

findings concerning A.C.'s sexual history were false;

d) Roh perjured himself on multiple occasions during Mr. Deskovic's trial, including by

deliberately and recklessly misstating and overstating his scientific conclusions.

235. Westchester County Medical Examiner's Office policymakers were deliberately indifferent

to the known and obvious risk that the Office's policy, custom, or pattern and practice of

providing false and scientifically unsupported evidence to prosecutors, and of failing supervise,

train, and discipline deputy medical examiners created a risk that the constitutional rights of

criminal suspects like Mr. Deskovic would be violated.

236. As a direct result of the policies, customs, or patterns and practices of Westchester County,

Jeffrey Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and

suffered the other grievous and continuing injuries and damages as set forth above.

**COUNT XI**

68

**42 U.S.C. § 1983 Claim for Unreasonable Search and Unnecessary and Wanton Infliction
of Pain in Violation of the Fourth, Eight, and Fourteenth Amendments
Against Defendant Tweed**

237. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

238. Defendant Tweed, acting under color of law, conducted searches of Mr. Deskovic's person

that were unreasonable violations of Mr. Deskovic's legitimate expectation of privacy, lacked

any legitimate penalogical objective, and therefore violated Mr. Deskovic's Fourth and

Fourteenth Amendment right to bodily integrity.

239. Furthermore, defendant Tweed repeatedly, maliciously, sadistically, and without any

legitimate penalogical objective subjected Mr. Deskovic to invasive, assaultive, and violative

physical and sexual conduct, and otherwise unnecessarily and wantonly inflicted pain upon Mr.

Deskovic.  Tweed acted with deliberate disregard for Mr. Deskovic's health and safety, in

violation of Mr. Deskovic's right under the Eighth and Fourteenth Amendments to be free from

cruel and unusual punishment.

240. Defendant Tweed's actions to deprive Mr. Deskovic of his Fourth, Eighth, and Fourteenth

Amendment rights violated clearly established constitutional law, and no reasonable corrections

officer in 2004 would have believed that defendant's actions were lawful.

241. Defendant Tweed's conduct directly and proximately caused Mr. Deskovic to suffer the

grievous injuries enumerated above at the time of the constitutional violations and continuing to

this day and into the future.

### Count XII

**State Law Claim for Malicious Prosecution
Against Defendants Levine, McIntyre, Tumolo, Stephens, and Roh**

69

242. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

243. Defendants Levine, McIntyre, Tumolo, Stephens, and Roh, despite knowing that probable cause did not exist to arrest and prosecute Mr. Deskovic for the rape and murder of A.C., and despite the fact that the grand jury's probable cause determination was vitiated by the defendants' undisclosed misconduct and by other concealed, material, exculpatory and impeachment evidence, acted individually and in concert to cause Mr. Deskovic to be arrested and prosecuted for those crimes. The defendants' conduct violated Mr. Deskovic's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures, and proximately caused his wrongful conviction.

244. Specifically, defendants Levine, McIntyre, Tumolo, and Stephens knew or in the absence of their deliberate and reckless indifference to the truth should have known of information that probable cause did not exist to arrest and prosecute Mr. Deskovic, including but not limited to the facts that Mr. Deskovic's waiver of his right to counsel prior to January 10, 1990 was not knowing and voluntary, that Mr. Deskovic's allegedly inculpatory statements on and prior to January 25, 1990 were not the product of his free will and rational intellect, that allegedly inculpatory evidence had been fabricated by the defendants, and that those factors as well as additional material, exculpatory and impeachment evidence which was not disclosed to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding against Mr. Deskovic.

245. Following Mr. Deskovic's indictment, defendants Levine, McIntyre, and Tumolo intentionally and with deliberate and reckless disregard for the truth, caused Mr. Deskovic's

70

prosecution to continue despite knowing that probable cause had been vitiated. Specifically, after DNA testing results exonerated Mr. Deskovic, the defendants continued to conceal their pre-indictment misconduct, and committed additional misconduct in the course of post-indictment investigation, including but not limited to concealing from prosecutors additional material, exculpatory evidence that undermined probable cause.

246. Additionally, prior and subsequent to Mr. Deskovic's indictment and being notified of exonerative DNA testing results, defendants Levine, McIntyre, and Tumolo deliberately and recklessly failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Mr. Deskovic's prosecution. The deliberate and reckless investigative failures of the defendants included but were not limited to failing to investigate known exculpatory and potentially exculpatory information provided by witnesses, failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence, and failing to pursue evidence and leads concerning other suspects.

247. Defendant Roh caused Mr. Deskovic to be maliciously prosecuted in violation of the Fourth Amendment by deliberately and recklessly fabricating allegedly inculpatory evidence concerning A.C.'s prior sexual history, which was critical to the continued prosecution of Mr. Deskovic following the exculpatory DNA test results, and which Roh knew or in the absence of his deliberate and reckless indifference should have known would cause Mr. Deskovic's prosecution to continue.

248. Specifically, just weeks after learning that DNA testing proved Mr. Deskovic not to be the source of the semen found inside A.C., Roh provided assistant district attorney Bolen with a

71

fabricated explanation for the source of the semen by falsely stating (a) that there was a scientific

basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape

and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These

false and fabricated pre-trial statements were repeated by Bolen to the court in pretrial

conferences discussing the DNA testing and Mr. Deskovic's continued prosecution, and were

elicited from Roh at trial.

249. In fact Roh knew, or in the absence of his deliberate and reckless indifference should have

known, that he had no scientific basis for concluding that A.C. had been sexually active on

multiple occasions, and that he had not seen the scarring that he described to Bolen. Upon

information and belief, Roh concealed the material, exculpatory and impeachment evidence of

his fabrications from Bolen.

250. The defendants performed the above-described acts deliberately, with reckless disregard for

the truth, and with malice.

251. In fact, Mr. Deskovic was innocent of the rape and murder of A.C. On November 2, 2006,

the prosecution terminated in Mr. Deskovic's favor when charges against him were dismissed on

motion of the Westchester County District Attorney, following the vacatur of his conviction and

his release from prison on September 20, 2006, after sixteen years of wrongful incarceration.

252. Defendants' actions to deprive Mr. Deskovic of his liberty without probable cause were in

violation of clearly established constitutional law, and no reasonable police officer in 1989 and

1990 would have believed that the defendants' actions were lawful.

253. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly

prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and

72

continuing injuries and damages as set forth above.

## COUNT XIII

### State Law Claim for Intentional or Reckless Infliction of Emotional Distress Against Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh

254. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

255. The conduct of defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh in deliberately causing, or recklessly disregarding the risk of causing, the wrongful arrest, prosecution, and incarceration of Jeffrey Deskovic was extreme and outrageous, and directly and proximately caused the grievous and continuing injuries and damages set forth above.

256. The conduct of defendant Tweed in deliberately subjecting Mr. Deskovic to unnecessary, invasive, assaultive, and violative physical contact, including contact of a sexual nature, was extreme and outrageous, and directly and proximately caused the grievous and continuing injuries and damages set forth above.

257. Defendants' actions intentionally to inflict emotion distress upon Mr. Deskovic were in violation of clearly established law, and no reasonable police officer in 1989 and 1990, or corrections officer in and subsequent to 1994, would have believed that the defendants' actions were lawful.

## COUNT XIV

### State Law Claim for Negligent Infliction of Emotional Distress Against Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh

258. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

259. Defendants Levine, McIntyre, Tumolo, Brovarski, Stephens, and Roh negligently and grossly negligently, and in breach of their duties owed to Mr. Deskovic to refrain from (a) compelling him to be a witness against himself, (b) fabricating evidence, (c) withholding material, exculpatory and impeachment evidence, (d) failing to conduct a constitutionally adequate investigation, and (e) maliciously prosecuting and causing Mr. Deskovic's false arrest and imprisonment, directly and proximately caused Mr. Deskovic, an innocent man, to be falsely arrested, malicious prosecuted, and wrongly imprisoned for sixteen years. The defendants' actions caused Mr. Deskovic to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

260. Defendant Tweed negligently and grossly negligently breached his duty to refrain from subjecting Jeffrey Deskovic to unnecessary, invasive, assaultive, and violative physical contact, including contact of a sexual nature, and thereby caused Mr. Deskovic to suffer physical harm and to fear for his physical safety throughout his incarceration.

261. Defendants' actions negligently to inflict emotion distress upon Mr. Deskovic were in violation of clearly established law, and no reasonable police officer in 1989 and 1990, or corrections officer in and subsequent to 1994, would have believed that the defendants' actions were lawful.

## COUNT XV

### Respondeat Superior Claim Against the City of Peekskill

262. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

74

263. At all times relevant to this complaint defendants Levine, McIntyre, Brovarski, and Tumolo acted as agents of, and in the scope of their employment with, defendant City of Peekskill. The conduct by which the defendants committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while the defendants were carrying out their routine investigative functions as PPD detectives, and engaging in such conduct as would have been reasonably expected, and was in fact foreseen by, by their employer.

264. The City of Peekskill is liable for its agents' state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XVI

### Respondeat Superior Claim Against Putnam County

265. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

266. At all times relevant to this complaint defendant Stephens acted as an agent of, and in the scope of his employment with, defendant Putnam County. The conduct by which defendant Stephens committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while Stephens was carrying out his routine investigative function as a Putnam County police officer, and was engaged in such conduct as would have been reasonably expected by, and was in fact foreseen by, his employer.

267. Putnam County is liable for Stephens's state law torts of malicious prosecution, intentional

75

or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XVII

### Respondeat Superior Claim Against Westchester County

268. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

269. At all times relevant to this complaint defendant Roh acted as an agent of, and in the scope of his employment with, defendant Westchester County. The conduct by which defendant Roh committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while Roh was carrying out his routine function as a Deputy Medical Examiner, and was engaged in such conduct as would have been reasonably expected by, and was in fact foreseen by, his employer.

270. Westchester County is liable for Roh's state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

**WHEREFORE**, Jeffrey Deskovic prays as follows:

A.  That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to him, and against all non-municipal defendants, in an amount, to be determined at trial, that will deter such conduct by defendants in the future;

C.  For a trial by jury;

76

D.  For pre-judgment and post-judgment interest and recovery of his costs, including

reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.  For any and all other relief to which he may be entitled.

Respectfully submitted,

September 18, 2007

Barry Scheck
Nick Brustin (NB0605)
Jennifer Laurin
Cochran, Neufeld & Scheck LLP
99 Hudson Street, 8th Floor
New York, New York 10013
Tel:  (212) 965-9081
Fax: (212) 965-9084
Attorneys for Plaintiff Jeffrey Deskovic

Exhibit "B", Part 1 (McGarr)

*Parties Added.*
*Amended Summons Issued).*

Amended Complaint:
Adding parties - George Bolen
Adding/amending allegations - ¶¶ 15, 16,
28, 120, 124–26, 130, 132, 134, 136, 157,
158, 160, 163, 165, 168, and Count III

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JEFFREY DESKOVIC,                    )
                                     )
    Plaintiff,                       )
                                     )
        v.                           )
                                     )
CITY OF PEEKSKILL, PUTNAM COUNTY,    )    No. CV-07-8150
WESTCHESTER COUNTY, DAVID LEVINE,    )
THOMAS MCINTYRE, WALTER              )
BROVARSKI, EUGENE TUMOLO, JOHN       )
AND JANE DOE SUPERVISORS, DANIEL     )
STEPHENS, LOUIS ROH, MILLARD         )
HYLAND, GEORGE BOLEN, and            )
ALAN TWEED                           )
                                     )
    Defendants.                      )

U.S. DISTRICT COURT
FILED
JUN 13 2008
S.D. W.P. OF N.Y.

### FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Jeffrey Deskovic, by and through his attorneys, the law firm of Cochran, Neufeld &

Scheck, LLP, states as follows:

1. On November 15, 1989, a fifteen year old Peekskill High School sophomore, A.C.,[1] left her

home after school to take pictures for her high school photography class. A.C., by all accounts a

quiet and gentle girl with a sweet disposition who had recently immigrated from Colombia,

walked to a nearby park to photograph the fall foliage.

---

[1] The victim will be referred to as "A.C." throughout the complaint in an effort to protect
the privacy of her family.

1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

2. A.C. never returned home. That afternoon, Steven Cunningham, a twenty-nine-year-old with a drug habit and a criminal record, spotted A.C. in the park as he sat smoking crack. He attacked her, then he raped her, and ultimately he murdered her, leaving behind a trail of evidence demonstrating his involvement in the crime - including, critically, his semen.

3. The horrible tragedy of A.C.'s death was inexcusably compounded when her classmate, Jeffrey Deskovic, who had just turned sixteen years old, was wrongly arrested, prosecuted, and convicted of the crime. Unbelievably, Mr. Deskovic was convicted despite DNA testing on Cunningham's semen which proved, months prior to Mr. Deskovic's criminal trial, that he could not have committed the terrible crime with which he was charged.

4. Mr. Deskovic spent almost sixteen years of his adolescence and young adulthood fighting from behind bars to prove his innocence. He was finally vindicated in 2006, when new DNA testing established that the semen found on A.C.'s body came from Cunningham, who subsequently confessed, pled guilty to, and was convicted of the crime. Even worse, not only was an innocent youth wrongly convicted and A.C.'s actual killer allowed to go free, but in a final sickening turn of events Cunningham killed again, murdering another Peekskill woman just four years after his rape and murder of A.C.

5. Mr. Deskovic's wrongful conviction and years of wrongful incarceration, despite the fact that police and prosecutors knew of the DNA evidence and other clearly exculpatory facts, was the direct result of a veritable perfect storm of misconduct by virtually every actor at every stage of his investigation and prosecution.

6. Peekskill detectives and supervisors investigating A.C.'s rape and murder targeted Mr. Deskovic as a suspect, and then failed to investigate evidence pointing to his innocence. Instead,

2

they built their case by systematically coercing and fabricating Mr. Deskovic's false confession,

by similarly coercing and fabricating allegedly corroborating evidence from witnesses, and by

hiding evidence of Mr. Deskovic's innocence and their improper investigation from prosecutors

and the defense - even after learning that DNA evidence proved Mr. Deskovic's innocence.

7. So, too, did Westchester County officials systematically fabricate false proof of Mr.

Deskovic's guilt and conceal evidence that supported his innocence.   Deputy Medical Examiner

Louis Roh provided Westchester County prosecutors with fabricated "evidence" that purported

to explain how Mr. Deskovic could have raped A.C. despite the presence of another man's

semen inside of her.  Thus, Dr. Roh told prosecutors before trial - and provided testimony that

was central to the trial prosecutor's presentation to the jury - that based upon his autopsy of

A.C., he had scientific proof that she had in fact been sexually active on multiple occasions prior

to her rape.  In fact, not only did Dr. Roh lack any credible observational evidence or scientific

basis for such conclusions, but the assertion that the victim was ever sexually active was

completely contrary to all known facts about A.C. - who was by all accounts a reserved,

traditionally Catholic, and completely sexually inexperienced young girl.

8. The pervasive and systematic official misconduct that led to Mr. Deskovic's wrongful

conviction did not occur in isolation, outside of official bureaucratic channels.  Rather, the actors

who deprived Mr. Deskovic of his constitutional protections and caused him to be wrongly

arrested, prosecuted, and convicted were acting with the direct participation, knowledge, and/or

acquiescence of supervisors and policymakers in Peekskill and Westchester County, and

pursuant to policies, customs, or patterns and practices of misconduct and egregious failures of

supervision and oversight within the Peekskill Police Department, the Westchester County

District Attorney's Office, and the Westchester County Medical Examiner's Office.

9. The victimization of Jeffrey Deskovic did not end with his wrongful conviction. Throughout his nearly sixteen years imprisoned as a juvenile and a young adult, Mr. Deskovic endured sexually humiliating acts inflicted upon him by corrections officer Alan Tweed, who, like those who caused Mr. Deskovic's wrongful conviction, preyed upon Mr. Deskovic's obvious weakness to magnify the horror of his wrongful incarceration.

10. This civil rights action seeks accountability for the official misconduct and abuses of power that led to Mr. Deskovic's wrongful arrest, prosecution, and conviction, and that robbed Mr. Deskovic of sixteen years of youth and young adulthood.

## JURISDICTION

11. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

12. Supplemental jurisdiction over Mr. Deskovic's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

13. Plaintiff has complied with the requirements of New York General Municipal Law Section 50-I. Mr. Deskovic made and served a notice of claim on all municipal defendants, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of those notices, and no offer of settlement has been made.

14. At the request of the City of Peekskill, Putnam County, and Westchester County, on June 28, 2007 Mr. Deskovic submitted to a hearing pursuant to New York General Municipal Law Section 50-e.

## VENUE

4

15. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of New York,

the judicial district in which a substantial part of the events or omissions giving rise to the claim

occurred

16. Venue is also proper in the Southern District of New York pursuant to 28 U.S.C. §

1391(b)(1), as Mr. Deskovic currently resides within the Southern District and all defendants

reside in the State of New York.

**JURY DEMAND**

17. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a

jury trial on all issues and claims set forth in this Complaint.

**PARTIES**

18. Plaintiff Jeffrey Deskovic is, and at all times material to this Complaint was, a citizen and

resident of the State of New York. He resides in Tarrytown, New York.

19. Defendant City of Peekskill is a municipality that is a political subdivision of the State of

New York, was the employer of defendants Levine, McIntyre, Brovarski, Tumolo, and John and

Jane Doe Supervisors, and is and was at all times relevant to this complaint responsible for the

policies, practices, and customs of the Peekskill Police Department ("PPD").

20. Defendant Putnam County is a municipality that is a political subdivision of the State of New

York, was the employer of defendant Stephens, and is and was at all times relevant to this

complaint responsible for the policies, practices, and customs of the Putnam County Sheriff's

Department.

21. Defendant Westchester County is a municipality that is a political subdivision of the State of

New York, was the employer of defendants Roh and Hyland, and is and was at all times relevant

5

to this complaint responsible for the policies, practices, and customs of the Westchester County

District Attorney's Office and the Westchester County Medical Examiner's Office.

22. Defendant David Levine at all times relevant to this complaint was a duly appointed and

acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances,

regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He

is sued in his individual capacity.

23. Defendant Thomas McIntyre at all times relevant to this complaint was a duly appointed and

acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances,

regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He

is sued in his individual capacity.

24. Defendant Walter Brovarski at all times relevant to this complaint was a duly appointed and

acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances,

regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He

is sued in his individual capacity.

25. Defendant Eugene Tumolo at all times relevant to this complaint was a duly appointed and

acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances,

regulations, policies, customs, and usage of the City of Peekskill and the State of New York.

Defendant Tumolo is sued in his individual capacity for that conduct undertaken by him when he

possessed the rank of lieutenant with the PPD. He is sued in his official capacity as the current

Chief of the PPD.

26. Defendants John and Jane Does at all times relevant to this complaint were duly appointed

and acting supervisors of the PPD, acting under color of law pursuant to the statutes, ordinances,

6

regulations, policies, customs, and usage of the City of Peekskill and the State of New York.

They are sued in their individual capacities.

27. Defendant Daniel Stephens at all times relevant to this complaint was a duly appointed and

acting investigator of the Putnam County Sheriff's Department, acting under color of law

pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Putnam County

and the State of New York. Defendant Stephens is sued in his individual capacity.

28. Defendant George Bolen at all times relevant to this complaint was a duly appointed and

acting assistant district attorney for the Westchester County District Attorney's Office, acting

under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage

of Westchester County and the State of New York. Defendant Bolen is sued in his individual

capacity.

29. Defendant Louis Roh at all times relevant to this complaint was a duly appointed and acting

Deputy Medical Examiner in the Westchester County Medical Examiner's Office, acting under

color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of

Westchester County and the State of New York. Defendant Roh is sued in his individual

capacity.

30. Defendant Millard Hyland at all times relevant to this complaint was the duly appointed and

acting Chief Medical Examiner for Westchester County, acting under color of law pursuant to

the statutes, ordinances, regulations, policies, customs, and usage of Westchester County and the

State of New York. Defendant Hyland is sued in his individual and official capacities.

