UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LINDA MCGARR,

               Plaintiff,

      -against-

CITY OF PEEKSKILL, WESTCHESTER
COUNTY, DAVID LEVINE, THOMAS
MCINTYRE, WALTER BROVARSKI, EUGENE
TUMOLO, JOHN AND JANE DOE
SUPERVISORS, DANIEL STEPHENS,
GEORGE BOLEN, LOUIS ROH, and MILLARD
HYLAND,

             Defendants.

07 CV 9488 (KMK)(GAY)

**PLAINTIFF LINDA MCGARR'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT STEPHENS'S MOTION FOR SUMMARY JUDGMENT**

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ....................................................................................ii-iii

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS ................................................................................. 2

ARGUMENT ................................................................................................... 5

    I.      DEFENDANT STEPHENS INTERFERED WITH LINDA MCGARR'S CONSTITUTIONAL RIGHT TO RAISE HER SON ........................................... 6

    II.     STEPHENS'S CLAIM TO THE CONTRARY IS MISPLACED ........................ 8

          A.     Stephens's Argument Misstates the Law ..................................... 8

          B.     Stephens Misstates the Record:  His Actions Were Directed at Jeff's Relationship with his Mother ...................................... 14

CONCLUSION ............................................................................................... 17

i

## TABLE OF AUTHORITIES

PAGE NO(s):

**FEDERAL CASES**

*Adler v. Pataki,*
    185 F.3d 35 (2d Cir. 1999) ................................................................................ 9

*Busch v. City of New York,*
    00 CV 5211(SJ), 2003 WL 22171896 (E.D.N.Y. Sept. 11, 2003) ................................. 11

*Butera v. Dist. of Columbia,*
    235 F.3d 637 (D.C. Cir. 2001) .......................................................................... 11, 12, 13

*Curnow v. Ridgecrest Police,*
    952 F.2d 321 (9th Cir. 1991) ............................................................................. 14

*Domino Media, Inc. v. Kranis,*
    9 F. Supp.2d 374 (S.D.N.Y. 1998) .................................................................... 6

*Dusenbury v. City of New York,*
    97 CIV. 5215 (HB), 1999 WL 199072 (S.D.N.Y. Apr. 9, 1999) .............................. 10, 11

*Fischl v. Armitage,*
    128 F.3d 50 (2d Cir. 1997) ................................................................................. 5

*Fodelmesi v. Schepperly,*
    87 CIV. 6762 (KMW), 1991 WL 120311 (S.D.N.Y. June 25, 1991) ........................ 10, 11

*Ginsberg v. New York,*
    390 U.S. 629 (1968) ........................................................................................ 12

*Greene v. City of New York,*
    675 F. Supp. 110 (S.D.N.Y. 1987) .................................................................. 9-10, 11, 12

*Hodgers-Durgin v. de la Vina,*
    199 F.3d 1037 (9th Cir. 1999) ......................................................................... 14

*Kogut v. The County of Nassau,*
    06-CV-6695 (JS)(WDW), 2009 WL 2413648 (E.D.N.Y. Aug. 3, 2009) .................. 11, 12

*Laureano v. Goord,* 06 CIV. 7845 SHS RLE, 2007 WL 2826649 (S.D.N.Y. Aug. 31, 2007),
    *report and recommendation adopted,*
    2007 WL 2852770 (S.D.N.Y. Sept. 28, 2007) .................................................... 10, 11

*Lee v. State Dept. of Corr. Services,*
    97 CIV. 7112 (DAB), 1999 WL 673339 (S.D.N.Y. Aug. 30, 1999) ............................... 10

*Lowery v. County of Riley,*
    552 F.3d 1086 (10th Cir. 2008) ........................................................................... 8

*McCurdy v. Dodd,*
    352 F.3d 820 (3d Cir. 2003) ................................................................................. 13

*Moreland v. Las Vegas Metro. Police Dep't,*
    159 F.3d 365 (9th Cir. 1998) ............................................................................... 13

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,*
    182 F.3d 157 (2d Cir. 1999) ................................................................................. 5

*Patel v. Searles,*
    305 F.3d 130 (2d Cir. 2002)................................................................. 1, 7, 8, 9, 14

*Pizzuto v. County of Nassau,*
    240 F. Supp. 2d 203, (E.D.N.Y. 2002) ..................................................... 11, 12

