UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LINDA MCGARR,

                Plaintiff,

     -against-

CITY OF PEEKSKILL, WESTCHESTER
COUNTY, DAVID LEVINE, THOMAS
MCINTYRE, WALTER BROVARSKI, EUGENE
TUMOLO, JOHN AND JANE DOE
SUPERVISORS, DANIEL STEPHENS,
GEORGE BOLEN, LOUIS ROH, and MILLARD
HYLAND,

                Defendants.

07 CV 9488 (KMK)(GAY)

**PLAINTIFF LINDA MCGARR'S MEMORANDUM OF LAW OPPOSING MOTIONS
FOR SUMMARY JUDGMENT BY DEFENDANTS CITY OF PEEKSKILL, DAVID
LEVINE, THOMAS MCINTYRE, AND EUGENE TUMOLO**

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ................................................................................iii-vi

INTRODUCTION ................................................................................................ 1

FACTS ................................................................................................................ 4

ARGUMENT ...................................................................................................... 13

I.    THE PEEKSKILL DEFENDANTS AND TUMOLO INTERFERED
      WITH LINDA MCGARR'S CONSTITUTIONAL RIGHT TO
      RAISE HER SON ...................................................................................... 13

II.   THE DEFENDANTS ERR IN CLAIMING THAT NO REASONABLE JURY
      COULD FIND THAT THEY VIOLATED MS. MCGARR'S
      CONSTITUTIONAL RIGHTS .......................................................................... 15

      A.    THERE IS SUBSTANTIAL EVIDENCE THAT THE PEEKSKILL
            DEFENDANTS AND TUMOLO INTENDED TO INTERFERE WITH
            MS. MCGARR'S RELATIONSHIP WITH HER TEENAGE SON IN
            ORDER TO EXTRACT A CONFESSION ............................................... 16

      B.    AT A MINIMUM, A REASONABLE JURY COULD CONCLUDE
            THAT THE PEEKSKILL DEFENDANTS AND TUMOLO WERE
            DELIBERATELY INDIFFERENT TO THE RELATIONSHIP
            BETWEEN MS. MCGARR AND HER TEENAGE SON ..................... 21

      C.    BECAUSE JEFFREY DESKOVIC WAS A MINOR AT THE TIME OF
            THE INTERFERENCE MS. MCGARR NEED NOT DEMONSTRATE
            INTENTIONALITY ........................................................................ 23

III.  QUALIFIED IMMUNITY IS INAPPROPRIATE ............................................. 28

      A.    THE LAW WAS CLEARLY-ESTABLISHED PRIOR TO 1989 .......... 29

            1.    The unlawfulness of coercing confessions and
                  fabricating and withholding evidence was clearly
                  established ...................................................................... 29

            2.    The unlawfulness of interference with family association
                  was well established before 1989 ................................. 31

i

B.    THE OFFICERS CANNOT CLAIM THAT THEIR ACTIONS WERE
      OBJECTIVELY LEGALLY REASONABLE ......................................... 33

CONCLUSION ..................................................................................................... 35

TABLE OF AUTHORITIES

PAGE NO(s):

**FEDERAL CASES**

*Adler v. Pataki*
    185 F.3d 35 (2d Cir. 1999)...........................................................................................24

*Amore v. Novarro*
    624 F.3d 522 (2d Cir. 2010).........................................................................................29

*Anderson v. Creighton*
    483 U.S. 635 (1987).....................................................................................................31

*Anthony v. City of New York*
    339 F.3d 129 (2d Cir.2003).........................................................................................20

*Busch v. City of New York*
    No. 00 Civ. 5211 (SJ), 2003 WL 22171896 (E.D.N.Y. Sept. 11, 2003) ........................21

*Butera v. Dist. of Columbia*
    235 F.3d 637 (D.C. Cir. 2001) ...........................................................................25, 26, 32

*Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*
    587 F.3d 176 (3d Cir. 2009).........................................................................................27

*Cornejo v. Bell*
    592 F.3d 121 (2d Cir. 2010).........................................................................................29

*Cortes-Quinones v. Jimenez-Nettleship*
    842 F.2d 556 (1st Cir. 1988)........................................................................................27

*Cnty. of Sacramento v. Lewis*
    523 U.S. 833 (1998)...............................................................................................22, 23

*Duchesne v. Sugarman*
    566 F.2d 817 (2d Cir. 1977)...................................................................................32, 34

*Dusenbury v. City of New York*
    97 CIV. 5215 (HB), 1999 WL 199072 (S.D.N.Y. Apr. 9, 1999) ..............................24, 25

*Estate of Bailey by Oare v. County of York*
    768 F.2d 503 (3d Cir. 1985).........................................................................................26

*Farmer v. Brennan*
    511 U.S. 825 (1994).....................................................................................................21

*Fischl v. Armitage*
   128 F.3d 50 (2d Cir. 1997)...........................................................................13

*Fodelmesi v. Schepperly*
   87 CIV. 6762 (KMW), 1991 WL 120311 (S.D.N.Y. June 25, 1991)..................24, 25, 33

*Ginsberg v. New York*
   390 U.S. 629 (1968)............................................................................26, 32

*Grandstaff v. City of Borger*
   767 F.2d 161 (5th Cir.1985) ........................................................................26

*Greene v. City of New York*
   675 F. Supp. 110 (S.D.N.Y. 1987).......................................................24, 25, 33

*Hanrahan v. Doling*
   331 F.3d 93 (2d Cir. 2003).......................................................................28, 31

*Hodgers-Durgin v. de la Vina*
   199 F.3d 1037 (9th Cir. 1999) .....................................................................27

*Jackler v. Byrne*
   658 F.3d 225 (2d Cir. 2011).........................................................................29

*Joyner by Lowry v. Dumpson*
   712 F.2d 770 (2d Cir. 1983)....................................................................32, 34

*Kerman v. City of New York*
   374 F.3d 93 (2d Cir. 2004)......................................................................29, 35

*Lee v. State Dept. of Corr. Services*
   97 CIV. 7112 (DAB), 1999 WL 673339 (S.D.N.Y. Aug. 30, 1999)..........................25, 33

*Logan v. Hollier*
   711 F.2d 690 (5th Cir. 1983) .......................................................................27

*Lowery v. County of Riley*
   552 F.3d 1086 (10th Cir. 2008) .....................................................................27

*Malley v. Briggs*
   475 U.S. 335 (1986)............................................................................31, 34

*Mattis v. Schnarr*
   502 F.2d 588 (8th Cir.1974) ........................................................................27

*Maxfield v. Cintas Corp., No. 2*
   487 F.3d 1132 (8th Cir. 2007) .....................................................................27

*McCray v. City of New York*
    2007 WL 4352748, 03–CV9685 (DAB) (S.D.N.Y. Dec. 11, 2007)......................... 16, 21

*McCurdy v. Dodd*
    352 F.3d 820 (3d Cir. 2003)........................................................................ 26

*Moreland v. Las Vegas Metro. Police Dep't*
    159 F.3d 365 (9th Cir. 1998) ...................................................................... 27

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*
    182 F.3d 157 (2d Cir. 1999).......................................................................... 13

*Patel v. Searles*
    305 F.3d 130 (2d Cir. 2002)................................................................... *passim*

*Pena v. DePrisco*
    432 F.3d 98 (2d Cir. 2005).................................................................... 22, 23

*Pizzuto v. County of Nassau*
    240 F. Supp. 2d 203 (E.D.N.Y. 2002) ..................................................... 21, 25

*Prince v. Massachusetts*
    321 U.S. 158 (1944)............................................................................25-26, 32

*Reasonover v. St. Louis County, Mo.*
    447 F.3d 569 (8th Cir. 2006) ...................................................................... 27

*Rivera v. Marcus*
    696 F.2d 1016 (2d Cir. 1982)....................................................................... 32

*Roberts v. U.S. Jaycees*
    468 U.S. 609 (1984)............................................................................. *passim*

*Robertson v. Hecksel*
    420 F.3d 1254 (11th Cir. 2005) .................................................................. 26

*Russ v. Watts*
    414 F.3d 783 (7th Cir. 2005) ...................................................................... 26

*Russo v. City of Bridgeport*
    479 F.3d 196 (2d Cir. 2007).................................................................23, 29-30

*Simon v. City of New York*
    09-CV-1302 ENV RER, 2011 WL 317975 (E.D.N.Y. Jan. 3, 2011)........................ 20, 21
    *report and recommendation adopted*
    2011 WL 344757 (E.D.N.Y. Feb. 1, 2011)

*Smith v. City of Fontana*
    818 F.2d 1411 (9th Cir. 1987) ........................................................................... 27

*Southerland v. City of New York*
    652 F.3d 209 (2d Cir. 2011)................................................................... 13, 30

*Stanley v. Illinois*
    405 U.S. 645 (1972)............................................................................. 26, 32

*Troxel v. Granville*
    530 U.S. 57 (2000)............................................................................... 13, 15

*United States v. Rivera*
    365 F.3d 213 (3d Cir. 2004)...................................................................... 27

*Varrone v. Bilotti*
    123 F.3d 75 (2d Cir.1997)......................................................................... 35

