UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LINDA McGARR,

                              Plaintiff,

         v.

CITY OF PEEKSKILL, DAVID LEVINE, THOMAS
McINTYRE, EUGENE TUMOLO, JOHN AND
JANE DOE SUPERVISORS, and DANIEL
STEPHENS,

                              Defendants.

Case No. 07-CV-9488 (KMK)

OPINION AND ORDER

Appearances:

Diane L. Houk, Esq.
Debra L. Greenberger, Esq.
Emery Celli Brinckerhoff & Abady, LLP
New York, New York
*Counsel for Plaintiff*

Peter A. Meisels, Esq.
John M. Flannery, Esq.
Lalit K. Loomba, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
White Plains, New York
*Counsel for Defendants McIntyre, Levine, and City of Peekskill*

James A. Mitchell, Esq.
Mary Margulis-Ohnuma, Esq.
Ballard Spahr Stillman & Friedman LLP
New York, New York
*Counsel for Defendant Eugene Tumolo*

KENNETH M. KARAS, District Judge:

Linda McGarr ("McGarr"), the mother of Jeffrey Deskovic ("Deskovic"),[1] filed the instant action against the City of Peekskill and a number of police officers and other officials. Her suit arises from the wrongful arrest, conviction, and incarceration of Deskovic. After multiple conferences and rounds of briefing, several claims, as well as several originally named Defendants have been dismissed, *see Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443 (S.D.N.Y. 2012); *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154 (S.D.N.Y. 2009); *Deskovic v. City of Peekskill*, Nos. 07-CV-8150, 07-CV-9488, 2009 WL 2475001 (S.D.N.Y. Aug. 13, 2009), and McGarr now alleges a single claim pursuant to 42 U.S.C. § 1983 ("Section 1983") for violation of her constitutional right to familial association. Currently before the Court are Defendants Levine's, McIntyre's, and the City of Peekskill's (collectively, "the Peekskill Defendants'") Motion for Summary Judgment on this claim, and Defendant Tumolo's Motion for Summary Judgment on this claim. Both Motions are granted in full.

## I. Background

The Court assumes the Parties' familiarity with this dispute, and will summarize this case's history, focusing on those facts relevant to the instant motions.

### A. Factual Background

In 1989, Deskovic was sixteen years old and a sophomore at Peekskill High. A.C. was Deskovic's classmate. (Rule 56.1 Statement by Peekskill Defs. ("Peekskill 56.1") ¶ 17; Def.

---

[1] Deskovic is the named Plaintiff in the case captioned *Deskovic v. City of Peekskill et al.*, No. 07-CV-8150. The cases were filed as related, and they have been consolidated for pre-trial purposes. Both suits involve Defendants City of Peekskill, David Levine, Thomas McIntyre, Eugene Tumolo, John and Jane Doe Supervisors, and Daniel Stephens. Deskovic additionally named Putnam County as a defendant. Some Defendants have settled, and the Court has dismissed others.

Tumolo's Statement Pursuant to Local Rule 56.1 of Material Facts Not in Dispute ("Tumolo 56.1") ¶¶ 1–2; Deskovic's Resp. to Peekskill Defs.' Statement Pursuant to Local Rule 56.1 ("Deskovic Response 1") ¶ 17; Deskovic's Resp. to Def. Tumolo's Statement Pursuant to Local Rule 56.1 ("Deskovic Response 2") ¶¶ 1–2; Deskovic's Counterstatement of Material Facts Pursuant to Local Rule 56.1 ("Deskovic 56.1") ¶ 6.)[2]  A.C. lived with her mother, step-father, and sister.  (Peekskill 56.1 ¶ 27.)  Other schoolmates included Martin Burrett, John Laurino, and Frederick Claxton, Jr.  (*Id.* ¶¶ 19, 25.)

On Wednesday, November 15, 1989, A.C. was raped and killed in the woods near the Peekskill High campus.  She had left her house alone after school, carrying a camera to take photos.  (Peekskill 56.1 ¶ 28.)  She was picked up in one location, carried into the woods, where she was raped at another location (and where her bra was ripped off).  The perpetrator ejaculated during the rape.  The perpetrator then strangled A.C. and dragged her body and covered it with leaves at a third location.  (Deskovic 56.1 ¶ 1.)  Steven Cunningham, an African American male, has admitted to committing the rape and murder.  He has stated that immediately before committing the crimes, he had been smoking crack, and then he saw A.C. walking alone near the

---

[2] Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York requires a party seeking summary judgment to submit a statement "of the material facts as to which the moving party contends there is no genuine issue to be tried."  *See also Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).  The facts recited herein are drawn primarily from these statements—so-called 56.1 statements—and attached documents.  Furthermore, in her "Statement of Additional Material Disputed Facts Pursuant to Local Rule 56.1," McGarr "incorporates by reference Paragraphs 1 to 105 of the Statement of Additional Material Facts of Plaintiff Jeffrey Deskovic submitted in opposition to [the Peekskill Defendants'] and [Tumolo's] motions for summary judgment in the related action."  (Pl.'s Statement of Additional Material Disputed Facts Pursuant to Local Rule 56.1 ("McGarr's 56.1") ¶¶ 1–105 (Dkt. No. 307 (07-CV-9488 Dkt.).  Where there is no dispute as to a given fact, the Court will therefore rely on either the Peekskill Defendants' 56.1 Statement or Deskovic's 56.1 Statement without providing cross-citations.  Where there is a dispute, the Court will note it.

wooded area and attacked her.  (*Id.*)