31. Defendant Alan Tweed at all times relevant to this complaint was a duly appointed and

acting corrections officer for the State of New York at the Elmira Correctional Facility, acting

7

under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage

of the State of New York. Defendant Tweed is sued in his individual capacity.

## FACTS

### The Crime and Initial Investigation

32. On the afternoon of November 15, 1989, fifteen-year-old Peekskill High School sophomore

A.C. came home from school, and then went out again to take photographs very close to her

home, for a photography class assignment. When A.C. did not return home that day, her family

contacted the Peekskill Police Department and reported her missing.

33. From November 15 until November 17, the PPD conducted, at best, a reckless investigation

into A.C.'s disappearance. As a result, although A.C.'s body would ultimately be found only a

few hundred yards from her home, the PPD was unable to adduce any leads as to her location for

more than thirty-six hours. Ultimately, the New York State Police were brought in to assist in

the investigation, which, together with A.C.'s family's distress, greatly increased the pressure on

PPD detectives and supervisors to solve the case.

34. On the morning of November 17, PPD officers and members of the State Police found the

body of A.C. in a heavily wooded area of Hillcrest Park near Griffins Pond, very close to her

family's home. Her body was discovered covered with leaves and naked from the waist down in

a part of the park known as "the Pit." A.C. had been raped, and had died from asphyxiation and

blunt trauma to the head.

35. Between the time of A.C.'s disappearance and when her body was discovered, heavy storms

and tornado conditions had blown through Peekskill.

36. More than a dozen police officers, medical personnel, and employees of the Westchester

8

County District Attorney's office responded to the Griffins Pond area in the hours following the discovery of A.C.'s body. Although crime scene tape was put up around the scene, public access to the area - which included several walking paths and was located near an apartment complex - was not otherwise restricted. Hence, passers-by were able to visit and examine the area prior and subsequent to the police investigation there on the 17th.

37. PPD personnel, including defendants Levine, McIntyre, Brovarski, and Tumolo, and additional PPD patrol officers, detectives, and supervisors, assisted by the New York State Police, canvassed the crime scene and collected and vouchered dozens of items of evidence. Among the evidence recovered by the police were a torn note found underneath A.C.'s body, a white bra found along a dirt path that led to A.C.'s body, and a 35 millimeter camera found along a paved park path.

38. Immediately in the investigation PPD personnel, including the PPD defendants, developed very specific theories as to how A.C.'s rape and murder had transpired. The PPD defendants built and pursued their investigation around leads that correlated to their initial theories, and those theories were adopted by the prosecutor and argued to the jury at Jeffrey Deskovic's trial.

39. Thus, based upon the note found under A.C.'s body - which appeared to be in her handwriting and to refer an individual named "Freddy" - the PPD defendants concluded that A.C. had been in a romantic relationship with a Peekskill High School student named Freddy Claxton, and that her rape and murder was connected to that relationship.

40. This initial theory also led the PPD defendants to create, with the assistance of the New York City Police Department, a suspect profile suggesting, among other characteristics, that A.C. had known her attacker, that the perpetrator was a white or Hispanic man younger than nineteen

9

years old and approximately five feet, ten inches tall, and that he was a loner with physical or mental handicaps.

41. Additionally, on November 17, PPD investigators, including but not limited to defendants Levine, McIntyre, Brovarski, and Tumolo, surmised that the crime had occurred in three separate locations: crime scene "one," where the police thought A.C. had left her camera when initially assaulted by her attacker; crime scene "two," where the police believed A.C. had been raped and her bra left behind; and crime scene "three," the place to which A.C.'s body was dragged after the rape. PPD detectives, including defendants Levine and McIntyre, photographed, diagramed, and, upon information and belief, marked the three crime scene areas.

42. In fact, the theories and profile developed by the PPD defendants in the earliest hours and days of their investigation bore almost no relationship to the manner in which the actual perpetrator, Steven Cunningham, carried out the crime. Cunningham was a twenty-nine-year-old African American man who was over six feet tall. He had never known or seen A.C. prior to November 15. On the day of A.C.'s murder Cunningham had been drinking at a local bar, bought crack, and then went to the Pit, where he smoked the crack and four cigarettes. Cunningham carried out the crime in only two locations: He grabbed A.C. from behind on a park path, and dragged her to the Pit area, where he raped and killed her, and left her body.

43. Cunningham left four cigarette butts at the crime scene, as well as his crack pipe and full vials of crack. Before he left the scene, he spoke to two boys who were playing basketball at a court in Hillcrest Park. Cunningham was known to the PPD, had been arrested prior to November 15, and, upon information and belief, his fingerprints were on file with the PPD.

44. A.C.'s body was taken from the crime scene by Deputy Medical Examiner Dr. Louis Roh

10

and his assistant, and an autopsy was performed on November 17. The results of the autopsy,

contained in a report dated November 20, 1989, included that A.C. had died from asphyxia due

to ligature strangulation, and a fractured skull.

45. Dr. Roh found loose hairs on A.C.'s right breast, right leg, and left arm, and in A.C.'s pubic

region, which he submitted to a hair examiner in the Westchester County Department of

Laboratories and Research for analysis. Dr. Roh also prepared oral, rectal, and vaginal swabs,

and submitted them along with A.C.'s bra, jeans, and underwear for serological analysis by the

Westchester County laboratory.

### Peekskill Police Focus on Peekskill High School for Suspects

46. Defendants Levine and McIntyre were the assigned detectives handling the A.C.

investigation, and they conducted the investigation with the assistance of other PPD detectives,

including but not limited to defendant Brovarski, and under the supervision of defendants

Tumolo and John and Jane Doe Supervisors not known at this time.

47. Within a week of A.C.'s rape and murder, Freddy Claxton was called to the office of

Peekskill High School Principal Sheldon Levine - who, upon information and belief, was the

brother of defendant Detective David Levine. When Freddy arrived Principal Levine was

present with multiple PPD investigators, including, upon information and belief, one or more of

the PPD defendants, who expressed that they wished to speak with Freddy in connection with

A.C. In the presence of and/or with the knowledge of the PPD investigators, Principal Levine

called Freddy's mother to obtain her permission for the questioning, and she refused.

48. At or prior to that meeting, Freddy had told PPD investigators, including, upon information

and belief, one or more PPD defendants, that he lived in an apartment complex next to Hillcrest

11

Park, and that there was a male drifter who was frequently spotted in, and possibly lived in, Hillcrest Park, who may have committed the crime. Upon information and belief, PPD personnel never investigated Freddy's information concerning this drifter.

49. Later that day, one or more of the same PPD investigators who had been present in Principal Levine's office, including upon information and belief one or more PPD defendants, went to Freddy's house. Freddy answered the door, and the investigators asked Freddy to accompany them to the PPD stationhouse. When Freddy refused, reiterating that his mother did not want him to speak to the police, and that he needed to stay home to take care of his younger brother, the investigators told Freddy, in substance, that they just needed his assistance, that it was okay for him to accompany them to the stationhouse, and that he should bring his younger brother along.

50. Once at the PPD stationhouse, Freddy was separated from his younger brother and placed in an office with multiple investigators, including, upon information and belief, one or more PPD defendants. The detectives asked Freddy what his relationship was with A.C., and Freddy told them that he knew A.C. but never spoke with her. The detectives began to interrogate Freddy aggressively, standing around him while he was seated in a chair, and repeatedly accusing him of having exchanged romantic notes with A.C. and hiding a romantic relationship with her. Freddy repeatedly and consistently denied the detectives' allegations.

51. The interrogation continued until Freddy's father entered the interrogation room and interrupted the questioning. Upon information and belief, Freddy's father had arrived at the PPD stationhouse approximately a half hour previously, having learned of the interrogation, but had been prevented by PPD investigators, including one or more PPD defendants, from seeing his

12

son and ending the interrogation.

### The PPD Defendants Conceal Material, Exculpatory and Impeachment Evidence

52. The interrogation of Freddy Claxton, the circumstances under which PPD detectives isolated, deceived, and coercively questioned Freddy, and the substance of Freddy's denials that he and A.C. had any romantic relationship, were never documented by PPD detectives.

53. PPD detectives continued to investigate Freddy Claxton by interviewing other witnesses, including, for example, other Peekskill High School students, both prior to and, upon information and belief, subsequent to the indictment. PPD detectives, including but not limited to the defendants, were consistently told by multiple sources that Freddy and A.C. had not had any romantic relationship. During those interviews one or more PPD defendants coerced or attempted to coerce witnesses to state that Freddy and A.C. had been in a romantic relationship. Detectives, including the defendants, failed to document or disclose to prosecutors material, exculpatory and impeachment evidence concerning interviews conducted by them, the circumstances of their coercion of witnesses, and the substance of multiple witnesses' statements denying the existence of a relationship between Freddy and A.C.

54. Furthermore, PPD investigators, including the PPD defendants, interviewed multiple witnesses, many on multiple occasions, who provided information that A.C. had never been involved in any romantic relationship - let alone a sexual relationship - prior to her death. The PPD defendants failed to document or disclose to prosecutors this material, exculpatory and impeachment evidence concerning A.C.'s sexual history.

55. The subsequent revelation that DNA testing proved the sperm found inside A.C. had not come from Jeffrey, and ensuing efforts by the prosecution and defendant Roh to advance a

13

theory of Jeffrey's guilt notwithstanding the presence of sperm from another man inside of A.C.,
meant that evidence concerning Freddy and A.C.'s alleged relationship and/or any consensual
sexual partners that A.C. could have had was critical to the continued existence of probable
cause to prosecute Jeffrey and to his ultimate conviction.

### The Investigation Focuses on Jeffrey Deskovic

56. In November 1989 Jeffrey Deskovic had just turned sixteen and was a Peekskill High School
sophomore. He was white, approximately five feet, ten inches tall, and was acquainted with
A.C. as a classmate.

57. Jeffrey had struggled socially and academically in school in the years leading up to A.C.'s
death. Although his grades were improving his sophomore year, he had been evaluated by and
received assistance from schools and outside sources in connection with his academic struggles
and learning disabilities. School records also reflected that Jeffrey was seeing a school social
worker.

58. Jeffrey had also received emotional and psychological counseling and treatment from a
number of outside sources since a relatively young age. Jeffrey had been evaluated and treated
for a variety of psychological symptoms, including anxiety, depression, and, for a time,
complaints of hearing voices.

59. Jeffrey had also received counseling and other mental health evaluation and treatment in
connection with his family life. Jeffrey never met his biological father, whom his mother never
married, and he and his half brother were raised by his mother and grandmother. With the
exception of a brief and abusive relationship between Jeffrey's mother and the father of Jeffrey's
brother, Jeffrey grew up without any father figure in the home.

14

60. Jeffrey was deeply affected by A.C.'s death, which prompted his feelings for her, previously casual, to intensify into a deeper admiration and attachment. Jeffrey attended multiple wakes held for A.C. as well as her funeral, and was visibly distraught at these events. Jeffrey also visited the crime scene shortly after A.C.'s body was found - following a map that had been published in the local newspaper, as well as other public descriptions of the area, which he was generally familiar with from prior visits to Hillcrest Park.

**PPD Investigators Exploit Jeffrey's Emotional and Psychological Vulnerabilities**

61. The attention of PPD investigators, including the PPD defendants, was drawn to Jeffrey after receiving reports that he had been extremely emotional at A.C.'s wakes and funeral, and appeared to be taking an unusual interest in A.C.'s death.

62. Immediately upon beginning their investigation of Jeffrey Deskovic, the PPD defendants learned that Jeffrey was affected by emotional and psychological difficulties, struggled academically and socially in school, and led a troubled family life. Indeed, Jeffrey's known difficulties in these regards were, upon information and belief, a significant factors in causing the PPD defendants to view Jeffrey as a suspect, and to initiate questioning of Jeffrey in connection with the crime.

63. The PPD defendants, knowing of Jeffrey's emotional and psychological problems, deliberately and recklessly devised a strategy for investigating and questioning Jeffrey that played upon and exploited those vulnerabilities, and carried out that strategy throughout the course of their investigation and numerous meetings with and interrogations of Jeffrey. The tactics devised by the defendants included, without limitation, the following: building a false relationship of friendship, trust, and cooperation with Jeffrey by repeatedly telling him that the

15

police needed his assistance in the investigation of A.C.'s death and that he had unique abilities and access that enabled him to provide important assistance to the police; encouraging Jeffrey to conduct his own investigation into the crime and to share with them any information or leads that he was able to acquire; and otherwise building a false relationship of trust and cooperation with Jeffrey. The defendants' tactics were deliberately calculated, and were calibrated to Jeffrey's known emotional and psychological vulnerabilities, to mislead Jeffrey concerning the nature of his relationship and interactions with the police.

64. Several weeks after A.C.'s death, defendants Levine and McIntyre approached Jeffrey on the street as he was walking to school in the morning. Levine and McIntyre asked Jeffrey to accompany them to the PPD stationhouse to speak with them about A.C. Jeffrey agreed to accompany them, and specifically requested that the detectives not contact his mother to inform her of his whereabouts.

65. Prior to that day, Jeffrey had never been arrested, had never been to the PPD stationhouse, and had never been questioned by police.

66. Assistant district attorney Neary was notified by defendant Tumolo that Jeffrey was being questioned, and Neary was present at the PPD stationhouse for some of that morning. Neary did not speak with Deskovic, but instructed the PPD defendants to obtain Jeffrey's consent to take a polygraph examination.

67. Upon information and belief, assistant district attorney George Bolen, who was the supervising trial attorney in the Westchester District Attorney's Office, was also notified concerning the December 12 questioning of Jeffrey Deskovic, and was told of all subsequent important investigative events and decisions of which the District Attorney's Office was aware

concerning Jeffrey Deskovic.

68. Upon Jeffrey's arrival, he was taken to an office where, for the next several hours, he was alone with and questioned by McIntyre and Levine. Jeffrey told the PPD defendants, among other things, that he had visited the crime scene within twenty-four hours of A.C.'s body being found, and that he had learned certain facts about the crime from the newspaper and other public sources.

69. In the course of McIntyre and Levine's questioning of Jeffrey, McIntyre accused Jeffrey of the rape and murder of A.C. When Jeffrey reacted by denying the accusation, McIntyre discouraged Jeffrey from ending the interview by suggesting to him that it was a sign of guilt and encouraging Jeffrey, again, to assist the PPD in its investigation.

70. During the questioning Jeffrey was shown one or more photographs of the deceased A.C. and of the crime scenes. McIntyre and Levine also shared with Jeffrey details of the crime and the investigation that had not been made public - including, but not limited to, the fact that a note concerning Freddy Claxton had been found under A.C.'s body, and the PPD's theory that A.C. and Freddy had been romantically involved.

71. In fact, during the first and subsequent meetings with and interrogations of Jeffrey, PPD investigators, including the PPD defendants, provided Jeffrey with information about numerous non-public details and investigative theories concerning A.C.'s death. Throughout their numerous meetings with and interrogations of Jeffrey, the PPD defendants encouraged and coerced Jeffrey to incorporate those details into his own statements concerning the crime. The PPD defendants subsequently falsely represented, in police reports and conversations with prosecutors, that Jeffrey actually had independent knowledge of the facts provided by them.

17

72. The PPD defendants also became aware that Jeffrey had learned, through newspapers and other sources, certain facts about the crime and the investigation that had not been kept confidential by the police. The PPD defendants subsequently falsely represented, in police reports, conversations with prosecutors before trial, pretrial hearings, and at trial that these public facts were actually the product of Jeffrey's independent knowledge about the crime.

73. The details and theories provided to Jeffrey by the PPD defendants, and/or known by the PPD defendants to have been learned by Jeffrey through public sources rather than by his independent knowledge of the crime, included but were not limited to the following facts: (a) that a note referring to Freddy Claxton was discovered under A.C.'s body; (b) that a bra was found away from A.C.'s body; (c) that A.C.'s body was covered in leaves; (d) the manner in which police believed A.C. to have been asphyxiated; (e) the nature and location of A.C.'s head trauma;(f) the location where A.C.'s camera was discovered; (g) that A.C. had lost a set of keys; (h) the possibility that the rapist had not ejaculated; and (I) the three crime scene locations identified by the PPD.

74. Jeffrey's alleged independent knowledge of the above facts was critical to obtaining a probable cause determination from the grand jury and in procuring Jeffrey's conviction at his criminal trial.

### Jeffrey Obtains Legal Counsel - Which the Defendants Disregard

75. After leaving the PPD stationhouse, Jeffrey went to Peekskill High School and informed one of his teachers, Mr. Tompkins, that he had been interrogated by the police and accused of the murder of A.C. That afternoon a meeting was convened that included Mr. Tompkins, Jeffrey, school administrators including Principal Sheldon Levine, and, eventually Jeffrey's mother.

76. At the meeting, Jeffrey told the school officials present that he had been interrogated and accused of A.C.'s murder. The school officials then questioned Jeffrey concerning the crime, and asked him if he had committed it. Jeffrey denied any involvement.

77. When Jeffrey's mother arrived at the meeting she expressed to all those present that she did not want Jeffrey to speak with the Peekskill Police, and that she would be retaining an attorney to represent Jeffrey.

78. Upon information and belief, one or more school officials present at this meeting subsequently informed one or more of the PPD defendants that Jeffrey's mother did not wish for him to speak to the police, and that she was retaining an attorney to represent her son.

79. The day after his interrogation and subsequent meeting with school officials, Jeffrey and his mother met with attorney Lou Ecker. Jeffrey and Ecker spoke privately, and at the conclusion of the meeting Ecker informed Jeffrey and his mother that he would contact the Peekskill Police Department, inform them that Jeffrey was represented by counsel, and request that no further questioning of Jeffrey occur outside the presence of counsel. Jeffrey understood then and up through the time of his alleged confession that Lou Ecker was representing him as his attorney.

80. Within days of Ecker's meeting with Jeffrey, Ecker contacted the PPD, spoke with defendant Tumolo, and informed Tumolo that he represented Jeffrey and that Jeffrey should not be questioned any further. This information was shared with all of the PPD defendants, and with representatives of the Westchester County District Attorney's Office, including but not limited to assistant district attorneys Bolen and Neary.

81. Subsequent to Ecker's call to Tumolo, defendant Levine reached out to Jeffrey to attempt to speak with him. Jeffrey told Levine that he was represented by attorney Ecker, and that pursuant

19

to Ecker's instructions Jeffrey was not to speak with the police concerning the A.C. investigation. Although, upon information and belief, Levine knew that Ecker had told prosecutors that he no longer represented Jeffrey and had referred Jeffrey to Legal Aid, Levine did not inform Jeffrey of this fact or otherwise attempt to resolve the evident confusion regarding the status of Ecker's representation. Rather, Levine told Jeffrey, in substance, that it was okay for Jeffrey to speak to the police notwithstanding Ecker's advice. Levine's statements deliberately disregarded Jeffrey's invocation of his right to counsel, and were a deliberate effort to mislead Jeffrey into believing that the police were not required to cease all contact with him if he requested and/or was represented by an attorney.

82. Levine's advice concerning the status and significance of Jeffrey's legal representation was erroneous, deceptive, and deliberately coercive, such that any subsequent waiver by Jeffrey of his right to counsel in speaking with the police was not knowing or voluntary.

### The PPD Defendants Conceal Their Fifth Amendment Violations

83. Trusting Levine's representation, and believing representations by the PPD defendants that he could be of assistance to their investigation, Jeffrey agreed to meet again with the police in connection with the A.C. investigation. PPD investigators, including but not limited to the PPD defendants, met with and questioned Jeffrey on many occasions over the course of many hours on many days, up to and including January 25, 1990. Jeffrey told the PPD defendants on numerous occasions in the course of these interviews that his mother did not want him to be with the police, did not know that he was with the police, and that the police should not inform her of Jeffrey's whereabouts.

84. At these meetings, Jeffrey was repeatedly given Miranda warnings, and the PPD defendants,

20

including but not limited to Levine and McIntyre, prepared Miranda waiver forms representing that Jeffrey's waivers of his Miranda rights were knowing and voluntary. In light of defendant Levine's earlier statement to Jeffrey that, despite Jeffrey's understanding and invocation of his legal representation it was okay for Jeffrey to speak to the police, Jeffrey's waivers of his Miranda rights at those subsequent meetings were not in fact knowing or voluntary. The defendants deliberately obtained and documented Jeffrey's alleged waivers of his Miranda rights in order to conceal Levine's knowing misrepresentation concerning the status and significance of Jeffrey's legal representation.