*Prince v. Massachusetts,*
    321 U.S. 158 (1944) ............................................................................................. 12

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984)............................................................................................. 6, 9

*Robertson v. Hecksel,*
    420 F.3d 1254 (11th Cir. 2005) ......................................................................... 13

*Russ v. Watts,*
    414 F.3d 783 (7th Cir. 2005) ............................................................................. 13

*Smith v. City of Fontana,*
    818 F.2d 1411 (9th Cir. 1987) ........................................................................... 14

*Southerland v. City of New York*
    652 F.3d 209 (2d Cir. 2011)................................................................................. 6

*Stanley v. Illinois,*
    405 U.S. 645 (1972)............................................................................................. 12

*Troxel v. Granville,*
    530 U.S. 57 (2000)............................................................................................. 6, 8

*Trujillo v. Board of County Commissioners,*
    768 F.2d 1186 (10th Cir. 1985) ........................................................................... 9

Plaintiff submits this memorandum of law, the accompanying Declaration of Debra L. Greenberger ("Greenberger Decl.") and exhibits thereto, and the response to the statement of undisputed facts pursuant to Local Rule 56.1 in opposition to the motion of Defendant Stephens for summary judgment.[1]

## INTRODUCTION

Plaintiff Linda McGarr's relationship with her son, Jeffrey Deskovic ("Jeff"), was irreparably harmed when Defendant Stephens, in a conspiracy with the Peekskill police, coerced her son's confession and fabricated inculpatory evidence, leading to his arrest and conviction.

At the time of his confession and arrest, Jeff was barely sixteen years old.  He lived with his mother, Linda McGarr, who was his custodial parent. Ms. McGarr was a single mother raising two minor sons and caring for her elderly mother who lived with Ms. McGarr and her children.  Once Stephens coerced Jeff's confession, her son was pried from her, removed from her custody and she was prevented from raising him.

Stephens's attempt to avoid liability for his outrageous acts in coercing Jeff's confession and fabricating evidence must fail.  His actions irreversibly interfered with the intimate relationship between a mother and her minor son who was living in her custody — a relationship that receives the "greatest degree" of protection under the United States Constitution.  *Patel v. Searles*, 305 F.3d 130, 136 (2d Cir. 2002).  Stephens knew that his actions would have that result: he knew that Jeff was only a tenth grader who lived with his mother. Moreover — though the law does not require Plaintiff to so prove — the evidence also demonstrates that Stephens directed his actions to have that result:  He orchestrated the timing

---

[1] While Putnam County has also moved for summary judgment, Putnam is not a defendant in this action. Putnam County is only a defendant in the related action, *Deskovic v. City of Peekskill, et al.*, 07-cv-8150.

and location of the so-called polygraph so that Ms. McGarr would be kept in the dark and unable to intercede on her son's behalf.  He never intervened to stop the coercion even when officers repeatedly told Jeff that the only way he could go home to his mother was if he falsely confessed — even threatening that Jeff would be forced to be in Brewster, more than 25 miles from home, "all night" unless he repeated his confession.  And Stephens participated in the attempt to secure Jeff's confession though Jeff explained that he feared that if he confessed his family would learn about it.  Plaintiff is entitled to have a jury decide Stephens's liability for his role in depriving Ms. McGarr of her relationship with her oldest son.

## STATEMENT OF FACTS

To avoid burdening the Court we limit our discussion of the facts to those of particular relevance to Linda McGarr's action—viewed in the light most favorable to Plaintiff— and refer the Court to Mr. Deskovic's statement of facts for a full discussion of the relevant facts.

January 25, 1990 was a school day.  Plaintiff Linda McGarr's Statement of Additional Material Facts in Dispute ¶ 29 (hereinafter "P. 29").[2]  His mother, Linda McGarr, believed Jeff was at school.  *Id.*  Unbeknownst to her, Defendant Stephens and the Peekskill police officers conspired to ask Jeff to leave school and undergo a "polygraph" examination that day conducted by Stephens, who was known for having a "knack" for getting confessions.  P. 12-70.  Per the officers' instructions, Jeff arrived at the Peekskill police department at approximately 8 a.m.  P. 29.  Defendants orchestrated the purported polygraph in Brewster, New York, 40 minutes away from Ms. McGarr's home in Peekskill.  P. 31, 92.  They never asked Ms.