*Weyant v. Okst*
    101 F.3d 845 (2d Cir. 1996)...................................................................... 22

*Wyatt v. Cole*
    504 U.S. 158 (1992).................................................................................. 31

**STATE CASES**

*Ortiz v. Jordan*
    131 S. Ct. 884 (2011)................................................................................. 29

**Statutes**
Fed. R. Civ. P. 56(c)(2)....................................................................................... 13

Plaintiff Linda McGarr submits this memorandum of law, the accompanying Declaration of Diane L. Houk and exhibits thereto, the responses to the statement of undisputed facts pursuant to Local Rule 56.1, and a statement of additional disputed facts, in opposition to the motion for summary judgment by Defendants City of Peekskill, David Levine, and Thomas McIntyre (collectively the "Peekskill Defendants") and the motion for summary judgment by Defendant Eugene Tumulo.[1]

## INTRODUCTION

By December 12, 1989, the Peekskill police had fixated on Jeffrey Deskovic ("Jeff") as their lead suspect in A.C.'s rape and murder. No witnesses or forensic evidence supported their hunch, however. In the absence of evidence, they needed a confession. But obtaining a confession from Jeff, an innocent teenager who was barely sixteen years old, posed a challenge for many reasons, not least of which was Jeff's mother and custodial parent, Linda McGarr. Ms. McGarr distrusted the police (which, in this case, appears to have been wise) and sought to shield her young son from police interrogation. The police officers knew that if she were not impeded, Ms. McGarr would stop Jeff from cooperating with police. To extract the confession the police needed, they had to interfere with Ms. McGarr's attempts to protect her son from police interrogation.

The Peekskill officers knew that Ms. McGarr would be a thorn in their side from shortly after their initial December 12, 1989 interrogation of Jeff. While Jeff cooperated with police during the December 12th interrogation, when Ms. McGarr learned that the officers had interrogated Jeff on December 12, a school day, without her or the school's knowledge or consent, she immediately met with not one, but two, attorneys to secure representation for Jeff.

---

[1] Plaintiff McGarr pleaded a *Monell* claim against the City of Peekskill. While Peekskill did not move for summary judgment on that claim, Plaintiff is not pursuing her *Monell* claim against the City of Peekskill.

The police were informed within a few days that Jeff was represented and they could not contact him.  It was no leap for them to realize that a 16-year-old boy did not independently retain an attorney; his mother and custodial parent was the reason he "lawyered up."  They also learned that Ms. McGarr instructed Jeff not to assist the police, because the police could "do it themselves."

Accordingly, the Peekskill officers repeatedly interfered with Ms. McGarr's relationship with her son by interfering with her parental advice (both directly and through the attorney she obtained) in order to extract Jeff's confession:

- The police instructed Jeff to ignore the advice of the attorney Ms. McGarr obtained: Attorney Lou Ecker contacted the police to instruct them not to speak to Jeff and told Jeff not to assist the police.  But the police told Jeff he could speak to them notwithstanding Mr. Ecker's advice, because "we're friends," a statement McIntyre admits was coercive, if made.  Jeff complied.

- The police coordinated the logistics of multiple meetings with Jeff in order to conceal these meetings from Ms. McGarr:  The police repeatedly met with Jeff away from his home and away from his school (which had a policy of notifying parents of police questioning) so Ms. McGarr would not learn of the meetings.  On at least two occasions the police asked Jeff's friend and classmate Martin Burrett to contact Jeff on the officers' behalf.

- The police manipulated Jeff to capitalize on his youthful desire to heroically solve the tragic crime.  They cynically exploited his teenage desire to believe that he was smarter than his stodgy mother who distrusted the police.

- The police orchestrated an interrogation under the guise of a polygraph on January 25, 1990 in Brewster, 25 miles and 40 minutes from Ms. McGarr's home, to further shroud the interrogation and reduce the chance Ms. McGarr would learn of—and stop—their interrogation.

- After Jeff refused to confess despite a long day of questioning by a purported polygrapher, the police told Jeff that the only way he could go home to his mother was if he falsely confessed — even threatening that Jeff would be forced to be in Brewster, more than 25 miles from home, "all night" unless he repeated his confession.  When Jeff explained that he feared that if he confessed his family would learn about it, the police lied and said they would not.

The Peekskill police did not interfere with Ms. McGarr's upbringing and control over her son once or twice; they *repeatedly and consistently* sought to bypass her control over her teenage son over a six-week period.  This is powerful evidence of their state of mind, and their intent is a classic question for the jury.  Moreover, as defendants recognize in their motions, at trial plaintiff need not prove *intent* to disrupt Ms. McGarr's relationship with her son.  It is sufficient to prove that defendants were *reckless* (i.e. deliberately indifferent) to the harm to the parent-child relationship by their misconduct.

The defendants' attempt to avoid liability for their outrageous acts must fail.  Their actions irreversibly interfered with the intimate relationship between a mother and her minor son who was living in her custody — a relationship that receives the "greatest degree" of protection under the United States Constitution.  *Patel v. Searles*, 305 F.3d 130, 136 (2d Cir. 2002)

**FACTS**

To avoid burdening the Court we limit our discussion to facts of particular relevance to Linda McGarr's action—viewed in the light most favorable to Plaintiff—and refer the Court to Mr. Deskovic's statement of facts for a full discussion.

A.C. was raped and murdered on November 15, 1989, a horrendous crime. Plaintiff Linda McGarr's Statement of Additional Material Facts in Dispute Pursuant to Local Rule 56.1 ¶ 1 (hereinafter "P.").[2]  From the start of the murder investigation the Peekskill police suspected A.C.'s high-school classmates.  The lead officers were David Levine and Thomas McIntyre.  P. 5.  Lieutenant Eugene Tumolo supervised them.  P. 5.  Pursuant to Peekskill Police Department policy and New York State law, police officers were required to seek parental consent before questioning juveniles under the age of 16.  P. 76.  The Peekskill police, however, intentionally ignored that rule in order to attempt to bypass the parents of their first suspect and A.C.'s classmate, Freddie Claxton ("Freddie"), a 15-year-old boy that they interviewed just days after the murder.  P. 74-78.

While the police report concerning Freddie states that his father, Freddie Claxton Sr. ("Mr. Claxton") was notified before Freddie was interviewed on November 20, 1989 evidence from the Claxtons and Freddie's attorney (which must be credited at summary judgment), tells a different story of police officers who purposefully attempted to interrogate Freddie outside his parents' presence.  P. 74-77.  McIntyre, Tumolo and other officers visited Freddie at his home and on the playground on five separate occasions and repeatedly sought to

---

[2] All citations to "P." followed by a paragraph number refer to Plaintiff Linda McGarr's Statement of Additional Material Facts in Dispute Pursuant to Local Rule 56.1.  Paragraphs 1-105 of that Statement incorporate by reference the Statement of Additional Material Facts in Dispute submitted by Mr. Deskovic in the related action, *Deskovic v. City of Peekskill, et al.*, 07-cv-8150.  Paragraphs 106-125 of that Statement are additional facts not included in Mr. Deskovic's Statement.

question him without his father.  P. 75.  McIntyre and Tumolo then picked up Freddie at his

house, and convinced him and his 11-year-old brother to go to the station house.  P. 76.  On the

way to the station and at the station they aggressively questioned Freddie, yelling at him, and

accusing him of lying though his father was not present.  The aggressive questioning scared

Freddie.  P. 76-77, 106.  Then, when Freddie's father arrived, the officers refused to let him into

the room where they were questioning Freddie.  P. 77.  Still, the officers knew they were limited

in barring Freddie's father, so they "wrapped it up real fast and handed [Freddie] over to [his]

father."  P. 106.  As a result of Freddie's father's intervention, the police were not able to

complete their interrogation of Freddie.  Moreover, Freddie's mother quickly obtained a Legal

Aid lawyer for him and instructed Freddie not to speak to the police outside the presence of his

lawyer. P. 78, 107.  In contrast to their treatment of Jeff, the police respected Freddie's right not

to be questioned outside the presence of his lawyer and did not interrogate him further.  P. 107.

   The experience interrogating Freddie Claxton validated the Peekskill police

officers' initial instinct that teenage suspects are much more malleable when outside the presence

of their parents.  And it also served as a lesson to the Peekskill police officers:  Freddie's father

stopped the interrogation and his mother secured counsel which precluded future interrogations.

P. 78, 107.  While the police came to believe that Freddie was innocent, P. 74, that meant the

murderer—who they continued to erroneously believe was another classmate of A.C.—was still

at large.  And if the officers were going to convince a teenage criminal to confess, it was

imperative that the suspect's parents remained unaware of the officers' interrogations.

   With that lesson in mind, the police first approached Jeff on December 12, 1989,

when they stopped him on the street as he was walking alone to school.  P. 6, 108.  Had the

police approached Jeff at Peekskill High School, the principal would have contacted Jeff's

mother, because the school's policy (of which Officer Levine was aware) was that students could not be questioned at school by the police without parental consent.  P. 109.   As the youth officer for Peekskill High School and the designated liaison with the school, Officer Levine knew the consequences of approaching Jeff at school.  P. 109.  Instead, because the police chose to approach Jeff on the street, they were able to conceal their plans from Ms. McGarr.