When A.C. did not return home on the evening of November 15, her parents reported her missing.  The police found her body on November 17.  (*Id.* ¶ 4.)  Tumolo, then-Lieutenant in charge of detectives, and McIntyre and Levine, then detectives, were among the officers who arrived on the scene.  (Peekskill 56.1 ¶ 41.)  Police secured the area, took photographs, and gathered evidence—including parts of a Walkman, a torn bra, and a handwritten note by the victim; police also later recovered the victim's camera.  The Parties agree that evidence was gathered in three distinct locations.  (Peekskill 56.1 ¶¶ 46–48; Deskovic 56.1 ¶ 4.)  An autopsy was performed the same day.  Multiple photographs were taken of A.C.'s body, specifically, her injuries, during the autopsy.  A vaginal swab revealed semen, which the detectives believed to be from the rapist.  (Peekskill 56.1 ¶¶ 53–54; Deskovic 56.1 ¶ 4.)

Deskovic attended several of A.C.'s wake and funeral events later in November.  Levine and McIntyre also attended and observed that Deskovic seemed unusually upset.  (Peekskill 56.1 ¶¶ 64–67; Deskovic 56.1 ¶ 6.)  Around this time, officers were interviewing schoolmates, including Claxton, who was able to provide police with an alibi for his whereabouts during the time of the rape and murder.  (Peekskill 56.1 ¶¶ 70–71.)[3]  On or about November 23, McIntyre and Levine met with a New York Police Department criminal profiler, who offered a profile of the perpetrator's likely characteristics.  (Tumolo 56.1 ¶ 14.)  On November 27 and 28, police gathered more information about Deskovic, based in part on his exhibiting characteristics that fit the profiler's description.  (Peekskill 56.1 ¶¶ 75–76.)

Defendants McIntyre and Levine met with Deskovic multiple times between December

---

[3]  The nature of Claxton's interrogation is subject to some dispute, discussed below.

12, 1989, and January 25, 1990.  The Parties offer conflicting accounts of these interactions.

>According to Deskovic,
>
>>Levine and McIntyre approached [Deskovic] while he was walking to school on the morning of December 12, 1989 and insisted that he come to the station for questioning, telling him he had information that could help solve the case. Although no witness or forensic evidence linked [Deskovic] to the crime and [Deskovic] denied any knowledge of the crime, from a week or two into the investigation, the police considered [Deskovic] to be their only suspect. . . . Between December 12 and January 25, police met with [Deskovic,] who had no prior criminal justice system experience, on numerous occasions in and outside of the precinct.  There were eight documented meetings on [seven] different days, but [Deskovic] believes there could have been more than [ten] meetings.  The police took [Deskovic] on two or more visits to the crime scene . . . .

(Deskovic 56.1 ¶¶ 6–7 (citations omitted).)

>Deskovic further alleges that during this period, contrary to standard practice,
>
>>McIntyre and Levine t[old] [Deskovic] . . . nonpublic facts about the crime: (1) the victim's body was dragged, (2) the victim's body was covered in leaves, (3) the body was found in a certain location in the woods, (4) a note was found under the body written by the victim to [Claxton], (5) A.C. had lost her keys, and (6) A.C. dropped her camera when she was attacked.  McIntyre specifically pointed out where the body was found covered [in] leaves during a visit to the crime scene with [Deskovic].  [Deskovic] further remembers McIntyre and Levine telling him that [Claxton] was A.C.'s boyfriend, which was false. . . . [Deskovic] also learned nonpublic information about the crime through police photographs[, which] . . . document[ed] the location of objects found at the crime scene and the condition of the body, including the victim's wounds. . . . [O]n December 12, 1989, McIntyre and Levine showed [Deskovic] numerous photographs, telling [Deskovic] they were of the victim and crime scene.

(*Id.* ¶¶ 20–23 (citations omitted); *see also id.* ¶¶ 16–17.)  Peekskill Defendants specifically denied to the prosecutors, at the time of the investigation—and subsequently denied in their depositions—that they had provided any nonpublic information to Deskovic or showed him any photographs.  (*Id.* ¶¶ 18, 24.)

>Deskovic claims that throughout his interactions with McIntyre and Levine they repeatedly told him that they would like his help solving the case, asked him for

> his theories about the crime and told him that his input was useful. They told him
> that young people would talk more freely around him. They called him "buddy",
> [sic] asked [him] how "his" investigation was going, offered him coffee, and
> invited him to the station for pizza. . . . They told [him] that they wanted to share
> their files with him so that he could help, but could not do so until he took a
> polygraph exam.

(*Id.* ¶ 38 (citations omitted); *see also id.* ¶¶ 39–41.) Deskovic claims that during one meeting

with the officers, he drew a sketch of the crime scene at their urging. He states that his drawing

of the scene was "completely inconsistent with the locations of the crime scenes as identified" by

another officer, "who [had] prepared an accurate scale drawing depicting the three locations of

the crime based on measurements taken the day the body was found." (*Id.* ¶¶ 46–47.)[4]

Deskovic alleges that with respect to the status of his legal representation during the

investigation:

> On December 13, 1989, the day after he was first questioned by police,
> [Deskovic] and his mother met with attorney Lou Ecker, who told [Deskovic] not
> to talk to the police . . . . From that day on, [Deskovic] believed that he was
> represented by Ecker. . . . On December 21, 1989, McIntyre learned that
> Ecker . . . no longer represented [Deskovic]. . . . [ADA] Neary . . . instructed
> [McIntyre] to find out from [Deskovic] whether he had retained new counsel.