85. Throughout their numerous meetings with Jeffrey, the PPD defendants also deliberately employed tactics to denigrate and minimize the importance of the rights about which they were advising Jeffrey. Those tactics included but were not limited to deliberately portraying interrogation sessions as meetings in which Jeffrey was assisting the police, and telling and suggesting to Jeffrey that assertion of his rights to counsel and to terminate questioning would be signs of guilt and would impede the A.C. investigation.

86. Throughout the numerous meetings and interrogations that the PPD conducted with Jeffrey, the PPD defendants had access to one or more microcassette recorders, and understood the importance of recording suspect interrogations for the purpose of later establishing, in legal proceedings, the content of those interrogation sessions. The PPD defendants deliberately recorded only a small portion of their interactions with Jeffrey in order to misrepresent the nature of their course of conduct with Jeffrey, to hide the deliberately coercive and deceptive tactics employed by them, and to conceal exculpatory and impeachment evidence. Upon information and belief, the PPD defendants subsequently lied to prosecutors and to the jury in Jeffrey's

21

criminal proceedings concerning the circumstances of their recordings and the reasons why large

portions of their meetings with Jeffrey were unrecorded. The defendants' selective recording

tactics culminated in their final interrogation session on January 25, 1990, which the defendants

knew was aimed at coercing Jeffrey's confession to the crime, and of which no recordings were

made.

### The Police Question Jeffrey and Fabricate Additional Evidence of Guilt

87. Subsequent to informing Levine and the other PPD defendants that he was represented by

counsel, Jeffrey met with Levine and the PPD defendants for a day-long session on a school day.

This day-long session was later documented by the PPD defendants in police reports, partially

recorded by the PPD defendants in audiotapes, and discussed by the PPD defendants in trial and

pretrial testimony, and, upon information and belief, in pretrial conversations with prosecutors.

88. According to the PPD defendants' version of events, Jeffrey came to the Peekskill

stationhouse with typewritten notes that he had prepared of his own investigation and discussed

his investigation with Detective Levine. Then, according to the PPD defendants, Jeffrey

independently drew crime scene maps indicating the three crime scene locations identified by the

police and the fact that A.C.'s body was covered by leaves, and showing the path that A.C.

walked from her home to Hillcrest Park - all, according to the PPD defendants, based on non-

public information that Jeffrey knew because he was A.C.'s killer. Later that day, according to

the PPD defendants, Jeffrey accompanied them to the crime scene and further demonstrated his

knowledge of non-public facts about the crime, including but not limited to the three crime scene

locations and where A.C.'s camera had been found. Following the crime scene trip, Jeffrey

allegedly returned to the Peekskill stationhouse where he answered more questions about the

crime scene and, according to the PPD defendants, used the map he had drawn earlier in the day to show detective McIntyre where A.C.'s camera had been found.

89. In fact, the PPD defendants deliberately misrepresented critical facts and concealed material, exculpatory and impeachment evidence concerning that meeting as well as other sessions in which Jeffrey and the PPD defendants discussed the A.C. investigation. Contrary to the PPD defendants' representation that Jeffrey's crime scene maps depicted his own, independent knowledge of non-public facts, in fact the PPD defendants knew or in the absence of their deliberate and reckless indifference should have known that they had provided Jeffrey non-public facts about the crime, that other facts provided by Jeffrey were in fact public, and that Jeffrey had incorporated those facts into his maps. The PPD defendants deliberately concealed and manipulated their interactions with Jeffrey by selectively recording only short segments of the many hours of questioning and deliberately failing to record critical events, including but not limited to Jeffrey's drawing of crime scene maps, the visit to the crime scene, and an hour or more period of interrogation by defendant Levine during which he directly accused Jeffrey of raping and murdering A.C.

90. Levine requested that Jeffrey sign the crime scene maps drawn by him, and showed the maps to defendants McIntyre and Tumolo. The maps were subsequently provided to prosecutors.

### The Police Plan to Procure Jeffrey's Confession

91. In the course of his meetings with the PPD, the PPD defendants encouraged Jeffrey to submit to a polygraph examination. The PPD defendants convinced Jeffrey to take the polygraph "test" by telling him that if he "passed," they would permit him to be more fully involved in the A.C. investigation, and would provide him with access to their police files. Jeffrey ultimately agreed

23

to come to the PPD stationhouse on January 25, 1990 for the polygraph exam.

92. In fact, the polygraph "test" was a deliberate tactic employed by the defendants, including but not limited to Levine, McIntyre, and Tumolo, to escalate substantially the aggressiveness of their interrogation of Jeffrey and to exploit his intellectual, emotional, and psychological vulnerabilities in a manner that would produce a confession to A.C.'s rape and murder.

93. Upon information and belief, the PPD defendants, including Levine, McIntyre, and Tumolo, had polygraph testing services available to them through other law enforcement agencies and routinely used the services of those other agencies in order to conduct routine polygraphs. However the defendants, including but not limited to Levine, McIntyre, and Tumolo, jointly agreed to depart from their usual procedure for Jeffrey's polygraph examination, and to enlist the services of a polygrapher from the Putnam County Sheriff's Department, defendant Dan Stephens. Defendant Stephens performed polygraph "testing" out of a private, non-law-enforcement office in Brewster, New York, approximately an hour's drive from Peekskill.

94. The PPD defendants conveyed to Stephens, and Stephens understood, that his job on January 25 was not to obtain polygraph results from Jeffrey, but to obtain his confession. The PPD defendants and defendant Stephens deliberately and recklessly agreed and mutually planned and understood that the interrogation of Jeffrey by Stephens, under the guise of a polygraph examination, would produce a confession by, among other means, isolating Jeffrey in a location that was unfamiliar to him, deceiving him by interrogating him in a non-law-enforcement setting, aggressively interrogating him in a manner that would confuse and threaten him, confusing Jeffrey as to the nature of his knowledge of and involvement in the crime, increasing Jeffrey's dependency upon familiar investigators, including in particular defendant McIntyre, and

24

otherwise deliberately exploiting Jeffrey's known age and intellectual, emotional, and psychological vulnerabilities.

95. No personnel from the Westchester County District Attorney's Office were present at, and no recording equipment was brought by the PPD defendants to, Stephens's office on January 25. Upon information and belief, these were departures from the ordinary policies, procedures, customs, and practices followed by the PPD and the Westchester County District Attorney's Office in connection with confessions, and were deliberately done by the PPD defendants in order to conceal the nature and substance of the coercive interrogation they had planned to carry out with Jeffrey.

### The Coerced "Confession"

96. On the morning of January 25, 1990, a school day, Jeffrey arrived at the PPD stationhouse with his friend, Martin Burrett, in order to take the polygraph examination. Martin was asked to leave, and at approximately 10:00 a.m. Jeffrey was driven by defendant McIntyre to Stephens's office in Brewster, New York, approximately an hour away from Peekskill. Defendants Levine and Tumolo accompanied Jeffrey and McIntyre in a separate car.

97. Upon information and belief, defendants McIntyre, Levine, and Tumolo knew that Jeffrey's mother did not know of his whereabouts, believed him to have been in school, and would not have permitted Jeffrey to take the polygraph test if she had known.

98. When Jeffrey arrived in Brewster, Stephens was dressed in civilian clothing, and was not identified to him as a law enforcement officer. Jeffrey told Stephens that he had come to take a polygraph examination in order to be permitted to assist the PPD with their investigation into A.C.'s death.

25

99. Shortly after his arrival, defendant Stephens escorted Jeffrey to a small room with a table, two chairs, and a polygraph machine. Jeffrey remained in that room from approximately 11:00 a.m. until approximately 7:00 p.m. He had not eaten prior to arriving in Brewster, and he was given no food for at least the first six hours that he was in the room. Defendant Stephens and other individuals provided Jeffrey with multiple cups of coffee throughout the course of the day.

100. Defendants Levine, McIntyre, and Tumolo, who remained in a separate room monitoring the questioning and interrogation through a listening device, either witnessed or heard the words spoken to and by Jeffrey while at the Brewster office.

101. Stephens told Jeffrey, in substance, that once the polygraph examination began, it could not be stopped. One or more pieces of polygraph equipment was affixed to Jeffrey throughout the entire time that he spoke about and was questioned concerning A.C.'s death.

102. As PPD investigators had done in prior sessions with Jeffrey, Stephens provided Jeffrey with and obtained Jeffrey's signature on numerous waivers and releases, including on a "participatory" Miranda warning form and on consents to the polygraph examination.

103. Stephens began to question Jeffrey concerning the rape and murder of A.C., and Jeffrey told Stephens what he believed he knew about the crime and had discussed previously with PPD investigators. Jeffrey's responses incorporated details and theories that had been provided and suggested to him by the PPD defendants and/or Stephens, as well as facts that the PPD defendants knew to be publicly ascertainable.

104. During the course of his questioning of Jeffrey, Stephens employed interrogation tactics that were designed to trick, deceive, confuse, and intimidate Jeffrey, including but not limited to

26

shouting at Jeffrey, invading Jeffrey's personal space, repeatedly accusing Jeffrey of raping and

murdering A.C., and telling Jeffrey that he had failed the polygraph test and had already told

Stephens "within himself" that he was guilty of the crime. Jeffrey repeatedly denied his

involvement in the crime to Stephens.

105. Several hours into the questioning and interrogation, at a point when Jeffrey was visibly and

obviously distraught, frightened, and confused, Stephens turned to another deliberate tactic,

"good cop-bad cop," and told Jeffrey that he could speak with his "favorite" PPD detective.

Jeffrey chose defendant McIntyre. Upon information and belief, defendants Levine, McIntyre,

Tumolo, and Stephens knew that Jeffrey viewed McIntyre as his friend and a "father figure," and

intended that McIntyre's interaction with Jeffrey at this point would be the culmination of their

deliberate manipulation to obtain Jeffrey's involuntary confession.

106. Stephens left the room in which Jeffrey was sitting, and continued to listen to the remainder

of the interrogation in the nearby room where Levine, McIntyre, and Tumolo had been

monitoring the earlier questioning.

107. When McIntyre entered the room with Jeffrey, he was not the friend and father figure that

he had been previously and which he knew Jeffrey expected from their interactions. McIntyre

told Jeffrey, among other things, that he had known for weeks that Jeffrey was guilty of the

crime. He told Jeffrey in substance that Levine, Tumolo, and Stephens would physically harm

Jeffrey if he did not confess, and that McIntyre was trying to hold them back but that he didn't

have any "bullets" in his "gun," and that Jeffrey needed to give him some "bullets" by

confessing.

108. Upon information and belief, McIntyre drew upon his knowledge that Jeffrey had in the

27

past suffered from hearing "voices," as well as other symptoms of mental illness, to coerce Jeffrey's admission of guilt. After threatening Jeffrey with physical violence, McIntyre walked to the sole window in the small room, gestured to the sky, and told Jeffrey that A.C. was looking down from heaven, and wanted Jeffrey's help to find her killer. McIntyre also promised Jeffrey that if Jeffrey confessed he could go home, and that the only punishment Jeffrey would receive was treatment in a mental facility.

109. Frightened, confused, hungry, and trusting McIntyre's word that he would be physically harmed if he did not give the PPD defendants a confession, Jeffrey provided information that drew upon details concerning the crime that had been provided to him by the PPD defendants - many of which were inaccurate. By the end of his statement Jeffrey was sobbing uncontrollably. He eventually fell from his chair and curled himself in a fetal position under the table at which he had been sitting.

110. When Jeffrey finished his statement to McIntyre, defendants Tumolo and Stephens burst in the room, and Tumolo yelled, in substance, that Jeffrey had to repeat his confession, and that they would stay all night if he didn't. Jeffrey attempted to repeat the story that he had told McIntyre.

111. Jeffrey was placed under arrest in Brewster, and was transported by the PPD defendants back to the PPD stationhouse. During the ride back to Peekskill, McIntyre, Levine, and/or Tumolo attempted to convince Jeffrey to provide a more detailed confession. Jeffrey did not do so.

112. Subsequent to January 25, 1990, defendant McIntyre prepared a police report purporting to describe the events that transpired that day with respect to Jeffrey. McIntyre's report

28

documenting Jeffrey's statements and alleged confession on January 25 falsely represented that critical details originated with Jeffrey, when in fact they had been provided and/or suggested to Jeffrey by various PPD defendants over the course of their multiple interviews and interrogations. Upon information and belief, those details included but were not limited to the following: the fact that A.C.'s bra had been ripped and removed from her body; the fact that A.C.'s body was covered with leaves; the fact that the perpetrator had covered A.C.'s mouth with his hand; the fact that A.C. had been struck on the back of the head; the fact that A.C. had lost her keys; and the location where A.C.'s camera was found.

113. In addition to failing to disclose that critical details in Jeffrey's January 25 statements had been supplied by the PPD defendants, McIntyre's police report also deliberately excluded material, exculpatory and impeachment evidence concerning the coercive circumstances of Jeffrey's interrogation on January 25, including but not limited to the threats of violence against Jeffrey by the PPD defendants and the promise to Jeffrey that if he confessed he could go home and would receive mental health treatment.

114. Stephens prepared documentation of his questioning of Jeffrey during the alleged polygraph, including the words that Jeffrey allegedly spoke to him concerning A.C.'s rape and murder. This documentation falsely represented that facts relayed by Jeffrey originated with him, rather than with the defendants, and does not document material, exculpatory and impeachment evidence including but not limited to the coercive tactics utilized in his questioning, and the sources of the details that he attributed to Jeffrey. The details of the crime that were falsely attributed to Jeffrey's independent knowledge include but were not limited to the following: that A.C. suffered a blow to the back of her head with a blunt object; the

29

possibility that the perpetrator did not ejaculate; that A.C.'s body was covered with leaves; that A.C. dropped her keys; and that A.C.'s camera was lost; and the locations of the crime.

## Police Coerced, Fabricated, and Concealed Exculpatory Evidence Concerning Additional Investigation of Jeffrey Deskovic

115. Prior to and, upon information and belief, subsequent to Jeffrey's false confession and arrest, PPD investigators interviewed additional witnesses, including but not limited to Jeffrey's friends Martin Burrett and John Laurino, Martin's and John's family members, and additional witnesses whose statements were not documented and/or were misrepresented in critical respects. In the course of these interviews investigators, including but not limited to defendants Levine, McIntyre, and Brovarski, coerced and intimidated witnesses into providing false inculpatory information concerning Jeffrey, fabricated inculpatory statements, including statements portraying Jeffrey as violent or threatening, and failed to document and disclose to prosecutors interviews or portions of interviews that revealed material, exculpatory and impeachment evidence. This undisclosed evidence included, but was not limited to (a) the coercive and intimidating tactics utilized by police in interviewing the witnesses; (b) evidence that Jeffrey played no role in and had no independent knowledge of A.C.'s rape and murder; (c) evidence that A.C. and Freddy Claxton had no romantic or sexual relationship; and (d) evidence that A.C. had not had consensual sex prior to her rape and murder.

116. The PPD defendants' multiple interviews with Jeffrey's friend Martin Burrett became a centerpiece of their investigation. The PPD defendants knew that Jeffrey and Martin were best friends who spent much of their free time together, and as a result the defendants met with Martin, as well as his parents, both to attempt to obtain inculpatory information concerning

30

Jeffrey as well as to monitor Jeffrey's response to their questioning of him. In the course of these meetings, the defendants deliberately and recklessly employed many of the same tactics of deception and coercion that they employed with Jeffrey and, previously, with Freddy Claxton, including but not limited to aggressively questioning and threatening Martin into making false inculpatory statements about Jeffrey, and selectively recording their interactions with Jeffrey. Upon information and belief, the PPD defendants fabricated inculpatory information allegedly provided by Martin and his parents, including but not limited to statements alleging that Jeffrey had threatened to kill Martin, and statements concerning Jeffrey's relationship with A.C. The PPD defendants also learned from Matin's statements to them that Jeffrey had learned non-public facts concerning A.C.'s death and the investigation from PPD investigators.

117. The PPD defendants deliberately failed to document and affirmatively concealed material, exculpatory and impeachment evidence concerning interviews conducted with Martin Burrett and his family, including but not limited to the coercive tactics they utilized to obtain inculpatory statements from Martin, their fabrications of allegedly inculpatory evidence, and information provided to them from Martin that revealed that investigative facts known by Jeffrey had been provided to him by the PPD defendants.

### Jeffrey's Indictment Is Procured With Fabrications and Concealment of Material, Exculpatory and Impeachment Evidence

118. Prior to Jeffrey's false confession and subsequent indictment, PPD defendants and prosecutors had taken steps to obtain DNA testing to definitively include or exclude Jeffrey as the perpetrator. Prior to his false confession, Jeffrey consented to have his blood drawn and tested by the PPD, based upon his desire to assist the police, and upon the PPD defendants'

31

representation that a blood test could clear Jeffrey of any involvement in the crime. Jeffrey's

blood sample and a vaginal swab with semen that was taken from A.C. were sent to the FBI for

DNA testing. In a letter accompanying the samples and requesting DNA testing, defendant

Tumolo stated that the PPD "anticipate[d] that semen evidence will match that from Deskovic's

blood; hence either incriminating or exonerating him in this matter."

119. The PPD defendants and prosecutors were aware that the results of that testing would be

available in a short period of time. However rather than delay Jeffrey's indictment in order to

present the grand jury with the results of the DNA testing, which could conclusively prove or

disprove Jeffrey's guilt or innocence, prosecutors chose to seek Jeffrey's indictment

immediately, without the benefit of those results.

120. On February 27, 1990 Jeffrey Deskovic was indicted on three counts of murder in the

second degree, one count of first degree rape, and one count of fourth degree possession of a

weapon. Prior to his indictment, after approximately a month of incarceration at the Westchester

County Jail, Mr. Deskovic was released from custody pursuant to bail conditions, and was

subject to those bail conditions through the time of his trial. Additionally, for approximately six

months between his indictment and the time of trial Mr. Deskovic was ordered by the court to be

held at psychiatric facilities in Westchester and Rockland Counties.

121. Jeffrey Deskovic was charged and indicted based upon evidence that was fabricated by the

defendants and by means of the defendants' concealment from prosecutors and the grand jury of

material, exculpatory and impeachment evidence that undermined a probable cause

determination. These material misrepresentations included, but were not limited to, the

following: (a) the PPD defendants' creation of false police reports and false statements to

32

prosecutors representing that Jeffrey Deskovic possessed independent knowledge of numerous

non-public facts concerning A.C.'s death, when in fact those facts were provided to him by PPD

investigators and/or were known by the PPD defendants to be public knowledge; (b) the

defendants' fabrication of evidence to make Jeffrey's statements and ultimate confession appear

knowing and voluntary, including but not limited to preparing <u>Miranda</u> waiver forms that falsely

represented Jeffrey to have knowingly and voluntarily waived his right to counsel when in fact

because of Levine's misrepresentations to Jeffrey concerning Lou Ecker Jeffrey's waivers were

not knowing and voluntary; (c) the PPD defendants' concealment of material facts concerning

the coercive, deceptive, and intimidating tactics employed by them in the course of questioning

Jeffrey on and prior to January 25, including but not limited to their concealment of Stephens'

and McIntyre's coercive promises and direct and indirect threats of physical harm; and (d) the

PPD defendants' concealment of additional material, exculpatory and impeachment evidence

concerning witness interviews conducted by them in the case, including but not limited to

coercive tactics utilized in witness interviews, evidence that A.C. and Freddy Claxton had no

romantic or sexual relationship, evidence that A.C. had not had consensual sex prior to her rape

and murder, and other evidence that Jeffrey played no role in and had no independent knowledge

of A.C.'s rape and murder.

### DNA Evidence Exonerates Jeffrey - But the Prosecution Continues

122. Just days after Jeffrey's indictment, DNA testing by the FBI lab excluded Jeffrey as the

source of the semen found on the vaginal swab taken from A.C. The Westchester County

District Attorney's Office, including but not limited to Bolen, and the PPD, including but not

limited to defendants Levine, McIntyre, and Tumolo, were informed of this result, which was

33

documented in a March 26, 1990 report.