---

[2] All citations to "P." followed by a paragraph number refer to Plaintiff Linda McGarr's Statement of Additional Material Facts in Dispute.  Paragraphs 1-91 of that Statement incorporate by reference the Statement of Additional Material Facts in Dispute submitted by Mr. Deskovic in the related action, *Deskovic v. City of Peekskill, et al.*, 07-cv-8150.  Paragraphs 92-101 of that Statement are additional facts not included in Mr. Deskovic's Statement.

McGarr for permission to examine her son, nor did they even inform her that they asked Jeff not to attend school that day.  P. 29.   Jeff told the police that his mother "didn't know where I was."  P. 93.

Once in Defendant Stephens's office in Brewster, Stephens interrogated Jeff in the guise of performing a polygraph exam.  During the initial background stage of the polygraph, Jeff told Stephens, *inter alia,* that: (1) Jeff was barely sixteen years old (his sixteenth birthday was two months before); (2) Jeff was living with his mother and grandmother (and not his father); (3) Jeff attended 10th grade in high school, (4) Jeff's relationship with his mother was "good" when he was a child, and as a teenager, it was "so-so;" (4) Jeff had a younger brother; and (5) Jeff was Catholic and his mother and grandmother took him to church within the previous month.  P. 94; *see also* Greenberger Decl., Exhibit 70 (polygraph background questionnaire).

Notwithstanding that Stephens knew Jeff was a minor in his mother's custody, he aggressively interrogated Jeff using the so-called "polygraph" in order to get Jeff to confess (as detailed extensively in Mr. Deskovic's brief).  P. 29-43.  After many hours of this coercive interrogation, Stephens told Jeff that he had failed the test and was guilty.  P. 53.  At that point, Stephens retreated to a nearby room where he and the other officers were able to monitor everything occurring in the polygraph room over an intercom.  P. 45, 54, 64.  McIntyre then continued the interrogation for approximately 2 more hours, urging Jeff to confess using threats and false promises of leniency.  P. 54-61.  Stephens heard this entire conversation between McIntyre and Jeff.  P. 45, 64.  Specifically, he heard McIntyre tell Jeff that "if I [Jeff] did as they wanted that they would stop what they were doing and that I could go -- I could go home afterwards."  P. 61.  He also heard Jeff ask McIntyre "what is my family going to think?" and

McIntyre respond "that they would never find out." *Id.* (Of course, his mother did "find out" what he said, as Stephens and McIntyre knew she would. P. 62.) Stephens did not intervene after hearing McIntyre make these statements. Jeff "realized they were only going to take [him] home if they heard what they wanted to hear." P. 95. Jeff later told his mother that "he wanted to go home," but "[t]hey were not going to let him go home unless he took that test." *Id.* Jeff then falsely confessed to assaulting and murdering A.C. P. 63.

Stephens and Defendant Tumolo entered the room after the initial false confession to McIntyre. P. 66. Stephens was present as Tumolo told Jeff to repeat his confession, and, specifically, when Tumolo told him "we could be here all night" if he did not repeat the confession. P. 66, 96. Stephens said nothing to contradict Tumolo. Jeff repeated his false confession to Tumolo and Stephens. P. 66.

Jeff was then placed under arrested and transported to the Peekskill police department where he was charged with rape and murder. P. 67-68. Ms. McGarr came to see him at the police station—the first she learned of the events of that day. P. 97. She testified that Jeff was crying, traumatized, telling her that he "didn't do it," and Ms. McGarr was "quite upset." P. 98. Ms. McGarr explained that the night of the arrest was the first time that he was "away from me as a mother." *Id.*

Stephens's misconduct did not end on January 25, 1990, however. He then fabricated evidence further ensuring that Jeff would be convicted. After learning that the results of DNA testing indicated that the semen found in the victim did not come from Jeff, Stephens provided the prosecutor fabricated notes which claimed that during the so-called polygraph Jeff stated that he did not know if the rapist ejaculated—Jeff never made that statement. P. 71-83.

The prosecutor described Stephens's role in garnering the conviction as "extremely important," and described the fabricated evidence as "paramount" in the case. P. 84-91. In other words, Stephens had an extremely important and paramount role in securing Jeff's arrest and conviction, thereby depriving Ms. McGarr of her right to raise and nurture her oldest son, Jeff. On December 7, 1990, Jeff was convicted of rape and murder and, on January 18, 1991, he was sentenced to 15 years to life. P. 2.