Without contacting Jeff's mother or obtaining her permission, Levine and McIntyre then drove Jeff to police headquarters and questioned him for hours; as a result, Jeff missed a half day of school.  P. 110.  Linda McGarr only learned of this when, after Jeff returned to school, she was called by the principal's office.  P. 110.

When Ms. McGarr learned that Jeff had been questioned by the police without her knowledge or consent she immediately understood the gravity of the situation.  P 111.  She told the principal during the December 12th meeting that she was taking Jeff to see a lawyer; Jeff readily consented.  P. 111.  Linda McGarr then took Jeff home from school that day.   P. 111.  The next day, December 13, 1989, Ms. McGarr took Jeff to see an attorney, Ascher Katz.  P. 111.  Mr. Katz referred them to a criminal defense attorney as criminal law was not Katz's specialty; he advised Jeff not to take any police polygraph.  P.111.

That very same day, December 13, Ms. McGarr took Jeff to see Lou Ecker, a criminal defense attorney.  P. 112.  Mr. Ecker also advised Jeff not to take a police polygraph.  P. 112.  Mr. Ecker told both Ms. McGarr and Jeff that he would call the police to inform them that he was representing Jeff and warn them not to contact Jeff further.  P. 112.  As promised, on December 15, 1989, Mr.  Ecker called the police and explained that he was representing Deskovic.  P. 112.  Mr. Ecker also informed Jeff's family that he had spoken to the police.  P. 112.

After December 12, 1989, Jeff's mother *repeatedly* told Jeff to stay away from the police and not to return to the police station.  P. 113.  She did not trust the Peekskill police department because she believed that officers "use their badge for leverage.  They think they can get away with everything."  P. 113.  And she specifically told Jeff she did not want him to visit the crime scene, though she knew that Jeff had visited the scene to "help [the police] find some evidence. . . to help them solve the crime."  P. 113.

In addition to securing an attorney for Jeff and telling Jeff to stay away from the police, Ms. McGarr did everything else she could as a single mother to protect her son.  Ms. McGarr had her boyfriend, Jack Ekizian, tell Jeff to stay away from the police (and ultimately Jack put up the substantial bail amount for Jeff, P. 114).  P.114.  And she had Joe Costanza, her brother-in-law, come over to her house specifically to have a "chat" with Jeff to instruct him to stay away from the police.  P. 114.

But Ms. McGarr's entreaties were ultimately unsuccessful because of the officers' psychological coercion of Jeff:   Like teenagers everywhere, he believed he was smarter than his mother.  P. 115.  As Jeff explained in his deposition, he did not listen to his mother's wise advice because "the police kept telling me that they needed -- they needed my help.  And I bought into that fiction."  P. 115.  The police manipulated Jeff into believing that he was helping with the police investigation (described to Jeff by the officers as "his," i.e. Jeff's, investigation, P. 38).  P. 37-41.  The police exploited his teenage belief that his mother was simply "foolish" in her distrust and exploited his desire to rebel against her by helping the police.  P. 115.

McIntyre consulted with ADA Robert Neary on December 21, 1989, asking ADA Neary to obtain permission from Mr. Ecker, Jeff's attorney, for Jeff to consent to a blood test.  P. 82, 116.  When ADA Neary contacted Mr. Ecker that day or the next day to obtain such

7

permission, however, Mr. Ecker explained that because the family could not afford his services, Mr. Ecker had referred them to John Ryan at Legal Aid.  P. 82, 116.   ADA Neary then instructed McIntyre to ask Jeff whether he had retained new counsel so ADA Neary could contact that attorney.  P. 82, 116.

Both McIntyre and Levin admitted that they were supposed to ask Jeff if he was represented before questioning him further and Levine admitted it would be illegal and wrong not to have done so.  P. 85.  They have varying rationales for *why* they continued to talk to Jeff without asking him if he was represented, *see* P. 85, but it is undisputed that they did not ask Jeff.  A jury could certainly conclude that they did not ask Jeff if he was represented because the officers wanted Jeff to cooperate with the police notwithstanding his attorney's advice.

In early January 1990, *after* the police knew Ecker had represented Jeff and had referred Jeff to Legal Aid, the police placed a telephone call to Martin Burrett, a 15-year-old friend of Jeff's, to instruct Martin to telephone Jeff to ask Jeff to come to the police station at night on January 9.  P. 84, 117.  This convoluted approach to initiating a discussion with Jeff avoided calling or going to Jeff's home, eliminating the possibility that his mother would learn of the police contact.  (There is no doubt that the police knew where Jeff lived, his address is in their police reports.  P. 117.)  Jeff and Martin walked to the police station together on January 9; Jeff's mother had no idea.  P. 117.

When Jeff spoke to McIntyre on the night of January 9 outside the police station, Jeff told him that the police were not supposed to talk to him because he was represented by Mr. Ecker.  McIntyre smiled and laughed, telling Jeff that Jeff could talk to him because "we're friends."  P. 86.  McIntyre's statement—which McIntyre admits was coercive if made, P.86— convinced Jeff that he should put aside the advice given by the lawyer his mother retained on his

behalf (not to mention his mother's own advice).  Instead Jeff believed he could speak to the

police.  P. 88.  And each subsequent time he spoke to the police and they gave him *Miranda*

warnings he disregarded those warnings, believing he could speak to the police as Levine

advised.  P. 88.

In the numerous subsequent meetings between Jeff and the police, the next

day, January 10, a Wednesday.  P.88.  He then returned again on January 11th, a Thursday, and

provided a blood sample. P. 92.  The purpose of the blood test, as Tumolo stated in a

contemporary account, was that the result would "either incriminat[e Jeff] or exonerat[e] him in

this matter."  P. 8.

In the numerous subsequent meetings between Jeff and the police, the police

*never* picked Jeff up at his home, though his home was across the street from the Peekskill High

School, and *never* picked Jeff up at school.  P. 6, 117.  (In contrast, when the police wanted to

question Martin Burrett they did so at his home, see P. 118.)  Instead, every encounter with Jeff

was at police headquarters or on the street, with the police often specifically instructing Jeff to

meet them at police headquarters.  P. 6.

This was in marked contrast with the police officers' conduct in interviewing

student witnesses who were not suspects, where the police did not seek to conceal their police

work from the students' parents.  For example, when the police wanted to interview Martin

Burrett, Jeff's friend who was then 16 years old, they contacted Martin's father, Dennis Burrett,

on December 29, 1989 and asked him to bring Martin to the police station.  P. 80.  And when the

police had follow-up questions for Martin on January 22, 1990, they went directly to his home to

interview him.  P. 118.

On January 16, 1990, Levine, McIntyre and Tumolo met with Assistant District Attorney Neary to seek permission to arrest Jeff.  P. 42-44.  ADA Neary told the police there was no probable cause for an arrest at that point.  P. 49.  Levine, McIntyre and Tumolo thus understood that it was imperative that they obtain Jeff's confession.  P. 50.  Tumolo specifically sought out Putnam County Officer Daniel Stephens to help get a confession after Peekskill officers failed to do that on their own; Stephens was known for having a "knack" for obtaining confessions.  P. 51.

The Peekskill police's January 22 visit to Martin's home was taped, at least in part.  P.119.  Martin told Officer Levine during that visit that he and Jeff had visited the crime scene and placed what they believed was "evidence" (a wire, a piece of a tree with a red marking, a rock) into a book bag, and returned to Jeff's home. P. 119.  He also told Levine that when Ms. McGarr discovered the contents of the book bag she told the boys that "she doesn't want us down there, [i.e. at the crime scene] anymore" because "the police . . . could . . . do it themselves."  P. 119.   Ms. McGarr then threw out the wire, Martin told Levine.  P. 119.  This cemented the police's need to bypass Ms. McGarr to secure a confession.

While defendant Levine was at Martin's house on January 22, Jeff called.  P. 120.  Levine asked Martin to "give him [Jeff] a message"; he directed Martin to tell Jeff "that I want to talk to him."  P. 120.  And then Levine informed Martin that Jeff had promised to stop by the police station after school the next day, and instructed Martin "just make sure that he gets there, alright?"  P. 120.  Moreover, Martin testified that though he could not recall exact dates, prior to January 22 Levine had previously asked him to make sure that Jeff went to the police station.  P. 120.  Levine could have called Jeff to give him the message himself; he could have picked Jeff up from school to ensure Jeff went to police headquarters.  A reasonable jury could infer that

10

Levine did not because he wanted to conceal his communications with Jeff from Ms. McGarr and the school.

Jeff's last encounter with the Peekskill police before he was arrested was on January 25, 1990, a school day.  P. 58.  His mother, Linda McGarr, believed Jeff was at school. *Id.*  Unbeknownst to her, the Peekskill police officers had asked Jeff to leave school and undergo a "polygraph" examination by Stephens.  Per the officers' instructions, Jeff arrived at the Peekskill police department at approximately 8 a.m.  P. 58.  He arrived with his friend, Martin Burrett, but Tumolo yelled at Martin to leave.  P. 58.