(*Id.* ¶¶ 82–83 (citations omitted).) Deskovic further alleges that McIntyre and Levine never

followed up on this instruction from Neary. Deskovic also claims that they arranged his

immediately subsequent visit at the police station—*i.e.*, he did not show up at the station on his

own. Deskovic states that

> [w]hen Levine approached [Deskovic] on the street [that night] . . . and said hello,
> [Deskovic] immediately told Levine that he had a lawyer and the police were not

---

[4] According to Deskovic, in connection with his eventual confession, Cunningham also
"drew his own diagram of the crime scenes, which [more] closely matches the map created by
[this officer]." (Deskovic 56.1 ¶ 47.)

supposed to talk to him. Levine asked [Deskovic] who [Deskovic's] lawyer was and [Deskovic] responded that it was Ecker. Levine smiled and laughed, and said that [Deskovic] could talk to him because "we're friends."

(*Id.* ¶ 87 (citations omitted).)

By way of contrast, according to the Peekskill Defendants,

[o]n December 12, 1989, Levine and McIntyre approached Deskovic on the street as he was walking to school in the morning. Detectives McIntyre and Levine asked Deskovic if he would accompany them to police headquarters to answer questions about A.C.'s death. After an initial discussion, Deskovic agreed to go with them to the police station. However, [he] specifically requested that the detectives not contact his mother to inform her about his whereabouts. . . . Deskovic was read his *Miranda* rights prior to his interview with police on December 12, 1989. He acknowledged that he understood his rights and consented to speak with the police without an attorney present. Deskovic initialed a *Miranda* rights card . . . . McIntyre showed Deskovic a photograph showing the area [within the woods.] . . . Other than [that] photo[,] . . . McIntyre did not show Deskovic any other photographs.

(Peekskill 56.1 ¶¶ 77–84 (citations omitted).) Peekskill Defendants claim that during that interview, Deskovic discussed his theory of how A.C. had died; admitted to arriving at school late on the day after A.C.'s death because he had been unable to sleep; admitted to having had a crush on A.C.; made statements confirming he understood his *Miranda* rights; and said he would consider a polygraph test. (*Id.* ¶¶ 85–88.)

With respect to their specific meetings in January with Deskovic, Peekskill Defendants describe that, on January 9, Deskovic voluntarily arrived at Headquarters.

Levine [then] walked outside police headquarters and met with Deskovic. [Levine] and Deskovic walked up and down the street for several minutes and conversed. Deskovic never entered the police station at this time. As they were walking, Deskovic asked Levine if there had been any progress in the investigation, and volunteered that he had been conducting his own investigation. Deskovic further stated that he had created some notes concerning his investigation, and that he wanted to give the notes to [Levine] the next day. . . . Deskovic never mentioned attorney Louis Ecker, or that he was or may have been represented by him, or any other attorney, in any of Deskovic's subsequent interactions with the [officers.]

(*Id.* ¶¶ 111–20 (citations omitted).)  At the end of the meeting, Deskovic agreed to return to police headquarters the next day to turn over his notes and to give a blood sample.  (*Id.* ¶ 121.)

On January 10, as planned, Deskovic returned to the station, and portions of this encounter were recorded.  According to Peekskill Defendants,

> Levine accompanied Deskovic to a separate room . . . and confirmed that Deskovic had come voluntarily for the purpose of giving a blood sample. . . . Deskovic signed a voluntary consent form in connection with giving a blood sample . . . .  Deskovic gave [Levine] two pages of typed notes representing Deskovic's investigation of A.C.'s murder. . . .  Thereafter, during a part of the meeting that was not tape recorded, Deskovic drew two sketch maps, one depicting the crime scene and the second A.C.'s route from her home to the [woods].

(*Id.* ¶¶ 128–132 (citations omitted).)  Peekskill Defendants allege that the first diagram accurately reflected that the crime occurred at three distinct locations; that Deskovic had no explanation for how he knew that there were three locations; that the second diagram "was consistent with accounts of A.C.'s route provided to police by witnesses"; and that Deskovic stated that a "certain person" told him about the rape and murder of A.C.  (*Id.* ¶¶ 133–46.)  According to the Peekskill Defendants, Deskovic then accompanied several officers to the crime scene, where he accurately identified various areas where the crime had occurred.  (*Id.* ¶¶ 147–59.)  Deskovic then returned to the station, where he provided additional nonpublic information about the crime.  (*Id.* ¶¶ 162–66.)

Peekskill Defendants allege that they next spoke to Deskovic on January 22.  They spoke initially by phone, but later that evening, Levine encountered Deskovic after meeting separately with one of Deskovic's classmates.  (*Id.* ¶¶ 170–71, 176–78.)  Peekskill Defendants further allege that Deskovic voluntarily came to the station on both January 23 and 24.  On January 23, Deskovic was given *Miranda* warnings and was asked to take a polygraph examination.  The

next day, Deskovic voluntarily agreed to take the polygraph. (*Id.* ¶¶ 179–84.) Levine asked

Deskovic if he understood that the test was voluntary, and Deskovic confirmed that this was his

understanding. (*Id.* ¶ 185.)