123. Additionally, microscopic hair analysis and comparison of the hairs found on A.C.'s arm, leg, breast, and pubic area with the head and pubic hairs of Jeffrey Deskovic excluded Jeffrey as the source of those hairs. Critically, the hair analyst concluded that at least one hair found on A.C. was consistent with a "negroid-type" hair, typically shed by an African American individual. The Westchester County District Attorney's Office, including but not limited to Bolen, and the PPD, including but not limited to defendants Levine, McIntyre, and Tumolo, were informed of these results.

124. Bolen understood that in the absence of evidence that A.C. had been raped and murdered by multiple perpetrators, or that the semen found in A.C. was attributable to a consensual sexual encounter shortly before her death, the DNA evidence establishing that Jeffrey was not the source of the semen definitively proved Jeffrey's innocence, eviscerated probable cause, and was fatal to his prosecution. Accordingly, Bolen directed that additional investigation be done by the PPD, and personally conducted and personally directed further investigation in order to obtain evidence supporting probable cause to prosecute Jeffrey, and in particular to provide an explanation for the presence of another man's semen inside A.C. following her rape and murder. This investigation began immediately after the DNA results were received within days of Jeffrey's indictment and more than eight months prior to trial.

125. In furtherance of his investigation in the days after he was informed of the DNA results to determine whether prosecution could go forward in light of those results, Bolen also turned to defendant Deputy Medical Examiner Louis Roh, to provide evidence to support the continued prosecution of Jeffrey Deskovic in the face of exonerative DNA evidence. Between March 4,

34

1990 and March 21, 1990, Bolen and Roh discussed and agreed that Roh would provide evidence that in his scientific opinion A.C. had been sexually active on multiple occasions prior to her rape and death, and that during his autopsy he had observed scarring on A.C.'s hymen that proved this fact. Roh had on previous occasions provided, with Bolen's knowledge and at his request, baseless and/or false scientific evidence to support Bolen's prosecutions.

126. In fact, Bolen and/or Roh knew, or in the absence of their deliberate and reckless indifference should have known, that Roh had no scientific basis for stating that A.C. had been sexually active on multiple occasions, and had not in fact observed the scarring that he reported to Bolen. Roh and/or Bolen concealed that Roh's conclusions and findings concerning A.C.'s sexual history were fabricated - a fact which was material, exculpatory and impeachment evidence - and affirmatively misrepresented the basis for Roh's conclusions and findings to the defense and the court, beginning as early as a March 21 court conference eight months prior to trial and continuing through trial and to the present time.

127. Additionally, Bolen deliberately and recklessly failed to investigate known exculpatory evidence. For example, prior to trial, the State's hair comparison expert contacted Bolen and requested that he obtain hair reference samples from Roh, Roh's assistant, and Freddy Claxton, in order to prove or disprove the theory that the hairs found on A.C. that did not match Jeffrey Deskovic originated with those individuals. Bolen represented to the hair examiner that he would obtain those samples, and then deliberately or recklessly failed to do so. Bolen also deliberately or recklessly failed to obtain DNA testing on blood samples from Freddy Claxton, or from any other potential consensual donor of semen.

128. The PPD defendants also understood, in light of the exonerative DNA results, that the DNA

35

evidence conclusively establishing that Jeffrey was not the source of the semen fatally undermined their theory of his guilt and the validity of his confession.

129. This was all the more evident in light of the PPD defendants' investigative misconduct prior to Jeffrey's indictment - including, but not limited to, the defendants' interference with Jeffrey's right to counsel; their coercion of allegedly inculpatory statements from Jeffrey; their providing to Jeffrey one or more of the non-public facts contained in his allegedly inculpatory statements; their fabrications of allegedly inculpatory witness statements; and their withholding of additional exculpatory and impeachment evidence that undermined probable cause, including but not limited to evidence concerning their coercive tactics in witness interviews, witness statements and other evidence that Freddy Claxton and A.C. had not had a romantic relationship, witness statements and other evidence that A.C. was not sexually active, and other evidence undermining Jeffrey Deskovic's guilt. Even after learning of the DNA test results, however, the PPD defendants continued to conceal from prosecutors their previously undisclosed misconduct and still failed to disclose exculpatory and impeachment evidence to the prosecution.

130. Moreover, the PPD defendants conducted further post-DNA, pretrial investigation on their own initiative and at the direction of prosecutors including Bolen. Upon information and belief, in the course of that investigation the PPD defendants uncovered additional exculpatory and impeachment evidence, including but not limited to evidence that was material to the prosecution's efforts to account for the fact that Jeffrey was not the source of the semen found inside A.C. The PPD defendants failed to document and disclose this evidence.

131. Had the PPD defendants taken basic steps prior to and following Jeffrey's indictment to investigate known exculpatory evidence and leads, instead of blindly investigating only to

36

corroborate theories of guilt, they would have uncovered readily available evidence that not only exonerated Jeffrey, but also undermined their initial theories of the case and led them to the actual perpetrator. These investigative steps include, but are not limited to, the following: (a) conducting and documenting thorough interviews with individuals who were near the crime scene on November 15, 1989, including two individuals who were playing basketball and who spoke to Steven Cunningham that day; (b) conducting and documenting a complete and thorough canvass of the crime scene, and collecting and vouchering all available evidence, which upon information and belief would have led to the discovery of physical evidence traceable to Steven Cunningham; (c) thoroughly and completely investigating and documenting information provided to the police by witnesses who stated unequivocally that Freddy Claxton and A.C. had not had a romantic relationship of any kind; (d) thoroughly and completely investigating and documenting information provided to the police by witnesses who stated unequivocally that A.C. had not had consensual sex prior to her rape and murder; (e) thoroughly and completely investigating and documenting the possible sources for details and theories contained in Jeffrey Deskovic's statements to the police, which would have undermined the contention by the police and prosecutors that he had independent knowledge that could only have been possessed by the perpetrator.

### Prosecutorial and Police Misconduct Deprive Jeffrey of a Fair Trial

132. A critical challenge facing the prosecution at Jeffrey's criminal trial was to explain how Jeffrey could have raped A.C. despite scientific proof that the semen found inside of her, and hairs found on her body, were not his. At trial, Bolen explained to the jury why his theory of the case was true, despite clearly exculpatory evidence to the contrary, by arguing false and

unsupported evidentiary inferences to the jury through baseless allegations concerning a consensual sexual relationship between Freddy Claxton and A.C., and through Roh's fabrications. Bolen's misconduct at trial provides further evidence that his post-indictment, investigative conduct, beginning at least eight months prior to trial, in jointly fabricating evidence with Roh was knowing and deliberate.

133. Bolen elicited from Roh the false and fabricated testimony that they had discussed prior to trial: (a) that Roh had a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her death; and (b) that during his autopsy Roh had observed scarring on A.C.'s hymen. Bolen relied upon Roh's fabrications in his opening and closing arguments to the jury as the sole evidence supporting the prosecution theory that the semen found in A.C. had come from a consensual sex partner - namely Freddy Claxton. Roh and/or Bolen concealed the critical, exculpatory fact that Roh's critical testimony on this score had been fabricated prior to trial.

134. In truth, there was no factual basis for Roh's conclusions in his testimony that A.C.'s hymen showed multiple areas of previous, healed tear, and no factual basis by history or autopsy to suggest that A.C. engaged in multiple prior acts of sexual intercourse.

135. Furthermore, Bolen explained to the jury the presence on A.C.'s body of hairs that did not match Jeffrey - including hairs consistent with a "negroid" type - by advancing the baseless theory that the hairs had in fact been shed by Roh, his African American assistant, and Freddy Claxton. Bolen advanced this argument despite his deliberate and reckless decision never to obtain hair samples from Roh, his assistant, or Claxton for comparative analysis to confirm or conclusively refute his theory - despite Bolen's representation to the State's hair expert that such

samples would be obtained for comparison.

136. Additionally, Bolen argued to the jury at trial that Freddy Claxton was the actual donor of the semen found inside of A.C., despite the fact that he knew, or in the absence of his deliberate and reckless indifference should have known, that there was no basis in fact for such an assertion. Specifically, Bolen learned during his own investigation and/or through investigations conducted by PPD officers at his direction after DNA testing vitiated probable cause, that there was no evidence supporting the assertion that Freddy and A.C. had ever had a sexual relationship. In an effort to conceal that knowledge, Bolen deliberately and/or recklessly failed to investigate his theory of Freddy Claxton's relationship with the victim, including by failing to order or request that DNA testing be conducted on Freddy Claxton - a procedure which would have definitively disproved Bolen's theory.

137. The PPD defendants' fabrications and concealment of material, exculpatory and impeachment evidence adduced in their investigation also were critical in obtaining Mr. Deskovic's conviction.

138. The PPD defendants' fabrications formed the basis for Bolen's argument at trial that Jeffrey's January 25 confession and prior allegedly incriminating statements were knowing and voluntary, and demonstrated that he knew facts that only the perpetrator of A.C.'s rape and murder could have known. In particular, Bolen argued that Jeffrey's knowledge of the note referring to Freddy Claxton proved that he had been present at and motivated to commit the crime; that Jeffrey's statement that he ripped off A.C.'s bra was consistent with the non-public fact that A.C.'s bra had been found away from her body; that Jeffrey's statement that he held his hand over A.C.'s mouth matched non-public details concerning A.C.'s injuries; that Jeffrey's

39

statement that he hit A.C. on the back of the head with a Gatorade bottle matched non-public

facts concerning A.C.'s cause of death; that Jeffrey's knowledge that A.C. had lost her keys

corroborated his involvement in the crime; that Jeffrey's statement that the perpetrator might not

have ejaculated confirmed that he could have committed the crime and not left behind semen;

and that Jeffrey's drawing of three crime scenes and the location where A.C.'s camera was found

was consistent with the PPD's non-public theory of how the crime was committed.

139. Furthermore, the PPD defendants' deliberate concealment of material, exculpatory and

impeachment evidence was material to the jury's consideration of all of the issues raised at trial -

including but not limited to the voluntariness and truthfulness of Jeffrey's confession, and the

prosecutor's arguments concerning a relationship between Freddy Claxton and A.C. and A.C.'s

sexual history - as well as to the jury's assessment of the credibility of the State's witnesses and

the integrity of the investigation of the case.

### Mr. Deskovic's Incarceration and Efforts to Prove His Innocence

140. On December 7, 1990 Jeffrey Deskovic was convicted by a Westchester County jury of

murder, rape, and possession of a weapon. On January 18, 1991, at a sentencing proceeding

where Jeffrey proclaimed his innocence and pleaded for mercy from the court, Judge Collabella

sentenced Jeffrey to fifteen years to life in prison.

141. From the time of his conviction until his ultimate release in 2006 Jeffrey Deskovic fought

tirelessly to vindicate his innocence, through the courts on appeal and through habeas petitions,

and by direct appeals to policymakers, including former Westchester County District Attorney

Jeanine Pirro, that his case and criminal trial be reexamined.

142. Mr. Deskovic appealed his conviction to the New York Appellate Division, Second

40

Department. The court affirmed his conviction on February 14, 1994. On July 6, 1994 the New

York Court of Appeals denied Jeffrey leave to appeal the decision of the Second Department.

143. Mr. Deskovic sought relief from his wrongful conviction through a petition for a writ of

habeas corpus, which was denied by District Judge Barbara Jones on November 21, 1997. In his

December 4, 1997 appeal of that denial to the Second Circuit Court of Appeals, Mr. Deskovic

argued that he should have "the opportunity to further establish his innocence by additional and

new DNA testing employing the state of the art of DNA investigation in a science which can be

even more certain today." The appeal was rejected on April 26, 2000, and Mr. Deskovic's

petition for certiorari was denied by the United States Supreme Court on January 8, 2001

### Jeffrey Endures Physical and Sexual Assault by Correctional Officers

144. Throughout the many years that Jeffrey Deskovic was incarcerated at Elmira Correctional

Facility, and on multiple occasions on or subsequent to September 18, 2004, defendant Tweed,

in the course of conducting routine searches of Jeffrey's person outside the confines of his prison

cell, repeatedly, routinely, and deliberately conducted pat-down searches of Jeffrey in a manner

that was contrary to prison policy for the purpose of subjecting Jeffrey to unnecessary, invasive,

assaultive, and violative  physical contact, including contact of a sexual nature.

145. Defendant Tweed's conduct included, but was not limited to, violating policies and

procedures for pat-down searches that required prisoners to remove items from their own pockets

prior to pat-down, and instead removing items from Jeffrey's pockets himself, for the purpose of

groping Jeffrey's sexual organs and otherwise assaulting and harassing Jeffrey.

146. Upon information and belief, defendant engaged in this conduct openly and notoriously, as

a matter of routine pattern and practice, and with the knowledge and express or tacit approval of

41

his colleagues and supervisors.

### The Real Killer Is Identified and Jeffrey Is Exonerated

147. Jeffrey Deskovic continued his tireless efforts to obtain DNA retesting and comparison,

until 2006 when newly elected Westchester County District Attorney Janet DiFiore consented to

conduct STR DNA testing on the semen found on the vaginal swab taken from A.C., and to run

the results of that testing against the available DNA databases for convicted offenders.

148. In September 2006 the DNA profile obtained from the semen found on the vaginal swab

was matched to Steven Cunningham, who was already incarcerated in New York for the 1993

murder of a Peekskill school teacher. In March 2007 Mr. Cunningham pleaded guilty to the rape

and murder of A.C., and on May 2, 2007 he was sentenced to an additional twenty years in

prison for the crime.

149. Jeffrey Deskovic did not know Steven Cunningham, and had never met or seen him prior to

attending court proceeding in 2007.

150. On September 20, 2006 Jeffrey Deskovic's conviction was vacated and he was released

from prison based upon a joint CPL § 440.10 motion by the Westchester County District

Attorney's Office and counsel for Mr. Deskovic.

151. On November 2, 2006, on motion by the Westchester County District Attorney, the

indictment against Mr. Deskovic was dismissed on the ground of actual innocence.

### Policies and Customs of the PPD, the Westchester County District Attorney's Office, and the Westchester County Medical Examiner's Office

152. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey

Deskovic, the City of Peekskill and the PPD, by and through their final policymakers,

42

maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants; (b) fabricating evidence; (c) failing to document and disclose material, exculpatory and impeachment evidence to prosecutors; and (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations.

153. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey Deskovic, the City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately train and supervise PPD investigators in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory and impeachment evidence to prosecutors.

154. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to train and supervise PPD investigators were reflected by the multiple acts of misconduct and illegality committed by multiple PPD detectives and supervisors in relation to multiple suspects and witnesses in the A.C. investigation, as described above.

155. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and train were also reflected in numerous prior cases and investigations which, upon information and belief, were known to the PPD defendants and policymakers prior to the A.C. investigation. The misconduct committed in those cases by PPD investigators, including but not limited to defendant Tumolo and other investigators involved in Mr. Deskovic's case, was

43

actually or constructively known to PPD supervisors and policymakers prior to the A.C. investigation - including by means of their direct participation in the investigations, and/or by published judicial decisions exposing the investigative misconduct - and, upon information and belief, PPD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate PPD investigators in response to such notice.

156. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to adequately supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring constitutional duties, including but not limited to (a) the disclosure of exculpatory and impeachment evidence to the defense; (b) investigating and acting upon exculpatory evidence that vitiates probable cause; and (c) constitutional prohibitions on fabricating evidence and suborning perjury.

157. Pursuant to this policy, custom, or pattern and practice, policymakers for the District Attorney's Office abdicated and effectively delegated to senior assistant district attorneys and supervisors, including but not limited to Bolen, the authority and discretion to conduct and supervise investigations and prosecutions with deliberate and reckless disregard for their constitutional and ethical duties. As a result, assistant district attorneys and supervisors, including but not limited to Bolen, routinely and knowingly engaged in investigative and prosecutorial misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of impunity.

158. In particular, as a direct result of policymakers' and supervisors' abdication of authority for

44

supervising, training, and disciplining prosecutors, assistant district attorney Bolen routinely,

notoriously, and as a matter of policy, custom, and pattern or practice violated constitutional and

ethical norms by concealing material, exculpatory and impeachment evidence from the defense

and deliberately and recklessly failing to investigate known exculpatory leads in order to permit

him to argue evidentiary inferences to juries that he knew, or in the absence of his deliberate

indifference should have known, were unsupported or contradicted by known facts. In

furtherance of this policy, custom, and pattern or practice Bolen routinely failed to disclose

material, exculpatory and impeachment evidence to the defense; deliberately and recklessly

failed to investigate known exculpatory evidence, and in particular forensic evidence;

deliberately and recklessly relied upon forensic experts, including Deputy Medical Examiner

Roh, to provide fabricated, baseless, and/or misleading scientific inculpatory evidence; and

engaged in additional acts of prosecutorial misconduct aimed at securing convictions at all costs.

159. The District Attorney's Office's failure to supervise, train, and discipline assistant district

attorneys was reflected by the multiple acts of misconduct and illegality committed by multiple

members of and supervisors in the Westchester County District Attorney's Office in the course

of the investigation and prosecution of Jeffrey Deskovic, as described above. The District

Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was also

reflected by multiple high priority and highly publicized prosecutions and post-conviction

proceedings prior and subsequent to the prosecution of Jeffrey Deskovic, in which senior district

attorneys and supervisors, including but not limited to Bolen, engaged in, condoned, and

facilitated prosecutorial misconduct.

160. Bolen's prior record of fabricating, concealing, and failing to investigate evidence in

furtherance of his theories of prosecution included but was not limited to his work, individually and in concert with Roh, on the prosecution of Jean Harris for the murder of Herman Tarnower. Bolen's and Roh's conduct included the following:

    a.  On March 10, 1980 Dr. Herman Tarnower died of gunshot wounds in Westchester County, New York. Jean Harris was arrested and charged with second degree murder.

    b.  Bolen was the lead Westchester County District Attorney's Office prosecutor on the case, and Roh was the Deputy Medical Examiner who conducted an autopsy on the body of Dr. Tarnower, prepared a report of that autopsy, and provided expert forensic pathology consultation and testimony on behalf of and at the request of the State.

    c.  The prosecution's theory of the case was that Ms. Harris, who had been in a romantic relationship with Dr. Tarnower, had intentionally shot him in the course of a dispute. Ms. Harris's defense was that on the night of Dr. Tarnower's murder she had attempted to commit suicide by shooting herself, and that Dr. Tarnower was accidentally shot in a struggle when he attempted to prevent her from killing herself.

    d.  Bolen and Roh discussed and agreed early on in the prosecution of Ms. Harris, and on an ongoing basis through the trial, that Roh would materially misrepresent scientific evidence in support of the State's theory of intentional murder. Specifically, Bolen and Roh agreed that Roh would testify to having made observations and drawn conclusions, supported by scientific evidence, that Dr. Tarnower had been shot while his hand was raised in a "defensive" posture - and specifically that Roh had performed histologic examinations of tissues from a bullet wound in Dr. Tarnower's chest, and that in the course of those examinations Roh had observed and analyzed evidence supporting the

46

conclusion that a single bullet had traveled through Dr. Tarnower's hand and chest. In fact, both Bolen and Roh knew, or in the absence of their deliberate and reckless disregard of the truth should have known, that Roh had not in fact made the histologic observations he claimed to have made, and that the Roh's assertions in written and oral reports and in trial testimony that he had in fact seen and analyzed the histological evidence that allegedly provided the scientific basis for his forensic conclusions were baseless, false, and fabricated.

161. The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was known, or in the absence of their deliberate and reckless indifference should have been known, to policymakers for the District Attorney's Office, at and prior to the time of Jeffrey Deskovic's prosecution. Policymakers were on actual and constructive notice of the misconduct of Bolen and other assistant district attorneys through, among other mechanisms, their direct involvement in Jeffrey Deskovic's prosecution, Bolen's widely known reputation for engaging in and condoning prosecutorial misconduct, and misconduct perpetrated in multiple high priority and highly publicized prosecutions and post-conviction proceedings prior to Mr. Deskovic's conviction.

162. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through its final policymakers and their delegees, maintained a policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions to Westchester County prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that such conclusions would violate criminal suspects' right to a fair trial. In particular, defendant

47

and Deputy Medical Examiner Roh routinely, notoriously, and as a matter of policy, custom, and

pattern or practice fabricated evidence, gave perjured testimony, and/or engaged in deliberate

and reckless overreaching with respect to allegedly inculpatory scientific conclusions.

163. Roh's acts of fabricating evidence, giving perjured testimony, and/or engaging in deliberate

and reckless overreaching with respect to allegedly inculpatory scientific conclusions prior and

subsequent to Jeffrey Deskovic's case include but are not limited to the following:

a. As described above, Roh, in concert with Bolen, provided false and fabricated scientific

conclusions prior to and at the time of trial in the Jean Harris prosecution.

b. Roh also conducted a deliberately or reckless inadequate investigation into, and false and

baseless testimony concerning, the 1994 death of Daniel Vassello in Orange County,

New York. Pursuant to a contractual agreement with Orange County, Roh investigated

Daniel's death, including by performing an autopsy and preparing an autopsy report, and

stated a conclusion, later repeated by him at in pretrial conversations with prosecutors

and at trial, that Daniel had died as a result of the effects of gasoline inhalation. Based in

part on Roh's autopsy report, Daniel's parents, Daniel and Dona Vassello, were indicted

on charges of criminally negligent homicide. In fact, as Judge Jeffrey G. Berry found in

his August 4, 1995 decision acquitting the Vassellos on all charges, and rejecting the

conclusions and testimony of Roh, the cause of Daniel's death was not gasoline

inhalation, but rather bacterial meningitis. Roh knew, and/or in the absence of his

deliberate and reckless indifference should have known, that his autopsy of Daniel

Vassello had contravened fundamental standards of forensic pathology, that his autopsy

report contained baseless and/or false conclusions concerning Daniel's cause of death,

48

and that he lacked a scientific basis for his pretrial assertions and trial testimony that to a reasonable degree of medical certainty Daniel died of gasoline fume inhalation.

c. Following the Vassello case, on August 17, 1995, Orange County District Attorney Francis Phillips wrote to the County Coroner Anthony Ingrassia to inform him that, "in various criminal cases" Dr. Roh's findings had been "either incomplete, inadequate, or erroneous," and that "a suitable replacement" must be found for Dr. Roh to do forensic work on behalf of Orange County. (Phillips Letter, attached as Exhibit 1.)

d. In 1997 Michael Maragh was prosecuted and tried in Orange County in connection with the death of his girlfriend. Roh testified on behalf of Orange County pursuant to his contract with the County to conduct autopsies and other pathology-related investigation into suspicious deaths in the County. On November 12, 1997, during Roh's cross-examination in the Maragh case, Roh was shown the August 17, 1995 Francis Phillips letter. Roh testified that he had never seen the letter before that day.

e. In January 1998, two months later, Roh testified as a retained expert for the defendant in the Dutchess County case of People v. Kilmer. On cross-examination, Assistant District Attorney Marjorie Smith asked Roh whether he was aware of the Phillips letter that was shown to him during the Maragh trial. Roh first testified that he was not aware of the letter, then gave evasive answers to further questions about whether he had ever seen the letter. On February 11, 1998, Judge Thomas J. Dolan, who presided over the Kilmer trial, wrote to Dutchess County District Attorney William Grady to "formally advise" Grady of "inconsistent" and "disturbing" testimony given by Roh in Dutchess County and in the Maragh case. (Judge Dolan Letter, attached as Exhibit 2.)

f.  On March 16, 1998 Grady wrote to the New York State Department of Health, Office of Professional Medical Conduct, which is the State entity responsible for medical licensing in New York State, and described Roh's conduct in the <u>Maragh</u> and <u>Kilmer</u> cases as a "serious breach of [Roh's] ethical and professional responsibility to truthfully answer the questions posed to him while under oath without regard for the potential professional embarrassment." (Grady Letter, attached as Exhibit 3.)

g.  In 2001, Charles Bodenburg was tried in Suffolk County in connection with the death of three-year-old Kayla Zachman. Autopsy evidence, including head trauma with diffuse axonal injury, pointed to shaken infant syndrome and smothering being the cause of death; toxicology analysis revealed a blood alcohol concentration of .03% and a brain alcohol concentration of .01% in the girl. On June 7, 2001 Bodenburg was convicted of second degree murder. Roh was retained by the defense as a pathology expert, and he testified at trial. Roh testified that the actual cause of death was alcohol poisoning. Rebuttal evidence was presented by the prosecution citing medical and toxicologic literature indicating children may survive very high levels of alcohol. On July 16, 2001 Dr. Charles Wetli, Chief Medical Examiner for Suffolk County, Dr. Stuart Dawson, Deputy Chief Medical Examiner for Suffolk County, and Dr. Edward Briglia, Chief of the Suffolk County Toxicology Laboratory, wrote to the New York State Department of Health, the entity responsible for State medical licensing, concerning Roh's conduct in the case. The letter described Roh's testimony as lacking scientific basis, and stated that Roh "went far beyond what would be expected of a defense expert," and that "his testimony was misleading and had no reasonable basis in fact." (July 16, 2001 Letter,

50

attached as Exhibit 4.)

h. On December 31, 2002, 83-year-old Aniele Walker died in White Plains, Westchester County, New York. Her nephew, John Spruill, was charged with and acquitted of her murder. Roh was the Deputy Medical Examiner who conducted an autopsy on the body of Ms. Walker. Roh was deposed over the course of several in connection with a Westchester County Surrogate's Court proceeding, In the Matter of Aniela Walker, No. 074/2003, that was brought in connection with Ms. Walker's death. In the course of those proceedings, Roh was examined extensively concerning his autopsy and cause-of-death findings in the Walker case, including questioning concerning whether the examinations and observations that he made in that case were consistent with minimally accepted practices in pathology and with Roh's own practices over his more-than-two-decades of experience. On October 31, 2003, Roh admitted under oath, and in the presence of a Westchester County Assistant District Attorney, that following an earlier session of his deposition on October 20, 2003 he willfully destroyed twenty-to-thirty file drawers of index cards documenting his prior instances of testimony as a pathology expert, in order to avoid having to produce them in response to a subpoena. (Excerpt of Roh Testimony in In the Matter of Aniela Walker, attached as Exhibit 5.)

164. Additionally, prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train and discipline deputy medical examiners. The absence of supervision, training, and discipline as a matter of policy, custom, or pattern and practice established a

51

climate of impunity in which the misconduct of defendant Roh and others was condoned and facilitated, and created a known and obvious risk that the constitutional rights of criminal suspects would be violated.

165. Policymakers for the Westchester County Medical Examiner's Office were on actual and constructive notice of the misconduct of Roh and other deputy medical examiners through, among other mechanisms, their direct involvement in and knowledge of Jeffrey Deskovic's prosecution, Roh's widely known reputation for fabricating engaging in and condoning prosecutorial misconduct including in the investigations and prosecutions described above, and specific publicity and notoriety generated from Roh's conduct in highly publicized criminal proceedings prior to Mr. Deskovic's conviction.

## DAMAGES

166. The actions of the defendants deprived plaintiff Jeffrey Deskovic of his civil rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and under the laws of New York.

167. The unlawful, intentional, wilful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Jeffrey Deskovic to be wrongly seized, maliciously prosecuted, unfairly tried, wrongfully convicted, subjected to illegal searches and cruel and unusual punishment during the course of his incarceration, and forced to serve nearly sixteen years in prison for a crime he did not commit.

168. The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the defendants caused Jeffrey Deskovic the following injuries and damages, which were foreseeable to the defendants at the time of their acts and omissions,

52

and which continue to date and will continue into the future: multiple physical assaults and

batteries, including assaults of a sexual nature, and other physical injuries; pain and suffering;

severe mental anguish; multiple suicide attempts; emotional distress; loss of family relationships;

severe psychological damage; loss of educational opportunity; loss of professional opportunity;

loss of income; out-of-pocket legal expenses for appellate representation; infliction of physical

illness; inadequate medical care; humiliation, indignities and embarrassment; degradation;

permanent loss of natural psychological development; and restrictions on all forms of personal

freedom including but not limited to diet, sleep, personal contact, educational opportunity,

vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family

relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled

monetary relief.

169. All the acts and omissions committed by the defendants described herein for which liability

is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently

and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages

## COUNT I

### 42 U.S.C. § 1983 Claim for Violation of Mr. Deskovic's
### Right Against Self-Incrimination and to a Fair Trial
### Against Defendants Levine, McIntyre, Tumolo, and Stephens

170. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

171. Defendants Levine, McIntyre, Tumolo, and Stephens, acting individually and in concert,

deliberately and recklessly coerced and compelled allegedly inculpatory statements from Jeffrey

Deskovic and caused those statements to be introduced against him in connection with his

53

indictment and prosecution, in violation of Jeffrey's Fifth and Fourteenth Amendment rights not to be compelled to be a witness against himself, not to be deprived of liberty without due process of law, and to a fair criminal trial.

172. Specifically, on and prior to January 25, 1990, defendants Levine, McIntyre, Tumolo, and Stephens deliberately and recklessly exploited Jeffrey Deskovic's youth, inexperience with law enforcement, emotional and psychological vulnerabilities, and lack of advice and assistance of legal or parental counsel to convince Jeffrey, through physical threats, trickery, deceptive promises, and other means to make false inculpatory statements that were not voluntarily and freely given. Furthermore, Jeffrey's waivers, on and prior to January 25, 1990, of his right not to submit to questioning by the police without the presence or assistance of legal counsel were not freely and voluntarily made, as a result of the defendants' deliberate and reckless actions to deceive Jeffrey concerning the status and legal significance of his representation and the defendants' questioning.

173. Additionally, defendants Levine, McIntyre, Tumolo, and Stephens, individually and in concert, deliberately and recklessly provided Jeffrey Deskovic with non-public facts known to the PPD in connection with the A.C. investigation, and through coercion, deception, and trickery compelled Jeffrey to adopt those facts as his own by incorporating them into allegedly inculpatory statements concerning his knowledge of and involvement in the crime.

174. Because of the PPD defendants' coercion and trickery Jeffrey's will was overborne such that the confession was not the product of his free will and rational intellect.

175. At the time that Jeffrey Deskovic allegedly confessed to the rape and murder of A.C., a reasonable person in Jeffrey's position would have perceived his freedom to be significantly

54

restricted and would not have understood himself to be free to leave, and hence Jeffrey was in

the defendants' custody. Among the circumstances that rendered Jeffrey's alleged confession

custodial were factors that were not documented and were affirmatively concealed from

prosecutors and the court by the defendants, including but not limited to the defendants' direct

and indirect threats on January 25 that Jeffrey would be physically harmed if he did not confess,

and the defendants' deceptive and coercive promises concerning the consequences of Jeffrey's

January 25 confession.

176. The false and involuntary confession obtained from Jeffrey Deskovic on January 25, 1990

was introduced against him in pretrial proceedings and at his criminal trial.

177. Defendants' actions to compel Mr. Deskovic to be a witness against himself were in

violation of clearly established constitutional law, and no reasonable police officer in 1989 and

1990 would have believed that the defendants' actions were lawful.

178. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly

convicted and imprisoned for sixteen years, and suffered the other grievous and continuing

injuries and damages as set forth above.

### COUNT II

**42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Denial
of a Fair Trial by Fabricating Evidence, Withholding Material, Exculpatory and
Impeachment Evidence, and Failing to Investigate
in Violation of the Fourteenth Amendment
Against Defendants Levine, McIntyre, Brovarski, Tumolo, and Roh**

179. Mr. Deskovic hereby incorporates and references all of the foregoing paragraphs and

further alleges as follows.

180. Defendants Levine, McIntyre, Brovarski, Tumolo, and Roh, acting individually and in

concert, fabricated evidence, concealed material, exculpatory and impeachment evidence, and

deliberately and recklessly failed to conduct a constitutionally adequate criminal investigation,

thereby depriving Mr. Deskovic of his Fourteenth Amendment right not to be deprived of liberty

without due process of law and to a fair criminal trial.

181. Specifically, defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens, deliberately

and recklessly coerced inculpatory statements from Mr. Deskovic which were not the product of

Mr. Deskovic's free will and rational intellect, supplied Mr. Deskovic with specific details of the

crime which Mr. Deskovic subsequently incorporated and repeated in allegedly inculpatory

statements, and/or knew that details known to Mr. Deskovic were readily obtainable through

public sources. The defendants falsely represented to prosecutors in police reports, in the course

of charging and indicting Mr. Deskovic, and at trial, that Mr. Deskovic's statements were in fact

freely and voluntarily given, and that Mr. Deskovic had independent knowledge of non-public

details of the crime that actually had been provided to him by the defendants and/or were

available from public sources. The false evidence which the defendants thereby fabricated was

introduced against Mr. Deskovic at trial, was a basis for the jury's verdict against him, and thus

deprived him of a fair criminal trial.

182. Additionally, defendants Levine, McIntyre, Brovarski, and Tumolo deliberately and

recklessly coerced and/or fabricated allegedly inculpatory statements from witnesses including

but not limited to Freddy Claxton, Martin Burrett, and Martin Burrett's parents, and concealed

additional material, exculpatory and impeachment evidence concerning witness interviews

conducted by them in the case, including but not limited to coercive tactics utilized in witness

interviews, evidence that A.C. and Freddy Claxton had no romantic or sexual relationship,

56

evidence that A.C. had not had consensual sex prior to her rape and murder, and other evidence from witnesses that Jeffrey played no role in and had no independent knowledge of A.C.'s rape and murder.

183. Furthermore, defendants Levine, McIntyre, Brovarski, and Tumolo deliberately and recklessly failed to investigate leads pointing toward other suspects and corroborating Mr. Deskovic's innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Deskovic's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses; failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence; and failing to pursue evidence and leads concerning other suspects after their theory of Mr. Deskovic's guilt had been fatally undermined by known exculpatory evidence. The defendants' deliberate and reckless failure to investigate exculpatory evidence that was known to them, or that in the absence of their deliberate and reckless indifference should have been known to them, caused Mr. Deskovic to be deprived of a fair criminal trial.

184. Defendant Roh deliberately and recklessly fabricated allegedly inculpatory evidence concerning A.C.'s prior sexual history, and concealed material, exculpatory and impeachment evidence concerning those fabrications. In the course of pretrial investigations and conversations with Bolen, Roh falsely, deliberately, and with reckless disregard for the truth represented (a) that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These false and fabricated pre-trial statements were repeated by

57

Bolen to the court in pretrial conferences discussing the DNA testing and Mr. Deskovic's continued prosecution, and were elicited from Roh at trial.

185. In fact Roh knew, or in the absence of his deliberate and reckless indifference should have known, that he had no scientific basis for concluding that A.C. had been sexually active on multiple occasions, and that he had not seen the scarring of A.C.'s hymen that he described to Bolen. Upon information and belief, Roh concealed the material, exculpatory and impeachment evidence of his fabrications from prosecutor Bolen.

186. This false and fabricated evidence concerning A.C.'s prior sexual history was introduced against Mr. Deskovic at trial and relied upon by Bolen in his opening and closing statements, was a basis for the jury's verdict, and thus deprived him of a fair criminal trial.

187. The truth of the defendants' fabrications and the other material, exculpatory and impeachment evidence that was concealed by them could not have been discovered by the Mr. Deskovic or his attorney through the exercise of due diligence.

188. Had the defendants' fabrications and material, exculpatory and impeachment evidence known to them been documented and/or disclosed they would have tended to prove Mr. Deskovic's innocence, cast doubt on the entire police investigation and prosecution, and impeached the critical trial testimony of defendants Levine, McIntyre, Stephens, Roh, and other witnesses. The exculpatory and impeachment evidence withheld by the defendants, considered individually and collectively, undermines confidence in the verdict against Mr. Deskovic, and the concealment of this evidence deprived Mr. Deskovic of a fair criminal trial.

189. The defendants' conduct violated Mr. Deskovic's clearly established constitutional rights to a fair trial and not to be deprived of liberty without due process of law, as guaranteed by the

Fourteenth Amendment. No reasonable police officer or medical examiner in 1989 and 1990 would have believed that the actions taken by the defendants in fabricating evidence, failing to document and disclose material, exculpatory evidence, and failing to investigate exculpatory evidence were lawful.

190. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT III

### 42 U.S.C. § 1983 Claim for Malicious Prosecution and Unlawful Prolonged Detention Based on Post-Indictment Failure to Investigate in Violation of the Fourth and Fourteenth Amendments Against Defendants Levine, McIntyre, Tumolo, Stephens, Bolen, and Roh

191. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

192. Defendants Levine, McIntyre, Tumolo, Stephens, Bolen, and Roh, despite knowing that probable cause did not exist to arrest, continually detain, and/or prosecute Mr. Deskovic for the rape and murder of A.C., and despite the fact that the grand jury's probable cause determination was vitiated by the defendants' undisclosed misconduct and by other concealed, material, exculpatory and impeachment evidence, acted individually and in concert to cause Mr. Deskovic to be arrested, continually detained, and prosecuted for those crimes. The defendants' conduct violated Mr. Deskovic's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures, and proximately caused his wrongful conviction.

193. Specifically, defendants Levine, McIntyre, Tumolo, and Stephens knew or in the absence of

their deliberate and reckless indifference to the truth should have known of information that

probable cause did not exist to arrest and prosecute Mr. Deskovic, including but not limited to

the facts that Mr. Deskovic's waiver of his right to counsel prior to January 10, 1990 was not

knowing and voluntary, that Mr. Deskovic's allegedly inculpatory statements on and prior to

January 25, 1990 were not the product of his free will and rational intellect, that allegedly

inculpatory evidence had been fabricated by the defendants, and that those factors as well as

additional material, exculpatory and impeachment evidence which was not disclosed to the grand

jury or prosecutors undermined the evidence presented in support of a probable cause finding

against Mr. Deskovic.

194. Following Mr. Deskovic's indictment, defendants Levine, McIntyre, and Tumolo

intentionally and with deliberate and reckless disregard for the truth, caused Mr. Deskovic's

prosecution to continue despite knowing that probable cause had been vitiated. Specifically,

after DNA testing results exonerated Mr. Deskovic, the defendants continued to conceal their

pre-indictment misconduct, and committed additional misconduct in the course of post-

indictment investigation, including but not limited to concealing from prosecutors additional

material, exculpatory evidence that undermined probable cause.

195. Additionally, prior and subsequent to Mr. Deskovic's indictment and being notified of

exonerative DNA testing results, defendants Levine, McIntyre, and Tumolo deliberately and

recklessly failed to investigate evidence that they knew, or in the absence of their deliberate and

reckless indifference should have known, vitiated probable cause for Mr. Deskovic's

prosecution. The deliberate and reckless investigative failures of the defendants included but

were not limited to failing to investigate known exculpatory and potentially exculpatory

information provided by witnesses, failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence, and failing to pursue evidence and leads concerning other suspects.

196. Defendants Bolen and Roh caused Mr. Deskovic to be detained and prosecuted in violation of the Fourth Amendment by deliberately and recklessly fabricating allegedly inculpatory evidence concerning A.C.'s prior sexual history that was critical to the continued prosecution of Mr. Deskovic following the exculpatory DNA test results, and which Bolen and Roh knew or in the absence of their deliberate and reckless indifference should have known would cause Mr. Deskovic's prosecution to continue. Furthermore, Bolen deliberately and recklessly failed to investigate additional evidence that he knew, or in the absence of his deliberate and reckless indifference should have known, vitiated probable cause for Mr. Deskovic's prosecution.

197. Specifically, shortly after learning that DNA testing proved Mr. Deskovic not to be the source of the semen found inside A.C., and in furtherance of investigation conducted to obtain evidence to support the continued prosecution of Mr. Deskovic, Bolen and Roh met, discussed, and agreed that Roh would provide a fabricated explanation for the source of the semen by falsely stating (a) that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These false and fabricated pre-trial statements were repeated by Bolen to the court in a March 21 court hearing more than eight months before trial discussing the DNA testing and the viability of Mr. Deskovic's continued prosecution, and were elicited from Roh at trial.