Ms. McGarr testified: "I love my son with all my heart," "He's my whole life." P. 99. As a result of Stephens's misconduct, Jeff was incarcerated for nearly 16 years. P. 7. Ms. McGarr lost her right to raise him, to make crucial decisions about his upbringing: One microcosm of the many decisions she was unable to make is that though she raised him Catholic, he converted to Islam in jail to attempt to secure protection from Muslim inmates. P. 100. While Ms. McGarr visited Jeff frequently in jail, such visits were no substitute for raising her son, in her home. P. 101.

## ARGUMENT

"[S]ummary judgment is a drastic device, since it[] . . . cuts off a party's right to present his case to the jury." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc*., 182 F.3d 157, 160 (2d Cir. 1999) (quotation marks omitted). It may be granted only when the submissions, viewed most favorably to plaintiff, "show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2). "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55-56 (2d Cir. 1997) (citation omitted).

Here, Stephens's entire argument is limited to a *single sentence* in his brief, citing a single case from outside this circuit, and ignores relevant Second Circuit case law.  This is inappropriate and, as an initial matter, this Court should deem Stephens's argument waived.[3] Even if this Court considers the merits of his motion, it should be denied, because a reasonable jury could find that Stephens interfered with Linda McGarr's right to raise her son.

## I.    DEFENDANT STEPHENS INTERFERED WITH LINDA MCGARR'S CONSTITUTIONAL RIGHT TO RAISE HER SON

Ms. McGarr, as a mother, had a constitutional right, protected by the Fourteenth Amendment's Due Process Clause, to the care, custody, and control of her son Jeff.  Parents have a basic constitutional right under well-established Supreme Court precedent to live with and raise their children and to not have the State seize their children without justification — a mother is entitled to "a substantial measure of sanctuary from unjustified interference by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).  This right was fundamentally interfered with when Defendant Stephens coerced Plaintiff's sixteen-year-old son's confession and fabricated inculpatory evidence, leading to the state's removal of Jeff from Ms. McGarr's home.

The Second Circuit, in *Southerland v. City of New York,* recently reaffirmed this "long" line of precedent which recognizes that "parents have a constitutionally protected liberty interest in the care, custody and management of their children, and that the deprivation of this interest is actionable under a theory of substantive due process."  652 F.3d 209, 230 (2d Cir. 2011) (internal citations and quotation marks omitted) (citing *Troxel v. Granville,* 530 U.S. 57, 65–66 (2000) (cataloging cases concerning the "fundamental right of parents to make decisions concerning the care, custody, and control of their children")).  This right to care for one's

---

[3] Moreover, should Stephens attempt to buttress his motion by raising new arguments in reply, this Court should not consider those arguments. *Domino Media, Inc. v. Kranis,* 9 F. Supp.2d 374, 387 (S.D.N.Y. 1998) ("New arguments first raised in reply papers in support of a motion will not be considered.").

children is derived from the right to "freedom of intimate association," which is constitutionally protected "as a fundamental element of personal liberty."  *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002).

In *Patel*, the Second Circuit applied this legal framework in a situation similar to the instant case, holding that the plaintiff had stated a substantive due process claim against officers who, lacking sufficient evidence to arrest a suspect on a high-profile murder, as in this case, "focused the criminal inquiry on plaintiff by concocting and disseminating false evidence about him." *Id.* at 134.  Similar to *Patel*, the conduct at issue here involves an allegation of interference with a parent/child relationship; in contrast, the child in *Patel* was an adult, unlike Jeff Deskovic who was a minor at the time he was interrogated by Defendant Stephens.

There is ample evidence in this case that, like the plaintiff in *Patel,* Ms. McGarr has established a claim for a deprivation of her right to the intimate association with her son.  As an initial matter, Ms. McGarr's relationship with her son must "receive the greatest degree of [constitutional] protection" under the law because the "parent/child relationship[ is] obviously among the most intimate." *Id.* at 136.  Indeed, *Patel* held that the parent/child relationship enjoyed the highest protection though Mr. Patel was an adult and did not live with his father. Here, because Jeff was a minor who lived in his mother's custody, the intimacy of the relationship with his mother, and the attendant strength of the constitutional protection, is even greater.  *See id.* at 136 ("to determine whether other familial relationships are protected, one must, according to this formulation, assess such factors as cohabitation and the precise degree of kinship").