Tumolo, along with Levine and McIntyre, orchestrated the purported polygraph in Brewster, New York, 40 minutes away from Ms. McGarr's home in Peekskill.  P. 58.  They never asked Ms. McGarr for permission to examine her son, nor did they even inform her that they asked Jeff not to attend school that day.  P. 122.   Jeff told the police that his mother "didn't know where I was."  P. 58, 122.

After many hours of a coercive interrogation, as detailed extensively in Jeff Deskovic's briefing, Stephens told Jeff that he had failed the test and was guilty.  P. 66.  Levine, McIntyre, and Tumolo heard the entire interrogation over an intercom.  McIntyre then continued the interrogation for approximately two more hours, urging Jeff to confess using threats and false promises of leniency.  P. 65.  Specifically, McIntyre told Jeff that "if I [Jeff] did as they wanted that they would stop what they were doing and that I could go -- I could go home afterwards."  P. 68.   Jeff asked McIntyre "what is my family going to think?" and McIntyre responded "that they would never find out."  *Id.*  (Of course, his mother did "find out" what he said, as McIntyre knew she would.  P. 73.)  Levine and Tumolo heard these statements.  P. 65.   Jeff "realized they were only going to take [him] home if they heard what they wanted to hear."  P. 69.  Jeff later

told his mother that "he wanted to go home," but "[t]hey were not going to let him go home unless he took that test."  *Id.*  Jeff then falsely confessed to assaulting and murdering A.C.  P. 71.

Defendant Tumolo entered the room after the initial false confession to McIntyre. P. 72.   While Jeff was on the floor and sobbing, Tumolo told Jeff to repeat his confession, and threatened him that "we could be here all night" if he did not repeat the confession.  P. 72 (Deskovic 50-h. at 241).  Jeff repeated his false confession to Tumolo while curled in the fetal position and sobbing.  P. 72.

Jeff was then placed under arrest and transported to the Peekskill police department where he was charged with rape and murder.  P. 73.   When Ms. McGarr was notified that Jeff was arrested, she immediately came to see him at the police station—the first she learned of the events of that day.  P. 124.  She testified that Jeff was crying, traumatized, telling her that he "didn't do it," and Ms. McGarr was "quite upset."  P. 124.  Ms. McGarr explained that the night of the arrest was the first time that he was "away from me as a mother."  *Id.*

On December 7, 1990, Jeff was convicted of rape and murder and, on January 18, 1991, he was sentenced to imprisonment for 15 years to life.  P. 11.

Ms. McGarr testified: "I love my son with all my heart,"  "He's my whole life." P. 125.  As a result of the officers' misconduct, Jeff was incarcerated for nearly 16 years.  P. 14. Ms. McGarr lost her right to raise Jeff, to make crucial decisions about his upbringing:  One microcosm of the many decisions she was unable to make is that though she raised him Catholic, Jeff converted to Islam in jail to attempt to secure protection from Muslim inmates.  P. 125. While Ms. McGarr visited Jeff frequently in jail, such visits were no substitute for raising her son, in her home.  P. 125.

## ARGUMENT

"[S]ummary judgment is a drastic device, since it[] . . . cuts off a party's right to present his case to the jury." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999) (quotation marks omitted).  It may be granted only when the submissions, viewed most favorably to plaintiff, "show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2).  "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55-56 (2d Cir. 1997) (citation omitted).

### I.   THE PEEKSKILL DEFENDANTS AND TUMOLO INTERFERED WITH LINDA MCGARR'S CONSTITUTIONAL RIGHT TO RAISE HER SON

Ms. McGarr, as Jeff's mother, had a constitutional right, protected by the Fourteenth Amendment's Due Process Clause, to the care, custody, and control of her teenage son.  Parents have a basic constitutional right under well-established Supreme Court precedent to raise their children and to not have the State seize their children without justification — a mother is entitled to "a substantial measure of sanctuary from unjustified interference by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984); *see also Southerland v. City of New York*, 652 F.3d 209, 230 (2d Cir. 2011) (reaffirming  this "long" line of precedent); *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (cataloging cases concerning the "fundamental right of parents to make decisions concerning the care, custody, and control of their children").  This right to care for one's children is derived from the right to "freedom of intimate association," which is constitutionally protected "as a fundamental element of personal liberty." *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002).

In *Patel*, the Second Circuit applied this legal framework in a situation similar to this case, holding that the plaintiff had stated a substantive due process claim against officers who, lacking sufficient evidence to arrest a suspect on a high-profile murder, as in this case, "focused the criminal inquiry on plaintiff by concocting and disseminating false evidence about him." *Id.* at 134.

A reasonable jury could find that, like the plaintiff in *Patel*, Ms. McGarr was deprived of her right to intimate familial association with her son.  As an initial matter, Ms. McGarr's relationship with her son must "receive the greatest degree of [constitutional] protection" under the law because the "parent/child relationship[ is] obviously among the most intimate." *Id.* at 136.  Moreover, a jury could find that the extent of the interference here was significant: through a coordinated pattern of activity designed to induce Jeff's confession, the police officers repeatedly interfered with Ms. McGarr's right to the care and custody of her son. They (1) wrongfully encouraged Jeff to cooperate with police notwithstanding his lawyer's advice to the contrary, (2) interfered with the advice Ms. McGarr and her family gave to Jeff, namely that he should not speak to the police, (3) repeatedly orchestrated their interactions with Jeff to obscure their communications with Jeff to ensure that Ms. McGarr would not intervene and stop Jeff's cooperation, and (4) to elicit his confession they drove him far from home and told him he could only return to his mother if he confessed — threatening that he could stay in Brewster all night — while falsely promising  that his mother would never learn of the confession.

Ultimately, as a result of the false confession that the defendants orchestrated, the evidence they fabricated (particularly the claim that Jeff volunteered numerous nonpublic details that defendants had fed him over the course of multiple surreptitious meetings), and the

exculpatory evidence they withheld, Jeff was taken from Ms. McGarr's custody and incarcerated. She was deprived of the opportunity to be a mother to him: to care and raise Jeff, to "direct [his] education and upbringing," and to "nurture him and direct his destiny." *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). She was deprived of the right to direct his religious upbringing, as he converted to Islam in jail. P. 125. Indeed, he was held in prison with limited contact with her for nearly 16 years, depriving Ms. McGarr of her son's companionship until he was a grown man in his 30s. P. 14.

This certainly meets the requirement for interference under *Patel* for purposes of summary judgment.[3] *Patel*, 305 F.3d at 137 (where "close family relationships are at issue," even relatively "less severe burdens" "have been held to implicate the right to intimate association").

## II. THE DEFENDANTS ERR IN CLAIMING THAT NO REASONABLE JURY COULD FIND THAT THEY VIOLATED MS. MCGARR'S CONSTITUTIONAL RIGHTS

The parties dispute the level of *mens rea* required to make out a familial interference claim. As detailed *infra* in Section II.C., because Jeff was a minor child living in Ms. McGarr's custody at the time of the interference, the weight of the case law, including the governing case in the Second Circuit, *Patel*, 305 F.3d 130, is that plaintiff must show only that the deprivation resulted from *intentional* conduct which violated the constitution (here, coercing a confession, fabricating evidence and withholding exculpatory evidence, *see* P. 16-105) and need not demonstrate that such intentional conduct was directed at the parent-child relationship. The Peekskill Defendants and Tumolo disagree and both contend that Ms. McGarr must demonstrate *either* (1) "intent to disrupt familial association" *or* (2) "deliberate indifference to

---

[3] To the extent that the Peekskill Defendants or Tumolo claim that their actions were legitimate or justified, Plaintiff joins in Deskovic's arguments and incorporates them by reference.

familial association rights."  Tumolo Br. at 18 (citing *McCray v. City of New York*, 2007 WL 4352748, 03–CV9685 (DAB), at \*27 (S.D.N.Y. Dec. 11, 2007)); *see also* Peekskill Def. Br. at 2 (same).[4]

This Court, however, need not resolve this dispute.  As detailed below, a reasonable jury could find that the police officers *intended* to disrupt the parent-child relationship between Ms. McGarr and her son in order to coerce Jeff's confession.  Moreover, the parties *agree* that summary judgment cannot be granted if a reasonable jury could find that, at a minimum, the Peekskill Defendants and Tumolo were deliberately indifferent (i.e. reckless) to Ms. McGarr's right to raise her son and there is certainly ample evidence of such indifference.

A.   **THERE IS SUBSTANTIAL EVIDENCE THAT THE PEEKSKILL DEFENDANTS AND TUMOLO INTENDED TO INTERFERE WITH MS. MCGARR'S RELATIONSHIP WITH HER TEENAGE SON IN ORDER TO EXTRACT A CONFESSION**

A reasonable jury could easily find that the Peekskill Defendants and Tumolo intended to interfere with Ms. McGarr's relationship with her son in order to coerce Jeff's confession.