The Parties also dispute the nature of McIntyre's and Levine's interactions with

Deskovic's schoolmates. According to Deskovic,

> [his] close friend and classmate John Laurino, age 15, was questioned by police
> soon after they first interviewed [Deskovic]. According to the police report, John
> said he felt [Deskovic] was acting strangely, that he had confronted him about the
> crime, and that [Deskovic's] denials of involvement had been unconvincing. In
> fact, John never confronted [Deskovic] about the crime as described in the police
> report and did not tell the police that he had. . . . The police also created
> reports . . . attributing . . . statements to [Deskovic's] friend and classmate Martin
> Burrett. . . . In fact, [Deskovic] never said any of these things to Martin, and
> Martin never told the police that he had.

(Deskovic 56.1 ¶¶ 31–33 (citations omitted); *see also id.* ¶ 79.) Deskovic further claims that

Martin's subsequent statements to the Grand Jury about the timing of his first conversations with

Deskovic about the crime were made only after police were "'adamant' that they wanted him to

give [a] date they wanted to hear. Following this pressure, Martin then testified at the Grand

Jury" that he first spoke with Deskovic about the crime on November 17, rather than November

19. (*Id.* ¶ 34; *see also id.* ¶¶ 80–81.) Finally, Deskovic alleges that McIntyre and Levine

engaged in a pattern of coercively interrogating high school students, as evidenced by the

aggressive questioning of Claxton when he was a suspect. (*Id.* ¶¶ 74–78.)

By contrast, according to Peekskill Defendants, officers met with Laurino and his mother

on December 19. During the meeting, Laurino's mother said that Deskovic was "troubled" and

"Schizo"; John informed officers that Deskovic had been acting "strangely"; John reported that

Deskovic had admitted to having "problems with the police"; and John informed officers that he

had asked Deskovic if he had killed A.C., and Deskovic had answered cryptically. (Peekskill

56.1 ¶¶ 92–98 (internal quotation marks omitted).)  Similarly, officers met with Burrett and his

father on December 29, and with Martin again on January 4.  During those conversations, Martin

stated, among other things, that Deskovic had told him details of A.C.'s murder; that Deskovic

had told Martin not to speak with the police again; and that Deskovic had given a cryptic answer

when asked if he had killed A.C.  (*Id.* ¶¶ 102–110.)  Levine spoke with Martin again on January

22, during which conversation, Martin told Levine that he had visited the woods with Deskovic,

who had asked to borrow money for a gun.  (*Id.* ¶¶ 172–74.)

There is not much factual dispute as to the nature of the testing of the semen found in

A.C.'s body.  On January 11, Tumolo sent samples from the rape kit and Deskovic's voluntarily

given blood sample to the FBI for testing.  Tumolo stated in the attached letter, "we anticipate

that DNA developed from analyzing the semen evidence will match that from Deskovic's blood;

hence either incriminating him or exonerating him in this matter."  (Deskovic 56.1 ¶ 8 (internal

quotation marks omitted).)  The FBI replied on March 2, informing the police that the DNA

contained in the semen did not match the blood sample, thus the semen could not have come

from Deskovic.  The FBI confirmed this finding on March 26.  (*Id.* ¶¶ 9–10.)[5]

There is some dispute regarding the officers' conduct after they received the DNA results

from the FBI.  Deskovic alleges that following the negative results from the DNA testing, the

officers concluded that the semen must have come from another, consensual sexual partner, and

they thus began "additional investigation, including investigation into the victim's background in

order to determine whether she had been sexually active. . . .  Levine, McIntyre, and Tumolo all

---

[5] According to Peekskill Defendants, they were not initially notified of the results from the DNA testing until several days later, on March 8, 1990.  (Peekskill 56.1 ¶ 169.)  This dispute is immaterial.

admitted that the police investigation into the victim's sexual history showed that she was not sexually active." (*Id.* ¶¶ 102–03.) But the officers did not detail "information about the victim's lack of sexual history . . . in any [police] report," nor did they otherwise convey this information to the prosecutor or to Deskovic. (*Id.* ¶ 104.) The Peekskill Defendants allege, in contrast, that the prosecuting ADA "did not instruct [the officers] to conduct any additional investigation after he was assigned to the case. To [the prosecuting ADA's] knowledge, the [officers] did not conduct any additional investigations after the indictment was filed. The [officers] did not, in fact, conduct any investigations concerning the Deskovic case after the indictment was returned." (Peekskill 56.1 ¶¶ 241–43 (citations omitted).)

On January 13, after taking Deskovic's blood sample but prior to receiving the DNA test results, McIntyre sought permission from the District Attorney's office to arrest Deskovic based on a police psychiatrist's evaluation of Deskovic and Deskovic's diagram of the crime scene.[6] The ADA replied that there was insufficient probable cause supporting an arrest. (Deskovic 56.1 ¶ 42.) On January 16, Levine, McIntyre, and Tumolo tried again "but were told [that] there was no probable cause and [that] they should wait for the DNA results." (*Id.* ¶ 9; *see also id.* ¶¶ 42–49 (documenting that this meeting took place, that McIntyre, Levine, and Tumolo have inconsistent memories of this meeting and of the psychiatrist's report, and that ADA Neary concluded there was insufficient probable cause to arrest).)

It is undisputed that Defendant Stephens administered the polygraph examination of Deskovic and that different polygraphers administered the polygraph examinations of other

---

[6] The nature of the psychiatrist's report is contested by the Parties but is immaterial.

witnesses.  The Parties disagree, however, as to the details of both the polygraph examination and the subsequent interrogation of Deskovic.