198. In fact Bolen and/or Roh knew, or in the absence of their deliberate and reckless

61

indifference should have known, that Roh had no scientific basis for concluding that A.C. had

been sexually active on multiple occasions, and that he had not seen the scarring of A.C.'s

hymen that he described to Bolen.

199. The above-described acts were shocking, and were performed by the defendants

deliberately, with reckless disregard for the truth, and with malice.

200. In fact, Mr. Deskovic was innocent of the rape and murder of A.C. On November 2, 2006,

the prosecution terminated in Mr. Deskovic's favor when charges against him were dismissed on

motion of the Westchester County District Attorney, following the vacatur of his conviction and

his release from prison on September 20, 2006, after sixteen years of wrongful incarceration.

201. Defendants' actions to deprive Mr. Deskovic of his liberty without probable cause were in

violation of clearly established constitutional law, and no reasonable police officer in 1989 and

1990 would have believed that the defendants' actions were lawful.

202. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly

prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and

continuing injuries and damages as set forth above.

### COUNT IV

#### 42 U.S.C. § 1983 Claim for Engaging in Conduct that Shocks the Conscience
#### in Violation of the Fourteenth Amendment
#### Against Defendants Levine, McIntyre, Brovarski, and Tumolo

203. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

204. In their drive to secure Mr. Deskovic's wrongful conviction, defendants Levine, McIntyre,

Brovarski, and Tumolo deliberately engaged in arbitrary and conscious-shocking conduct that

62

contravened fundamental canons of decency and fairness and violated Jeffrey Deskovic's

substantive due process right under the Fourteenth Amendment.

205. Specifically, the defendants deliberately exploited Jeffrey Deskovic's vulnerabilities,

tricked, and threatened Jeffrey to coerce his confession; provided investigative facts to Jeffrey

that fabricated a false confession and concealed the defendants' coercion and other misconduct;

fabricated additional allegedly inculpatory evidence from witnesses and other sources to

corroborate Jeffrey's guilt prior to his indictment; deliberately concealed from prosecutors their

pre-indictment misconduct, as well as additional exculpatory and impeachment evidence

provided to them by witnesses; deliberately concealed, after DNA evidence conclusively

exposed the falsity of his confession, additional exculpatory and impeachment evidence that

undermined any basis for Jeffrey's guilt and continued prosecution; deliberately and recklessly

failed to investigate leads pointing toward other suspects and corroborating Mr. Deskovic's

innocence; and engaged in additional, conscience-shocking misconduct that led to the conviction

and wrongful imprisonment of an innocent man.

206. The defendants' conduct violated Mr. Deskovic's clearly established constitutional right to

substantive due process, as guaranteed by the Fourteenth Amendment. No reasonable police

officer in 1989 and 1990 would have believed that the actions taken by the defendants in

deliberately failing to conduct a constitutionally adequate investigation were lawful.

207. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly

convicted and imprisoned for sixteen years, and suffered the other grievous and continuing

injuries and damages as set forth above.

## COUNT V

63

**42 U.S.C. § 1983 Claim for Supervisory Liability Against PPD Supervisors**

208. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further states as follows.

209. Defendants Tumolo and John and Jane Doe Supervisors knew or in the absence of their deliberate indifference, recklessness, and gross negligence should have known, that their subordinate officers had deprived Mr. Deskovic of his clearly established constitutional rights through misconduct that included but was not limited to coercing and compelling allegedly inculpatory statements from Mr. Deskovic, providing Mr. Deskovic with non-public details concerning A.C.'s rape and murder and the PPD investigation, fabricating witness statements and other evidence, concealing material, exculpatory and impeachment evidence, and failing to conduct a constitutionally adequate investigation of Mr. Deskovic. Defendants Tumolo and John and Jane Doe Supervisors, by deliberately, recklessly, and grossly negligently failing to supervise their subordinate police officers, and by their active and direct participation in and facilitation of their subordinates' misconduct, caused their subordinates to deprive Mr. Deskovic of his clearly established constitutional rights, including but not limited to his rights not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures, not to be deprived of liberty without due process of law, and to a fair trial.

210. Moreover, defendants Levine, McIntyre, Brovarski, Tumolo, and other PPD detectives acted with impunity in an environment in which they were not trained, supervised, or disciplined by defendants Tumolo and John and Jane Doe Supervisors, and in which they knew that their violations of Mr. Deskovic's constitutional rights would be facilitated, approved, and/or condoned by the defendant supervisors.

64

211. The deliberately indifferent, reckless, and/or grossly negligent conduct of defendants Tumolo and John and Jane Doe Supervisors violated their clearly established duty, in 1989 and 1990, to supervise subordinate detectives including defendants Levine, McIntyre, and Brovarski, and no reasonable police supervisor in 1989 and 1990 would have believed that deliberately indifferent, reckless, and/or grossly negligent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

212. Defendants Tumolo and John and Jane Doe Supervisors' actions and omissions proximately and directly caused Mr. Deskovic to be wrongly prosecuted, convicted, and imprisoned for sixteen years, and to suffer the other grievous and continuing injuries and damages as set forth above.

## COUNT VI

### 42 U.S.C. § 1983 Claim for Supervisory Liability Against Chief Medical Examiner Hyland

213. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further states as follows.

214. Defendant Hyland acted with deliberate indifference, recklessness, and/or gross negligence to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of his subordinate, Deputy Medical Examiner Roh, and thereby caused Roh to deprive Mr. Deskovic of his rights not to be convicted on the basis of fabricated evidence, to be free from unreasonable search and seizure, not to be deprived of liberty without due process of law, and to a fair criminal trial, as guaranteed by the Fourth and Fourteenth Amendments.

215. Specifically, defendant Hyland knew or should have known - based on, among other facts, Roh's reputation for and open and notorious practice of fabricating scientific conclusions and

65

providing perjured testimony, his widely reported and criticized false and baseless scientific testimony high priority and highly publicized cases prior to Mr. Deskovic's conviction, and, upon information and belief, his actual knowledge and/or approval of the reports prepared and testimony given in Jeffrey Deskovic's case - of a high degree of risk that defendant Roh would perform his duties as Deputy Medical Examiner in a manner that violated the constitutional rights of citizens.

216. The deliberately indifferent, reckless, and/or grossly negligent conduct of defendant Hyland violated his clearly established duty, in 1989 and 1990, to supervise subordinate medical examiners, and no reasonable medical examiner in 1989 and 1990 would have believed that deliberately indifferent, reckless, and/or grossly negligent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

217. Defendant Hyland's actions and omissions proximately and directly caused Mr. Deskovic to be wrongly prosecuted, convicted, and imprisoned for sixteen years, and to suffer the other grievous and continuing injuries and damages as set forth above.

### COUNT VII

### 42 U.S.C. § 1983 Claim for Failure to Intercede
### Against Defendants Levine, McIntyre, Brovarski, Tumolo,
### and John and Jane Doe Supervisors

218. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

219. By their conduct and under color of state law, defendants Levine, McIntyre, Brovarski, Tumolo, and John and Jane Doe Supervisors had opportunities to intercede on behalf of Mr. Deskovic to prevent his coerced confession, malicious prosecution, and deprivation of liberty

66

Exhibit "B", Part 2 (McGarr)

without due process of law, but, due to their intentional conduct and/or deliberate or reckless indifference, declined or refused to do so.

220. The defendants' failures to intercede violated Mr. Deskovic's clearly established constitutional rights not to be compelled to be a witness against himself, to be free from unreasonable search and seizure, not to be deprived of liberty without due process of law, and to a fair trial as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer or police supervisor in 1989 and 1990 would have believed that failing to intercede to prevent the defendants from coercing suspect statements, fabricating evidence, failing to document and disclose material, exculpatory and impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Deskovic to be arrested and prosecuted without probable cause were lawful.

221. As a direct and proximate result of the defendants' failures to intercede Mr. Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### 42 U.S.C. § 1983 Civil Rights Conspiracy Claim
### Against Defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens

222. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

223. Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others yet unknown agreed among themselves and with other individuals to act in concert in order to deprive Mr. Deskovic of his clearly established Fourth, Fifth, and Fourteenth Amendment rights not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures,

67

not to be deprived of his liberty without due process of law, and to a fair criminal trial.

224. In furtherance of the conspiracy the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a) Defendants Levine, McIntyre, Tumolo, Stephens, and others planned to obtain Jeffrey's confession through physical threats, trickery, deceptive promises, and other means deliberately designed to exploit Jeffrey's known age and intellectual, emotional, and psychological vulnerabilities;

b) Defendants Levine, McIntyre, Tumolo, and others provided Jeffrey Deskovic with non-public facts known to the PPD in connection with the A.C. investigation, and through coercion, deception, and trickery compelled Jeffrey to adopt those facts as his own by incorporating them into allegedly inculpatory statements concerning his knowledge of and involvement in the crime;

c) Defendant Levine and others deceived Jeffrey concerning the status and legal significance of his representation by Lou Ecker in relation to the defendants' questioning of him, and defendants Levine, McIntyre, Stephens, and others subsequently caused Jeffrey to waive his <u>Miranda</u> rights under circumstances that were not knowing and voluntary;

d) Defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens deliberately and recklessly created false police reports, reported false facts to prosecutors, and otherwise fabricated evidence that falsely inculpated Mr. Deskovic and concealed the defendants' investigative misconduct, including but not limited to police reports and other documents falsely representing that Mr. Deskovic had independent knowledge of non-public facts

68

concerning A.C.'s rape and murder; <u>Miranda</u> waiver forms falsely representing that Mr. Deskovic's waivers were knowing and voluntary; and allegedly inculpatory witness statements.

e) Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others deliberately concealed additional material, exculpatory and impeachment evidence from prosecutors, including but not limited to facts concerning the coercive and intimidating tactics used by them to interview witnesses and interrogate Jeffrey Deskovic; evidence that Freddy Claxton and A.C. had not been in a romantic or sexual relationship; evidence that A.C. had not been sexually active prior to her rape and murder; and other evidence tending to establish Jeffrey Deskovic's innocence, including material, exculpatory and impeachment evidence discovered subsequent to Mr. Deskovic's indictment which vitiated probable cause;

f) Prior and subsequent to Mr. Deskovic's arrest, charging, and indictment for the crime, defendants Levine, McIntyre, Brovarski, Tumolo, and others deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Mr. Deskovic's innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Deskovic's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses; failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence; and failing to pursue evidence and leads concerning other suspects after their theory of Mr. Deskovic's guilt had been fatally undermined by known exculpatory evidence;

69

g) Defendants Levine, McIntyre, Stephens, and others hid their misconduct and secured Mr. Deskovic's wrongful conviction by deliberately provided perjured testimony in the grand jury and/or in Mr. Deskovic's criminal trial.

225. As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Deskovic was wrongly arrested, prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### 42 U.S.C. § 1983 Claim Against the City of Peekskill

226. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

227. The City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants, in particular juveniles; (b) fabricating evidence; (c) failing to document and disclose material, exculpatory and impeachment evidence to prosecutors; and (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations.

228. Furthermore, the City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to train and supervise PPD investigators in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting and documenting

70

criminal investigations, conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory and impeachment evidence to prosecutors.

229. The PPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to train and supervise PPD investigators, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple investigators and supervisors in the PPD in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent cases.

230. PPD policymakers were deliberately indifferent to the known and obvious risk that the policy, custom, or pattern and practice of investigative misconduct and failure to train and supervise PPD investigators created a risk that the constitutional rights of criminal suspects like Mr. Deskovic would be violated.

231. The misconduct and constitutional violations committed by the PPD defendants in the course of the investigation and prosecution of Jeffrey Deskovic were carried out pursuant to the PPD's policy, custom, or pattern and practice of investigative misconduct, and were directly and proximately caused by the PPD's failure to train and supervise investigators. As a direct and proximate result of the PPD's policies, customs, or patterns and practices, Jeffrey Deskovic was wrongly prosecuted, convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT X

### 42 U.S.C. § 1983 Claim Against Westchester County

232. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

71

alleges as follows.

233. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring constitutional and ethical duties.

234. This policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys was evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple members of and supervisors in the Westchester County District Attorney's Office in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent investigations and prosecutions, including but not limited to, as described above, the Jean Harris case.

235. As a direct and proximate result of the Westchester County District Attorney's Office policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys, prosecutors, including but not limited to assistant district attorney Bolen, committed multiple constitutional violations and related misconduct in the course of prosecuting Jeffrey Deskovic, including but not limited to the following:

a) Assistant district attorney Bolen deliberately or recklessly obtained Mr. Deskovic's conviction by means of fabricated evidence, including but not limited to defendant Roh's deliberately and recklessly false pretrial statements and testimony that (a) there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and murder, and (b) Roh had observed scarring of A.C.'s hymen during his

72

autopsy, which caused Mr. Deskovic to be maliciously prosecuted and subjected to an unfair

criminal trial on the basis of material fabrications;

b) Bolen concealed from the defense material, exculpatory and impeachment evidence,

including but not limited to, upon information and belief, that Roh's conclusions and

findings concerning A.C.'s sexual history were fabricated;

c) Bolen deliberately or recklessly failed to investigate known exculpatory evidence,

including but not limited to deliberately and recklessly failing to obtain reference hair

samples from Roh, his assistant, and Freddy Claxton, and deliberately or recklessly failing to

obtain DNA testing from Freddy Claxton or any other potential consensual sex partner.

d) Bolen deliberately or recklessly suborned perjury and made false arguments that lacked

evidentiary foundation in order to obtain Mr. Deskovic's conviction, including but not

limited to arguing at trial that hairs found on A.C. had come from Roh, his assistant, and

Freddy Claxton, and that the semen found inside A.C. had come from Freddy Claxton.

236. Westchester County District Attorney's Office policymakers were deliberately indifferent

to the known and obvious risk that the policy, custom, or pattern and practice of failing

supervise, train, and discipline assistant district attorneys in connection with fundamental and

recurring ethical and constitutional duties created a risk that the constitutional rights of criminal

suspects like Mr. Deskovic would be violated.

237. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of

Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final

policymakers and their delegees, maintained a policy, custom, or pattern and practice of

providing false and scientifically unsupported scientific conclusions to Westchester County

73

prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that such conclusions would violate criminal suspects' right to a fair trial.

238. Additionally, prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train and discipline deputy medical examiners. County policymakers maintained this policy, custom, or pattern and practice despite the fact that they knew or, in the absence of their deliberate indifference should have known, that deputy medical examiners, including defendant Roh, openly and notoriously fabricated scientific evidence, gave perjured testimony, and otherwise committed misconduct in connection with their duties as deputy medical examiners.

239. The Westchester County Medical Examiner's Office policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions, and its policy, custom, or pattern and practice of failing to supervise, train, and discipline deputy medical examiners, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple members of and supervisors in the Westchester County Medical Examiner's Office in the course of the investigation and prosecution of Jeffrey Deskovic, misconduct committed by Roh in the Jean Harris case, reported and/or admitted misconduct by Roh in the Vassello, Maragh, Kilmer, Bodenburgh, and Walker/Spruill cases, and in the course of other prior and subsequent cases.

240. As a direct and proximate result of the Westchester County Medical Examiner's Office's policy, custom, or pattern and practice of providing false and scientifically unsupported

74

conclusions to Westchester County prosecutors, and of failing to supervise, train, and discipline deputy medical examiners, Deputy Medical Examiner Louis Roh committed multiple constitutional violations and related misconduct in the course of prosecuting Jeffrey Deskovic, including but not limited to the following:

a) Roh deliberately and recklessly fabricated the false fact that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and murder, in order to support the prosecution's theory that the semen found in A.C. had come from a consensual donor;

b) Roh deliberately and recklessly fabricated the false fact that he had observed scarring of A.C.'s hymen;

c) Roh concealed material, exculpatory and impeachment evidence from assistant district attorney Bolen, including, upon information and belief, the fact that his conclusions and findings concerning A.C.'s sexual history were false;

d) Roh perjured himself on multiple occasions during Mr. Deskovic's trial, including by deliberately and recklessly misstating and overstating his scientific conclusions.

241. Westchester County Medical Examiner's Office policymakers were deliberately indifferent to the known and obvious risk that the Office's policy, custom, or pattern and practice of providing false and scientifically unsupported evidence to prosecutors, and of failing supervise, train, and discipline deputy medical examiners created a risk that the constitutional rights of criminal suspects like Mr. Deskovic would be violated.

242. As a direct result of the policies, customs, or patterns and practices of Westchester County, Jeffrey Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and

suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT XI

### 42 U.S.C. § 1983 Claim for Unreasonable Search and Unnecessary and Wanton Infliction of Pain in Violation of the Fourth, Eight, and Fourteenth Amendments Against Defendant Tweed

243. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

244. Defendant Tweed, acting under color of law, conducted searches of Mr. Deskovic's person that were unreasonable violations of Mr. Deskovic's legitimate expectation of privacy, lacked any legitimate penalogical objective, and therefore violated Mr. Deskovic's Fourth and Fourteenth Amendment right to bodily integrity.

245. Furthermore, defendant Tweed repeatedly, maliciously, sadistically, and without any legitimate penalogical objective subjected Mr. Deskovic to invasive, assaultive, and violative physical and sexual conduct, and otherwise unnecessarily and wantonly inflicted pain upon Mr. Deskovic.  Tweed acted with deliberate disregard for Mr. Deskovic's health and safety, in violation of Mr. Deskovic's right under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment.

246. Defendant Tweed's actions to deprive Mr. Deskovic of his Fourth, Eighth, and Fourteenth Amendment rights violated clearly established constitutional law, and no reasonable corrections officer in 2004 would have believed that defendant's actions were lawful.

247. Defendant Tweed's conduct directly and proximately caused Mr. Deskovic to suffer the grievous injuries enumerated above at the time of the constitutional violations and continuing to this day and into the future.

**Count XII**

**State Law Claim for Malicious Prosecution**
**Against Defendants Levine, McIntyre, Tumolo, Stephens, and Roh**

248. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

249. Defendants Levine, McIntyre, Tumolo, Stephens, and Roh, despite knowing that probable

cause did not exist to arrest and prosecute Mr. Deskovic for the rape and murder of A.C., and

despite the fact that the grand jury's probable cause determination was vitiated by the

defendants' undisclosed misconduct and by other concealed, material, exculpatory and

impeachment evidence, acted individually and in concert to cause Mr. Deskovic to be arrested

and prosecuted for those crimes. The defendants' conduct violated Mr. Deskovic's right

pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free

of unreasonable searches and seizures, and proximately caused his wrongful conviction.

250. Specifically, defendants Levine, McIntyre, Tumolo, and Stephens knew or in the absence of

their deliberate and reckless indifference to the truth should have known of information that

probable cause did not exist to arrest and prosecute Mr. Deskovic, including but not limited to

the facts that Mr. Deskovic's waiver of his right to counsel prior to January 10, 1990 was not

knowing and voluntary, that Mr. Deskovic's allegedly inculpatory statements on and prior to

January 25, 1990 were not the product of his free will and rational intellect, that allegedly

inculpatory evidence had been fabricated by the defendants, and that those factors as well as

additional material, exculpatory and impeachment evidence which was not disclosed to the grand

jury or prosecutors undermined the evidence presented in support of a probable cause finding

against Mr. Deskovic.

77

251. Following Mr. Deskovic's indictment, defendants Levine, McIntyre, and Tumolo intentionally and with deliberate and reckless disregard for the truth, caused Mr. Deskovic's prosecution to continue despite knowing that probable cause had been vitiated. Specifically, after DNA testing results exonerated Mr. Deskovic, the defendants continued to conceal their pre-indictment misconduct, and committed additional misconduct in the course of post-indictment investigation, including but not limited to concealing from prosecutors additional material, exculpatory evidence that undermined probable cause.

252. Additionally, prior and subsequent to Mr. Deskovic's indictment and being notified of exonerative DNA testing results, defendants Levine, McIntyre, and Tumolo deliberately and recklessly failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Mr. Deskovic's prosecution. The deliberate and reckless investigative failures of the defendants included but were not limited to failing to investigate known exculpatory and potentially exculpatory information provided by witnesses, failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence, and failing to pursue evidence and leads concerning other suspects.