Moreover, a jury could find that the extent of the interference here was significant: Stephens's conduct fundamentally destroyed a mother's ability to raise her teenage

7

son.  As a result of the false confession that Stephens orchestrated and the evidence he

fabricated, Jeff was taken from Ms. McGarr's custody and incarcerated.  She was deprived of the

opportunity to be a mother to him: to care and raise Jeffery, to "direct [his] education and

upbringing," and to "nurture him and direct his destiny."  *Troxel v. Granville*, 530 U.S. 57, 65-66

(2000).  She was deprived of the right to direct his religious upbringing, as he converted to Islam

in jail.  P. 100.  Indeed, he was held in prison with limited contact with her for nearly 16 years,

depriving Ms. McGarr of her son's companionship until he was a grown man in his 30s.  P. 7.

This certainly meets the requirement for interference under *Patel*.[4]  *Patel*, 305 F.3d at 137

(where "close family relationships are at issue," even relatively "less severe burdens" "have been

held to implicate the right to intimate association").

## II.   STEPHENS'S CLAIM TO THE CONTRARY IS MISPLACED

Defendant Stephens's cursory claim to the contrary should be rejected.

### A.  Stephens's Argument Misstates the Law

Even if this Court considers the merits of Stephens's one-sentence argument, the

argument fails.  Stephens notably ignores the Second Circuit's case law on point and instead

cites a Tenth Circuit case, *Lowery v. County of Riley*, 552 F.3d 1086, 1092 (10th Cir. 2008), for

the proposition that Plaintiff must prove that Stephens's conduct was "directed at the family

relationship with knowledge that the statements or conduct will adversely affect that

relationship."  Stephens MOL at 24-25.  *Lowery,* however, is not the law in this Circuit.  In fact,

it conflicts with Second Circuit case law, case law from Courts within this Circuit, and case law

from the vast majority of other Courts of Appeals which have addressed this question.

---

[4] To the extent Defendant Stephens claims that his actions were legitimate or justified, Plaintiff joins in
Deskovic's arguments and incorporates them by reference.

*Patel* (discussed above) considered the question of whether a plaintiff who has demonstrated an officer's interference with a parent/child relationship must also prove that the officer had "directed" his actions at the family: the Second Circuit made clear that "this Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association." *Id.* at 137 (citing *Adler v. Pataki*, 185 F.3d 35, 43-44 (2d Cir. 1999)).[5]  Though the Court did not resolve the question because of the facts in Patel's case, it made clear that the weight of Supreme Court and Second Circuit authority was that no such direct evidence need be shown:  even under "the strict standard suggested by defendants — *which we do not believe finds support in Roberts [v. U.S. Jaycees*, 468 U.S. 609 (1984)] *or in any of our precedents* — plaintiff has alleged a constitutional violation." *Id.* (emphasis added).

Courts in this Circuit have repeatedly upheld claims alleging interference in the relationship between a parent and a child in that parent's custody without requiring a showing that the defendants directed their actions at that relationship.

In *Greene v. City of New York*, 675 F. Supp. 110, 115 (S.D.N.Y. 1987), the Court rejected the City's claim — which relied on *Trujillo*, the Tenth Circuit predecessor to *Lowrey* — that the plaintiff must show "a specific awareness on the defendant's part that the plaintiff had children who would be deprived of his companionship if he were killed." *Id.* at 115 (citing *Trujillo v. Board of County Commissioners*, 768 F.2d 1186, 1190 (10th Cir. 1985)).  *Greene* held that the Tenth Circuit's reasoning was "not compelling," as it confused the required *mens rea* requirement:  "Clearly, the Supreme Court has held that § 1983 actions may not be brought under certain constitutional provisions based on negligent acts. . . .  However, to require in this

---

[5] The Plaintiff in *Adler* contended that he was fired in retaliation for his wife's lawsuit—the Second Circuit imposed no requirement that Plaintiff demonstrate that, in deciding to fire Plaintiff, Defendants intended to interfere with Plaintiff's relationship with his wife.  *Adler*, 185 F.3d at 43-44.