Most striking is the lengths to which the police officers went to ensure that Ms. McGarr did not learn of their continuing interrogations of Jeff after December 12, 1989.  The officers repeatedly instructed Jeff's friend, Martin Burrett to contact Jeff to ask Jeff to contact the police, though they could have called Jeff directly.  P.84; Deskovic Dep. at 196-98;  Ex. 49 at 17, 20; Burrett Dep at 53.  And they repeatedly met Jeff at police headquarters or on the street, rather than approach Jeff at school or in his home, as they did when questioning other classmates during their investigation.  P. 74-75, 79-80, 118.  While the police may claim litigation-minted

---

[4] Tumolo submitted a joint brief for both this case and the related case, *Deskovic v. City of Peekskill, et al.*, 07-cv-8150.  The Peekskill Defendants submitted separate briefs in each case and, accordingly, the citations to the Peekskill defendants' brief are to the brief for this case only.

rationales for this odd behavior, a jury is entitled to discredit such excuses and find that it evidences a desire by defendants to obscure their actions from Ms. McGarr—particularly after Ms. McGarr secured an attorney for Jeff.

In fact, the defendants' interference was most direct with respect to Mr. Ecker, the lawyer Ms. McGarr obtained for Jeff.  Mr. Ecker instructed the police not to contact Jeff.  P. 81.  The police certainly understood that Mr. Ecker's involvement was because Jeff's mother had contacted Mr. Ecker when she learned Jeff was interrogated.  P. 112.  Yet the police specifically sought to manipulate Jeff to ignore Mr. Ecker's advice—and, in turn, Ms. McGarr's advice.  When the police spoke to him on January 9, Jeff told the police that he was not supposed to talk to them.  P. 86.  McIntyre, however, responded that Jeff could talk to them because "we're friends."  *Id.*

Equally powerful are the officers' actions on the day they coerced Jeff's confession.  Levine, McIntyre and Tumolo took Jeff far from home and kept him in Brewster all day.  P. 58.  They falsely promised that his mother would never learn of his confession.  P. 68.  And when Jeff said he wanted to go home they refused and they threatened to keep him there all night until he confessed and then repeated his confession.  P. 65-72.  Defendants may claim this was simply an attempt to maintain the pressure on Jeff to have him confess.  A jury, however, is entitled to find otherwise, i.e. to find that, coupled with the other evidence indicating a desire to sideline Ms. McGarr, the defendants were attempting to coerce a confession and arrest Jeff before Ms. McGarr learned of their wrongful conduct and intervened to protect her son from their abuses.[5]

---

[5] This is not to say that the defendants' *primary* purpose was to interfere with Ms. McGarr's relationship with their son; their primary purpose was to coerce a confession, and the means by which they effectuated that purpose was by circumventing Ms. McGarr.  This is similar to *Patel*, where the officers' primary purpose was solving a murder case by obtaining witnesses who would accuse their prime suspects; the

Moreover, the police had the motivation: they understood that when Ms. McGarr learned Jeff had been interrogated she immediately obtained a lawyer.  P. 112.  They knew that Ms. McGarr did not trust the police and instructed Jeff not to cooperate with the police. P. 113. And they realized that when the parents of another teenage suspect, Freddie Claxton, became involved, the police were unable to complete their interrogation.  P. 106-07, 75.

In light of this evidence, a reasonable jury could certainly find that the police intended to and did interfere with Ms. McGarr's relationship with her son Jeff as part and parcel of their attempt to secure Jeff's confession.  While Tumolo—Levine and McIntyre's supervisor—attempts to present himself as uninvolved in Levine and McIntyre's misconduct, the evidence is sufficient for a jury to conclude that he is more than culpable.  As the supervisor of Levine and McIntyre, Tumolo was charged with stopping police misconduct.  He did not. Instead Tumolo directly participated in the constitutional violation here: (1) he secured Stephens's assistance, knowing he had a "knack" for obtaining confessions; (2) he heard the entire coercive interrogation by Stephens and did not intervene; (3) he heard McIntyre coerce Jeff's confession by, among other things, telling Jeff that he could "go home" only if he confessed and his family would "never find out;" (4) Tumolo then made Jeff repeat his confession, though Jeff was sobbing on the floor, threatening that Jeff could "be here all night" if he did not comply; and (5) Tumolo did nothing to inform the prosecutor that the confession had been coerced.  P. 51, 62, 67-71.  Tumolo was also directly involved in improperly interrogating Freddie Claxton; he additionally approved the false police reports of Freddie's interrogation

---

means by which they pursued that goal was by interfering with Mr. Patel's familial relationships. *See Patel*, 305 F.3d at 134.  A helpful analogue is Sixth Amendment jurisprudence.  Where police wrongfully conduct an interrogation after the suspect has invoked the right to counsel, that violates the Sixth Amendment.  The Sixth Amendment is violated even though the police officers' primary purpose is a criminological goal (an arrest) and the violation of the suspect's right to counsel is merely the means by which the officers pursue that goal.

which made no mention that the police had wrongfully barred Freddie's father from entering the interrogation room.  P. 77, 106-07.

The Peekskill Defendants and Tumolo claim that, notwithstanding this evidence, Ms. McGarr has no claim *as a matter of law* because the police officers offered Jeff the opportunity to notify his mother and Jeff declined.  Peekskill Def. Br. at 2.  Tumolo goes so far as to claim they were "honoring" Jeff's wishes not to tell his mother about his relationship with the Peekskill police.  Tumolo Br. at 19.[6]  They are wrong.  While defendants may present evidence of this theory to the jury, a reasonable jury could find that the officers exploited a teenage boy's desire to be an adult and rebel against what he perceived as his mother's "foolish" distrust of the police.  The officers' actions, *writ large*, demonstrate a cynical exploitation of a teenager's youthful desire to heroically solve an important crime.  *See* Deskovic Dep. at 964; P. 37 - P.41.  Against this backdrop, a jury can find that when the police offered Jeff the opportunity to contact his mother, they did so disingenuously, simply to provide him the opportunity to assert his independence.  (What teenage boy would insist that he "had to call his mommy" for help?)  As Martin Burrett, Jeff's best friend, has testified when he explained why he did not tell his own mother about the police questioning which "scared" him: "it was not one of those manly things to do back then, to show emotion of like being scared. . . . you have to be

---

[6] Tumolo further points to evidence of arguments between Ms. McGarr and her teenage son as somehow relevant to the question of whether, as a matter of law, the police officers' misconduct interfered with the familial relationship.  Tumolo Br. at 19.  Tumolo errs.  While a jury might consider the nature of Ms. McGarr's relationship with her son (and may conclude that their disputes reflect the standard challenges of parenting a teenage boy as a single mom or, at worst, faulty parenting judgments about the appropriate use of corporal punishment as a disciplinary tool), at summary judgment this evidence is irrelevant.  Jeff never testified that he and his mother were estranged; to the contrary, in January 1990 he described their relationship as "good" when he was a child, and "so-so" as a teenager.  P. 123**.**  Moreover, when Ms. McGarr decided to find a lawyer to protect Jeff after the December 12 police interrogation, he readily consented.  P.111.

all macho."  P. 121.  In any event these offers—disingenuous or otherwise—do not inoculate the police from responsibility for their wrongful actions detailed above.

The case law cited by defendants is wholly inapposite.  In *Anthony v. City of New York*, 339 F.3d 129, 142–43 (2d Cir.2003), the Second Circuit considered a due process claim by Wright, the half-sister of Anthony, a disabled woman who was involuntarily committed overnight.  The Court rejected the claim because of both the nature of the half-sisters' separation and the officers' conduct.  First, the siblings were "separated only for a short time," and "Wright [was permitted] to spend the night in Anthony's hospital room."  *Id.* at 143.  Second, the "police officers undertook numerous attempts to contact Wright before transporting Anthony to the hospital."  *Id.*  This case is markedly different:  While the siblings in *Anthony* were merely separated overnight, Ms. McGarr was separated from her son for 16 years.  And, most relevant to this motion, the officers in *Anthony* were not indifferent to Ms. Wright's familial association rights; to the contrary, they took active steps to involve Ms. Wright in the care of her sibling.  Here, the police officers did not "undert[a]ke numerous attempts to contact [Ms. McGarr],"— they did not make even a single attempt to contact her.  *Id.*  Indeed, they actively sought to keep her in the dark in order to effectuate their goal of coercing Jeff's confession.

The Peekskill Defendants also repeatedly cite *Simon v. City of New York*, 09-CV-1302 ENV RER, 2011 WL 317975 (E.D.N.Y. Jan. 3, 2011), *report and recommendation adopted*, 2011 WL 344757 (E.D.N.Y. Feb. 1, 2011), a case involving wholly distinguishable facts.  *Simon* involved a false arrest and wrongful detention claim by a woman who was detained twice for under 24 hours each time.  Simon alleged not a single "factual allegation[] supporting even an *inference* that defendants acted with intent or deliberate indifference to disrupt her familial associations."  *Id.* at *14 (emphasis added).  In marked contrast, Ms. McGarr has alleged

20

a plethora of facts allowing a jury to infer that the police officers "acted with intent or deliberate

indifference" to her relationship with her teenage son. Moreover, the detention in *Simon* was

insufficiently substantial, *id.* at \*15, whereas here the Peekskill officers' misconduct resulted in a

16-year separation.[7]

> **B.  AT A MINIMUM, A REASONABLE JURY COULD CONCLUDE
> THAT THE PEEKSKILL DEFENDANTS AND TUMOLO WERE
> DELIBERATELY INDIFFERENT TO THE RELATIONSHIP
> BETWEEN MS. MCGARR AND HER TEENAGE SON**

The Peekskill Defendants and Tumolo both admit that they can be held liable for

violating Ms. McGarr's substantive due process rights if there is evidence permitting a

reasonable jury to determine that they were "deliberately indifferent" to Ms. McGarr's right to

the care and custody of her son. *See* Tumolo Br. at 18; Peekskill Def. Br. at 2.