According to Deskovic, Stephens had a specific reputation in the region for getting confessions where others had failed.  (*Id.* ¶ 51.)  Stephens and McIntyre subsequently admitted that the goal of this polygraph test was to elicit a confession.  (*Id.* ¶ 53.)  Tumolo and Levine have no such recollection.  Deskovic expected the polygraph to be administered at the Peekskill Police Department.  He arrived at 8:00 a.m. on a school day, and he brought Burrett with him for support.  Tumolo yelled at Burrett, causing Burrett to leave.  (*Id.* ¶ 58.)  The officers then escorted Deskovic to Stephens's office in Brewster, New York, approximately forty minutes away; they arrived at around 9:00 a.m.  Deskovic was immediately connected to the polygraph machine.  (*Id.*)  Deskovic had not eaten.  (*Id.* ¶ 59.)  He was alone with Stephens for the polygraph from 9:00 a.m. until 5:00 p.m.  (*Id.* ¶ 58.)  During that time, Levine went out for food several times, but he did not offer food to Deskovic until after Deskovic had falsely confessed. (*Id.* ¶ 59.)  The officers did, however, provide Deskovic with coffee.  (*Id.*)  Deskovic's expert criticizes the length of the polygraph test, the fact that officers did not give Deskovic food, and the fact that the officers gave Deskovic coffee.  (*Id.* ¶¶ 59–61.)

According to Deskovic's expert, these aspects of the questioning demonstrate that the polygraph "was not consistent with deception-detection polygraphing, but instead was . . . a 'guilt-presumptive interrogation.'"  (*Id.* ¶ 54.)  Rather than using the reliable "Backster Method," in which he was trained, Stephens employed the "Arther technique," which is "primarily intended for use in interrogations and eliciting confessions"; indeed, the Arther technique "is not a valid way to conduct a polygraph test and is particularly prone to errors with the actually innocent."  (*Id.* ¶ 55 (internal quotation marks omitted).)  In 1990, a professional polygrapher

would not have used the Arther technique to test truthfulness. (*Id.*) Stephens also used a less accurate scoring technique. (*Id.* ¶ 56.)

Deskovic alleges that Stephens, who was taller and heavier than Deskovic, yelled at Deskovic, asked rapid questions, called Deskovic a liar, and accused Deskovic of murder. (*Id.* ¶ 64.) During the polygraph, McIntyre, Levine, and Tumolo were in an adjoining room, listening to the examination over the intercom system. Moreover, throughout the afternoon, Stephens periodically left the room to talk over the results, leaving Deskovic alone in the polygraph room. (*Id.* ¶¶ 62–63.) At 5:00 p.m., after failing to elicit a confession, Stephens asked Deskovic with which officer Deskovic wanted to speak. Deskovic asked for McIntyre. Stephens left, and McIntyre entered. After discussing the polygraph results, McIntyre said that the other officers wanted to hurt Deskovic, and that McIntyre needed some "bullets" to help Deskovic. McIntyre promised Deskovic leniency if he confessed. McIntyre also said that A.C. wanted to hear Deskovic confess. (*Id.* ¶¶ 66–69.) These statements induced Deskovic falsely to confess to the murder. Tumolo then entered the room and demanded that Deskovic repeat the confession or else they could stay at Stephens's office "all night." Deskovic was sobbing in a fetal position on the floor. He tried to confess again but eventually broke down. (*Id.* ¶ 72 (internal quotation marks omitted).) The officers took Deskovic back to the station, where they asked him to sign a statement that he was not coerced, but he refused to sign. (*Id.* ¶ 73.)

According to the Peekskill Defendants, Deskovic arrived at headquarters at 9:30 a.m. He was read his *Miranda* rights, and he acknowledged that he understood the rights and wanted to proceed with a polygraph. The officers left with Deskovic to go to Stephens's office in Brewster, because there was no on-site polygraph facility; every test that Peekskill police administered during this case was conducted elsewhere. (Peekskill 56.1 ¶¶ 186–91.) During the

drive to Brewster, McIntyre told Deskovic that he was not obligated to take the test; that he could stop at any time he wanted; that he could leave at any time; that he did not have to answer any question he did not want to answer; and that McIntyre would take him home at any time. Deskovic acknowledged that he understood his rights. Deskovic expressly indicated that he did not want to speak to his mother. (*Id.* ¶¶ 192–95.) The polygraph session between Stephens and Deskovic lasted from 11:15 a.m. to 4:30 p.m. Stephens employed "a number of procedures and specific steps and inquiries." (*Id.* ¶ 200.) During the course of the polygraph, Deskovic made several statements that were interpreted as incriminating. (*Id.* ¶ 201.)[7] Furthermore, the results of the test indicated that Deskovic "had responded deceptively to the key questions focused on whether he was involved in A.C.'s death." (*Id.* ¶ 203.) At approximately 5:00 p.m., Deskovic asked to speak to McIntyre. McIntyre entered the room and asked Levine to get a hamburger and coffee for Deskovic, which he immediately consumed. Deskovic had not previously requested anything to eat. (*Id.* ¶¶ 204–05.) During the conversation that followed, Deskovic confessed. (*Id.* ¶¶ 206–07.) "Shortly thereafter, [Tumolo] entered the room and asked Deskovic to repeat what he [had] said. Deskovic repeated what he had told [McIntyre], but when he got to the part about ripping off A.C.'s bra, he became extremely distraught." (*Id.* ¶ 208.) The interview ended at approximately 7:00 p.m. (*Id.*) Deskovic was then placed under arrest. Peekskill Defendants further emphasize that Deskovic "was not beaten or otherwise subject to physical force at any time during the polygraph exam by [Stephens] or the ensuing interview

_____

[7] One of the statements, that "during the rape, the suspect had intercourse with A.C., but Deskovic did not know if he ejaculated," (Peekskill 56.1 ¶ 201(b))—referred to hereinafter as "the ejaculation statement"—is subject to dispute and will be discussed at greater length below.

with [McIntyre]. Deskovic was not handcuffed during any portion of the polygraph exam by [Stephens] or the ensuing interview . . . ." (*Id.* ¶¶ 210–11.)