253. Defendant Roh caused Mr. Deskovic to be maliciously prosecuted in violation of the Fourth Amendment by deliberately and recklessly fabricating allegedly inculpatory evidence concerning A.C.'s prior sexual history, which was critical to the continued prosecution of Mr. Deskovic following the exculpatory DNA test results, and which Roh knew or in the absence of his deliberate and reckless indifference should have known would cause Mr. Deskovic's prosecution to continue.

78

254. Specifically, just weeks after learning that DNA testing proved Mr. Deskovic not to be the source of the semen found inside A.C., Roh provided assistant district attorney Bolen with a fabricated explanation for the source of the semen by falsely stating (a) that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These false and fabricated pre-trial statements were repeated by Bolen to the court in pretrial conferences discussing the DNA testing and Mr. Deskovic's continued prosecution, and were elicited from Roh at trial.

255. In fact Roh knew, or in the absence of his deliberate and reckless indifference should have known, that he had no scientific basis for concluding that A.C. had been sexually active on multiple occasions, and that he had not seen the scarring that he described to Bolen. Upon information and belief, Roh concealed the material, exculpatory and impeachment evidence of his fabrications from Bolen.

256. The defendants performed the above-described acts deliberately, with reckless disregard for the truth, and with malice.

257. In fact, Mr. Deskovic was innocent of the rape and murder of A.C. On November 2, 2006, the prosecution terminated in Mr. Deskovic's favor when charges against him were dismissed on motion of the Westchester County District Attorney, following the vacatur of his conviction and his release from prison on September 20, 2006, after sixteen years of wrongful incarceration.

258. Defendants' actions to deprive Mr. Deskovic of his liberty without probable cause were in violation of clearly established constitutional law, and no reasonable police officer in 1989 and 1990 would have believed that the defendants' actions were lawful.

79

259. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly

prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and

continuing injuries and damages as set forth above.

### COUNT XIII

**State Law Claim for Intentional or Reckless Infliction of Emotional Distress**
**Against Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh**

260. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

261. The conduct of defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh in

deliberately causing, or recklessly disregarding the risk of causing, the wrongful arrest,

prosecution, and incarceration of Jeffrey Deskovic was extreme and outrageous, and directly and

proximately caused the grievous and continuing injuries and damages set forth above.

262. The conduct of defendant Tweed in deliberately subjecting Mr. Deskovic to unnecessary,

invasive, assaultive, and violative physical contact, including contact of a sexual nature, was

extreme and outrageous, and directly and proximately caused the grievous and continuing

injuries and damages set forth above.

263. Defendants' actions intentionally to inflict emotion distress upon Mr. Deskovic were in

violation of clearly established law, and no reasonable police officer in 1989 and 1990, or

corrections officer in and subsequent to 1994, would have believed that the defendants' actions

were lawful.

### COUNT XIV

**State Law Claim for Negligent Infliction of Emotional Distress**
**Against Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh**

80

264. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

265. Defendants Levine, McIntyre, Tumolo, Brovarski, Stephens, and Roh negligently and grossly negligently, and in breach of their duties owed to Mr. Deskovic to refrain from (a) compelling him to be a witness against himself, (b) fabricating evidence, (c) withholding material, exculpatory and impeachment evidence, (d) failing to conduct a constitutionally adequate investigation, and (e) maliciously prosecuting and causing Mr. Deskovic's false arrest and imprisonment, directly and proximately caused Mr. Deskovic, an innocent man, to be falsely arrested, malicious prosecuted, and wrongly imprisoned for sixteen years. The defendants' actions caused Mr. Deskovic to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

266. Defendant Tweed negligently and grossly negligently breached his duty to refrain from subjecting Jeffrey Deskovic to unnecessary, invasive, assaultive, and violative physical contact, including contact of a sexual nature, and thereby caused Mr. Deskovic to suffer physical harm and to fear for his physical safety throughout his incarceration.

267. Defendants' actions negligently to inflict emotion distress upon Mr. Deskovic were in violation of clearly established law, and no reasonable police officer in 1989 and 1990, or corrections officer in and subsequent to 1994, would have believed that the defendants' actions were lawful.

## COUNT XV

## Respondeat Superior Claim Against the City of Peekskill

81

268. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

269. At all times relevant to this complaint defendants Levine, McIntyre, Brovarski, and Tumolo acted as agents of, and in the scope of their employment with, defendant City of Peekskill. The conduct by which the defendants committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while the defendants were carrying out their routine investigative functions as PPD detectives, and engaging in such conduct as would have been reasonably expected, and was in fact foreseen by, by their employer.

270. The City of Peekskill is liable for its agents' state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XVI

### Respondeat Superior Claim Against Putnam County

271. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

272. At all times relevant to this complaint defendant Stephens acted as an agent of, and in the scope of his employment with, defendant Putnam County. The conduct by which defendant Stephens committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while Stephens was carrying out his routine investigative function as a Putnam County police officer, and was engaged in such conduct as would have been reasonably expected by, and was in fact foreseen

82

by, his employer.

273. Putnam County is liable for Stephens's state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XVII

### Respondeat Superior Claim Against Westchester County

274. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

275. At all times relevant to this complaint defendant Roh acted as an agent of, and in the scope of his employment with, defendant Westchester County. The conduct by which defendant Roh committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while Roh was carrying out his routine function as a Deputy Medical Examiner, and while Roh was engaged in such conduct as would have been reasonably expected by, and was in fact foreseen by, their employer. Westchester County is liable for Roh's state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

**WHEREFORE,** Jeffrey Deskovic prays as follows:

A. That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to him, and against all non-municipal defendants, in an amount, to be determined at trial, that will deter such conduct by defendants in

the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E. For any and all other relief to which he may be entitled.

Respectfully submitted,

June 9, 2008

_____
Barry Scheck
Nick Brustin (NB0605)
Jennifer Laurin (JL9668)
Cochran, Neufeld & Scheck LLP
99 Hudson Street, 8th Floor
New York, New York 10013
Tel: (212) 965-9081
Fax: (212) 965-9084
Attorneys for Plaintiff Jeffrey Deskovic

84

ORANGE COUNTY DISTRICT ATTORNEY
ORANGE COUNTY GOVERNMENT CENTER, GOSHEN, NEW YORK 10924-1627
FAX: 914-294-6958    TEL: 914-294-5471



**FRANCIS D. PHILLIPS II**
*District Attorney*

August 17, 1995

Hon. Anthony Ingrassia
Orange County Coroner
59 Eisenhower Drive
Middletown, New York 10940

RE: DR. LOUIS ROH

Dear Anthony:

We have had substantial problems with quality of the work of Dr. Louis Roh. In various criminal cases his findings have been either incomplete, inadequate, or erroneous. I cannot in good conscience rely upon his findings in cases where the cause of death is more than a simple gunshot wound or stab wound. All of the Coroners must understand that we need to find a suitable replacement for him who will perform forensic work on behalf of the County of Orange.

There have also been problems with regard to Dr. Roh's fees which, if I thought we would be able to retain him in the future, would be a problem in and of itself. In the meantime it is critical that the Coroners, District Attorney, and members of law enforcement work together to find and retain another forensic pathologist.

I must candidly advise you that if Dr. Roh continues to do forensic work I will be forced to retain an independent forensic pathologist to review all of his autopsy findings. I want to present input from police agencies who are in a better position to articulate the problems we have had. I would like to set up a meeting in early September. Please advise me of a convenient date on which all or most of the Coroners will be able to attend.

Very truly yours,

FRANCIS D. PHILLIPS II
DISTRICT ATTORNEY

PEOPLE'S
EXHIBIT
66
11-30-05   BSD

ROH000051



STATE OF NEW YORK

COUNTY COURT OF THE COUNTY OF DUTCHESS

COUNTY COURT HOUSE

POUGHKEEPSIE, NY 12601

431-1810

THOMAS J. DOLAN
COUNTY JUDGE

February 11, 1998

William V. Grady
Dutchess County District Attorney
236 Main Street
Poughkeepsie, New York 12601

RE:  People v. Kilmer/Testimony of Dr. Roh

Dear Bill:

During the Kilmer trial, Dr. Louis Roh, who is the Deputy Medical Examiner for Westchester County, testified for the defendant.

I have enclosed a copy of the appropriate part of the record of trial containing Dr. Roh's testimony in the Kilmer case. Also provided to you is a copy of the appropriate section of the minutes of an Orange County trial, People v. Maragh, dated November 12, 1997.

Obviously, the inconsistent nature of Dr. Roh's testimony under oath in both of these cases is very disturbing and I feel constrained to formally advise you of the situation for whatever action you feel is appropriate under the circumstances.

Very truly yours,

Thomas J. Dolan
County Court Judge

TJD/ds

encl.

PRINTED ON RECYCLED PAPER

ROH000027



STATE OF NEW YORK
## COUNTY COURT OF THE COUNTY OF DUTCHESS
COUNTY COURT HOUSE
POUGHKEEPSIE, NY 12601
431-1810

THOMAS J. DOLAN
COUNTY JUDGE

February 11, 1998

William V. Grady
Dutchess County District Attorney
236 Main Street
Poughkeepsie, New York 12601

RE:   People v. Kilmer/Testimony of Dr. Roh

Dear Bill:

During the Kilmer trial, Dr. Louis Roh, who is the Deputy Medical Examiner for Westchester County, testified for the defendant.

I have enclosed a copy of the appropriate part of the record of trial containing Dr. Roh's testimony in the Kilmer case. Also provided to you is a copy of the appropriate section of the minutes of an Orange County trial, People v. Maragh, dated November 12, 1997.

Obviously, the inconsistent nature of Dr. Roh's testimony under oath in both of these cases is very disturbing and I feel constrained to formally advise you of the situation for whatever action you feel is appropriate under the circumstances.

Very truly yours,

Thomas J. Dolan
County Court Judge

TJD/ds

encl.

PRINTED ON RECYCLED PAPER

ROH000027



March 16, 1998

Ms. Agnes Larson, Program Director
New York State Department of Health
Office of Professional Medical Conduct
145 Huguenot Street, 6th Floor
New Rochelle, New York 10801

RE:   DR. LOUIS ROH

Dear Ms. Larson:

During a recent homicide trial conducted in the Dutchess County Court, Dr. Louis Roh, a Board Certified Forensic Pathologist, appeared as an expert witness for the defense. In this case, Dr. Roh, testified as a private physician but professionally holds employment as the Deputy Chief Medical Examiner in Westchester County.

As part of his testimony, Dr. Roh made certain remarks which the presiding County Court Judge, Thomas Dolan, found very disturbing; I concur with his assessment. Certainly ethical and professional responsibility require of a public servant the highest degree of candor, whether testifying in that capacity or not, and it is for that reason that I am bringing this matter to your attention.

As enclosures to this correspondence, I have provided you with certain portions of Dr. Roh's testimony in the Dutchess County case. That testimony occurred in January of 1998. Within that testimony, reference is made to a letter written by Orange County District Attorney Francis Phillips; I have enclosed a copy of that correspondence as well. I have also provided you with relevant portions of Dr. Roh's testimony as transcribed from a trial that took place on November 12, 1997 in Orange County Court before the Hon. Jeffrey G. Berry. A member of my staff has spoken personally with the presiding Judge, the Judge's Law Clerk, the prosecutor and the defense attorney in the Orange County case and confirmed that Dr. Roh was actually shown a copy of the letter in question and provided with an opportunity to read it as appears in the record of the trial proceedings.   Also

ROH000028

Ms. Agnes Larson, Program Director
Office of Professional Medical Conduct
Page 2
16 March 1998

enclosed are copies of two (2) newspaper articles authored by Paula McMahon, a reporter with the *Middletown Times Herald Record.* Ms. McMahon had discussed the issue of this letter with Dr. Roh on at least one occasion after the November 12, 1997 appearance in Orange County Court.

It should be noted that in both the Orange County case and the Dutchess County case, the Court permitted inquiry and cross-examination regarding the underlying incident referenced in Mr. Phillips' letter. However, given the circumstances, while Dr. Roh's denying knowledge of the letter and his effort to avoid any knowledge of its contents, would not constitute perjury, I believe it does constitute a serious breach of his ethical and professional responsibility to truthfully answer the questions posed to him while under oath without regard for the potential professional embarrassment.

This information is being provided to you for whatever action you deem appropriate under the circumstances.

Very truly yours,

WILLIAM V. GRADY
District Attorney

wmu
Enclosures - 5

ROH000029



March 16, 1998

Ms. Agnes Larson, Program Director
New York State Department of Health
Office of Professional Medical Conduct
145 Huguenot Street, 6th Floor
New Rochelle, New York 10801

RE:    DR. LOUIS ROH

Dear Ms. Larson:

During a recent homicide trial conducted in the Dutchess County Court, Dr. Louis Roh, a Board Certified Forensic Pathologist, appeared as an expert witness for the defense. In this case, Dr. Roh, testified as a private physician but professionally holds employment as the Deputy Chief Medical Examiner in Westchester County.

As part of his testimony, Dr. Roh made certain remarks which the presiding County Court Judge, Thomas Dolan, found very disturbing; I concur with his assessment. Certainly ethical and professional responsibility require of a public servant the highest degree of candor, whether testifying in that capacity or not, and it is for that reason that I am bringing this matter to your attention.

As enclosures to this correspondence, I have provided you with certain portions of Dr. Roh's testimony in the Dutchess County case. That testimony occurred in January of 1998. Within that testimony, reference is made to a letter written by Orange County District Attorney Francis Phillips; I have enclosed a copy of that correspondence as well. I have also provided you with relevant portions of Dr. Roh's testimony as transcribed from a trial that took place on November 12, 1997 in Orange County Court before the Hon. Jeffrey G. Berry. A member of my staff has spoken personally with the presiding Judge, the Judge's Law Clerk, the prosecutor and the defense attorney in the Orange County case and confirmed that Dr. Roh was actually shown a copy of the letter in question and provided with an opportunity to read it as appears in the record of the trial proceedings. Also

ROH000028

Ms. Agnes Larson, Program Director
Office of Professional Medical Conduct
Page 2
16 March 1998

enclosed are copies of two (2) newspaper articles authored by Paula McMahon, a reporter with the *Middletown Times Herald Record*. Ms. McMahon had discussed the issue of this letter with Dr. Roh on at least one occasion after the November 12, 1997 appearance in Orange County Court.

It should be noted that in both the Orange County case and the Dutchess County case, the Court permitted inquiry and cross-examination regarding the underlying incident referenced in Mr. Phillips' letter. However, given the circumstances, while Dr. Roh's denying knowledge of the letter and his effort to avoid any knowledge of its contents, would not constitute perjury, I believe it does constitute a serious breach of his ethical and professional responsibility to truthfully answer the questions posed to him while under oath without regard for the potential professional embarrassment.

This information is being provided to you for whatever action you deem appropriate under the circumstances.

Very truly yours,

WILLIAM V. GRADY
District Attorney

wmu
Enclosures - 5

ROH000029

## COUNTY OF SUFFOLK



**ROBERT J. GAFFNEY**
SUFFOLK COUNTY EXECUTIVE
DEPARTMENT OF HEALTH SERVICES
**Clare B. Bradley, M.D. M.P.H.**
COMMISSIONER

DIVISION OF MEDICAL-LEGAL INVESTIGATIONS &
FORENSIC SCIENCES
SIDNEY B. WEINBERG CENTER
FOR FORENSIC SCIENCES

ACCREDITED BY ABFT, ASCLD/LAB & NAME

**CHARLES V. WETLI, M.D.**
CHIEF MEDICAL EXAMINER

July 16, 2001

Re:   Dr. Louis Roh

New York State Department of Health/OPMC
Attention: "Intake"
433 River Street
Suite 303
Troy, New York  12180

Dear Sir or Madam:

Earlier this year, Dr. Louis Roh testified for the defense in a homicide trial (People v Charles Bodenburg) held in Suffolk County, New York. The victim, Kayla Zachman, was a three year old girl who had consumed an alcoholic beverage (supposedly, Amaretto). The defendant subsequently caused the death of this child. The autopsy, performed by Dr. Stuart Dawson, revealed head trauma with diffuse axonal injury, typical for the "Whiplash Shaken Infant Syndrome"; other aspects of the investigation lead to the conclusion that smothering was also a factor. Toxicologic analysis revealed a blood alcohol concentration of 0.03% and a brain alcohol concentration of 0.01%. (Note: A serum alcohol concentration of 0.05% was determined on a blood sample taken in the hospital Emergency Room – serum levels are slightly higher than whole blood).

It would not be unexpected for a defense pathologist to challenge the mechanism of the brain injury, and the conclusion that smothering was a component in the death. However, Dr. Roh testified that alcohol poisoning was the cause of death (despite the fact that diffuse axonal injury, regardless of cause, is a lethal injury). He supported his conclusion by "his experience" and subsequently by an article (attached) where he neglected to mention that the blood alcohol concentration reported in that child was determined more than seven hours after ingestion.

ROH000001

In our opinion, Dr. Roh's testimony went far beyond what would be expected of a defense expert and that his testimony was misleading and had no reasonable basis in fact. In this case, Dr. Dawson provided direct testimony for the state. Dr. Wetli and Dr. Briglia provided rebuttal testimony and cited the medical and toxicologic literature which indicates children may survive extremely high levels of alcohol (two articles enclosed).

Attached for your consideration are the three articles mentioned above, the autopsy report, neuropathology report and toxicology report. Enclosed is the Trial Transcript of Dr. Roh's testimony and the Summation of the Assistant District Attorney.

Should you need additional documents, information or clarification, please contact Dr. Wetli. Thank you for looking into this matter

Sincerely,

Charles V. Wetli, M. D
Chief Medical Examiner

Stuart L. Dawson, M. D.
Deputy Chief Medical Examiner

Edward J. Briglia, Ph. D.
Chief, Toxicology Laboratory

CVW/slg

Cc:  (Without enclosures):     Dr. Clare B. Bradley, Suffolk County Health Commissioner
                               Ms Georgia Tschiember, Assistant District Attorney
                               Mr. Robert Cabble, Assistant County Attorney

FORENSIC SCIENCES BLDG. #487
725 VETERAN'S MEMORIAL HIGHWAY
HAUPPAUGE, NY 11787-4311

MAILING ADDRESS
P.O. BOX 6100
HAUPPAUGE, NY 11788-0099

TELECOPIER.   1-(616)-853-5555
              1-(616)-853-4573

ROH000002

# ORIGINAL

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF WESTCHESTER
 2   -------------------------------------------X

     ADMINISTRATION PROCEEDING
 3   IN THE MATTER OF
                                        FILE NO.
                                        #074/2003
 4
 5   ANIELA WALKER a/k/a ANE LA WALKER,
     a/k/a ANIELE WALKER,
 6
                         Decedent.
 7   -------------------------------------------X
 8                     Surrogate Court
                       140 Grand Street
 9                     White Plains, New York
                       October 31, 2003
10                     9:30 a.m.
11
12
13
14
15              Continued examination before
16   trial of a NON-PARTY WITNESS, LOUIS ROH, M.D.,
17   held pursuant to Subpoena, at the above time
18   and place, before a Notary Public of the
19   State of New York.
20
21
22              SULLIVAN REPORTING
                388 Tarrytown Road
23         White Plains, New York 10607
                (914)949-4545
24
25
```

Page 330

```
 1    A P P E A R A N C E S :
 2              PISCIONERE & NEMAROW, P.C.
                Attorneys for Petitioner
 3              363 Boston Post Road
                Rye, New York 10580
 4              BY: ANTHONY PISCIONERE, ESQ.
 5
                GEORGE LAMBERT,
 6              Public Administrator
                SCHUMAN, SALL & GEIST, ESQS.
 7              One North Lexington Avenue
                White Plains, New York 10601
 8              BY: IVAN LAWNER, ESQ.
 9
                RABIN, PANERO & HERRICK, ESQS.
10              Attorneys for Objectants
                44 Church Street
11              White Plains, New York 10601
                BY: MATTHEW D. SCHWARZ, ESQ.
12
13
14    ALSO PRESENT:
15
                JAMES McCARTY, ESQ.
16
17
18
19
20
21
22
23
24
25
```

- Louis Roh, M.D. -

1  the nose in the areas where you observed the

2  abrasions, would that be consistent?

3      A.   No, it's not consistent.

4      Q.   Why not?

5      A.   That's my opinion.

6      Q.   Didn't you testify a few minutes ago

7  that those injuries, those abrasions to the nose

8  were consistent with a fingernail scrapping the

9  nose?

10     A.   That's what I said.  It's not consistent

11  with pinching the nose.

12     Q.   Doctor, I am asking you to assume for

13  purposes of our question.  The question I am about

14  to ask you; when Mr. Spruill went to pinch the

15  decedent's nose that he also scratched her nose

16  with his fingernail, are the injuries you observed

17  consistent with him having scratched her, if he

18  did scratch her, when he pinched her nose?

19     A.   If he scratched her five times in the

20  back of the nose, yes.

21     Q.   Doctor, the records of testimony that

22  you say you keep, those are on index cards?

23     A.   No.

24     Q.   Didn't you testify, Doctor, that you

25  keep records of all the cases that you testify on?

- Louis Roh, M.D. -

Page 401

1        A.    No, autopsies I do.

2        Q.    Doctor, do you recall testifying in this

3   case in your deposition testimony that you keep

4   records of every case that you testify on and that

5   you have those records for more than five years of

6   your testimony?

7        A.    I don't recall.

8        Q.    Doctor, let's refer your attention to

9   your deposition --

10       A.    If I did I am wrong.  I don't keep it.

11       Q.    You don't keep it, Doctor?

12       A.    The testimony record, no.

13       Q.    Let's go back to your deposition

14  transcript and see if that refreshes your

15  recollection, Doctor?

16       A.    If I said I did it, that was wrong.

17       Q.    Doctor, let me refresh your recollection

18  first.

19            MR. SCHWARZ:  He didn't say his

20       recollection needed to be refreshed.

21       Q.    Deposition transcript, October 20, 2003,

22  Page 51 -- starting at Page 50, Line 22:

23            "Question:  Doctor, I am talking about

24  the cases that you testified on.  Do you keep some

25  records regarding those cases?

- Louis Roh, M.D. -

Page 402

```
 1              "Answer:  Yes, I do."