context, in addition to the intent to shoot with reckless disregard as to the consequences, a specific awareness on the defendant's part that the plaintiff had children who would be deprived of his companionship if he were killed would effectively nullify the right altogether in the wrongful death context." *Id.* at 115.  This approach has been followed by other Courts in this Circuit.  *See Dusenbury v. City of New York*, 97 CIV. 5215 (HB), 1999 WL 199072 (S.D.N.Y. Apr. 9, 1999) (holding that the children of father who was incapacitated by wrongful use of excessive force had a claim for temporary deprivation of parenthood as courts "have recognized such a claim where the state action that affected the parent-child relationship was more than merely negligent without further allegations that the official was trying to break up the family"); *Fodelmesi v. Schepperly*, 87 CIV. 6762 (KMW), 1991 WL 120311, at *6 (S.D.N.Y. June 25, 1991) (upholding the parents claim that they were deprived of the companionship of their disabled child[6] and rejecting the argument that a federal claim only exists where "the State action in question is directly aimed at the parent/child relationship");  *Lee v. State Dept. of Corr. Services*, 97 CIV. 7112 (DAB), 1999 WL 673339, at *8-9 (S.D.N.Y. Aug. 30, 1999) (upholding mother's claim that her right to family association with mentally incapacitated adult son was violated when he was misidentified and extradited).

While some Courts in this Circuit have rejected substantive due process claims for interference with a relationship with an *adult* child where there is no evidence that defendants directed their conduct at that relationship, the courts have generally made clear that the analysis would be different had the state interfered with a parental relationship with a *minor* child.  For

---

[6]  The child in question had an I.Q. of 60 and needed special care.  For purposes of the legal analysis in this area, courts have treated disabled children who are in their parents' custody due to the disability as in the same stead as minor children.  *Laureano v. Goord*, 06 CIV. 7845 SHS RLE, 2007 WL 2826649, at *12 (S.D.N.Y. Aug. 31, 2007), *report and recommendation adopted*, 2007 WL 2852770 (S.D.N.Y. Sept. 28, 2007).

example, in *Pizzuto v. County of Nassau*, 240 F. Supp. 2d 203, 210 (E.D.N.Y. 2002), the Court

rejected plaintiff's family association claim:  In canvassing the case law, the Court found that the

family association right exists "only where custodial relations are involved," as it is "the right to

remain together as a family free from superceding government decisions."  The Court

distinguished the cases cited above (*Greene,* 675 F.Supp. 110, *Dusenbury,* 1999 WL 199072,

and *Fodelmesi*, 1991 WL 120311) as "each of these cases involves disruption or preemption of

custodial relationships between parents and minor children."  *Pizzuto*, 240 F. Supp. 2d at 210-11.

In contrast, the son in *Pizzuto* was an adult who "had already married and started his own

family."  *Id.*  Other Courts in this Circuit have adopted this approach.  *Busch v. City of New York*,

00 CV 5211(SJ), 2003 WL 22171896 (E.D.N.Y. Sept. 11, 2003) (rejecting family association

claim for parents whose adult son was killed by police and noting that the "Court agrees with the

reasoned analysis of Judge Garaufis in *Pizzuto*"); *Laureano v. Goord*, 06 CIV. 7845 SHS RLE,

2007 WL 2826649 (S.D.N.Y. Aug. 31, 2007), *report and recommendation adopted*, 2007 WL

2852770 (S.D.N.Y. Sept. 28, 2007) ("within this circuit, there is a right to companionship only

where custodial relations are involved. Under this principle, a minor child . . . could recover

under § 1983 for violation of the right of companionship, but an adult independent child could

not.").[7]  Here, there is no dispute that "custodial relations" are involved because Jeff was a minor

in Ms. McGarr's custody.  Accordingly, Ms. McGarr has a constitutional right to raise her son.

---

[7] The one case that may deviate from this pattern is *Kogut v. The County of Nassau*, 06-CV-6695
(JS)(WDW), 2009 WL 2413648 (E.D.N.Y. Aug. 3, 2009), which rejected, at the pleadings stage, the
family association claims brought by children whose father was wrongfully convicted.  While the
underlying Amended Complaint makes clear that the children were minors at the time of the conviction,
there is no allegation that the children lived with their father or that the officers knew about these children
when they committed their misconduct — both crucial distinctions with the instant case.  Greenberger
Decl. Exhibit 71 (Amended Complaint for *Restivo*).  Moreover, the *Kogut* decision never even mentions
the fact that these children were minors nor does it consider the reasoning of the line of cases, described
*supra* and *infra*, which hold that there should be "sharply different constitutional treatment" for claims
involving the relationship between parents and minors.  *See, e.g.*, *Butera v. Dist. of Columbia*, 235 F.3d

Moreover other Courts of Appeals have explicitly distinguished as warranting "sharply different constitutional treatment" claims involving the relationship between parents and their minor children from claims involving the relationship between parents and adult children. *Butera v. Dist. of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001).