While neither defense brief defines deliberate indifference, the standard is well

defined in constitutional jurisprudence. Deliberate indifference is a lower standard than

intending or knowing that harm will occur. *Farmer v. Brennan*, 511 U.S. 825, 835, 842 (1994)

(defining deliberate indifference as "*less than* acts or omissions for the very *purpose* of causing

harm or with *knowledge* that harm will result" (emphasis added)). Instead it is tantamount to

recklessness, i.e. "knowledge of a substantial risk of serious harm." *Id.* at 842. The "state of the

---

[7] The other cases cited by defendants are also distinguishable because, in each, there was no evidence that the defendant officers intended to interfere with the familial relationship. In *Busch v. City of New York*, No. 00 Civ. 5211 (SJ), 2003 WL 22171896 at \*4-5 (E.D.N.Y. Sept. 11, 2003), the police shot an emotionally disturbed man who was wielding a hammer; plaintiff never claimed that the police even knew of the plaintiff's family, let alone intended to interfere with that relationship. Similarly, in *Pizzuto v. County of Nassau*, 240 F.Supp.2d 203, 213 (E.D.N.Y. 2002), a prisoner was beaten to death by corrections officers; there was neither evidence of knowledge of the familial relationship nor evidence that the Defendants in the case "took acts that purposely and directly affected Plaintiffs' relationship with [the decedent]." (Note that *Busch* and *Pizzuto* rested their analyses on the fact that the decedents were independent adults; both held that no intentionality was required where the police interfere with the relationship between a parent and a minor child, *see* Section II.C.). In *McCray v. City of New York*, 03 CIV 9685 DAB, 2007 WL 4352748 (S.D.N.Y. Dec. 11, 2007), the Central Park jogger case, the Court similarly held: the plaintiffs "make no showing that Defendants acted with intent to disrupt familial association, or that Defendants acted with deliberate indifference to their familial association rights."

defendant's knowledge is normally a question of fact to be determined after trial," and not appropriate to "resolution at summary judgment." *Weyant v. Okst*, 101 F.3d 845, 856-57 (2d Cir. 1996) (reversing grant of summary judgment in part because the district court "applied an erroneous legal standard, for as discussed above, conduct may have been deliberately indifferent if it was reckless though not intentional").

Not only do the parties in this case agree that evidence of deliberate indifference suffices to establish a familial association claim, the governing Supreme Court case*, Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998), so holds. *Lewis* involved a high-speed car chase where the officer braked his motorcycle but failed to stop before hitting and killing Lewis. The Supreme Court held that application of the Fourteenth Amendment "shocks the conscience" inquiry can be met by evidence of deliberate indifference where the government actor had an opportunity for deliberation, such as in many prison misconduct cases. *Id.* at 850-54. In contrast, because the high-speed pursuit in *Lewis* provided the officers no opportunity to deliberate, the plaintiff had to prove intentional conduct to state a substantive due process claim. *Id.*

Applying that standard, in *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005), the Second Circuit held that pedestrians who were hit and killed by an intoxicated off-duty police officer could state a claim against other officers who condoned the killer's drunk driving. *Pena* held that though plaintiff did not accuse the "defendants of acting with specific intent or desire to cause physical injury," it was "sufficient to assert that the defendants created a serious danger by acting with deliberate indifference to it," because the defendants had "ample opportunity, not only during the day in question, but also during the days, weeks and months that preceded it, in

which to decide what to do and say in response to the alleged practice of drinking and driving by off-duty officers."  *Id.* at 114.

And in *Russo v. City of Bridgeport*, 479 F.3d 196, 208-10 (2d Cir. 2007), the Court upheld a claim (brought by the plaintiff under the substantive due process clause, but analyzed by the Court under the Fourth Amendment) against officers for their "refusal to investigate available exculpatory evidence" resulting in a "sustained detention."  In considering the required state of mind the Court held that "'deliberate indifference'—but not negligence—can support a finding of liability in situations where the government owes a special duty of care to those in its charge."  *Id.* at 210 (internal citation omitted).  Because there was evidence that the officers acted with indifference to "Russo's incarceration and . . . his asserted innocence" by failing to investigate an exculpatory tape and misrepresenting the contents of that tape "to evoke a confession," the district court's grant of summary judgment was erroneous.  *Id.*

Similarly, here the Peekskill Defendants and Tumolo took Jeff in their charge and drove him to Brewster, miles from home where his mother could not find him.  Their decisions were not "made in haste, under pressure," *Lewis,* 523 U.S. at 852; to the contrary, the defendants spent weeks deliberately circumventing Ms. McGarr and fostering their psychologically coercive relationship with Jeff.  As defendants recognize, evidence of deliberate indifference is sufficient for a jury to find in plaintiff's favor.

The evidence outlined above demonstrating intent is equally indicative of indifference and easily meets this lower standard of culpability.  *See* Section II.A..

### C.     BECAUSE JEFFREY DESKOVIC WAS A MINOR AT THE TIME OF THE INTERFERENCE MS. MCGARR NEED NOT DEMONSTRATE INTENTIONALITY

While the evidence outlined above demonstrates that the officers directed their conduct at the relationship between Ms. McGarr and her son, plaintiff need not so demonstrate.

Instead, as *Patel* and other cases make clear: "this Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association." *Id.* at 137 (citing *Adler v. Pataki*, 185 F.3d 35, 43-44 (2d Cir. 1999)).[8]  Though the Court did not reach the question in *Patel*, it made clear that the weight of Supreme Court and Second Circuit authority was that no such direct evidence need be shown:  even under "the strict standard suggested by defendants —*which we do not believe finds support in Roberts [v. U.S. Jaycees*, 468 U.S. 609 (1984)] *or in any of our precedents* — plaintiff has alleged a constitutional violation."  *Id.* (emphasis added).

Courts in this Circuit have repeatedly upheld claims alleging interference in the relationship between a parent and a child in that parent's custody without requiring a showing that the defendants directed their actions at that relationship.  In *Greene v. City of New York*, 675 F. Supp. 110, 115 (S.D.N.Y. 1987), the Court rejected the City's claim that the plaintiff must show "a specific awareness on the defendant's part that the plaintiff had children who would be deprived of his companionship if he were killed."  *Id.* at 115; *see also Dusenbury v. City of New York*, 97 CIV. 5215 (HB), 1999 WL 199072 (S.D.N.Y. Apr. 9, 1999) (holding that the children of a father who was incapacitated by wrongful use of excessive force had a claim for temporary deprivation of parenthood as courts "have recognized such a claim where the state action that affected the parent-child relationship was more than merely negligent without further allegations that the official was trying to break up the family"); *Fodelmesi v. Schepperly*, 87 CIV. 6762 (KMW), 1991 WL 120311, at *6 (S.D.N.Y. June 25, 1991) (upholding the parents' claim that they were deprived of the companionship of their child who was in their custody and rejecting

---

[8] The Plaintiff in *Adler* contended that he was fired in retaliation for his wife's lawsuit—the Second Circuit imposed no requirement that Plaintiff demonstrate that, in deciding to fire Plaintiff, Defendants intended to interfere with Plaintiff's relationship with his wife.  *Adler*, 185 F.3d at 43-44.

the argument that a federal claim only exists where "the State action in question is directly aimed at the parent/child relationship"); *Lee v. State Dept. of Corr. Services*, 97 CIV. 7112 (DAB), 1999 WL 673339, at *8-9 (S.D.N.Y. Aug. 30, 1999) (upholding mother's claim that her right to family association with mentally incapacitated adult son was violated when he was misidentified and extradited).

Moreover, Courts in this Circuit and others have explicitly distinguished substantive due process claims for interference with a relationship with an *adult* child—for which plaintiff must demonstrate that defendants directed their conduct at that relationship—from claims for interference with a parental relationship with a *minor* child.  For example, in *Pizzuto v. County of Nassau*, 240 F. Supp. 2d 203, 210 (E.D.N.Y. 2002), the Court found that the family association right exists "only where custodial relations are involved," as it is "the right to remain together as a family free from superceding government decisions."  The Court distinguished the cases cited above (*Greene,* 675 F.Supp. 110, *Dusenbury,* 1999 WL 199072, and *Fodelmesi*, 1991 WL 120311) as "each of these cases involves disruption or preemption of custodial relationships between parents and minor children."  *Pizzuto*, 240 F. Supp. 2d at 210-11.