Deskovic alleges that after the negative DNA results came back, the Peekskill Defendants and Stephens jointly fabricated the ejaculation statement—"I don't know if [the rapist] ejaculated"—and falsely reported to the prosecutors that Deskovic had offered it during the polygraph. According to Deskovic, they fabricated this statement in order "to counteract the exculpatory force of the DNA evidence." (Deskovic 56.1 ¶ 26.) Deskovic notes that the statement is false; Cunningham did ejaculate during the rape. (*Id.*) Deskovic further explains that he could not have made the statement, as, at the time of the confession, he was not aware that one could have sex and not ejaculate. (*Id.* ¶ 27.) Deskovic also points out that McIntyre's contemporaneous police reports, which, according to McIntyre, were thorough and accurate, did not include this statement. (*Id.* ¶ 28.) Indeed Deskovic claims that

> [t]he ejaculation statement first appeared in a set of notes written by . . . Stephens, which purported to reflect statements made by [Deskovic] during the "polygraph" exam on the day of the confession. Stephens' notes were forwarded to the prosecution sometime *after* Stephens, Levine and McIntyre discussed the DNA results. They were not included in the Peekskill file, and no one saw them until after the DNA evidence came back on March 2, 1990.

(*Id.* ¶ 29 (emphasis in original) (citations omitted).) The prosecution heavily relied on "the ejaculation statement" at trial to explain the negative DNA test results. The prosecutors' theory was that the semen found inside of A.C. came from a consensual partner—this, despite the fact that the police allegedly were aware from their subsequent investigation that A.C. was not sexually active. (*Id.* ¶ 30.)

Prior to his criminal trial, Plaintiff, through counsel, filed an omnibus motion seeking, *inter alia*, suppression of his confession to McIntyre. The trial court conducted a *Huntley*

hearing. In preparation for a legal brief, Deskovic's counsel requested that Deskovic provide a letter explaining the circumstances of the interrogation. According to the Peekskill Defendants, Deskovic "never mentioned that [McIntyre] threatened that the other officers (Tumolo and Levine) wanted to or would harm Deskovic, or that McIntyre could not protect Deskovic from those other officers unless Deskovic made certain statements or admissions"; Deskovic "never mentioned that [McIntyre] had promised Deskovic that he would not have to go to jail, and would only have to spend a short period of time in a mental hospital, if Deskovic made certain statements or admissions"; but Deskovic did explain that he had started crying, because he realized that he had trapped himself. (Peekskill 56.1 ¶¶ 250–56.) Deskovic did not testify at the hearing, and counsel's motion for suppression was based on the argument that Deskovic had not been given effective *Miranda* warnings; Deskovic "never argued . . . that [his] statements were the product of unlawful threats of physical coercion or promises of lenient treatment." (*Id.* ¶ 260.) The trial court denied the suppression motion. (*Id.* ¶ 261.)

Deskovic's account of his pretrial letter to counsel differs. Deskovic alleges that in his letter, he wrote "I realized they were only going to take me home if they heard what they wanted to hear, or else I wasn't going to leave there alive." (Deskovic 56.1 ¶ 69 (internal quotation marks omitted).) Deskovic also alleges that counsel "did not use evidence of police misconduct in his defense . . . because [counsel believed] that a Westchester jury would never believe that their police officers could engage in such misconduct." (*Id.*)

During the criminal trial, Deskovic did not testify, and his counsel did not call any expert witnesses to testify. (Peekskill 56.1 ¶¶ 272, 274.) The prosecution relied heavily on two facts. First, the prosecutor emphasized the fact that Deskovic had been able to tell the police nonpublic information about the rape and murder of A.C. that only the actual perpetrator would know.

McIntyre, Levine, and Tumolo had represented to the prosecutor that they had not fed this information to Deskovic, whereas, Deskovic alleges that they had. (Deskovic 56.1 ¶¶ 11, 35.) Second, the prosecutor relied on the ejaculation statement to counter the force of the negative DNA exclusion. (*Id.* ¶¶ 26–27, 36.) Deskovic was convicted and sentenced to fifteen years to life. (*Id.* ¶ 11.) There is no dispute that Deskovic sought direct and collateral relief, including habeas relief, from his conviction, consistently maintaining his innocence throughout the appellate and habeas processes. There is also no dispute that Deskovic was exonerated, that Cunningham confessed, or that Cunningham has been convicted for A.C.'s rape and murder.

B. Procedural History

Deskovic filed a notice of claim on December 19, 2006. He filed the operative Third Amended Complaint on March 17, 2010. (Dkt. No. 268. (07-CV-8150 Dkt.).) McGarr filed her Second Amended Complaint on April 9, 2010. (Dkt. No. 119 (07-CV-9488 Dkt.).) The Court has previously ruled on several motions arising from this case. Most recently, the Court denied summary judgment to Defendants Stephens and Putnam County on Deskovic's Section 1983 claims against them, but granted summary judgment to Stephens on McGarr's Section 1983 claim, finding that he was entitled to qualified immunity. Following past motion practice and several stipulations between the Parties, McGarr's only remaining claim is that Defendants deprived her of her First and Fourteenth Amendment right of familial association. Peekskill Defendants and Tumolo seek summary judgment on this claim. The Court held oral argument on the instant motions on May 16, 2013.