 2              Continuing on Page 51:

 3              "Question:  What type cases or what

 4     cases do you keep those records on?

 5              "Answer:  I do make a little index card

 6     for the case testifying, but it doesn't go back to

 7     1970.

 8              "Question:  How far back does it go?

 9              "Answer: I don't recall.

10              "Question:  Does it go back more than

11     five years?

12              "Answer:  Yes

13              "Question:  Is that for each and every

14     case you testified on for the last five years or

15     more?

16              "Answer:  Yes.

17              "Question:  Whether you testified for

18     the prosecution or the defense?

19              "Answer:  That's correct.

20              "Question:  Does it include information

21     like the name of the case?

22              "Answer:  Yes.

23              "Question:  Name of the attorney?

24              "Answer:  Yes, and the judge."

25              That's it.  Do you recall giving
```

- Louis Roh, M.D. -

Page 403

1    those --
2        A.    Sometimes I do, yes.
3        Q.    So you do have index cards in the cases
4    you testified for?
5        A.    Yes.
6        Q.    Do you keep those in your office at the
7    medical examiner's office?
8        A.    No.
9        Q.    Where do you keep them?
10       A.    I throw them out.
11       Q.    Wait a second.  We just asked you these
12   questions and answers if you had the records and
13   you said you did?
14       A.    Some I throw out; some I keep.
15       Q.    The ones you keep, where do you keep
16   them?
17       A.    In my office.
18       Q.    Up at the Medical Examiner's office?
19       A.    That's correct.
20       Q.    On index cards?
21       A.    Index cards, yes.
22       Q.    Doctor, I'm going to ask you at your
23   next deposition to produce those cards that you
24   kept on the cases that you testified to.  I'm
25   going to ask you to preserve those from this day

- Louis Roh, M.D. -

Page 404

1    forward and not to throw out any other cases.

2         A.    I don't have it.

3         Q.    What do you mean you don't have it?

4         A.    I don't have index cards.  I only have

5    index cards of the autopsy.

6         Q.    Your deposition transcript is very clear

7    when you testified in this case on October 20,

8    2003, that you kept index cards for each and every

9    case that you testified on for the last five years

10   or more, whether you testified for the

11   prosecution --

12        A.    I said --

13        Q.    Let me finish, Doctor -- whether you

14   testified for the prosecution or the defense and

15   that it included information of the name of the

16   case, name of the attorney and the judge.  In

17   fact, you even added in "Yes, and the judge," in

18   your answer.

19             Is it your testimony today that you

20   don't maintain such cards?

21        A.    Yeah, it's been thrown out.

22        Q.    When?

23        A.    After the testimony.

24        Q.    It is your testimony, Doctor, that

25   between October 20, 2003 and today's date, which

- Louis Roh, M.D. -

1    is October 31, 2003, you have thrown out all these

2    cards that you testified you kept?

3         A.    Yes, I did.

4         Q.    Doctor, do you understand the concept of

5    perjury?

6         A.    Yes, I do.

7         Q.    Where did you throw the cards out,

8    Doctor?

9         A.    In the garbage.

10        Q.    Which garbage; at the office or did you

11   take them home to throw them out?

12        A.    No, in the office.

13        Q.    Did you give them to anybody before you

14   threw them out?

15        A.    No, I just put them in the garbage.

16        Q.    How big were these cards; how much space

17   did they take up?

18        A.    A regular garbage bin.

19        Q.    How much space did the cards take up,

20   more than one file draw?

21        A.    No, a few.

22        Q.    How few?

23        A.    I would say maybe 20, 30.

24        Q.    Doctor, you testified that you testified

25   in over 300 cases, didn't you?

- Louis Roh, M.D. -

1    A.   No, I didn't say that I save all the

2    index cards.

3    Q.   That's not my question.  In this case

4    haven't you said in your deposition that you have

5    testified in over 300 cases?

6    A.   My answer is, I do not have index cards,

7    not now.

8    Q.   That's not my question, Doctor.  Did you

9    give deposition testimony in this case that you

10   have testified in over 300 cases?

11   A.   Yes, I did.

12   Q.   How many cases are you telling us now

13   that you have maintained index cards for?

14   A.   Maybe 20, 30.

15   Q.   Is it your testimony that between

16   October 20 and October 31 of 2003 you destroyed

17   those 20 or 30 records of testimony?

18   A.   Yes, I did.

19   Q.   Can you tell us the reason you did that,

20   Doctor?

21   A.   Because I didn't want to get subpoena.

22   Q.   You thought that those records might be

23   subpoenaed by us in connection with this case?

24   A.   That's correct.

25   Q.   And as a result you willfully destroyed

- Louis Roh, M.D. -

1    those records?

2         A.   That's correct.

3         Q.   When did you do it, Doctor, how long

4    after October 20?

5         A.   I don't know the exact date.

6         Q.   Did you do it yesterday?

7         A.   I don't know exact date.

8         Q.   Did you do it this week?

9         A.   I don't recall exact date.

10        Q.   Did you do it last week?

11        A.   I don't recall.

12        Q.   Did you do it within days of October 20?

13        A.   I do not recall.

14        Q.   Did you discuss the destruction of these

15   records with any person --

16        A.   No.

17        Q.   Let my finish the question.  Did you

18   discuss the destruction of these records prior to

19   your destroying these records?

20        A.   No.

21        Q.   Did you shred these records in any way?

22        A.   No.

23        Q.   Did you just toss them in the garbage?

24        A.   That's correct.

25        Q.   And you knew that these records might be

Page 408

1    subpoenaed by me in connection with this case,

2    correct?

3         A.   No.

4         Q.   You didn't know that?

5         A.   I didn't know that.

6         Q.   I thought you just said you throw them

7    out because you were worried --

8         A.   Well --

9         Q.   Let me finish the question, Doctor.

10            I thought you said you destroyed these

11   records because you were worried they were going

12   to be subpoenaed by me in connection with this

13   case?

14        A.   Well, that was one of the reasons.

15        Q.   What are the other reasons?

16        A.   I didn't want to keep any unnecessary

17   records, because you have been subpoenaing all

18   kinds of things.  I realize that keeping all these

19   records creates more problems, so I decided to get

20   rid of it.

21            You subpoenaed everything.  So I realize

22   that keeping all these unnecessary records creates

23   a problem.

24        Q.   Let me ask you a question.  Have you

25   ever been challenged in such a way in a case where

- Louis Roh, M.D. -

Page 409

1   all your records have been subpoenaed like this?

2      A.   No.

3      Q.   So when a challenge such as this comes

4   about, your response was to destroy the evidence;

5   is that correct?

6      A.   That's correct.

7      Q.   Doctor, did you keep any of the records

8   in your computer?

9      A.   No.

10      Q.   Did you keep any of the records at your

11  home?

12      A.   No.

13      Q.   Doctor, is this the first time that you

14  have been involved in a civil case where the

15  person taking your deposition was also charged

16  with murder?

17      A.   I don't recall.

18      Q.   Do you recall any other case such as

19  this, Doctor?

20      A.   I do not recall.

21      Q.   In any event, this is the first time

22  that all these records like this have been

23  subpoenaed, correct?

24      A.   I don't recall, most likely.

25      Q.   This is the first time you have come up

- Louis Roh, M.D. -

1   against this; is that right?

2       A.   That's correct.

3       Q.   And your response to this was to destroy

4   the evidence?

5           MR. LAWNER:   Objection as to form.

6       A.   This are my records.

7       Q.   You thought those records would be

8   subpoenaed as evidence, correct?

9       A.   No, I didn't say that.

10      Q.   You thought those records would be

11  subpoenaed?

12      A.   I felt keeping all those records create

13  frivolous subpoena issues.  So I decided to get

14  rid of it.

15      Q.   You thought they had frivolous subpoena

16  issues associated with them?

17      A.   As far as I am concerned subpoenaing my

18  index card is frivolous.

19      Q.   So you decided to prevent the subpoena

20  of records that you thought might be frivolous, by

21  destroying them?

22      A.   That's correct.

23      Q.   Doctor, did you believe when you

24  destroyed those records you had anything to hide?

25      A.   That's not a record.

- Louis Roh, M.D. -

1      Q.    Doctor, let's assume for purposes of my

2   question that the index cards we are talking about

3   are records?

4      A.    That's my file.

5      Q.    That's your file?

6      A.    Yeah, I decided to get rid of it.

7      Q.    When you destroyed your file, was it

8   because you thought you had something to hide?

9      A.    No.

10      Q.    You didn't think you had anything to

11   hide?

12      A.    I decided to get rid of it so I don't

13   have to come here and discuss about this thing one

14   by one.

15      Q.    So you were worried that we were going

16   to start to look into the other cases that you

17   gave testimony?

18      A.    We are talking about three days

19   testimony.  I didn't want to go through that.

20      Q. . Were you worried that we were going to

21   uncover other cases that you had to testify on?

22      A.    No.

23      Q.    Were you worried that we might discover

24   certain testimony of yours that you had given in

25   other cases that it might be contradictory to the

Page 412

1   testimony --

2       A.   No.

3       Q.   Let me finish -- to the testimony you

4   have given in this case?

5       A.   No.

6            MR. PISCIONERE:  I think it's time to

7       take a few minute break.

8            (Recess taken.)

9       Q.   I am going to instruct you, Doctor, that

10  you are not to destroy any evidence that in any

11  way you feel might be associated with your

12  testimony in this case?

13      A.   Such as?

14      Q.   Anything, Doctor.  I am not limiting it

15  to anything in the world.  Anything.

16           MR. McCARTY:  You can't say that.

17           MR. PISCIONERE:  He doesn't want to --

18           MR. SCHWARZ:  You can't subpoena --

19       you issued a subpoena.  He produced the

20       documents.  You can't have an all

21       encompassing subpoena for every single

22       thing he has ever done in his entire life.

23           MR. PISCIONERE:  Maybe what we should

24       do is get the law secretary in here and

25       have the Court issue some direction.  I

- Louis Roh, M.D. -

Page 413

1    think you are right.

2        I will be right back.  If you want to

3    come with me, I am going to get a law

4    secretary.

5        (Recess taken.)

6        MR. PISCIONERE:  Mr. DiBella, before

7    you begin, if I may, towards the end before

8    we broke I gave you direction or attempted

9    to give a direction to Dr. Roh, which upon

10    reflection I believe is inappropriate and

11    poorly advised.

12        I want to, for the record, retract the

13    direction I gave to Dr. Roh, not to destroy

14    some things, because I don't believe I had

15    authority to do so.  I believe we'll

16    request the court to give direction to

17    Dr. Roh.

18        MR. DiBELLA:  Did anybody else want to

19    say anything?

20        My name is Robert DiBella.  I am Judge

21    Scarpino's Principal Court Attorney here in

22    the Surrogates Court.  The attorneys came

23    to my office for a conference with respect

24    to some direction to the witness, Dr. Roh,

25    regarding retention of his records and the

- Louis Roh, M.D. -

Page 414

1    direction not to destroy records, that
2    Mr. Piscionere feels may be relevant to
3    issues scheduled to be heard in an
4    evidentiary hearing before Judge Scarpino.
5         I had an opportunity to speak to Judge
6    Scarpino about this briefly and after
7    hearing the attorneys and speaking to the
8    Judge, it's the Court's feeling,
9    Doctor, that you should be careful in what
10   you choose to destroy at this juncture.
11        We don't obviously, as I told you last
12   time, I asked you to preserve everything in
13   your file.  Apparently our definition of
14   what that might mean and your definition of
15   what that might mean, may not be the same.
16        Perhaps those words are susceptible to
17   different interpretations, but what is
18   important is that records, whatever form
19   they may be in, or whatever file or place
20   they are kept in, that may be relevant to
21   issues at our hearing, be preserved.
22        That is our broad objection active.
23   We are not looking to make this any more
24   difficult than we need to with regard to
25   your operations.

- Louis Roh, M.D. -

1    We have a substantial obligation, the

2  Court does, to protect evidence in a trial

3  so hopefully the truth can be arrived at,

4  consistent with our laws and rules.

5    Again, I am reiterating our direction

6  to you that we want any documents relating,

7  in any manner, wherever they be and

8  whatever form they are kept in under your

9  custody or potential control, to be

10  preserved.

11    In addition, records that relate to

12  conclusions that you draw as a medical

13  examiner in different situations, should be

14  preserved also.

15    I can't tell you that you need to

16  preserve every scrap of paper that exists

17  that you ever touched.

18    THE WITNESS:  You have to tell me,

19  that's true.

20    MR. DiBELLA:  I am not making

21  something that broad.  These things are not

22  static.  If you know you are being asked at

23  the depositions -- you are being deposed on

24  many separate days now -- about information

25  or findings or testimony that you may have

- Louis Rob, M.D. -

Page 416

1    given in other cases, about conditions you

2    observed in this case and they are

3    different from those or consistent with

4    those, that could be relevant.  It's

5    possible that could be relevant here.

6        If you said, I think there was an

7    example given by Mr. Piscionere that a

8    blunt instrument would not cause a

9    particular type of condition, but in this

10   case you feel that it did, there maybe good

11   and substantial reasons why they are

12   different and circumstances that may

13   explain any apparent inconsistencies from

14   one testimony to another.

15       But if the whole file or record has

16   been destroyed, then we can never arrive at

17   the information in the first instance, let

18   alone the explanation of it.  This is our

19   problem.

20       I am not here sitting in on the

21   deposition where I have the ability to rule

22   on a question by question basis and know

23   where he is going and where he might be

24   going when you are being questioned.

25   That's impossible.  I don't have the

- Louis Roh, M.D. -

Page 417

1    ability right now to do that.

2         So we are dependent on your

3    professional judgment in a lot of ways, but

4    I want you to know that the Court is

5    considered that any destruction of records

6    could be very problematic.

7         THE WITNESS:  It's not a record.  It's

8    my memo on a piece of paper.

9         MR. DiBELLA:  A memo on a piece of

10   paper is a record.

11        THE WITNESS:  This is something I had

12   let's say ten years ago.  I may have jotted

13   it down on the index card so I can refresh

14   my memory to testify in court.

15        I usually throw them out.  They have

16   nothing to do with this case and he is

17   asking, bring all those, my memo cards to

18   this deposition.

19        If he asked me about a particular,

20   this particular case, certainly I bring it

21   in.  In fact, he asked me to bring the

22   index card on this case, so I brought it in

23   this morning.

24        But he is asking me to bring my memo

25   pad, jot down on the index card, cases

- Louis Roh, M.D. -

Page 418

1    stretching) back 20, 30 years.  These are

2    my scraps of paper.  That's not, of course,

3    on record.  It has nothing to do with this

4    case.

5         You have to draw the line, which is

6    relevant, which is not relevant.  In my

7    opinion those cases are not relevant.

8         MR. DiBELLA:  It's Judge Scarpino's

9    opinion, it's the only important one with

10   regard to what is relevant in this case.

11   Do you understand that?

12        THE WITNESS:  I understand that.

13        MR. DiBELLA:  I am not challenging

14   your medical opinion and I assure you, you

15   will not going to be challenged to change

16   Judge Scarpino's legal opinion.

17        You have an attorney.  You can seek

18   the advice of your attorney.  If you are

19   directed by one of these guys, why you feel

20   there is an inappropriate reason for the

21   objection, you should seek the advice of

22   your counsel.  It's a confidential

23   discussion with your counsel.  And counsel

24   will advise you as to what to do.

25        There are procedures that your counsel

- Louis Roh, M.D. -

Page 419

1    can utilize to prevent Mr. Piscionere from

2    getting things that he demands.  They can

3    move to quash subpoenas.  They can move for

4    further direction from the Court for an

5    order, limiting, narrowing the discovery,

6    the request of information.  These

7    procedures have worked well for the courts

8    for many hundreds of years in all kinds of

9    cases, but they have to utilized in the

10   right order.

11        You can't be the person who decides

12   what you will give and what you will not.

13   The fact that you don't normally or

14   sometimes don't keep these cards, is not

15   the point.

16        If you have saved them and they do

17   have relevant information, they do exist

18   and they do have relevant information, it

19   may be something that Mr. Piscionere is

20   entitled to, subject to your attorneys

21   bringing the proper objections.

22        These records can sometimes be viewed

23   with what we call incamera, where the court

24   alone looks at them before any disclosure

25   is had, to determine whether they are

- Louis Roh, M.D. -

Page 420

1   relevant and if we make a decision as to

2   relevance or there is a question, it can be

3   appealed.  Other people can see what we

4   have done and determine whether we did the

5   right thing or the wrong thing.  So all

6   these things occur in a civilized process.

7        Again, I am not going to chastise you

8   for doing something wrong.  I don't feel

9   you have.  The order that we gave before

10  was limited.

11       But records include all types of

12  information; computer discs, hard drives,

13  telephone records, tapes, anything that

14  records an event.

15       If you had index cards and wrote on

16  them to refresh your recollection at a

17  later time, it's a record.  It may be a

18  personal record, it might be a business

19  records.  It might be some other type of

20  record to qualify, but the broad term of

21  record will include all types of

22  communication and information.

23       I don't want to have to give you a

24  three-page definition on the laws that make

25  those up.  I am just trying to suggest to

- Louis Roh, M.D. -

Page 421

1    you that you need to consult with your

2    attorney with regard to what Mr. Piscionere

3    asks you to bring and use their best

4    judgment in compliance.

5        My boss is not the kind of kind who

6    likes to punish people, but he insists some

7    people abide by the rules so that the

8    process is protected and we can do the best

9    job we can with the information that we

10   have.  Okay?

11       THE WITNESS:  Okay.

12       MR. DiBELLA:  So please, with regard

13   to any further records that are contained,

14   please make every effort to preserve these

15   and be very careful not to destroy things

16   that may have some import and put us in a

17   worse position later.  I would like to

18   avoid that issue.

19       Does anyone feel that more needs to be

20   done on this area?

21       MR. PISCIONERE:  No.

22       MR. LAWNER:  No.

23       MR. PISCIONERE:  Thank you.

24       MR. DiBELLA:  Okay.  Have a good day.

25   Doctor, I heard you have to leave, have a