The D.C. Circuit's opinion in *Butera*, 235 F.3d 637, is particularly thorough in analyzing this distinction. In rejecting a mother's claim of a constitutional right to the companionship of her *adult* child, *Butera* canvassed the relevant case law and found that it:

> focus[es] on securing the rights of parents to have custody of and to raise their minor children in a manner that develops parental and filial bonds free from government interference. This emphasis is clear in cases such as *Prince v. Massachusetts*, 321 U.S. 158 (1944), where, in the context of the prosecution of a child's guardian for furnishing her with religious literature to sell on the public streets in violation of child labor laws, the Court stated that "the custody, care, and nurture of the child reside first in the parents," *id.* at 166, and *Ginsberg v. New York*, 390 U.S. 629 (1968), where the Court recognized parents' right "to direct the rearing of their children [as] basic in the structure of our society." *Id.* at 639. Moreover, while the Court in *Stanley v. Illinois*, 405 U.S. 645 (1972), recognized a parent's constitutional interest in the "companionship" of his children, it did so in the context of a parent's right to the custody and care of a minor child. *See id. at 651*. We find nothing in Supreme Court case law to indicate an intention to extend these concerns in support of a constitutional liberty interest in a parent's relationship with her adult son. . . . When children grow up, their dependence on their parents for guidance, socialization, and support gradually diminishes. At the same time, the strength and importance of the emotional bonds between them and their parents usually decrease.

*Id.* at 655-56 (internal citations omitted). *Butera* therefore concluded that, "as a long line of Supreme Court cases attests, the differences between the two stages of the relationship" – i.e.

---

637, 656 (D.C. Cir. 2001); *Pizzuto*, 240 F. Supp. 2d at 210-11. Accordingly, to the extent *Kogut* rejected a claim brought by minor children in their father's custody, its analysis is poorly considered and should be rejected. Moreover, to the extent *Kogut* based its holding on Supreme Court case law requiring more than a showing of negligence to make out a constitutional violation, it confused the *mens rea* requirement, as elucidated in *Greene*, 675 F. Supp. at 115.

before adulthood and after – "are sufficiently marked to warrant sharply different constitutional treatment." *Id.* at 656 (internal citation omitted). *See also Robertson v. Hecksel*, 420 F.3d 1254, 1257 (11th Cir. 2005) (noting that "the Supreme Court cases extending liberty interests of parents under the Due Process Clause focus on relationships with *minor* children" (emphasis in original) and noting scholars "reviewing Supreme Court caselaw" have found "no explicit guidance on how to decide the question of whether parents have a right to companionship with their adult children."); *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005) ("we agree with our sister circuits that minor children's need for the guidance and support of their parents warrants 'sharply different constitutional treatment'" (quoting *Butera*, 235 F.3d at 56)); *McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003) ("the parental liberty interest as defined by the Supreme Court . . . concerns the right of parents to make critical child-rearing decisions concerning the care, custody, and control of minors. . . By its very definition, it must cease to exist at the point at which a child begins to assume that critical decisionmaking responsibility for himself or herself. . . . [W]e agree with the District of Columbia Circuit that childhood and adulthood are markedly distinct, thus requiring different constitutional treatment in this context.").

Indeed, the Tenth Circuit decision relied upon by Defendant Stephens is an outlier among the Court of Appeals in requiring a showing of intent for claims alleging interference in a parent's relationship with her minor child. None of the other Circuits require such a showing where the defendant interfered with the plaintiff's right to raise her minor child. In fact, the Ninth Circuit has held that a plaintiff can even state a claim of interference with the relationship with an *adult* child without proving that the defendant directed his actions at the familial relationship. *See*, *e.g.*, *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998) (allowing a parent to bring a companionship claim in the context of an adult child where

the deprivation was incidental to the state action); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (same); *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987) (children may bring § 1983 action for deprivation of father's companionship where police officers killed father during arrest), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999).