The D.C. Circuit's opinion in *Butera v. Dist. of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001) is particularly thorough in analyzing this distinction.  In rejecting a mother's claim of a constitutional right to the companionship of her *adult* child, *Butera* canvassed the relevant case law and found that it:

> focus[es] on securing the rights of parents to have custody of and to raise their minor children in a manner that develops parental and filial bonds free from government interference. This emphasis is clear in cases such as *Prince v. Massachusetts*, 321 U.S. 158 (1944), where, in the context of the prosecution of a child's guardian for furnishing her with religious literature to sell on the public streets in violation of child labor laws, the Court stated that "the custody, care, and nurture of the child reside first in the

> parents," *id.* at 166, and *Ginsberg v. New York*, 390 U.S. 629
> (1968), where the Court recognized parents' right "to direct the
> rearing of their children [as] basic in the structure of our society."
> *Id.* at 639. Moreover, while the Court in *Stanley v. Illinois*, 405
> U.S. 645 (1972), recognized a parent's constitutional interest in the
> "companionship" of his children, it did so in the context of a
> parent's right to the custody and care of a minor child. *See id. at*
> *651.* We find nothing in Supreme Court case law to indicate an
> intention to extend these concerns in support of a constitutional
> liberty interest in a parent's relationship with her adult son. . . .
> When children grow up, their dependence on their parents for
> guidance, socialization, and support gradually diminishes. At the
> same time, the strength and importance of the emotional bonds
> between them and their parents usually decrease.

*Id.* at 655-56 (internal citations omitted). *Butera* therefore concluded that, "as a long line of

Supreme Court cases attests, the differences between the two stages of the relationship" – i.e.

before adulthood and after – "are sufficiently marked to warrant sharply different constitutional

treatment." *Id.* at 656 (internal citation omitted).

      We do not contend that the Circuits have uniformly adopted the approach of the

D.C. Circuit. Indeed there appears to be a Circuit split on the matter, with Circuits aligning in

three different groups: (i) several Circuits have adopted the D.C. Circuit's approach of

distinguishing claims alleging interference with a custodial relationship from allegations of

interference with a relationship with an adult child,[9] (ii) some Circuits require a showing of

---

[9] *See Robertson v. Hecksel*, 420 F.3d 1254, 1257 (11th Cir. 2005) (noting that "the Supreme Court cases extending liberty interests of parents under the Due Process Clause focus on relationships with *minor* children" (emphasis in original) and noting scholars "reviewing Supreme Court caselaw" have found "no explicit guidance on how to decide the question of whether parents have a right to companionship with their adult children."); *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005) ("we agree with our sister circuits that minor children's need for the guidance and support of their parents warrants 'sharply different constitutional treatment'" (quoting *Butera*, 235 F.3d at 56)). The Third Circuit previously aligned itself with the Seventh, Eleventh and D.C. Circuits. *See McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003) ("[W]e agree with the District of Columbia Circuit that childhood and adulthood are markedly distinct, thus requiring different constitutional treatment in this context."); *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 509 n. 7 (3d Cir. 1985) (adopting the holding of *Bell* that a parent whose minor child has died as a result of unlawful state action may maintain an action under § 1983 for deprivation of liberty). The Fifth Circuit, in *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir.1985), upheld a jury verdict in § 1983 action awarding $200,000 to father whose son was shot by police officers. *See also*

intentionality even for interference with relationships with children,[10] and (iii) the Ninth Circuit

has held that no showing of intentionality is required even for interference with an adult child.[11]

Against this background, the Second Circuit's opinion in *Patel* is much closer to the Ninth

Circuit's position than to Circuits which require intentionality regardless of whether there is a

custodial relationship with a minor child.

Because Jeff was indisputably a minor who was in the custody of his mother at

the time of the compelled confession and resulting arrest — facts that the police were well aware

of — a jury could find that the Peekskill Defendants and Tumolo's actions deprived Ms. McGarr

of her right to care for and raise her son.  Accordingly, under the precedent of the Second Circuit

as well as many of its sister Circuits, this Court should reject defendants' claim that plaintiff

must additionally demonstrate that the police directed their actions at Ms. McGarr's relationship

with Jeff.

---

*Logan v. Hollier,* 711 F.2d 690 (5th Cir. 1983) (remanding to district court question whether plaintiff whose daughter was killed by police officers has a cognizable claim under § 1983).  Finally, the Eight Circuit, in *Mattis v. Schnarr,* 502 F.2d 588, 595 (8th Cir.1974), held that a father whose son was shot by police officer stated a § 1983 claim for deprivation of parenthood without due process of law because the "practical effect of the [the officer's] act was to deny the plaintiff the fundamental right to raise his son."

[10] The Tenth and First Circuits have required evidence of intentionality.  *See Lowery v. County of Riley*, 552 F.3d 1086, 1092 (10th Cir. 2008); *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 563 (1st Cir. 1988).  The Third Circuit has purported to require evidence of intent, s*ee Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*, 587 F.3d 176, 191 (3d Cir. 2009), without explicitly overruling *McCurdy* or *Estate of Bailey* which held otherwise, *see* note 9.  Similarly, in *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 585 (8th Cir. 2006), the Eight Circuit held that intentionality was required, without even mentioning *Mattis,* 502 F.2d at 595, which held otherwise, *see* note 9.  Neither *Chambers* nor *Reasonover* is good law in their respective Circuits, because where two panels of the same circuit "conflict, the earlier is the controlling authority and the latter is ineffective as precedents." *United States v. Rivera,* 365 F.3d 213, 213 (3d Cir. 2004); *see also Maxfield v. Cintas Corp., No. 2,* 487 F.3d 1132, 1135 (8th Cir. 2007) ("the 'prior panel rule'-provides that one panel of this court has no authority to overrule an earlier decision of another panel").

[11]  *See, e.g., Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 371 (9th Cir. 1998) (recognizing a companionship claim in the context of a parent and an adult child where the deprivation was incidental to the state action); *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987) (adult and minor children may bring § 1983 action for deprivation of father's companionship where police officers killed father during arrest), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999).

### III.   QUALIFIED IMMUNITY IS INAPPROPRIATE

Tumolo argues that he is entitled to qualified immunity against Ms. McGarr's claim for "all of the same reasons" (and no additional reasons) that he claimed entitlement to qualified immunity for Jeff Deskovic's claims.  Tumolo Br. at 20-21. Accordingly, because Jeff Deskovic's opposition brief of this same date thoroughly rebuts Tumolo's fallacious arguments, and to avoid burdening the Court, we adopt those arguments and incorporate them by reference herein.

While the Peekskill Defendants claimed that they were entitled to qualified immunity in the brief they submitted in the *Deskovic* case, their brief in this action contains no such claim.

In light of the Court's request for briefing on qualified immunity for Ms. McGarr's claim for the separate motion of Defendant Stephens, however, we wish to take this opportunity to explain why neither the Peekskill Defendants nor Tumolo are entitled to qualified immunity.[12]

*** 

In analyzing qualified immunity on a motion for summary judgment, a court must "review the facts in the light most favorable to the plaintiff and draw all permissible inferences in the plaintiff's favor."  *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003).

Given the numerous "dispute[s] as to the material historical facts," summary judgment on qualified immunity is inappropriate in this case and the factual questions should be

---

[12] Neither the Peekskill Defendants nor Tumolo sought to supplement their motion for summary judgment to brief the qualified immunity issue in light of the Court's July 25 Order which asked the parties to brief the question of whether Defendant *Stephens* is entitled to summary judgment on the basis of qualified immunity for Ms. McGarr's family association claim.  This Court should accordingly deem any claim for qualified immunity waived.  If this Court nonetheless considers any such claim first raised on reply, we also incorporate Jeff Deskovic's arguments rebutting the Peekskill Defendants' claim for qualified immunity to the extent relevant.

resolved by the fact finder. *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)

(internal citations omitted); *see also Ortiz v. Jordan*, 131 S. Ct. 884, 892 (2011) (qualified

immunity is typically a "purely legal" issue only in "contests not about what occurred, or why an

action was taken or omitted, but disputes about the substance and clarity of pre-existing law").

Government officials sued in their individual capacity are entitled to qualified

immunity upon showing "either (1) their conduct did not violate clearly established rights of

which a reasonable person would have known, or (2) it was objectively reasonable [for them] to

believe that their acts did not violate these clearly established rights." *Amore v. Novarro*, 624

F.3d 522, 530 (2d Cir. 2010) (quoting *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010)

(alterations in orig.)). "[I]f the law was sufficiently clearly established, the immunity defense

ordinarily should fail, since a reasonably competent public official should know the law

governing his conduct." *Jackler v. Byrne*, 658 F.3d 225, 243 (2d Cir. 2011) (internal quotation

marks omitted).

### A.   THE LAW WAS CLEARLY-ESTABLISHED PRIOR TO 1989

#### 1.   The unlawfulness of coercing confessions and fabricating and withholding evidence was clearly established

There can be no serious question that by 1990 it was clearly established that the

police officers' conduct, in coercing Jeff's confession, fabricating inculpatory evidence, and

withholding exculpatory evidence, was unlawful.