## II.  Discussion

### A.  Standard of Review

Summary judgment shall be granted where it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (same).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).  "A fact is material when it might affect the outcome of the suit under governing law."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial.  *See*

*Westinghouse Electric Corp. v. N.Y.C. Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24.

B. Doctrine of Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[Qualified] immunity protect[s] government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 132 S. Ct. 1657, 1665 (2012) (second alteration in original) (internal quotation marks omitted); *see also Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010) (noting that qualified immunity allows public officials "to perform their duties unflinchingly and without constant dread of retaliation"). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation, "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted). Summary judgment may be granted on the "basis of a qualified immunity defense premised on an assertion of objective reasonableness [if] the defendant show[s] that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions

were objectively unreasonable in light of clearly established law." *O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (second alteration in original) (internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable law enforcement officer in defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (second alteration in original) (citations and internal quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official. *Id.* at 2094 (citations and internal quotation marks omitted). Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

C. Analysis

McGarr's sole remaining claim is that her right of familial association under the First and Fourteenth Amendments was violated by the investigation into Deskovic, which led to his incarceration and complete separation from McGarr.  As the Court explained in its previous *Deskovic* decision, "[t]his right is called both the right to familial association and the right to intimate association."  894 F. Supp. 2d at 467.  The Court also explained that, as pled, "McGarr's claim . . . fit[s] under the Fourteenth Amendment, as McGarr has not alleged any retaliatory action based on Deskovic's First Amendment activities."  *Id.* at 468.

1. The Peekskill Defendants

In their Answer, the Peekskill Defendants asserted as an affirmative defense that "[t]he individual defendants are entitled to qualified immunity."  (Answer to Third Am. Compl. ¶ 199 (Dkt. No. 120 (07-CV-9488 Dkt.).)  They did not invoke this defense in their six-page Memorandum of Law, but they did assert the defense at oral argument.  McGarr asks the Court to deem the defense waived.  (Mem. of Law in Supp. of the Peekskill Defs.' Mot. for Summ. J. ("Peekskill McGarr Mem."); Pl. McGarr's Mem. of Law Opposing Mots. for Summ. J. by Peekskill Defs. and Eugene Tumolo ("McGarr Mem.") 28 & n.12.)  The Second Circuit has explained that "[a]lthough the defense of qualified immunity can indeed be forfeited, [courts] nevertheless have the power to consider it.  That [courts] generally ignore arguments advanced for the first time on appeal (or, as here, at oral argument) is a prudential rule, not [a] jurisdictional one . . . ."  *Fabrikant v. French*, 691 F.3d 193, 211–12 (2d Cir. 2012) (fourth alteration in original) (citations and internal quotation marks omitted).  Here, the relevant considerations augur in favor of considering whether qualified immunity is available to McIntyre and Levine.  First, the Court previously ruled that Defendant Stephens was entitled to qualified

immunity on McGarr's familial association claim, and serious inequity could result if the Court did not at least consider whether its analysis with respect to Stephens is controlling here. Second, courts generally do not deem an argument to be waived "where [it] presents a question of law and there is no need for additional fact-finding. The matter of whether a right was clearly established at the pertinent time is a question of law." *Id.* at 212 (quoting *Dean v. Blumenthal*, 577 F.3d 60, 67 n.6 (2d Cir. 2009)).

As in its previous decision, "[t]he Court begins . . . by examining whether a reasonable law enforcement officer in [McIntyre's or Levine's] position would have believed his or her conduct would violate McGarr's right to familial association." *Deskovic*, 894 F. Supp. 2d at 468. Here again, the Court answers in the negative; "there is no evidence that" the Peekskill Defendants "intentionally interfered with McGarr's relationship with Deskovic (as distinguished from intentionally violating Deskovic's rights), and anything less than conduct intentionally directed at the familial relationship was not clearly established as unlawful within the Second Circuit . . . in 1990." *Id.* at 472. McGarr's arguments to the contrary are thoughtful but ultimately unpersuasive.

First, McGarr argues that the Peekskill Defendants' claim to qualified immunity is defeated, because they engaged in clearly unconstitutional actions as to Deskovic—*i.e.*, fabrication of evidence, coercion, *Brady* violations, malicious prosecution, etc. (McGarr Mem. 29–31.) She claims that nothing more is required. But the Court considered and rejected this logic in its previous decision. *See Deskovic*, 894 F. Supp. 2d at 473 n.38 (finding that *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007), and *Southerland v. City of New York*, 680 F.3d 127 (2d Cir. 2011), the cases relied on by McGarr here, do not support the proposition that "so long as a defendant knew that his behavior was unlawful in some way, he did not have to know

which constitutional right he was violating to lose the protections of qualified immunity," and further explaining that "[t]hese cases did not change the law on qualified immunity"). Moreover, McGarr's arguments regarding the importance of Section 1983 as a means of deterring police misconduct underscore, rather than undercut, the Court's holding in this respect. True: One purpose of the federal civil rights laws is to deter police officers from coercing the confession of a suspect and fabricating evidence against him. (McGarr Mem. 31.) But that is precisely why *Deskovic* might have a valid Section 1983 claim against McIntyre and Levine, based on their alleged coercive interrogation, fabrication of evidence, malicious prosecution, etc. Imposing additional liability where the law was not clearly established as to the particular contours of McGarr's claim would not vindicate the deterrence purposes of Section 1983.[8]