Because Jeff was indisputably a minor who was in the custody of his mother at the time of the compelled confession and resulting arrest — facts that Stephens was well aware of — a jury could find that Defendant Stephens's actions deprived Ms. McGarr of her right to care for and raise her son.  Accordingly, under the precedent of the Second Circuit as well as the D.C., Eleventh, Seventh, Third, and Ninth Circuits this Court should reject Stephens's claim that plaintiff must additionally demonstrate that Stephens directed his actions at Ms. McGarr's relationship with Jeff.

### B.  Stephens Misstates the Record:  His Actions Were Directed at Jeff's Relationship with his Mother

Moreover, even if this Court holds that, notwithstanding the law cited above, Plaintiff must demonstrate that Stephens's actions were "directed at a protected relationship," *Patel,* 305 F.3d at 137, a reasonable jury could find that Plaintiff has met this burden.

The evidence demonstrates that, in conjunction with the Peekskill officers, Defendant Stephens orchestrated a scheme to conduct a so-called polygraph to have Jeff confess. The plan involved interrogating Jeff on a school day—ensuring that his mother would be left unaware of his whereabouts.  P. 29.  While Jeff thought he was going to take a polygraph at the Peekskill police station, the police transported him to Brewster — 25 miles, and 40 minutes away, from his mother's home — further decreasing the chance that she might learn of the interrogation and stop it.  P. 41.

14

From the start of the so-called polygraph Stephens knew that Jeff was a tenth grader who lived with his mother, his grandmother, and his younger brother.  P. 94.  A jury could find that Stephens knew that when he decided to extract a false confession from Jeff and when he fabricated evidence, he did so in order to send Jeff to jail and remove him from his mother's home.

More acutely, Stephens (along with McIntyre and Tumolo) all interfered with Ms. McGarr's relationship with her son that day.  Even after a long day during which Defendant Stephens attempted to extract a confession, Jeff was unwilling to confess.  Instead, Jeff told the police he wanted to go home, to his mother's house in Peekskill.  P. 61.  The police knew that and McIntyre promised that if Jeff "did as they wanted" Jeff could "go home."  *Id.*  The officers — including Stephens, who was listening to this conversation which was occurring in his office, P. 45, 64 — would not let Jeff go home until he confessed.  Jeff realized that he had to confess in order to be able to go home to his mother: he realized "they were only going to take [him] home if they heard what they wanted to hear."  P. 95.

Still Jeff was concerned about the effect of a false confession on his relationship with his mother, grandmother, and brother, asking "what is my family going to think?"  P. 61.  Stephens thus knew that a confession would interfere with Jeff's relationship with his family, principally his mother.  Yet McIntyre deceptively promised him "they would never find out," and Jeff falsely confessed.  *Id.*

Even after Jeff falsely confessed, the police, including Stephens, continued to interfere with his relationship with his mother, refusing to allow him to go home until he repeated the confession to Tumolo and Stephens.  P. 66, 96.  They threatened that he would be

forced to stay in Brewster "all night," if he did not confess again.[8]  *Id.*  And Stephens then fabricated inculpatory evidence which further ensured that Jeff would be convicted and permanently removed from Ms. McGarr's custody.  P. 71-83.

Stephens's motion simply ignores this powerful evidence.  Yet a jury is entitled to credit it and find that, when Stephens coerced the false confession and fabricated his notes he knew that Jeff was a minor child, living with, and dependent on, his mother.  He knew that his actions would interfere with that custodial relationship.  Furthermore, the jury is entitled to find that despite this knowledge, Stephens acted purposefully to extract a false confession and fabricate evidence that he knew would interfere with and impair Ms. McGarr's ability to continue to raise her son and to develop a healthy parent/child relationship with Jeff, as he became a man.

---

[8] Stephens is liable for McIntyre's and Tumulo's statements because he (1) heard them and failed to intervene and (2) he acted with them as co-conspirators, as detailed in Deskovic's brief.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant Stephens' motion for summary judgment as to Ms. McGarr.

Date:   November 7, 2011        Respectfully Submitted,
      New York, NY

Diane L. Houk
Debra L. Greenberger
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone (212) 763-5000
Fax (212) 763-5001

*Counsel for Plaintiff Linda McGarr*