The Second Circuit has repeatedly stated that the qualified immunity inquiry must

consider whether defendant's "conduct" or "acts" were unlawful. *Amore*, 624 F.3d at 530;

*Cornejo*, 592 F.3d at 128. The question is not whether a reasonable officer would know *which*

provision of the Constitution barred his conduct: As the Second Circuit held in *Russo v. City of*

*Bridgeport*, 479 F.3d 196, 212 (2d Cir. 2007), the "question of reasonable disagreement turns on

29

whether reasonable officers could disagree about *whether* conduct is illegal, not on whether they know the precise constitutional reason *why* it is not lawful."  Accordingly, *Russo* denied the police officers qualified immunity for their "refusal to investigate available exculpatory evidence" resulting in a "sustained detention," despite pre-existing ambiguity as to whether the conduct at issue would violate the Fourteenth Amendment or the Fourth Amendment.  *Id.* at 208; Similarly, in *Southerland v. City of New York*, 680 F.3d 127, 160 (2d Cir. 2012), the Court denied a caseworker's qualified immunity defense in a claim by children who were allegedly wrongfully removed from their father's custody.  The Second Circuit held that the standard for a child removal claim under the Fourth Amendment "was not established" at the time of underlying removal and "remains unsettled to this day," in part due to a subsequent case that altered the legal rubric.[13]  *Southerland* rejected the District Court's holding granting qualified immunity as "there was no clear application of Fourth Amendment standards in the child removal context" and instead held:

> What matters is whether an objectively reasonable caseworker . . . would have known that removing a child from his or her home without parental consent, circumstances warranting the removal, or court order would violate a constitutional right—not whether the caseworker would have known which constitutional provisions would be violated if the caseworker proceeded to act in a particular way.

*Id.* at 160.  Similarly, it matters not whether the police officers knew "which constitutional provisions would be violated," it is sufficient that an objectively reasonable officer would know that coercing a confession, fabricating evidence, and withholding exculpatory evidence "would violate a constitutional right."  *Id.*

---

[13] *Southerland* held that the Fourth Amendment applied to the children's claim not to be wrongfully removed, while the Fourteenth Amendment's procedural and substantive due process clauses applied to the father's claim.  *Id.* at 142-43.

This analysis reflects the important policy interests underlying qualified immunity.  "The primary goal of qualified immunity is to permit government officials to act in areas of legal uncertainty without undue fear of subsequent liability," *Hanrahan v. Doling*, 331 F.3d 93, 98 (2d Cir. 2003), to ensure that officers will not be "unduly inhibit[ed] . . . in the discharge of their duties, *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  Qualified immunity does not act as a shield for individuals who "knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

Granting qualified immunity to the Peekskill Defendants or Tumolo would subvert these goals entirely.  One fundamental and undisputed purpose of federal civil rights laws is to deter police officers from coercing the confession of a teenage boy and fabricating evidence that would wrongfully send him to jail for decades.  *Cf. Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.").

**2.     The unlawfulness of interference with family association was well established before 1989**

Even if it were appropriate to consider whether it was clearly established that the officers' actions were unlawful specifically because they violated Ms. McGarr's rights, that question was answered in the affirmative by the Second Circuit in *Patel*, 305 F.3d at 138-40. *Patel* denied qualified immunity to police officers for a substantive due process claim brought by an adult son alleging his family association rights with his father and siblings were harmed by the officers' wrongful acts in investigating a murder investigation.  *Patel* held that the "right to intimate association has been clearly established since 1984 when *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984)] was decided."  *Id.* at 139.

The Second Circuit in *Patel* recognized that "the clearest instance of the right to familial association is embodied in the decades worth of authority protecting parents' custodial rights," to raise their children such as the right Ms. McGarr asserts here. *Id. Patel*, in contrast, denied qualified immunity for the comparatively weaker constitutional claim of interference with the relationship between a parent and an adult child who was not in his parents' custody. *Id.* Indeed, while *Patel* explained that *Roberts* held that "constitutional protection extended to the most intimate relationships," *id.*, there is extensive Supreme Court precedent pre-dating *Roberts* specifically protecting custodial parent-child relationships from state interference. The Supreme Court has long focused on "securing the rights of parents to have custody of and to raise their minor children in a manner that develops parental and filial bonds free from government interference." *Butera v. District of Columbia*, 235 F.3d 637, 655 (D.C. Cir. 2001) (citing *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Ginsberg v. New York*, 390 U.S. 629 (1968); *Stanley v. Illinois*, 405 U.S. 645 (1972)).

Second Circuit cases prior to 1990 also clearly established a parent's substantive due process right to family integrity. In *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977), the Second Circuit made clear that a mother has a § 1983 claim against welfare authorities who improperly seized her child, explaining "the most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state." *See also Joyner by Lowry v. Dumpson*, 712 F.2d 770, 777-78, 782-83 (2d Cir. 1983) (remanding for trial on whether defendants' temporary foster care system violated "fundamental" right to "family integrity" by refusing to return children to parents' custody and restricting visitation); *Rivera v. Marcus*, 696 F.2d 1016, 1024-25 (2d Cir. 1982)

("we find that Mrs. Rivera possesses an important liberty interest in preserving the integrity and stability of her family"), *cited by Patel,* 305 F.3d at 139.

Not surprisingly, then, courts in the Second Circuit, as well as other Courts of Appeals, had repeatedly upheld claims by parents alleging that the police interfered with their relationship with their children for conduct that predated the officers' conduct here.  *See Greene v. City of New York,* 675 F. Supp. 110, 113–14 (S.D.N.Y. 1987) (upholding jury verdict for minor children for their claim that police officers violated their right to parenthood by using excessive force and killing their father) and Court of Appeals cases cited therein; *Fodelmesi v. Schepperly*, 87 CIV. 6762 (KMW), 1991 WL 120311 (S.D.N.Y. June 25, 1991) ("this court has upheld § 1983 actions by parents for deprivation of parenthood and familial association" and upholding claim by parents for actions police officers took between 1984 and 1987 against their adult son).[14]

## B.   THE OFFICERS CANNOT CLAIM THAT THEIR ACTIONS WERE OBJECTIVELY LEGALLY REASONABLE

*Patel* denied the defendant officers qualified immunity because the "uncertainty as to the contours of the right [to family association] . . . does not extend so far as to suggest that a murder investigation erodes all of the 'critical buffers between the individual and the power of the State.'"  *Id.* at 139 (quoting *Roberts*, 468 U.S. at 619).  Indeed, the Second Circuit in *Patel* held that there are certain "clearly established limits" to an officer's action in investigating a murder.  The Court in *Patel* refused to hold that the "right to intimate association does not impose any clearly established limits on the tactics that a police officer may use in the course of

---

[14] *See also Lee v. State Dept. of Corr. Services*, 97 CIV. 7112 (DAB), 1999 WL 673339, at *16 (S.D.N.Y. Aug. 30, 1999) (denying corrections officers qualified immunity for a mother's claim that the officers who improperly imprisoned her mentally incapacitated son violated her right to family association, explaining that the right was clearly established based on *Roberts* and its predecessors).

an investigation." *Id.* As the *Patel* Court recognized, to do so "would render hollow the right to intimate association." *Id.* at 140.

Just like the officers in *Patel*, the officers here intentionally interfered with Linda McGarr's custodial relationship with her minor son in order to coerce Jeff's confession. Intentional state interference with custodial relationships has long been held to violate a parent's constitutional rights. *See, e.g., Joyner by Lowry*, 712 F.2d at 777-78, 782-83; *Duchesne,* 566 F.2d at 825.

Moreover, even if this Court were to hold that no jury could find that the defendants' actions were directed at the custodial relationship, qualified immunity would still be inappropriate. Like the murder investigation in *Patel,* the murder investigation of A.C. in this case placed limits on police tactics. But unlike in *Patel* where the limits the court needed to determine were the *sui generis* limits on police officers' right to "engage in an extended public and private defamatory misinformation campaign," 305 F.3d at 140, the "clearly established limits" here are the familiar ones: the constitutional limits on coercing interrogations, fabricating evidence and withholding exculpatory evidence. Put another way, the officer defendants in *Patel* were facing liability for a "misinformation campaign," *id.,* which was only actionable to the extent the officer violated Patel's right to intimate association. In marked contrast, the police officers' misconduct here is independently actionable as a violation of Jeff Deskovic's constitutional rights. As detailed above, qualified immunity does not act as a shield for individuals who "knowingly violate the law." *Malley,* 475 U.S. at 341.

***

Given the numerous "dispute[s] as to the material historical facts" in this case, summary judgment on qualified immunity grounds is inappropriate and "the factual questions

must be resolved by the fact finder." *Kerman*, 374 F.3d at 109 (internal citations omitted).

Because qualified immunity is an affirmative defense, "the defendants bear the burden of

showing that the challenged act was objectively reasonable in light of the law existing at that

time." *Varrone v. Bilotti,* 123 F.3d 75, 78 (2d Cir.1997) (internal citations omitted).   They

cannot remotely meet this burden.

## CONCLUSION

For the foregoing reasons, this Court should deny the Peekskill Defendants and

Defendant Tumolo's motions for summary judgment as to plaintiff Linda McGarr.


Date:   September 7, 2012
         New York, NY

Respectfully Submitted,

Debra Greenberger /dlh

Diane L. Houk
Debra L. Greenberger
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone (212) 763-5000
Fax (212) 763-5001

*Counsel for Plaintiff Linda McGarr*