Second, McGarr argues that her constitutional right to familial association was clearly established in 1984, as recognized by the Second Circuit's decision in *Patel v. Searles*, 305 F.3d 130 (2d Cir. 2002). (*See* McGarr Mem. 31–32.) But in its previous decision, this Court noted that, with respect to Stephens, McGarr had not "allege[d] that [his] behavior was intentionally directed at the familial relationship," and consequently held that Stephens's "alleged misconduct does not fall within the category of behavior that *Patel* held . . . violated the right to familial association." *Deskovic*, 894 F. Supp. 2d at 470. McGarr's reliance on *Patel* is similarly

---

[8] *Patel v. Searles*, 305 F.3d 130 (2d Cir. 2002), discussed at greater length in the immediately following paragraph, is not to the contrary with respect to this deterrence argument. In *Patel*, the Second Circuit explained that to grant qualified immunity to the defendant officers in that case would be tantamount to holding that "the right to intimate association does not impose *any* clearly established limits on the tactics that a police officer may use in the course of an investigation." *Id.* at 139 (emphasis added). Not so, here, where the officers merely tried to circumvent McGarr's wishes and efforts to intervene on her son's behalf. There is no allegation that they tried to "engage in an extended public and private defamatory misinformation campaign to destroy a family, hoping that those tactics *might* produce incriminating leads." *Id.* at 140 (emphasis in original).

unavailing here, because McGarr has not alleged that McIntyre and Levine specifically targeted the familial relationship, qua the familial relationship, in order to generate leads from the family, such as accusations. At oral argument, counsel for McGarr put forth a valiant effort to explain why *Patel* was apposite with respect to Levine and McIntyre, even taking into account the Court's prior decision that *Patel* was inapposite with respect to Stephens. The Court recognizes that the factual circumstances are distinct, and it accepts, for present purposes, McGarr's allegations regarding the lengths that McIntyre and Levine went to in order to cut her out of the equation in 1989 and 1990—for example, by contacting Deskovic through his friends rather than directly, at school, to avoid detection by McGarr. (*See* McGarr's 56.1 ¶¶ 108–22.) Be that as it may, however, these allegations demonstrate that McIntyre and Levine attempted, at most, to bypass McGarr in their investigatory tactics so that Deskovic would confess, not that they attempted to "create hostility and mistrust among the members of [Deskovic's] family towards him with the hope that the resulting animosity would produce accusations [by family members] against him." *Patel*, 305 F.3d at 134; *see also id.* at 137 ("Patel has alleged facts sufficient to prove that the officers' conduct *was* intentionally directed at his family. For instance, Patel declares that the officers engaged in a misinformation campaign *designed to create hostility and mistrust among family members* that would ultimately lead to *false accusations* against Patel." (second and third emphases added) (brackets and internal quotation marks omitted)). This distinction is significant with respect to the Peekskill Defendants' qualified immunity defense, because only the latter, more egregious form of misconduct was clearly proscribed in 1989 and 1990. *See id.* at 138–40. The other cases identified by McGarr, (McGarr Mem. 32–33), suffer from other shortcomings. *Greene v. City of New York*, 675 F. Supp. 110 (S.D.N.Y. 1987), and *Fodelmesi v. Schepperly*, No. 87-CV-6762, 1991 WL 120311 (S.D.N.Y. June 25, 1991), are not

Circuit Court decisions, and *Duchesne v. Sugarman*, 566 F.2d 817 (2d Cir. 1977), and *Lowry ex rel. Joyner v. Dumpson*, 712 F.2d 770 (2d Cir. 1983), deal with state actions affecting child custody, and thus are not relevant to the precise "articulati[on] [of] the right in relation to the factual situation at hand." *Johnson*, 239 F.3d at 251.

### 2. Tumolo

As McGarr notes, "Tumolo argues that he is entitled to qualified immunity against [McGarr's] claim[s] for all of the same reasons (and no additional reasons) that he claimed entitlement to qualified immunity for [Deskovic's] claims." (McGarr Mem. 28 (internal quotation marks omitted); *see also* Tumolo Mem. 20–21.) According to McGarr, Tumolo has thus waived any other basis for qualified immunity, and this Court should consider the question no further. But at oral argument, Tumolo also adopted this Court's qualified immunity holding regarding Stephens as an independent basis for qualified immunity here, and for reasons already explained, the Court is willing to consider this defense. Here too, the Court holds that the contours of McGarr's right were not clearly established, and that Tumolo is entitled to summary judgment on McGarr's remaining claim, for the reasons just explained with respect to the Peekskill Defendants.

### III. Conclusion

For the reasons stated herein, the Peekskill Defendants' Motion for Summary Judgment is granted in part and denied in part with respect to Deskovic. Their Motion for Summary Judgment is granted in full with respect to McGarr. Defendant Tumolo's Motion for Summary Judgment is denied in full with respect to Deskovic, and granted in full with respect to McGarr. The Clerk of the Court is respectfully directed to terminate the pending motions. (Dkt. Nos. 514, 515 (07-CV-8150 Dkt.); Dkt. Nos. 295, 297 (07-CV-9488 Dkt.).) The Clerk of the Court is further directed to close the case captioned *McGarr v. City of Peekskill et al.*, No. 07-CV-9488.

SO ORDERED.

Dated:　　　September   , 2013
　　　　　　　White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE